# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# CRIMINAL CASE NO. 1:12-cr-00020-MR-DLH-5

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>)<br>vs. )<br>)<br>)<br>KEITH ARTHUR VINSON. )<br>_____ ) | **MEMORANDUM OF**<br>**DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Defendant's "Post-Trial Motion under Rule 29" [Doc. 295].

## I. PROCEDURAL BACKGROUND

A federal grand jury first indicted the Defendant Keith Arthur Vinson (Vinson), along with several other co-defendants, on April 4, 2012. [Doc. 1]. A Superseding Bill of Indictment was issued on December 5, 2012 [Doc. 100], and a Second Superseding Bill of Indictment (hereinafter "the Indictment") was issued on October 1, 2013, charging only the Defendant [Doc. 269].[1] The Indictment charged the Defendant with bank fraud conspiracy, in violation of 18 U.S.C. §§ 1344 and 1349 (Count One); two counts of conspiracy to defraud the United States, in violation of 18 U.S.C.

---

[1] The other named co-defendants pled guilty to various charges prior to the return of the Second Superseding Bill of Indictment.

§ 371 (Counts Two and Nine); aiding and abetting the misapplication of bank funds, in violation of 18 U.S.C. §§ 656 and 2 (Counts Three through Six and Ten); aiding and abetting wire fraud affecting a financial institution, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Seven and Eight); money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Eleven); and two counts of aiding and abetting money laundering, in violation of 18 U.S.C. §§ 1957 and 2 (Counts Twelve and Thirteen).

The trial commenced on October 7, 2013, and the Government rested its case on October 16. The Defendant made an oral Rule 29 motion for a judgment of acquittal that was denied. The Defendant elected to present no evidence. The parties presented closing arguments on October 17, 2013, and on that date the jury returned a verdict of guilty as to each count in the Indictment. [Doc. 291].

The Defendant filed the present post-trial motion pursuant to Rule 29 on October 29, 2013. [Doc. 295]. The Government filed its Response on November 15, 2013. [Doc. 301].

Having been fully briefed, this motion is now ripe for disposition.

## II. STANDARD OF REVIEW

When a defendant challenges a jury's verdict on the basis of insufficient evidence, "the verdict will be sustained if, when the evidence is

viewed in the light most favorable to the government, there is substantial evidence to support it." United States v. Sullivan, 455 F.3d 248, 260 (4th Cir. 2006). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Young, 609 F.3d 348, 355 (4th Cir. 2010) (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). In determining the issue of substantial evidence, the Court does "not reweigh the evidence or the credibility of the witnesses, but assume[s] that the jury resolved all contradictions in the testimony in favor of the Government." United States v. Roe, 606 F.3d 180, 186 (4th Cir.), cert. denied, 131 S.Ct. 617 (2010).

### III. ANALYSIS

The Defendant questions the sufficiency of the evidence as to each count in the Indictment. The Court will address each count in turn.

#### A. Count One: Bank Fraud Conspiracy

Count One deals with the "Lot Loan Program," a scheme to defraud banks by misrepresenting the nature of and/or the true borrower for a series of loans made at multiple banks from April through July 2008. The Defendant contends that the Government's evidence was insufficient to prove beyond a reasonable doubt that the Defendant was a knowing

3

member of a conspiracy to mislead any bank regarding any of the pertinent lot loans.  [Doc. 295 at 1].

Contrary to the Defendant's argument, the Government presented ample evidence of the existence of a conspiracy to defraud several banks. Buck Cashion (Cashion) testified at trial that the original plan was for George Gabler (Gabler) to secure a large loan using several Seven Falls lots as collateral, otherwise known as the "batch loan" plan.  After this plan was rejected by a number of banks, Cashion and Ray Chapman (Chapman) decided instead of pursuing one large loan, they would pursue a series of what appeared to be lot loans.  Although some officers at Pisgah Community Bank and the Bank of Asheville knowingly went along with this plan and became co-conspirators, the banks' loan committees were not advised of the secret terms and side-agreements that became the Lot Loan Program.  The conspirators used these secret side-agreements to defraud banks in two material ways: first, such agreements concealed the identity of the true borrower, that being the Defendant; and second, they mischaracterized the nature of the loans, converting a large, "A&D" (acquisition and development) loan into a series of individual lot loans that appeared to be to bona fide, arms-length purchasers. The conspirators also failed to disclose that loans were being made by other banks as well,

thereby concealing substantial new liabilities that affected the ability of the "borrowers" to repay the loans. Several bankers testified that these misrepresentations were material to their underwriting decisions and that they would not have made these loans had they known the truth.

The evidence further showed that the Defendant was aware of the object of this conspiracy and then knowingly joined with the purpose of helping it to succeed. Cashion testified that he had multiple conversations with the Defendant about the Lot Loan Program. According to Cashion, the Defendant provided the lots in order to make these straw loans happen and signed his name to HUD-1 forms that concealed material information, including the name of the true borrower. Emails from Andrew Hager showed that the Defendant was fully informed of the activities of the co-conspirators as they "shotgunned" these loans to bank after bank, changing the names of borrowers as it suited their purposes. [See, e.g., Ex. 130 (the "Plan D" email)]. Kostas Rantzos, Nick Dimitris (Dimitris), and Andrew Hager (Hager) testified they and another co-conspirator, Paul Rantzos, received kick-back payments as consideration for their performance as straw borrowers, and the exhibits showed that the checks for these kick-backs were signed by the Defendant. [Exs. 152, 162, 163]. Further, when Cashion and Chapman transferred Zeus Investments to the Defendant in

5

an effort to better position the parties for bankruptcy proceedings in 2009, the Defendant signed an agreement recognizing his responsibility for these straw loans. [Ex. 1167].

The conspiracy also benefitted from grossly inflated appraisals that underpinned these fraudulent loans. The Government presented evidence that these appraisals were false and materially misleading in that they mischaracterized the level of completion of the development, concealed significant seller concessions, and failed to disclose that these were not arms-length transactions. The Government introduced an email from appraiser Aaron Ollis to the Defendant, in which Ollis advised that the failure to record the higher, inflated price (without the 25% "purchase credit") at the Register of Deeds (thereby cheating the county out of additional tax revenues) "creates a problem as far as any records are concerned," and to which the Defendant replied, "Good advice." [Ex. 1115]. This evidence provides a basis from which a reasonably jury could conclude that the appraisals were inflated in order to perpetuate a fraud and that the Defendant knew it and endorsed it.

In sum, there is substantial evidence to support the jury's verdict with respect to Count One. Accordingly, the Defendant's Rule 29 motion with respect to this count of conviction must be denied.

## B. Count Two: Conspiracy to Defraud the United States

Count Two involved a § 371 conspiracy to defraud the United States by impairing the functions of the FDIC and by committing several federal offenses, including misapplication of bank funds, making false statements and records with intent to defraud a financial institution, wire fraud, and bank fraud. This conspiracy had five objects: (1) the Plastics Plant Loan Scheme; (2) the Check Fraud and Unauthorized B/AVL Loan Scheme; (3) the Check Kite Scheme; (4) the Charles Burnett Loan Scheme; and (5) the Queens Gap Misapplication Scheme.

The Defendant makes the general argument in his motion that "none of these objects related to any criminal conduct by the Defendant." [Doc. 295 at 1]. The Defendant's argument fails for two reasons. First, contrary to the Defendant's assertion, there was substantial evidence presented at trial to establish that the Defendant engaged in illegal conduct as described in the Indictment. In any event, however, and as the Court instructed the jury, it is unnecessary for the Defendant to have engaged in any of the overt acts himself (or even for any of the objects to have been successfully completed) to be guilty of the crime of conspiracy, and the overt act may, but for the alleged illegal agreement, appear totally innocent and legal.

The Defendant offers only cursory[2] arguments with respect to each object of the conspiracy, which the Court will now address in turn.

With respect to the Plastics Plant Loan Scheme, the Defendant argues that this transaction was not fraudulent because "the bank was specifically informed that the purpose of this loan was to benefit 7 Falls and thus to benefit Defendant." [Doc. 295 at 1]. Contrary to the Defendant's argument, however, this loan was fraudulent in two material respects: first, it was a loan to the Defendant through the use of straw borrowers; and second, the loan proceeds were not used for the stated purpose of providing short-term investment in the Seven Falls project but instead was used to pay off previous hard money loans. The conspirators benefited from this scheme by eliminating very high interest debt by substituting a federally-insured bank as the bearer of the risk.

Furthermore, while Bank of Asheville President Gordon "Buddy" Greenwood (Greenwood) was clearly aware of the Defendant's fraudulent scheme and in fact participated in it, there is substantial evidence in the record to support the conclusion by a reasonable jury that Greenwood was acting as a conspirator, not just as an agent of the bank. It is not a defense to a bank fraud charge that an account holder colluded with the bank's

---

[2] The Defendant's motion and argument are only two and a half pages long. [Doc. 295].

officers to commit offenses against the bank.  See, e.g., United States v. Jimenez, 513 F.3d 62, 74 (3rd Cir. 2008); United States v. Winkle, 477 F.3d 407, 414 n.3 (6th Cir. 2007); United States v. Yoon, 128 F.3d 515, 525 (7th Cir. 1997); United States v. Rackley, 986 F.2d 1357, 1361 (10th Cir. 1993). Thus, even though Greenwood knew the true nature of the loan transactions, the Bank of Asheville was nevertheless defrauded.

Next, the Defendant contends that the evidence presented with respect to the Check Fraud and Unauthorized Bank of Asheville Loan Scheme does not establish any criminal liability on the part of the Defendant. This argument is without merit. The evidence presented by the Government at trial established that the Defendant wrote a $400,000 check on an account at the Bank of Asheville which had a balance of only $113.83. [Exs. 301, 1332]. Rather than dishonor the check, Greenwood allowed the check to clear and then pressed the Defendant for payment. When payment was not forthcoming, Greenwood asked Bill Nesbit, then a manager at the Bank of Asheville, to make a quick loan to the Defendant to clear the unsecured, non-interest-bearing shortfall that had been on the bank's books for months before the end of the 2008 fiscal year. [See Ex. 305]. The Bank of Asheville made the loan on December 31, 2008, on Greenwood's loan authority. [Ex. 309]. Greenwood, however, lacked the

authority to approve such a loan. [See Ex. 1208]. Greenwood later presented the loan to the Bank's board for approval, but only after the fact. [See Ex. 306]. Bank Director Steven Cogburn testified that the board approved the loan only because it seemed to be the best of the bad options.

The Defendant argues that because the loan was approved by the board after the fact, "any irregularity in the process was expressly ratified by the Loan Committee." [Doc. 295 at 2]. This argument, however, ignores the fact that irrespective of how the bank responded, the Defendant's actions still constituted a bank fraud. Furthermore, a reasonable juror could find ample support for concluding that Greenwood was a co-conspirator, and as such the Defendant is responsible for Greenwood's acts in furtherance of the conspiracy even if unknown to the Defendant at the time. Greenwood misapplied bank funds to the Defendant's benefit, and did so to further the object of the conspiracy of funding the Seven Falls project. As this Court instructed the jury, the Defendant need not have been a major participant, nor did he need to know all the details of the acts committed by other co-conspirators, nor did he need to participate in every overt act of the agreement to be guilty of the conspiracy. Therefore, even if the Defendant did not specifically know that Greenwood was not authorized

to respond to Vinson's check in the manner that he did, the Defendant was still responsible for those acts committed in furtherance of the conspiracy.

Based on the evidence, a reasonable jury would be justified in finding that the Defendant committed bank fraud by writing the $400,000 check, and that his co-conspirator Greenwood acted in furtherance of the overall conspiracy by misapplying the bank's funds to cover that check and fraudulently enrich the Defendant. The approval of this loan after the fact by the bank's loan committee did not retroactively render these unlawful acts to be lawful.

With respect to the Check Kite Scheme, the Defendant contends that the evidence was legally insufficient to establish that the Defendant knowingly wrote any of the pertinent checks as part of an agreement with any other person to commit a fraud or to otherwise take advantage of any "float" in the check processing periods. [Doc. 295 at 2]. Contrary to the Defendant's argument, however, there was substantial evidence presented from which a reasonably jury could conclude that the Defendant conspired with Greenwood to commit bank fraud. The jury was not required to find that the Defendant worked directly with anyone to kite these particular checks. Furthermore, that the floated funds were applied to loans that were made as part of the conspiracy — including to loans that constituted

11

other objects of the same conspiracy count in the Indictment — serves as substantial evidence of the crime and of the Defendant's participation therein.

With respect to the Charles Burnett loan, the Defendant argues that "the Bank of Asheville was well aware that the purpose of [ ] this loan was to raise short term capital for Seven Falls." [Doc. 295 at 2]. This argument must be rejected for multiple reasons. First, as previously discussed, the fact that co-conspirator Greenwood knew that this was a straw loan and that the loans were being used to avoid scrutiny does not mean that "the bank" knew of its illegal purpose. In fact, the loan was structured to hide its purpose from the bank's loan committee. The lot that served as collateral for the loan had been appraised by Ollis at $853,000, but the loan was only for $500,000 because that was the amount that co-conspirator Greenwood and fellow bank officer John Hamrick could make with their combined loan authorities without loan committee approval. Second, the credit memorandum, which indicated that the proceeds would be used as "short-term working capital for Seven Falls" [Doc. 401], did not explain that the Defendant was in fact responsible for repayment or that Burnett was to be paid a kick-back to play the part of borrower. Third, the proceeds were not used as described in the loan memorandum, but instead were used to pay

off or "freshen up" other loans that had come due. [Ex. 1329]. Fourth, the HUD-1 document for the transaction did not disclose all the terms of the loan because the kick-back payments to Burnett were not reflected as disbursements. [Ex. 400]. Instead, they were paid outside of closing so the loan documents would not show the payments. The foregoing evidence provided a substantial basis from which a reasonable jury could conclude that the Burnett Loan was a straw loan and that material terms were not disclosed to the bank.

With respect to the fifth object of the conspiracy, the Queens Gap Fraud, the Defendant argues that the evidence presented at trial showed that these acts merely constitute a breach of contract and not a fraud, and that the funds belonged to the Defendant notwithstanding the agreement because the Defendant was the "owner of the account." [Doc. 295 at 2]. Contrary to his argument, however, the Defendant was not the "owner" of the account; it was a joint account for which both McCarthy and the Defendant had signature authority, and it was funded with McCarthy's money. The fact that the Defendant had access to this money if certain specific circumstances were satisfied did not legally entitle him to the money any more than it would in any embezzlement case.

Further, the fact that a contract was involved does not inoculate the Defendant. There was substantial evidence presented at trial to establish that the Defendant entered into the agreement with McCarthy intending to use the funds to pay off other loans, in contravention of the express provisions of the agreement. The Defendant's subsequent actions confirmed this fraudulent intent, as he drained millions of dollars from the account within one month of McCarthy disbursing the funds.

For the foregoing reasons, the Court concludes the evidence at trial provided substantial support for a reasonable jury to conclude that the Defendant conspired with others to defraud the United States and to commit various federal offenses to obtain funds from the Bank of Asheville through the execution of the aforementioned five schemes.

### C. Counts Three through Eight

Counts Three through Eight were substantive counts committed in the course of the conspiracy charged in Count Two. With respect to these substantive counts, the Defendant in his motion relies on the arguments made in his oral Rule 29 motion at trial. For the reasons previously stated in ruling on the Defendant's earlier motion, the motion is denied at to these counts.

## D. Count Nine: Conspiracy to Defraud the United States

Count Nine charged the Defendant with conspiracy to defraud the United States and to commit the federal offenses of misapplication of bank funds and bank fraud with respect to Pisgah Community Bank (PCB). The objects of this conspiracy included a straw loan taken out in the name of Ed Worlund using a hypothecated annuity belonging to Robert Dowling, and another straw loan to Cashion's mother, Betty Zieger.

In his motion, the Defendant argues only that "the evidence was legally insufficient under the Jackson v. Virginia [443 U.S. 307 (1979)] standard to support a finding that Defendant was a knowing and voluntary member of a conspiracy to defraud PCB." [Doc. 295 at 2]. Contrary to the Defendant's argument, however, the evidence presented at trial established that all the proceeds of these loans went directly to the benefit of the Defendant, and both Cashion and Hager testified to communicating with the Defendant about these matters. Additionally, the Defendant signed a memorandum of agreement regarding the Worlund loan, in which the Defendant also promised to pay Dowling for pledging his annuity as collateral for the loan. [Exs. 608, 609]. The evidence concerning the Defendant's knowledge and participation in this conspiracy is significant and compelling, and the Defendant fails to explain in his motion why the

15

Court should find such evidence to be insufficient to support the jury's verdict.

### E. Count Ten: Misapplication of PCB Bank Funds

In Count Ten, the Defendant was charged with the specific offense of misapplication of PCB bank funds to fund the Worlund straw loan. In his motion to dismiss this charge, the Defendant merely "notes that the purchase contract (Government's Exhibit 124e), like so many of the other contracts at issue, specifically set forth the provisions for the 25% purchase option and the 2 year repurchase clause." [Doc. 295 at 2-3]. The $650,000 loan at issue in Count Ten, however, did not involve a transfer of land; rather, it was secured by an annuity. The Defendant offers no further argument about why a reasonable juror could not find substantial evidence to support the conviction on this count. Having reviewed the record, particularly the testimony of Cashion, Hager, and Gourlay, the Court finds that there was substantial evidence presented to establish that Worlund acted as a straw borrower on the Defendant's half and that the Bank's loan committee was not advised of material information, specifically, the true nature of the loan or the financial state of Seven Falls, at the time it approved the loan. The Defendant's motion for acquittal as to Count Nine must be denied.

## F. Counts Eleven through Thirteen: Money Laundering

Count Eleven charged the Defendant with conspiracy to commit money laundering, while Counts Twelve and Thirteen are substantive counts relating, respectively, to the April 1, 2009 kick-back payment of $40,000 to Burnett and the July 2, 2009 transfer by wire of $144,600, the proceeds of the Queens Gap Scheme.

The Defendant argues that these activities were not criminal and thus the funds were not criminally derived. [Doc. 295 at 3]. In so arguing, he relies primarily on his previous arguments, but as to the Burnett kick-back he adds that this "borrower's fee" was specifically listed in the contract and was not hidden, and that Burnett testified that he did not consider the transaction to be improper. [Id.].

While Burnett may not have considered his conduct to be criminal, there is substantial evidence in the record from a reasonable juror could conclude that this was an illegal kick-back payment. Although the kick-back provision may have specifically listed in the parties' contract, that contract was not in the bank's file, and as Burnett testified, the Defendant's closing attorney specifically advised him that the payment would have to be made outside of closing. The payments therefore were made days later and were not reflected in the HUD-1. [Exs. 400, 413, 414]. Further, a

reasonable juror could find from the evidence that Greenwood purposely limited the loan to $500,000 specifically in order to prevent the loan committee from becoming involved and possibly discovering the fraudulent nature of the loan. In sum, the evidence presented by the Government established that this was a straw loan made in contravention of bank policy and FDIC regulation because the Defendant was unable to take out the loan himself, and that the Defendant paid a straw borrower a substantial kick-back to perform as nominee. The jury rightly concluded that this conduct was illegal, and therefore the financial transaction utilizing those proceeds likewise was illegal money laundering.

## IV. CONCLUSION

In summary, the Court concludes that there is substantial evidence to support findings of guilt for each and every count in the Indictment. Accordingly, the Defendant's Motion to Dismiss is denied.

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's "Post-Trial Motion under Rule 29" [Doc. 295] is **DENIED**.

**IT IS SO ORDERED.**                Signed: January 31, 2014

Martin Reidinger
United States District Judge