UNITED STATES DISTRICT COURT
OR THE WESTERN DISTRICT OF NORTH CAROLINA
(Asheville Division)

---------------------------x
UNITED STATES OF AMERICA, :
Plaintiff :
:
:
vs :Criminal Action:1:12-CR-20
:
KEITH ARTHUR VINSON, :
Defendant. : **EXCERPT OF PROCEEDINGS**
---------------------------x

Thursday October 10, 2013
Asheville, North Carolina

The above-entitled action came on for a Jury Trial Proceeding before the HONORABLE MARTIN K. REIDINGER, United States District Judge, in Courtroom 1 commencing at 9:02 a.m.

**APPEARANCES**:

On behalf of the Government:
DON GAST, Esquire
Office of the United States Attorney
100 Otis Street
Asheville, North Carolina 28801

MICHAEL E. SAVAGE, Esquire
U.S. Attorney's Office
227 W. Trade Street
1700 Carillon
Charlotte, North Carolina 28202

n behalf of the Defendant:
JOHN C. FISCHER, Esquire
Randolph and Fischer
318 Indera Mills Court
Winston-Salem, North Carolina 27101

Tracy Rae Dunlap, RMR, CRR 828.771.7217
Official Court Reporter

# I N D E X


| | DIRECT | CROSS |
|---|---|---|
| Avery Ted Cashion, III | 3 | 215 |

| | Page |
|---|---|
| Reporter's Certificate | 266 |

**P R O C E E D I N G S**

THE COURT: Call your next witness.

MR. SAVAGE: Your Honor, the United States would call Mr. Avery Cashion.

THE COURT: Come forward and be sworn.

(Witness duly sworn at 10:26 a.m.)

THE COURT: You may proceed.

MR. SAVAGE: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. SAVAGE:

Q. Good morning, sir.

A. Good morning.

Q. I'm going to ask you to speak up really loudly so the very last juror on the end can hear you. Can you do that? If you can, adjust the microphone.

A. I'm going to.

Q. Thank you very much. Would you, please, state your name?

A. Avery Ted Cashion, III.

Q. And Mr. Cashion, do you also go by the name "Buck?"

A. Yes, I do.

Q. Okay. And tell me, Mr. Cashion, in what city and state do you reside?

A. Lake Lure, North Carolina.

Q. How long have you been a resident of Lake Lure?
A. Since I was 15.
Q. Okay. Tell me a little bit about your background. Have you spent all your life in Lake Lure?
A. No. I went to Wake Forest University and then into the Army for 20 years.
Q. Okay. And tell us a little bit about your service to the country. When did you go in the Army and what did you do?
A. In 1975 I went in as a junior officer and I was in Special Forces. Then I worked in the comptroller field; was in Third Armored Division, and then went into the Finance Corps.
Q. Okay. And if you were in finance in the Army, what kind of things are you dealing with?
A. Paying soldiers.
Q. Okay. And did the Army have a lot of rules about how you pay soldiers?
A. Oh, yes.
Q. And what was your rank when you retired?
A. Lieutenant Colonel.
Q. And when did you retire?
A. 1995.
Q. Okay. And when you retired from the Army in 1995, what did you do?

A. Well, when you're in the military, you have two choices. You can either pick a place with a job, or you can pick a place to live. I decided to come back to Lake Lure, North Carolina --
Q. Okay.
A. -- where my family was.
Q. And let me ask you a little bit about your family. Who was there from your family in Lake Lure?
A. Well my father, who was retired Air Force -- he died while I was in the service -- and then my mother, who still lives in Lake Lure.
Q. Okay. And was she in business in Lake Lure at that time?
A. She was.
Q. What kind of business was she in?
A. She ran a company called Mountain Lake Realty. So, she was a real estate broker.
Q. And when you got back to Lake Lure in 1995, were you married?
A. Yes, I was.
Q. And who were you married to?
A. Joan Cashion.
Q. And what did you do when you and your wife got back to Lake Lure?
A. Well she went to work in the real estate office

with my mother, and then I became a contract worker with concrete. I, kind of, bought halfway into a concrete company, and for two years I dug ditches and poured concrete.

Q. Did you -- had you ever been a concrete worker before?

A. No, sir.

Q. Okay. How did you learn that business?

A. On-the-job training.

Q. And how long did you stay in the concrete business?

A. Well then I became a builder, so I'm not sure you ever get out of the concrete business. But, probably five or six years.

Q. And at that time, did other opportunities come open for you?

A. They did.

Q. Could you tell the ladies and gentlemen of the jury about those?

A. Well, what happened is -- it was kind of a normal progression for me. I went into the concrete business, dug ditches. Because as a -- you know, a lot of people don't like officers and they think they can't do anything once they get out of the Service. So I wanted to try to show people that I could learn things and actually know

what I was doing. And then I got a builder's license and did the same thing.
Q. What did you build?
A. Houses.
Q. Okay. And how many houses did you build?
A. 30?
Q. And about what time was this? What year?
A. It was probably 2005 or '04, something like that.
Q. All right. At that time, were you buying lots and that to build your houses on?
A. Usually, when I started building a good number of houses, what we did was, I worked with a developer and then a developer would buy a large tract of land and break it into lots. And since I was sort of a partner in that, then I would be the guy that would do the building of the houses.
Q. Okay. Did you do a development called High Vista?
A. We did.
Q. Okay. What was High Vista?
A. It was an 18-hole golf course. But five of the holes were not very good, so we went in and bought some lower level land that were really farms and built five new golf courses -- I mean holes, which made the course way, way nicer. And then that's also where we built a whole lot of houses. It's a gated community in between

Hendersonville and Asheville.
Q. Okay. Now you say "we." Who's "we?"
A. Well, there was Kent Smith -- I mean there was a group of about six or seven people: Tally, Ray Chapman, Bob Duffy --
Q. Who is Mr. Chapman?
A. He's my partner.
Q. Okay. And how long has he been your partner?
A. Well, we've been friends for 33 years. He's been my partner since he got out of the military, and I think he got out in 1998.
Q. Okay. And what does Mr. Chapman do? You met Mr. Chapman when you were in the Army?
A. I did.
Q. Where at?
A. I replaced him in the Third Armored Division in Germany -- Frankfurt, Germany.
Q. So you were stationed in Germany and you met Mr. Chapman. Did you stay friends with him after you retired?
A. We've been friends for 33 years.
Q. Okay. Did he retire after you?
A. He did.
Q. Okay. And where did he retire?
A. I'm sorry.

Q. Where did he go when he retired?
A. He came to Lake Lure to, actually, follow me, to go into business with me.
Q. Okay. And what is Mr. Chapman's part of your business? What part did he do?
A. Almost every document you're going to see he typed. He did all the books and the accounting.
Q. Okay. Was Mr. Chapman an accountant?
A. No. He was a self-made Quickbooks expert.
Q. Okay. And how about yourself? Do you feel comfortable with computers?
A. I don't use a computer at all. The last time I typed was as a sophomore in high school.
Q. Okay. So you don't use e-mail or any of that sort of thing?
A. No, sir.
Q. Do you have any familiarity with how Quickbooks works?
A. I do not.
Q. That would be Mr. Chapman's job?
A. That's correct.
Q. After you began -- after High Vista, what -- did you find some other investment opportunities?
A. We did, in the same group CDR: Carolina Development Resources. We went on to do a Somersby Park

project, and then we went and did something in Georgia called Taqueta Falls. And then we kind of stepped out of our league at that point and we got involved with this Walnut Cove.
Q. Okay. Let me stop you there.
A. Okay.
Q. You and Mr. Chapman, did you have a company that you operated through?
A. NC Four C's.
Q. That would be N, C, the word four and C, the letter C?
A. Right.
Q. Now with NC Four C's, what was it to do? What was its purpose?
A. Well, we were 50-50 partners. And when we started out, what we were trying to do is just buy and sale property. We'd buy a house, fix it up, sell it. Sometimes we'd do major repairs, sometimes minor repairs, fix the lawns and so on. Then we'd find a way to sell it for a profit.
Q. Were you successful in that?
A. Yes, we were.
Q. Okay. Did there come a time when you had an opportunity to buy a well known property in Lake Lure?
A. Oh, yes. The "Dirty Dancing" property.

Q. Okay. What do you mean the "Dirty Dancing" property?
A. That's where the *Dirty Dancing* movie was filmed, or at least a good portion of it.
Q. Okay. And the camp where the *Dirty Dancing* movie is staged?
A. That's where we bought that property.
Q. Okay. And was that a good buy?
A. At the time, we didn't think so because we paid about $2.8 million for it.
Q. Where did you get $2.8 million?
A. It was over time. Joan was very successful in real estate and making two, three, $400,000 a year. We had other investments that we were making, and our buying and our selling. And we had a loan or two, but those were paid off fairly quickly. So, when we sold it, we owned the property free and clear.
Q. Okay. And when you sold the property, did you get cash for it?
A. We got $3.2 million.
Q. All right.
A. And then we took a note back for $5 million.
Q. So did you make a plan with Mr. Chapman and your wife to invest that money somehow, to loan it out?
A. Well, what we did is that we loaned -- David

Payne, an attorney in town, closed the property for us. And he noticed that we had that $3,000 -- I mean that $3 million. And he needed money for a project. So he came to me and Ray and said, hey, I really need this money for a short time. I'd like to have you invest it in this Biltmore project that he had, a condo project here in town. And he had -- he was having trouble with his, I think, $5 million loan with Carolina First. They wanted to foreclose on him because he had changed dramatically what they were going to do to the property. And Carolina First --

Q. Let me ask you this, Mr. Cashion -- I don't mean to cut you off.

A. Okay.

Q. Have you heard the phrase "hard money lender" before?

A. Yes.

Q. What is a "hard money lender?"

A. Well, it's typically somebody that can either use their private money or they can use money that they obtain from other places. And then they loan it out at a high interest rate, because it's usually done for risky projects.

Q. Okay. Were you a hard money lender when you got your money from the *Dirty Dancing* property? Did you loan

that out at a high rate to Mr. Payne?
A. Yes.
Q. Was it a risky project?
A. No.
Q. Okay. Well, you didn't think it was risky?
A. No. I didn't think it was risky, no.
Q. Real estate: Does it tend to be risky just in general?
A. They do.
Q. If Mr. Payne was able to borrow money elsewhere, would he not have paid those rates instead of your high rates?
A. I think part of it was he was in a big hurry because the bank was coming down on him real hard. And the answer to your question is yes. He was trying to get Phase I and Phase II funded at a different bank, but that was a much larger number. And he needed something to -- that money was really used to purchase the property.
Q. Let me interrupt here, Mr. Cashion, what actually happened with Mr. Payne is not all that important to our case.
A. Oh.
Q. I want to ask you, did you become familiar with loaning money out -- hard money -- at that time?
A. Yes.

Q. Let me ask you -- to move it along just a little bit, we're going to talk -- in 2003, did you get introduced to a person by the name of Keith Vinson?
A. I did.
Q. And who is Keith Vinson?
A. The guy in the pink shirt.
Q. Okay. Standing in the courtroom today?
A. Do what?
Q. In the courtroom here today?
A. In the courtroom here today.
Q. Thank you. How did you meet Mr. Vinson?
A. He was introduced to me by a guy named Rusty Pulliam, who is a big-time developer and real estate person here in town.
Q. Okay. What kind of project were you involved in with Mr. Pulliam?
A. That's when we were on and when CDR was doing the Walnut Cove project.
Q. For those ladies and gentlemen of the jury who don't know Walnut Cove, can you just really briefly explain what Walnut Cove is?
A. Walnut Cove is probably one of the nicest developments ever made. I mean, it's over here in Asheville. It's a gated community. Beautiful golf course. It's part of The Cliffs communities. So, I

mean, it's high end.
Q. What would be the average price of a home and lot in Walnut Cove in this timeframe?
A. Oh. There were lots that went for $3 million. I don't know what the average was. I would say there wouldn't be very many that would go below five or $600,000.
Q. And what was your interest in Walnut Cove?
A. Well Kent Smith was the president of CDR, which I was a member of and Ray was a member of, and he used to work for The Cliffs and he did sales and marketing. And he kind of wanted to go out on his own to do his own developments, and Walnut Cove became one that he was able to put together.
Q. Okay. And how did that involve you?
A. Well, I kind of became the -- since I had my contractor's license, my role was to help in any way if I could find funding, or I would do the building, grading, whatever. I mean whatever -- or oversee that, not actually do that.
Q. How did Mr. Vinson get involved -- come into the picture?
A. Well, Walnut Cove -- CDR was not going to be able to finish the project and we were not going to be able to buy our option. We just couldn't get the funding that we

needed. And then Keith and three other -- Rusty Pulliam and, actually, Kent Smith went back and was with them. And Bree Slasher kind of came to our rescue, if you will.
Q. Okay. So they bought you out.
A. They participated -- it wasn't bought out until Jim Anthony came in and bought the whole thing out. But, yes, they sort of bought us out.
Q. Okay. And what was Mr. Vinson's occupation at that time?
A. A builder.
Q. And this was in what year about?
A. I'm going to say 2002, 2003, something like that. Maybe 2001.
Q. Coming forward, did you become involved in a development by the name of Waightstill Mountain?
A. Yes, we did.
Q. Okay. And what is Waightstill Mountain?
A. Keith acquired some property not too far from Biltmore Park. I can't remember the name of the road it's down, but it's -- I think he acquired a number of acres, I don't know, quite a few, 50, a hundred acres.
Q. Okay. And for what purpose?
A. To put housing developments in.
Q. And did you get involved in that?
A. I didn't get involved in the piece where he was

building up on the mountain. But then he sold or made a deal with a group calmed Windsor Autrey who build $200,000 houses, and then we would go in -- I would get the money and/or Ray and I would get the money. Keith would do the development. We'd build pads and they'd buy the pads on a takedown schedule, and then they would build the houses.

Q. Okay. And was that venture successful, at least at the beginning?

A. Yes.

Q. Okay. Did you continue to do business with Mr. Vinson after Waightstill Mountain?

A. Yeah. I think we did two more of those exactly the same and both turned out good.

Q. Okay. Now, how did Mr. Vinson finance his part of the project, if you know?

A. Well, I'm not sure what he financed. I think we went in and got the money, built the roads, water -- he built the roads, water and sewer and did the development himself, and we did the funding.

Q. Okay. So you got the money and Mr. Vinson did the building?

A. That's right.

Q. And then you paid Mr. Vinson the money that you raised, and you split the profits?

A. We usually got -- we usually didn't split the profits. Usually, what happened is, we got paid a fee, like a monthly fee or a lot fee or something to that nature, and then he took the risk of whether there was going to be any failure in the project. But we weren't trying to be the developer.
Q. Okay. Now, was this private equity investment that you were putting into these -- was this your own money that you were putting into these developments?
A. In some cases, we borrowed the money from banks.
Q. And in other cases?
A. There was some of our money put in, yes.
Q. And would you get your money back out of those deals?
A. We would.
Q. All right. This brings us up to on or -- to in or around like 2006. Did Mr. Vinson come to you with a proposition for a new development in and about 2006?
A. Yes, he did.
Q. And what was that proposition?
A. Basically, he was starting another high end Walnut Cove-type of development called Seven Falls --
Q. Okay.
A. -- which is in Etowah, near Brevard and Hendersonville.

Q. Was it even called Seven Falls at that point?
A. I don't know.
Q. Okay. Later?
A. I only remember it being called Seven Falls.
Q. Okay. And what was the proposition that Mr. Vinson brought to you?
A. Well, as in most projects, he had got a good loan, a $25 million loan from NBSC, but most projects require money in the game, their own money or equity. And he came to me and said I'll make it very much worth your while if you'll borrow $2 million for me so that I can use that money as seed money.
Q. Okay. You mean sort of like the "skin in the game" or the money down?
A. Exactly.
Q. And why you?
A. Well, we had been successful in other projects.
Q. And did you come to borrow that $2 million?
A. I did. He introduced me to a gentleman named Buddy Greenwood at Bank of Asheville and took me over there to meet him, and he worked the $2 million loan for us.
Q. And did Mr. Vinson tell you why -- what was -- what was your fee going to be on that money?
A. Well, that was debatable. But what he said was he

would double our money. This was early on in the project and the performer looked very healthy.
Q. You were going to borrow $2 million and you were going to get $4 million back?
A. Yes.
Q. That is a pretty good deal, isn't it?
A. I thought so.
Q. Did you agree to do that?
A. I did.
Q. Your Honor, at this point let me -- I'd like to publish -- show the witness what has been marked as Government's Exhibit No. 67. It is a series of agreements, particularly page 35, and I would like to publish it.
THE COURT: You may.
BY MR. SAVAGE:
Q. Okay. Mr. Cashion, can you see what's been marked as Government's Exhibit No.- -- it's a page of Government's Exhibit No. 67.
A. Yes, sir.
Q. What is that?
A. Well, it's an agreement between Keith and Zeus Investments.
Q. Okay. And what is the agreement? Well, first of all, who is "Zeus?"

A. Zeus is three individuals. It's George Gabler, myself, and Ray Chapman.
Q. Okay. And is this before or after the loan that you made at the Bank of Asheville?
A. This would be after.
Q. Okay. Let me -- before we move on to that, let me kind of step back just a minute and put this in perspective. If I could show you just the parties and the Court what has been marked as Government's Exhibit No. 1318. If we could -- I beg your pardon, Your Honor, 1328.
Mr. Cashion, can you see what has been marked as Government's Exhibit No. 1328?
A. Yes, sir.
Q. Okay. What is this document?
A. Well that's, really, a timeline of the different loans during a period of three years that we had given to Keith.
Q. Okay. And your -- how many loans and different transactions would you have done with Mr. Vinson between 2006 and 2009? Do you --
A. Fifty.
Q. Did you have numerous conversations with him?
A. With Keith?
Q. Yes.

A. Oh, five times -- he was sick of me. Five times a day; at least ten times a week so.
Q. And prior to coming to court here today did you meet with the government and review many of those transactions?
A. Yes.
Q. Okay. Would this assist you in illustrating your -- demonstrating your testimony, organizing your testimony?
A. It would help a lot.
Q. Thank you. And did you have a chance to review these entries on this timeline and compare them against the documents and your memory?
A. I have. I mean I know what these are, yes.
Q. And, again, would this assist you in your testimony?
A. Say that again.
Q. Will this assist you in your testimony?
A. Yes, it does.
Q. Your Honor, at this time we would like to offer and publish what is marked as Government's Exhibit No. 1328 as a demonstrative exhibit, and I'd like permission to put that on a board, as well, as we're going to go between the documents and the --
THE COURT: Any objection?

MR. FISCHER: No, sir.
MR. SAVAGE: Thank you.
THE COURT: Let it be admitted.
(Whereupon, the aforementioned exhibit was admitted into evidence without objection.)
MR. SAVAGE: If we could publish that to the jury, both electronically and on a board.
THE COURT: You may.
MR. SAVAGE: Your Honor, I've previously provided copies of this to the defense so that they could see, but I'll be putting up the same board in the same place. Is that all right?
THE COURT: And that will be fine. Since I have a copy of that too, you don't have to turn it to where I can see it.
MR. SAVAGE: Thank you.
BY MR. SAVAGE:
Q. And if I can ask Mr. Cashion: Can you see that?
A. I can see it. I can't read it.
Q. Well we'll also help you out with the screen. Your Honor, if I could?
A. I can read the one here on the screen.
Q. Okay. Your Honor, if I can approach and also give the witness a hard copy so he can read it as well?
THE COURT: You may.

BY MR. SAVAGE:
Q. I need to move this back because I can't see you.
All right. Now, at the beginning of our chart -- and the jury has it on the screen, and we'll be going back and forth from the screen and the chart. August 2006. Initial funding for Seven Falls: Six-month loan Bank of Asheville. What is that?
A. Well, going back, that's the equity in the project. Seed money. The $2 million, I think he used it to buy more property.
Q. Okay. And let me show you what has been marked as Government's Exhibit No. 1211. Your Honor, this is a document of the FDIC and it has been previously stipulated. We'd like permission to publish it.
THE COURT: You may.
BY MR. SAVAGE: Okay.
Q. Mr. Cashion, I'm going to put up a document that is actually a document the FDIC prepared but it has some information on it. And I'll ask Agent Seres to enlarge the top part. Do you see that it says -- at the very top it has a line of credit there of $6 million. It was originally going to be -- it was extended a number of times: 8/21/2006?
A. You mean the $2 million?
Q. Yes, sir. Do you see the date in the middle? $2

million. Can you see those?
A. I do.
Q. I'm sorry. $2 million. 8/21/2006.
A. Okay.
Q. Is that the $2 million we're talking about on the first entry on the timeline chart?
A. Yes, sir.
Q. Okay. And had you had any other loans at that time over at the Bank of Asheville?
A. No. That was my first time at Bank of Asheville.
Q. Okay. Well, when Mr. Vinson came to you to take out $2 million and introduced you to Mr. Greenwood, why didn't he ask just borrow the money?
A. I'm sorry?
Q. What?
A. I didn't hear you.
Q. Did Mr. Vinson tell you why he didn't borrow the money?
A. Well, I think, it was just he was tapped out at that bank.
Q. Well did he tell you he was tapped out?
A. Well he couldn't borrow the money. I just assumed he was tapped out.
MR. FISCHER: Objection.
THE COURT: Sustained. Ladies and gentlemen of

the jury, you will disregard any assumptions that this witness may testify to.

THE WITNESS: All right.

BY MR. SAVAGE:

Q. Okay. You borrowed the money. What did you do with it?

A. I gave it to Keith.

Q. Okay. And for what purpose?

A. For him to put into his Seven Falls project.

Q. Okay. And where was he going to -- specifically, do you know what he was going to do with the money at the Seven Falls project?

A. Well, I mean, we're getting ready to go back to another assumption. I think --

MR. FISCHER: Objection.

THE COURT: Sustained. You cannot make assumptions, sir. You have to testify as to your knowledge.

THE WITNESS: Then the answer is that I have no idea.

BY MR. SAVAGE:

Q. You had a conversation with Mr. Vinson; is that correct?

A. Yes.

Q. Tell us about that conversation when he came to

ask you to borrow $2 million.
A. That he had to put seed money into the project.
Q. What is "seed money?"
A. Seed money is his own money so that, you know, he's got skin in the game. I mean it's --
Q. Okay.
A. That's what it is.
Q. In your experience, you've done a number of developments. Did you understand what he meant -- what did you understand him to mean by "seed money?"
A. I did understand him.
Q. You did understand?
A. I did understand.
Q. What did you understand it to mean? What was he saying to you?
A. That that would be his ownership money into the project.
Q. Okay. Was it, in fact, his ownership money or money he borrowed?
A. I guess not.
Q. Okay. Well, was it -- it was your money.
A. It was my money.
Q. Okay, and you got it from the Bank of Asheville?
A. Correct.
Q. Okay. Where did -- do you know whether or not

Seven Falls had loans at the National Bank of South Carolina?
A.     I did know that.
Q.     How did you know that?
A.     Keith told me.
Q.     And did you have any personal dealings with the bank of South Carolina?
A.     I did.
Q.     National Bank of South Carolina?  When were your dealings with the National Bank of South Carolina?
A.     I think the first one we were doing another Waightstill Mountain deal or Windsor Autrey deal in Johnson City, and I believe I borrowed something around $700,000 in November or December of 2006 or seven.
Q.     If we can go back to Exhibit 1328.  And do you see an entry in there for June 11th 2007?
A.     I do.
Q.     Okay.  And just go ahead and read what that entry is.
A.     $6.5 million, A&D loan for Candler Dogwood.
Q.     Were you familiar with the phrase -- you've said "A&D."  It's spelled out there; right?
A.     "Acquisition and Development."
Q.     Okay.  What is that?
A.     Well the acquisition is that you buy the property,

or buy the assets, and the development is to put the roads, water, sewer, whatever else, drainage.
Q. Okay. And what was Candler Dogwood?
A. It was another Windsor Autrey project.
Q. Okay.
A. Basically, we're going to go in and do all the construction, or he does all the construction, and then they come in and build houses.
Q. Okay. Did you form a company with Mr. Vinson to do that?
A. Yeah. Yes, sir.
Q. What was the name of the company?
A. Candler Dogwood Development, maybe?
Q. Okay. And Candler Dogwood Development -- what was the -- what was your role going to be in Candler Dogwood Development?
A. Just money.
Q. And what was Mr. Vinson's role going to be in Candler Dogwood Development?
A. He's the developer.
Q. Okay. Now, meanwhile, let's go back to Government's Exhibit No. 67, page 85 -- page 35. I'm sorry. And can you see that document that's previously been published? Keeping up with the timeline: What is Zeus Investments again?

A. Zeus Investments are three people, and that's myself, Ray Chapman and George Gabler.
Q. Okay. And what is the purpose of this agreement, which is now dated November 14th 2006?
A. Basically, just what I said: We would get the money and he would do development.
Q. Now, which development is this for? Because I don't want to get everybody confused here. We talked about Candler Dogwood; now we're going back to this one. What is Zeus going to help with?
A. You know, I'm not familiar with this piece of paper and that's the problem. I don't know.
Q. Okay.
A. I don't know what this is -- when Ray did this, I'm not sure what loan we were dealing with.
Q. If you would go down to the bottom. Is your name on that?
A. Yes, it is.
Q. And do you see a signature there?
A. That's my signature.
Q. Okay. How about the other signature? Who else signed that?
A. That's Keith's signature.
Q. Okay. And if we go up to paragraph D, it says Keith will pay Zeus 2.5 percent of the gross sales price

of each closing in the Etowah project.
A. Okay.
Q. What was the "Etowah project?"
A. That's the Seven Falls project.
Q. All right. And then if you go up a little bit there mentions a man by the name of Ed Worlund. Who's Ed Worlund?
A. Ed Worlund is a very close friend of everybody, of Keith, of me, of Ray, and he worked for numerous groups. He worked for "Four C's." He worked for Zeus. He worked for Odin. He worked for Seven Falls.
Q. Okay. And if we go to the very top paragraph, paragraph one. Just go ahead and read paragraph one.
A. Zeus Investments --
MR. FISCHER: Objection. Your Honor, he said he wasn't familiar with the agreement.
THE COURT: Overruled.
BY MR. SAVAGE:
Q. If you could just read paragraph one.
A. Keep going.
THE COURT: Go ahead and read it.
THE WITNESS: "Zeus Investments agrees to provide operational and financial management services to Keith Vinson in support of all enterprises in which he participates. Zeus will also assist in raising funds for

these projects."

BY MR. SAVAGE:

Q. Okay. And going down to paragraph three. What was the compensation going to be for those services?

A. Well, it was going to be $10,000 that just went to Zeus in principal -- you know, just for general -- and then $5,000 per month to pay Ed.

Q. Okay. And how were those funds there -- how was this business in paragraph C, does it say how the business is to be carried out?

A. Payments for funds provided will be covered individually in separate notes but will generally be that Keith will pay the following amounts for the money borrowed: Closing costs and bank fees, three percent of the loan amount per month --

Q. Okay.

A. -- two percent to lender; one percent to Zeus.

Q. Now, was Zeus going to lend its own money to Mr. Vinson for his projects? How was it going to carry out its funding for these projects? How was it going to raise funds?

A. The problem is, sir, I'm not sure which projects we're talking about. That's the problem with this document.

Q. All right. All right. So let's go on to the

Candler Dogwood one. You had personal involvement in Candler Dogwood; is that correct?

THE COURT: Before you move on, Mr. Savage, is this a logical place for us to take a break?

MR. SAVAGE: Yes, sir.

THE COURT: Ladies and gentlemen of the jury, at this time we're going to take the morning break. I'm going to have the marshal take you into the jury room for approximately 15 minutes.

Marshal, please, take the jury out.

(Jury excused at 11:00 a.m.)

THE COURT: Anything we need to address while we have the jury out?

MR. SAVAGE: No, Your Honor.

MR. FISCHER: No, Your Honor.

THE COURT: One thing I would say, Mr. Savage.

MR. SAVAGE: Yes, Your Honor.

THE COURT: Where you have that placed, I can't see you.

MR. SAVAGE: Okay. I'll move it back.

THE COURT: Therefore, if you can adjust that a little bit during the break so that -- I know you don't want to block your view of the witness or the witness' view of you but, please, also don't block my view of you.

MR. SAVAGE: Yes, Your Honor.

MR. FISCHER: I've got kind of a direct line to here. So if the government would move it over this way, please.

MR. SAVAGE: Your Honor, we think we might put it just back here behind Counsel so it won't be in anybody's way.

THE COURT: That would be fine, like, if you're going to put it where the library cart is?

MR. SAVAGE: Yes, Your Honor.

THE COURT: That would be fine. Just make sure it's not in the lap of one of the jurors.

MR. SAVAGE: All right.

THE COURT: Anything else?

MR. FISCHER: No, sir.

MR. SAVAGE: No, Your Honor.

THE COURT: Marshal, 15 minutes, please.

(Off the record at 11:02 a.m.)

(On the record at 11:18 a.m.)

MR. SAVAGE: Your Honor, I have 14 copies of Government's Exhibit No. 1328 to dispense with the problem of the easel. When the jury comes back in I'd like permission just to give each a copy of the exhibit. I think it would be easier than trying to refer to the chart.

THE COURT: Okay. Mr. Fischer, do you have any --

MR. FISCHER: I have no problem where that, Judge.

THE COURT: Okay. Anything else we need to address before we bring in the jury?

MR. SAVAGE: No, Your Honor.

THE COURT: Apparently, members of the jury are inquiring as to the schedule of Monday, in light of it being a holiday, so I was going to tell them when they come back in that there will be no court on Monday. I mean, the government's already shut down so, you know, why don't we shut down actually during a shutdown when we have a holiday? But be that as it may, I was intending to tell them that at this time so they can make their plans.

Marshal, please, bring us the jury.

(Jury returns at 11:20 a.m.)

THE COURT: Ladies and gentlemen of the jury, I understand some of you have been inquiring as to the Court's schedule for Monday, in light of the fact that it is a federal holiday. So that you may make your plans, I wanted to let you know that on Monday we will not be having court and we will -- when we recess for the day on Friday we will resume on Tuesday morning, rather than Monday morning. There are certain federal regulations about what we are required to do in observance of certain federal holidays. And, therefore, even if I wanted to

have court on Monday, I would not be able to assemble everybody here. It would be my preference to go ahead and get this done but, unfortunately, we can't do that. So for that reason, there will be no court on Monday and you may make your plans accordingly.

Mr. Cashion, I would ask that you return to the witness stand, please. You were sworn previously. You will remain under oath until this trial is over.

(Witness resumes the stand at 11:21 a.m.)

MR. SAVAGE: Your Honor, while the witness takes the stand. I have a copy for each of the jurors of Exhibit 1328. Request permission to publish those in hard copy to each of the jurors.

THE COURT: You may distribute those. You may resume your direct examination.

MR. SAVAGE: Thank you, Your Honor.

BY MR. SAVAGE:

Q. Mr. Cashion, before the break we were talking about Candler Dogwood. What was Candler Dogwood?

A. Well, as I had mentioned earlier, there was a series of successful Windsor Autrey developments that I'd had with Keith where we provided the funding, he did the develop, and the developments turned out very nicely.

Q. Okay. And so what does that all have to do with Candler Dogwood?

A. That's another one of those particular projects. He came to me and asked me if we could do another Windsor Autrey project and I said yes.
Q. Okay. Well, what do you mean do another one? What were you going to do?
A. What we were going to do is buy the property and, once again, he would go in and put in roads, water, sewer, etcetera, build the pads for the houses to be built on. Windsor Autrey, the house building company, would come in and have some kind of takedown schedule and start building our houses.
Q. Let me show you what has been marked as Government's Exhibit 1153. And I'll ask you -- let me just make that larger. Do you recognize that document? If we go down to the bottom?
A. I do. I mean it's --
Q. Okay. And do you see your name on there?
A. I do.
Q. And there's another name for the bank's officer?
A. Yes.
Q. Did you know a Kimberly Mode?
A. I do.
Q. How did you know Kimberly Mode?
A. I met her through Keith when she was the loan officer, as I recall, for the $25 million A&D loan from

NBSC.
Q. Okay. And that was for Seven Falls, though, right?
A. That was for Seven Falls.
Q. So she was the loan officer for Seven Falls and for Candler Dogwood?
A. Correct.
Q. If we could go to page 80 of that exhibit. And here's -- there we go. Page nine, I'm sorry. If you could make that larger. Are you familiar with that type of document?
A. Yes, I am.
Q. What kind of document is that?
A. It's a HUD.
Q. Okay. And is this a HUD that pertains to the transaction you did with Mr. Vinson and the Candler Dogwood?
A. Yes, it is.
Q. The date -- the settlement date on that is what?
A. June 11th 2007.
Q. Okay. And the law firm there, "Peltz Law Firm," who picked them?
A. Where do you see the -- Peltz Law Firm. Jason Peltz?
Q. Pardon me?

A. Jason Peltz?
Q. Okay. And sir, I'm going to have to ask you -- your voice drops off a little bit, and it's a little hard for the court reporter to get everything.
A. Okay.
Q. I understand it's not a comfortable thing up there. So if we could scroll on down. There's a couple charges here. Let's just talk about this briefly. First of all, $2 million is going to pay off another loan. What's that all about?
A. Well, originally, I thought that this was a Region's Bank. And Keith had a loan at Region's Bank. I thought it was Winston Pulliam's loan. But that was the pay off for that particular bank which, I think, was money that purchased the property.
Q. Okay. And then later on, the principal amount of the new loan is going to $6.5 million?
A. Right.
Q. Then there's a thing called an "initial draw." What's a "draw?"
A. Well, in an A&D loan, typically, what happens is that up front you spend the money for the acquisition. You just buy the land and that comes right out of the loan. Then you put together, usually, AIA draws, which are construction draws that goes to banks.

Q. Wait. We can't -- we're using a lot of acronyms here. We're not in the Army, so we've got to back up. What's an AIA?

A. I don't know what the acronym stands for.

Q. Well, what is it?

A. It's a draw form, basically.

Q. Okay.

A. And the draw form is usually signed off by an engineer and signed off by a developer funding whoever is running the project.

Q. Okay.

A. Then it's -- attached to that, for the bank's purposes, all the invoices and lien waivers and proof of insurances and all that kind of stuff, and then that goes to the bank. The bank then sends somebody out to the property to check to see --

Q. Or not?

A. -- what work's been done. And then, if everything's happy, they disburse the money.

Q. Okay. And so there was an initial draw of $3.7 million. Do you remember what that was for?

A. Yes. Of course it was the origination fees of the $70,000 and the $2,000,269 for paying off Region's Bank and clearing that account. And then I think -- can you go up a little bit on that chart? No. I mean down, I

guess. And then cash to the borrower at closing was $1,000,380, and that money was for all the soft costs and money that had already been put into Waightstill -- I mean into Candler Dogwood and for future work that was going to be done immediately.

Q. Okay. And where was that money going to be deposited?

A. It was deposited, I think, in --

MR. FISCHER: Objection.

THE COURT: Sustained.

BY MR. SAVAGE:

Q. Well, who had control of that money?

A. Keith.

Q. Okay. And what bank was it in?

A. I don't know.

Q. Okay. And was that signed by you on behalf of Candler Dogwood?

A. Yes.

Q. Okay. What was your understanding to the use of that money?

A. I thought that money was being used for -- I know that he was planning on putting sewer down the road from the main sewer place down to where the project was and then all of his engineering and other things, and then also, then, to start putting the roads, water and sewer

up on the top of the mountain.
Q. Okay. And, around that timeframe, did you have another discussion with Mr. Vinson about Seven Falls? Let's go back to 1328. Can you read the third one?
A. I can.
Q. Okay. And what is the third line on the chart?
A. It's talking about Zeus Investments and the "Fulliam Dairy" loan.
Q. Your Honor, I know the jury has had it. But if we can publish 1328, as well, on the screen. Yes. What is that Zeus Investments loan?
A. Well, it's -- the Fulliam Dairy is a real nice piece of property that was key to the Seven Falls development. It's down on the French Broad River. And it's a very, very pretty piece of property.
Q. Let me stop you there.
A. Okay.
Q. Let me show you what's been marked and previously published as Government's Exhibit No. 1. Can you see that document?
A. I can.
Q. Have you seen that type of document before?
A. I have.
Q. What is it?
A. It's the layout of Seven Falls.

Q. Okay. Now, the Fulliam Dairy property, could you just put your finger on the screen and then put a circle around where it is? Just touch the screen.
A. Yeah. It may not be completely accurate, but I know it's got the village in it; it's got the three ponds in it.
Q. Let's go ahead and just circle that area about where it is.
A. (Witness indicating.)
Q. Okay. And when you -- in 2007, who owned that property?
A. In 2007?
Q. Mm-hmm. ("Yes.") Well, who did you buy it from?
A. Keith.
Q. Okay. And why did you buy it from Keith?
A. NBSC had a $25 million loan limit and they were exceeding that loan limit. So, they asked -- it's a 30-day note. They asked if Zeus, those three individuals, would take that $4 million so that it would reduce Keith's exposure at NBSC.
Q. Okay. And let me show you what has been marked as Government's Exhibit No.- -- one minute, Your Honor. One second, Your Honor. Can we show them Exhibit No. 67, page six? Okay. Now this is not a document you prepared, is it?

A. No, sir.
Q. Okay. But it would be a document that would have been a record of Zeus; is that correct?
A. A record of Zeus?
Q. Right. A record of Zeus prepared by Mr. Chapman?
A. Yes.
Q. Okay. Your Honor, request permission to publish this page of Exhibit No. 67, page six.
A. You may.
Q. Okay. Now, Mr. Cashion, who did all the document writing over at your business?
A. Ray Chapman.
Q. Okay. And would you type any of these records up?
A. No.
Q. Any of these documents?
A. No, sir.
Q. Well, where would Mr. Chapman get the information to put in these various agreements that we've been seeing?
A. Sometimes from me.
Q. Okay. And then he would type them up, and then they would -- they would be signed by the parties at some point?
A. Yes.
Q. Okay. And let's look at this document here. In

paragraph number one it says that Zeus agrees to purchase the Fulliam Dairy property from Seven Falls in order to continue to operate within the NBSC $25 million loan ceiling. Where did that information -- where did you get that information from? You just talked about that. That's the conversation you had with them.
A. It would have probably been --
MR. FISCHER: Objection.
THE COURT: Sustained.
BY MR. SAVAGE:
Q. Okay. Did you have a conversation with Mr. Vinson about that?
A. Yes.
Q. Okay. Did Mr. Vinson come and ask you to buy the Fulliam Dairy property?
A. Yes.
Q. So, where'd you get the information from?
A. Keith.
Q. Thank you.
It says -- the next sentence is -- if you could just read the next sentence.
A. This loan was intended to be less than 30 days, at which time Seven Falls would re-purchase the property.
Q. Okay. And who told you that?
A. That was Kim Mode and Keith Vinson.

Q. All right. And did you meet with them together or separately?
A. I don't know.
Q. You don't know if you met with them?
A. I know I met with them. I don't know if I met with them separately or together.
Q. Okay. Well when you met with Mr. Vinson, is this where you got this information?
A. Yes.
Q. Okay. The last sentence -- go ahead and read the last sentence.
A. The only cost to Seven Falls was to be the interest owed to NBSC and the closing cost associated with the loan. Zeus closed on the property on July 2nd 2007.
Q. Okay. Now let me show you what has been marked as Government's Exhibit No. 25. Your Honor, this is a record of the National Bank of South Carolina. It's previously stipulated and admitted. We request permission to publish.
THE COURT: You may.
BY MR. SAVAGE:
Q. Okay. Now, Mr. Cashion, this is an internal loan record from the bank. You wouldn't have seen this; is that correct?

A. If it was internal, no.
Q. But does it list your company, Zeus, on the second block about the new loan summary.
A. Yeah.
Q. And if I could ask Agent Seres to highlight that.
A. Yes, it does.
Q. Okay. And does it talk about what the loan amount is?
A. $4 million.
Q. Okay. And does it also say what the repayment terms are?
A. P &I maturity: 30 days.
Q. What's "P&I?"
A. Principal and interest.
Q. What's 30 days?
A. A month.
Q. And it has an LTV of 75 percent. What did you think the Fulliam Dairy property was worth at this time?
A. I thought it was worth much more than $4 million.
Q. Okay. Well, why?
A. I'm not sure at what time they were doing work on this project. There was a lot of work done on the property and that certainly raised it, but I don't know at what date that was done.
Q. Okay. Well what did it appraise for?

A. $6,800,000.
Q. Okay. Was it important -- was it an important property to Seven Falls?
A. One of the most important, yes.
Q. Why?
A. Well, what Keith had done with this piece of property is made it very special in that that's where the Arnold Palmer Golf Academy was going to be, which was something very high end and very special. And it was also going to be a housing development called Palmer -- Palmer Estates or something. I don't remember what the --
Q. Okay. So, for 30 days -- I mean, were you going to build something in 30 days?
A. I wasn't going to do anything with it. We were holding it so that he would stay under his loan limits at NBSC.
Q. Okay. And did you hold the loan -- was it paid off in 30 days?
A. It was not.
Q. What happened?
A. Well, it was supposed to be paid off with the proceeds of the Founder's Program --
Q. Okay.
A. -- which would have done two things with the

releases. It would have reduced the $25 million at NBSC, leaving room to slide this $4 million back over. Or it could have been paid off, with the proceeds of the closings themselves.

Q. Okay. Now, what about this? What is this Founder's Program?

A. And incredibly nice event. It was.

Q. Again, I'm going to ask you to keep your voice up. Okay?

A. I'm sorry. It was held out at the Biltmore Estate. And Arnold Palmer came in, and then there was 40 people that were selected to be Founders members. And there were benefits for those Founders members in that they got good discounts and so on for their lots that they were purchasing at the time. Keith had picked out very good lots for them to choose from and then there was future benefits, but I'm not sure what those future benefits were for Founders.

Q. Okay. And did you buy a lot at Founder's Day?

A. I did.

Q. What was the financing on those lots?

A. I believe I got 100 percent financing.

Q. Who financed those loans?

A. NBSC.

Q. And they had a Founder's Day lot program loan

program?
A. I think so.
Q. Okay. All right. And was that Founder's Day successful?
A. Very.
Q. Okay. In addition to you buying the lot, did anybody else in your business buy a lot?
A. Yes. Ray Chapman bought two. But he was buying two because one of them went to Ed Worlund, but Ed Worlund wasn't going to qualify. Ray bought two, one of them assigned to Ed.
Q. Okay. And why did you buy your lot?
A. I was in love with the Seven Falls project. I thought it was going to be as good or better than Walnut Cove, and I thought it would be a very good investment.
Q. Did that appear to be the case throughout 2007?
A. Yes, sir.
Q. Okay. And was that one of the factors in your agreeing to borrow $4 million for 30 days?
A. Yes, it was.
Q. Now let's scroll down to that memorandum. You couldn't just borrow the money. You had to pledge a guarantee to that, didn't you?
A. That's correct.
Q. Okay. How about your partners? Did they also

have to guarantee that?
A. All three of us did, yes.
Q. Okay. Well -- so, if anything happened, who was going to be on the hook for that money?
A. We were.
Q. Okay. And in addition to that, you already had $2 million out on Seven Falls. Is that right?
A. At Bank of Asheville, yes.
Q. At Bank of Asheville. So that would have been a total of $6 million as of this date. Correct?
A. Yes. And all R6 million should have been taken out of the Founder's program.
Q. That was the agreement?
A. That was the agreement.
Q. But in addition to that, you had another $6.5 million with Mr. Vinson in another project --
A. That's right.
Q. -- over at Waightstill. So, all together, you had, what, $12 million tied up with Mr. Vinson at that time?
A. That's correct.
Q. Well, let's just focus on Seven Falls here. Did that $6 million get paid off as agreed?
A. No, sir.
Q. Do you know why not?

A. Well, I mean, the Founder's Day program happened and it was successful. For some reason that money didn't get taken out. And then we hit 2008. In 2008 things start slowing down because of the winter and then the economy. And then the way that NBSC actually funded Seven Falls -- it was undercapitalized, and so they ran out of money.
Q. Okay. Well, were you still on the hook in 2008 for this $6 million?
A. Yes, sir.
Q. And your partners were on the hook as well.
A. Yes, sir.
Q. Now, was that going to cause a problem for you and your partners in 2008?
A. Yes, it was.
Q. Okay. And we talked about running out of money. Did you have discussions with Mr. Vinson in 2007 and 2008 about the money?
A. Yes, sir.
Q. Okay. And how often would you talk to him about the money?
A. I mean, I feel bad for Keith but, every day.
Q. Okay. Why every day?
A. Because it was really important.
Q. Okay. Well, where -- what did you -- where did

you see the money going?
A. Well, it went to payroll. It went to him trying to get the golf course going and the golf academy going, roads.
Q. Okay. Let's talk a minute about the payroll. What was the payroll that you were aware of out at Seven Falls in 2007 and 2008?
A. Are you talking about the amount?
Q. No. What was -- who was being employed?
A. Well, he had a General Manager, he had a chef --
Q. Okay. Was there a cooking facility out there?
A. Only when he would -- it was, like, a grill. I mean he would just bring one -- roll it in and he could cook on this grill.
Q. Was there food service for sale or anything like that?
A. No.
Q. Okay. Other than an Executive Chef, what other types of employees did you see at the --
A. Well he had people in the financial -- I mean, like, a CFO or budget officer or whatever.
Q. Okay.
A. And he had sales and marketing people.
Q. Did he have people working on the golf course?
A. He had people -- he had maintenance people working

on the golf course.
Q. Was -- how about golf pros?
A. He had a golf pro.
Q. Okay. Now, around this same time, had you gone in with Mr. Vinson on a condominium?
A. We did.
Q. Where was the condominium?
A. Colorado.
Q. Okay. Whereabouts in Colorado?
A. In Beaver Creek.
Q. Okay.
A. Colorado.
Q. Tell the ladies and gentlemen who haven't been to Colorado, what's Beaver Creek?
A. It's near Vail. It's a high end skiing resort, basically.
Q. Okay. Are you a skier?
A. I learned there.
Q. Okay. Well, what would cause you to buy a condo at Bear Creek [sic]?
MR. FISCHER: Object to relevance, Your Honor.
THE COURT: Are you going to tie this into something?
MR. SAVAGE: Yes, I am.
THE COURT: Overruled. Get there quickly,

Mr. Savage.

BY MR. SAVAGE:

Q. Who asked you to buy the condo out at Bear Creek [sic]?

A. Keith asked me to buy the condo on a short-term basis. He put me on the deed and he and Paula.

Q. How much was it?

A. I think it was $810,000.

Q. Did you ever go out there?

A. I don't think we borrowed that much, but I think that's how much the --

Q. $800,000?

A. Okay.

Q. Okay. Was that what it was?

A. I think that's about right.

Q. I'm going to ask you to speak up.

A. I think that's about right.

Q. Okay. How did you get out there? Did you go out there?

A. I did.

Q. How did you get there?

A. Well, once I got to fly on a really nice airplane that he owned.

Q. Okay. Who owned?

A. Keith owned it.

Q. Okay. And how much did it cost you to fly out there on Mr. Vinson's airline -- airplane?

MR. FISCHER: Objection.

THE COURT: I need Counsel to approach, please.

(At the bar of the court.)

THE COURT: This witness is going to be up there long enough as it is. Why are we on this detour?

MR. SAVAGE: It's not a detour, Your Honor. He spent $20,000 to fly this airplane. He had two airplanes. This is at the same time that they're trying to develop this business. He had no other income, and they're spending millions of dollars on his lifestyle. I'm trying to lay the foundation that he's a little bit difficult to work with but I'm trying to do it as fast as I can.

THE COURT: So you're saying the relevance of this is just to show where the money is going?

MR. SAVAGE: Yes, Your Honor. And the thing is that he didn't do the bookkeeping. He can say and observe where the money went because he is observing the things he did. I realize it's not as efficient as I would like it to be but I can't change the witness.

THE COURT: Do you have anything else on this?

MR. FISCHER: Not me. Like I said, Your Honor, I think we're getting far afield.

THE COURT: Yeah. If you're trying to prove where the money went through a witness who didn't do any of the books -- I mean, don't waste a lot of time on this.

MR. SAVAGE: I'm trying, Your Honor.

THE COURT: You're going to put everybody to sleep.

MR. SAVAGE: All right.

(Back in open court.)

THE COURT: The objection is overruled.

BY MR. SAVAGE:

Q. How much did it cost you to fly to Colorado to the $800,000 ski condominium when you went on Mr. Vinson's airplane?

A. I actually got to ride twice on his airplane out there. Once was free because he paid for it. And the other time is when we sent a group of Pisgah partners, which is four or five of us out there, and I think the gasoline was something like $15,000.

Q. Okay. Did he have more than one airplane?

A. He did.

Q. Did there come a time when Mr. Vinson asked you to buy him another -- a secondary plane?

A. He asked us to loan him money so he could purchase a smaller airplane because the other one burned too much gas.

Q. Okay. How much did you loan him to buy the second airplane?
A. $600,000.
Q. Okay. Did he keep the first one?
A. He did.
Q. Okay. So he had two airplanes?
A. He had two airplanes.
Q. Did Mr. Vinson have, to your knowledge, a stream of income outside of this project?
A. No.
Q. Okay. With respect to the cook and the golf pros, were they being paid to do work?
A. Well I know the golf pro was giving lessons.
Q. Other than that, was there -- I mean, was there a golf course there?
A. Well there was a partial nine-hole in the practice center. I don't know how much of the nine holes got finished but quite a bit of it did.
Q. Okay. Well, as a consequence, did you become concerned about the cash flow at the development at Seven Falls on the project?
A. Well, I did.
Q. Did you talk to Mr. Vinson about that?
A. I did. In fact, you know, one of the biggest conversations we had is that, you know, I told him don't

hire any people but he did. And then he's laughed about it since because it was a mistake.
Q. Why was it a mistake?
A. Because there wasn't that much to do. He needed an engineer and people working.
Q. Okay. Consequently, was there what they call "vertical improvements" happening out there?
A. When you say "vertical," are you talking about houses?
Q. Yes.
A. No.
Q. Okay. And were all the roads in?
A. They were working on the roads.
Q. Okay. Let me draw your attention to April of 2008. Did there come a time when you had a conversation with Mr. Vinson about paying contractors?
A. Yes.
Q. Okay. Who came to who?
A. Who came to what now?
Q. Did he come to you or did you go to him?
A. I went to him.
Q. Okay. And what was the subject of the conversation?
A. I'm not sure I'm following what you're asking. He came to me and asked me for some help so that he could

pay some lien people. Is that what you're talking about?
Q. Yes.
A. Okay.
Q. What "lien people?"
A. Well there was a number of -- I mean a lot of people working on the project, on the Seven Falls project. I knew that Bill Lapsley, the engineer, was struggling. I think Harry Redfearn, the sales and marketing person, was struggling. And I think there was Landscapes Unlimited that were trying to get paid. And then there was Bill Newman and Caleb Murphy. And, you know, there was a list of them. The bottom line is he just hadn't been funded properly to pay them.
Q. And did they come to you and say they weren't getting paid?
A. Well, not all of them but some of them did.
Q. And what did you do with that information?
A. Well I asked Keith, I said, what are we going to do?
Q. And what did he say?
A. He said I need some help.
Q. And prior to that was your company, Zeus, trying to raise money from outside investors?
A. Yes, but not outside investors at that time.
Q. Okay. And who was trying to raise money from

banks?
A. George and a little bit Ray.
Q. Who's George?
A. George Gabler is Keith's and my CPA.
Q. Okay. And to your knowledge, was Mr. Gabler successful in raising additional development money from banks?
A. Yeah. He had gone to some big banks and was not successful.
Q. Okay. Was there private investment money coming in at that time?
A. There was an opportunity -- Keith had worked real hard to get an AML loan which was going to be about $63 million.
Q. Okay.
A. And that's sort of from venture capitalists, a firm that collects money from other people and loan it to projects for other things.
Q. Okay. And about when is this that this AML came on the scene?
A. Well, AML probably came on the scene probably in April. I don't know the answer to that question.
MR. FISCHER: Objection. Your Honor, motion to strike.
THE COURT: Sustained.

BY MR. SAVAGE:
Q. When did you hear about AML?
A. Probably in April.
Q. All right.
MR. FISCHER: Objection.
THE COURT: Sustained.
BY MR. SAVAGE:
Q. Did you hear about AML in April 2008?
A. It was either April or May.
Q. Thank you. Who did you hear about AML from?
A. Keith.
Q. Thank you. Did he tell you about AML?
A. Yes, he did.
Q. Okay. What did he tell you about AML?
A. That AML was going to fund $63 million on his project.
Q. Okay. Was that a good thing for your company Zeus?
A. Absolutely.
Q. Why was it good for your company Zeus?
A. Because we would get -- we had a lot of money invested and we would get paid that money out.
Q. Was it good for you personally?
A. Yes.
Q. Did you want AML to fund the Seven Falls?

A. Yes.
Q. Did AML fund Seven Falls in April or May of 2008?
A. No.
Q. Was that a problem?
A. I don't think they were supposed to fund in April or May. I think they were supposed to fund sometime later than that ,but we were working on -- Keith was working on getting all the necessary things to put this together.
Q. Okay.
A. To get a big loan, there's a lot of work to do.
Q. Okay and was that taking time?
A. It was.
Q. Meanwhile, were there problems at Seven Falls while the financing was being processed?
A. Yes, there was.
Q. What problems were there?
A. Well the bulldozers basically had stopped, and people were threatening liens on the property.
Q. What are "liens?"
A. A lien is this -- finally, a contractor gets tired of not getting paid. Then they go and put a legal document in place at the courthouse that has to be satisfied before you could sell that piece of property.
Q. Okay. Now, you've been in developing before. Is

there a problem in raising money if you're a developer and there are liens on your development?
A. A huge problem.
Q. Why is it a huge problem?
A. Because they come in and they see that your project's broken. You know, you're not moving stuff and you've got liens on the property, and that's just never a good thing for getting money.
Q. Did you have any conversations with Mr. Vinson about the fact that there would be -- there could be liens on the property and what effect that might have on the AML funding?
A. Well, I think that's information that he gave me and that we needed to do something about it.
Q. Did you agree with that?
A. I did.
Q. Okay. Did you try and do something about it?
A. We did.
Q. Okay. And were you able -- were you successful about that, at least with -- as far as getting legitimate financing from banks?
A. Well, there's a story. Can I tell it?
Q. Please tell it.
A. There was a sequence of events. George and Ray basically failed to get funding for Seven Falls at all

these different banks. Keith came to me and said, man, I got all this property. I need some help. And Keith, being a friend and somebody that I thought was working very hard on this stuff -- and he was -- I said okay, I'll try. I go to Pisgah Community Bank and I ask for a $2.5 million loan for Seven Falls. They said we can't do a loan for Seven Falls because it's a development and we're just not going to do that. But they said, what you can do is have individual people borrow money individually as a personal investment.

Q. Okay. What kind of loan were you proposing at Pisgah Community Bank? What was the nature of the loan that you first proposed?

A. The $2.5 million?

Q. Yes.

A. An A&D loan.

Q. Okay. Were they willing to do that A&D loan?

A. They were not.

Q. And who is "they?"

A. Ted and Craig.

Q. Okay. And what about -- what time is this? What month and year?

A. This is March.

Q. Okay. And who is "Ted?"

A. Durham.

Q. What was his position with the bank?
A. He was the president.
Q. Okay. Now this was a brand new bank, wasn't it?
A. Yes, sir.
Q. In fact, you had just bought shares in that bank, hadn't you?
A. Yes, sir.
Q. How many shares in the bank had you purchased?
A. I guess $49,000 worth.
Q. And did your wife also purchase shares in the bank?
A. And she did the same.
Q. So you had almost $100,000 in the bank?
A. In -- yes, we did.
Q. Okay. And did you know Mr. Gourlay and Mr. Durham before you had gone over to pitch this Seven Falls loan?
A. I knew them well.
Q. Okay. How did you know them?
A. Well, from several banks. I mean I've probably known them for ten years. I met Ted -- I mean, yeah, I met Ted when he was at RBC Bank. Then he went to First Citizens Bank -- no. Then he went to BB&T. Then he went to First Citizens. And then he started his own bank.
Q. Okay. Let me show you what's been previously

marked as Government's Exhibit No. 126. It's been previously published, Your Honor, and the jury's previously seen this.

I'm going to talk to you about it. If we could highlight, or enlarge, the top part first. This is an e-mail stream. First of all, this is on April 11th 2008 and it's from Mr. Chapman. Is that your partner?

A. Yes, it is.

Q. And the subject is what?

A. "The Zeus and KV Update."

Q. Who's "KV?"

A. Oh. Keith Vinson.

Q. Now, it's to Kenneth Porter-Shirley, George Gabler, and Ed Worlund. Where were you physically on April 11th 2008?

A. I was in Africa.

Q. Okay. And what country in Africa?

A. Senegal.

Q. Okay. Who was you with?

A. I was with those three people.

Q. Okay. Was George Gabler with you in Senegal?

A. No.

Q. Okay. Well, who was with you in Senegal?

A. It must have been just Ed and Ken.

Q. Okay. And when -- did you ask Mr. Porter-Shirley

to type an e-mail for you to Mr. Chapman?
A. A response you mean?
Q. Yes.
A. Yes, I did.
Q. Okay. Why would you ask somebody else to type a response for you?
A. I can't type.
Q. Okay. And then if you could scroll down. It says, "Hi, Ray. Attached note from Buck. He likes the e-mail and says send it. K." What's that all about?
A. Well, what we were doing is -- well there's a sequence of events.
Q. Okay.
A. When we got turned down on the $2.5 million at Pisgah Community Bank, I had to go to Keith. And once we got the new thing, I had to go to Keith and say, you know, we're going to have to circumvent the way the bank is doing it. And I got -- do you want to do that? And he said yes. But I've got to have approval for the lot program because it's his lots and it's his lot program.
Q. Okay. So let's go down further. Go down a little further here. There's a couple of things that Mr. Chapman is writing if I go to the second paragraph in that stream. It says, George and I are having little success with banks." Who's the "George and I?"

A. Ray.
Q. And that's what you were just talking about. Right?
A. Yes.
Q. Okay. And the next one is -- if you can read the following -- the next sentence beginning with "anyway."
A. "Anyway, Craig is moving forward with all six lots. Shooting for a Tuesday closing. Jason from Community South is moving forward on three. Unclear on everyone else."
Q. Who is "Craig?"
A. Craig Gourlay --
Q. Okay.
A. -- at Pisgah Community Bank.
Q. Frank Gourlay was an officer at the Pisgah Community Bank?
A. A credit officer.
Q. That bank hadn't even opened yet, had it?
A. No. They were -- it had not. They were still doing work for the Bank of Rowan.
Q. They were still doing work with another company, another bank. Let me show you 1322. Let me show you what's been marked as Government's Exhibit No. 1322. Mr. Cashion, can you see Exhibit No. 1322?
A. Bigger is better. That's good.

Q. Do you recognize that? Have you seen that before?
A. I have.
Q. Did you see it at a meeting before you came to court?
A. I did.
Q. And do you see the loans that are at the top of that marked A through F, CBR?
A. Say that again. A through F what? Oh, yes. Community Bank of Rowan.
Q. And are those loans that you took out with your partners?
A. That's correct.
Q. And why did you take out those loans?
A. To give funds to Seven Falls as a bridge loan.
Q. Okay. Before you took out those loans to get a bridge loan, did you talk with Mr. Keith Vinson about those?
A. I did.
Q. Okay. And what did you -- what did you say to him?
A. Well, that we were going to have to give part of that money to keep Zeus and Four C's going as well.
Q. Was this a good thing as far as you were concerned, that you were able to get money from the bank of -- from the bank?

A. It was a good thing.
Q. Okay. Let me show you a different chart a little bit different than that which is Exhibit 1323. Now, do you see that chart?
A. I do.
Q. Okay. That's basically the same thing. There are some totals filled in there, are there not? On the -- we can enlarge the bottom.
A. Totals at the bottom?
Q. Yes.
A. Okay.
Q. And does that -- would that help you in testifying as to how the lot loans were made and what they raised at each bank?
A. That's about right.
Q. Well, would this help you in explaining that testimony? The chart?
A. Yes.
Q. Okay. Your Honor, request permission to publish Exhibit 1323.
THE COURT: You may.
BY MR. SAVAGE:
Q. And let's go and show the whole chart. If I could ask Agent Seres again to highlight the first -- the top part there. Now, again, the first bunch occur all about

on the same day, do they not, 4/24/2008? There appear to be six loans out to the CBR. What is "CBR?"
A. Community Bank of Rowan.
Q. Okay. All right. Now if you go down to the bottom -- if we scroll down -- leave it large, and scroll down to bottom of the chart. How much money did you raise at the CBR with these initial loans, the six loans?
A. Well, the loan amount was $2,673,000.
Q. How much was Mr. Vinson saying he needed at that time? What was the original amount of the bridge loan?
A. It's kind of a bucket with a hole in it --
Q. Okay.
A. -- because there's a lot going on in this project. But at that time we were trying to get $2.5 million.
Q. Okay. And remarkably, you got six loans and raised $2.6 million.
A. That's right.
Q. Now let me go back over to the Community Bank of Rowan -- Pisgah Community Bank. Where were those guys when you met with them? Was the bank even open yet?
A. No, it was not.
Q. Describe, for the ladies and gentlemen of the jury, where you met them and what -- who was there?
A. Well, it was in a small building. I mean, it did have a counter that you could cash checks once they were

opened. And then they had just offices that are kind of stacked together. And they're almost kind of stacked like you-all are. They're just right -- there's not very much room, so they're all kind of right there together.
Q. Okay. And when you asked them for the bridge loan, who -- it was turned down immediately, wasn't it?
A. It was.
Q. Whose idea was it to break it up into lots?
A. Well, there was three people in the conversation, of which I was one, Ted and Craig. They said that, basically, they thought they could do it this way.
Q. Okay. Was it going to be the same loan that you had proposed, just in individual names?
A. Exactly.
Q. Okay. And what did you tell Mr. Vinson about that?
A. I told him that they're not -- no banks already. George has failed. I just failed at Pisgah Community Bank. Nobody's going to give money to Seven Falls, they're just not going to do it. It's not far enough along and they're just not going to do it. So I went to him to get approval to do this lot loan because, as part of the approval, I was asking for money for Four C's and for Zeus so that we could continue our operation. So, it's twofold. It was good for him and good for us so we

could pay our bills.
Q. Okay. Let's go back to Exhibit 126 and the lower part of the e-mail. When it refers to the second paragraph and Craig going forward with all six lots, are those the lots we just talked about?
A. They are.
Q. Okay. And then there was Jason from CommSouth. Who is Jason from CommSouth?
A. I think it Jason Chambers.
Q. And did you try and get additional loans in addition to these six, the --
A. Yes.
Q. -- the T2.56 million?
A. Yes, we did.
Q. We're going to go back to the other chart. You raised approximately $10 million in the Lot Loan Program. Right?
A. Yes.
Q. Why did you need more money?
A. Keith thought NBSC was not going to charge him a release fee. But they did charge him the release fee, and that doubled the requirement. As time went on there were more requirements that needed to be fulfilled.
Q. What do you mean "more requirements?"
A. I mean as the project goes on there was always

more payroll, more whatever trying to pay other vendors.
Q. Okay. Well, were you doing this just for Keith?
A. No.
Q. Okay. When it comes down and says -- the next one -- the next sentence there says, "Before we close the lots, I'm not sure all of us will need to be involved in a discussion with him. He will only net about $1.4 million from this as we with lay it out." What did you understand that to mean?
A. Well, once we discovered that some of this money was going to go to NBSC, then he was -- we were also going to ask him to pay us money for invoices that he already owed us.
Q. Well if he's only going to net $1.4 million from the $2.6 million, was that going to be a possibility? Was he going to be able to pay you?
A. Yes, because Ray did this chart. But the $1.4 million, I think, is the net he got after he paid us.
Q. After he pays. Okay. Now if you'll go down a little bit to the last paragraph. This is Mr. Chapman talking to you, isn't it? I believe we should hold firm on these terms.
A. Yes.
Q. It says, "He is really hurting, so we may be forced to be flexible." Who is "he?"

A. Who is "he?"
Q. Yeah. Read that last --
A. The "he" is Keith.
Q. Keith? "The project looks great but it's out of money. Hyder is all over him to make $225K worth of payments." First -- "625K worth of payments."
A. Right.
Q. First of all, what is that? What does "625K" mean?
A. Thousands.
Q. Okay. Who is "Hyder?"
A. Keith had worked a great deal with this guy Bub Hyder, who is a wealthy real estate person in Henderson County. And he optioned the land but he had to pay, I don't know, quarterly, yearly, monthly, I don't know. He had to pay Hyder money to keep that option alive.
Q. Okay. What happens if he didn't pay the options?
A. I guess he could take the property back.
Q. Okay. And if he took the property back, what would happen to the development?
A. It would hurt the development.
Q. Would that hurt your ability to get AML funding?
A. Oh, absolutely.
Q. Okay. And then the last sentence says, "This is the last money we will see from him for a while so we

need to fill our coffers to get to get through until he has closings."
A. Right.
Q. What did you understand that to mean?
A. Well, you know, when you get into a project like that you're a team. You know, Keith has got to make it. But if he makes it and we don't make it, or if we make it and he don't make it, then everybody loses.
Q. Okay. And let's go to the next page of that e-mail. And if we could enlarge the top of it. Then it's, "He will argue he needs all the proceeds. I think we have to get the March and April invoices. $397,000. I think we also need to have the two year interest." What's that about?
A. Zeus had loaned him money. And there are -- we had monthly monies that he was supposed to be paying us for interest that we were paying to people ourselves. Anyway, money that had gone into Seven Falls he was paying interest on.
Q. Okay. And did you want to get paid for that?
A. Yes.
Q. And the last sentence says, "I think he will have strong concerns paying us two percent on the $2.5 million, $50K and the May invoice -- and paying the May invoice." What's that about?

A. I don't think the two percent ever got executed. If it did, I'm not aware of it. But the rest of it is just paying more invoices.
Q. And so who was invoicing him --
A. Ray.
Q. -- and on behalf of who?
A. Zeus.
Q. Okay. And what was the -- what was the monthly invoice for?
A. It was for money that was loaned to Seven Falls.
Q. Okay. In addition to the $4 million?
A. In addition to the $4 million.
Q. How much did Zeus have out to Mr.- -- to Seven Falls, in addition to the $4 million?
A. It was a lot. And I don't know.
Q. Millions?
A. Pardon?
Q. Was it millions?
A. Oh, yes.
Q. Okay. In addition to the $2 million you had and the $4 million, you had solicited your own investors. Is that correct?
A. That's right.
Q. Did you owe those people money -- did Zeus?
A. Yes.

Q. Could you pay them if Seven Falls didn't pay Zeus?
A. We could for a while but not long.
Q. Okay. Was that a concern?
A. Yes, it was.
Q. Now, listen. With respect to this Lot Loan Program -- not the way you proposed it, but the way it actually happened at Pisgah -- did you know that was wrong?
A. Yes.
Q. Okay. How did you know it was wrong?
A. Well, because what we were trying to do is the whole purpose of the lot program was to get us to the AML loan. And it seemed very safe because AML seemed very real. But if we had been using our own money, then this would have been a very wise choice. But when we borrowed money from the bank, that was a poor choice.
Q. Okay. Was it a risky business?
A. Very.
Q. Okay. Now, with respect to the bank. In fairness, did the bankers know what they were doing?
A. Say it again.
Q. When you talked to Mr. Gourlay and Mr. Durham, was it clear that these weren't going to be lot loans?
A. To them it was.
Q. Okay. Was it clear to all the banks that were on

the list?
A. It was not.
Q. Now let's go back to Mr. Gourlay and Mr. Smith. Now as time went on you got deeper and deeper in with that bank, did you not?
A. I did.
Q. Okay. In fact, you committed other offenses with Mr. Gourlay and Mr. Durham at that bank, did you not?
A. That's correct.
Q. And did you, in fact, before coming here to court, plead guilty to those offenses?
A. I did.
Q. And is one of the reasons you're here is that you have a Plea Agreement with the United States?
A. That's right.
Q. Okay. And what did you plead guilty to?
A. I think defrauding the United States government.
Q. Okay. And was that -- and let me show you with respect to that a plea agreement. I'm going to show it just to the Court. 1302, do you recognize that document?
A. I do.
Q. Okay. And if we could enlarge the document. And I'm going to ask you, does that refresh your recollection on the charge that you pled guilty to?
A. Okay. Where am I reading?

Q. Well, you can read -- look at paragraph four. What did you plead guilty to?
A. "The defendant is aware that the statutory minimum and maximum sentences for each count --"
Q. Well, I don't want you the read that. Do you remember the statute that you pled guilty to?
A. 34.
Q. Okay. And what was involved? What -- Count 34, what statute did that involve?
A. Oh. Violation of 18 U.S.C., 371.
Q. Do you know what that prohibits? What's that statute about?
A. Say again.
Q. Do you remember what that statute prohibits?
A. Quid pro quo? I mean, no, I don't.
Q. If we could go to Exhibit 1301. Okay. Do you recognize this document?
A. "Superseding Bill of Indictment."
Q. Okay. Are you named in that indictment?
A. Yes.
Q. Okay. And if we could go back to the Count 34.
A. I noticed you named me first.
Q. Do you see Count 34 there?
A. Yes, I do.
Q. Okay. And if you look down on paragraph 88, does

that refresh your recollection as to what charge you pled guilty to?
A. Yes, it does.
Q. Okay. And what charge -- what offense did you plead guilty to?
A. To defraud the United States by impairing and impeding the functions of the FDIC, an agency and instrumentality of the United States.
Q. Okay. Did you also plead guilty to conspiracy? Does that allege a conspiracy?
A. Yes. Down here at the bottom?
Q. Yes. And who did you conspire with?
A. The bankers.
Q. Okay. And other people?
A. Yes.
Q. Did Mr. Chapman know about it?
A. Yes.
Q. Did Mr. Durham?
A. Yes.
Q. Did Mr. Vinson?
A. Yes.
Q. Who's Mr. Ollis?
A. He's an appraiser.
Q. Okay. Did he appraise the lot loan properties?
A. He did. But I did not conspire with him.

Q. Okay. You didn't see the appraisals?
A. I'm sorry?
Q. You didn't see the appraisals?
A. I didn't read them.
Q. Okay. Did you care what the appraisals said?
A. Not really.
Q. Okay. Thank you. But you pled guilty to conspiring and to misapplying money of the Pisgah Community Bank. Is that correct?
A. That's correct.
Q. Did you know that Pisgah Community Bank couldn't -- Mr. Durham and Mr. Gourlay couldn't legally fund the loans in this way that they proposed?
A. Ask the question again.
Q. Did you know that Mr. Gourlay and Mr. Smith were doing something they shouldn't do with the bank's money?
A. Yes.
Q. Okay. Thank you. Did you have a conversation with Mr. Vinson about that after you went to the bank, the Pisgah Community Bank?
A. All right. In the quid pro quo one?
Q. No. I'm talking about -- back to the lot loans.
A. Back to the lot loans?
Q. Yes.
A. Yes.

Q. What did you tell Mr. Vinson about that part of the loan agreement?
A. That we were going to have -- we couldn't do it the way we wanted to do it using Seven Falls, which is the people that were -- are the organization that was supposed to get the money. We could not use that name because nobody was giving A&D loans to Seven Falls. So there was a way to get around that by doing this individual lot program.
Q. Okay. Let's go back to Exhibit 1323 and ask you -- down at the bottom, how much money did you want from the Community Bank of Rowan and the Pisgah Community Bank?
A. We wanted $2,673,000.
Q. Even if they wanted to, could they give that to one borrower?
MR. FISCHER: Objection.
THE COURT: Sustained.
BY MR. SAVAGE:
Q. Did you have a discussion with Mr. Durham and Mr. Gourlay concerning the bank's lending limits?
A. Yes.
Q. Okay. What did they tell you?
A. That each borrower could borrow $1.1 million.
Q. Okay. Was the amount of money that you were

requesting for the bridge loan, did it exceed that amount?
A. Yes.
Q. Okay. Did you discuss that with Mr. Vinson when you went back to him after you met with Mr. Gourlay and Mr. Durham?
A. Yes. That we couldn't -- I mean that we had to stay within their loan limits.
Q. Okay. Was the $2.5 million you were requesting, and the $2.6 million you eventually got, within those limits?
A. No.
Q. Now, attached to -- going back to Exhibit No. 126. Mr. Chapman, when you were in Africa, sent you an agreement of sorts. Let me show you that. You have seen that before coming here today, have you not?
A. I have.
Q. Okay. And what is the date on it?
A. 14 April.
Q. And going back. This is just before the first of the lot loans.
A. That's correct.
Q. Okay. Now let's go through the various items on here. Your Honor, request permission -- this has previously published, but we request permission to

publish it again.
THE COURT: You may.
MR. SAVAGE: We're going to go through this document. First of all, you didn't write this. You're not the person who typed any of these. Right?
A. That's correct.
Q. But you were the guy who was out there doing things, weren't you?
A. Mm-hmm. ("Yes.")
Q. Is that how it worked between you and Mr. Chapman?
A. It did.
Q. Mr. Chapman -- how would Mr. Chapman get information to type these things if you were out doing things?
A. Well a lot from me, but I'm not the only source.
Q. Okay. Now let's go through these. You're familiar with these transactions?
A. Paragraph one and two is a little bit fuzzy for me.
Q. Okay.
A. I'm not exactly sure what that is.
Q. All right. Well, let me ask you this. Are you familiar with NC Four C's buying a house in Biltmore Park?

A. Yes.
Q. Who did they buy the house for?
A. They bought it for Keith.
Q. Okay. And why did Keith need a house in Biltmore Park?
A. I think he bought that house to sell.
MR. FISCHER: Objection. Objection. Your Honor, he said he thinks.
THE COURT: Sustained.
BY MR. SAVAGE:
Q. Okay. Were you carrying a loan for a house in Biltmore Park on behalf of Mr. Vinson?
A. Ray was.
Q. Who was?
A. Ray.
Q. Ray Chapman was?
A. Yeah.
Q. Okay. And was NC Four C's -- just go ahead -- and all costs associated with this property would warrant or reimbursed by Keith. Now, who is this supposed to be in an agreement with, by and between?
A. Zeus and Keith.
Q. And Seven Falls; right?
A. And Seven Falls.
Q. And this is the first provision. And NC Four C's

was going to receive some sort of payment for that transaction, were they not?
A. That's where I don't know. I don't understand that paragraph.
Q. Okay.
A. I don't remember that we were going to get a payment. I don't remember.
Q. Okay. The next transaction. Who is "Keith" referred to in line number two? In paragraph two, who is "Keith?"
A. In paragraph two?
Q. Yes.
A. Oh. Keith Vinson.
Q. Okay. And who is Craig Gourlay?
A. He is the credit officer at Pisgah community.
Q. Okay. And do you know whether or not Mr. Vinson got a loan at Pisgah Community Bank?
A. I do know he got one, yes.
Q. Okay. And did Zeus get paid money after he got that loan?
A. We did.
Q. Okay. And let's go down to number three. Now, number three, and if you'll look at the top. That didn't happen, did it?
A. No.

Q. Okay. Was it -- was that the original deal that you pitched over at Pisgah?
A. Yes.
Q. And that was rejected.
A. Correct.
Q. Okay. Go through. The loan was actually made in a different way, though, wasn't it?
A. It was.
Q. Okay. And going through this. At closing, Seven Falls would provide for 24 months interest to be provided for funding the funding of the bank for which monthly payments will be drawn. This will be approximately $325,000. Did Seven Falls ever put up the monthly interest payments?
A. They did.
Q. Okay. Well, where did the interest payments really come from?
A. From the loan.
Q. From the lot loans themselves. Right?
A. Right.
Q. But it would have been from whatever proceeds Seven Falls would have received on this.
A. Right.
Q. Okay. And the other one is that at closing, March, April and May invoices for Zeus, including Odin,

Four C's, Buck and Pisgah Partners will be paid. Okay. We know what Zeus is. Who are all those other parties? We talked about Four C's. We know who you are. Who is Pisgah Partners?
A. Pisgah Partners was Keith Vinson, Buck Cashion, Ray Chapman, Lon Pierce and Dr. Ellison.
Q. Did it have money in Seven Falls?
A. No.
Q. Okay. Mr. Vinson owe money to Pisgah Partners?
A. We had monthly payments. He owed a little.
Q. What was Odin? What did Odin do?
A. Odin was Zeus, plus Ken Porter-Shirley.
Q. What did it do?
A. Odin was doing unusual projects like Jatropha in Africa.
Q. Did it also buy an airplane?
A. It did.
Q. Who had the airplane?
A. Keith.
Q. Okay. Did Odin expect to be repaid for the airplane it purchased for Mr. Vinson?
A. Yes.
Q. And then it says, "With respect to the lots, Seven Falls will continue to sell and market these lots as developer inventory." What does that mean?

A. That means we never really took the lots. We just left them in the -- in his inventory to sell it.
Q. Okay. And then is there some other provisions there. Why don't we kind of scroll on down to G. How long were these -- were your partners and you going to hold these lots?
A. Well --
Q. How long did you intend to hold these lots?
A. Two or three months, but two years at the most.
Q. Okay. And what was going to -- what was the source of repayment for those loans?
A. AML funding.
Q. Okay. And then was Zeus going to get paid for this service?
A. For the lot loan service?
Q. Yes.
A. No.
Q. Well, look at number H there. What does it say there?
A. Yeah. That never did happen.
Q. Okay. Well, originally, it didn't happen. But was that supposed to be part of the deal?
A. Yes. It was supposed to be part of the deal.
Q. But it didn't ever happen. Right?
A. No.

Q. Okay. Let's go to the next page of Exhibit 126, paragraph four. "George and Keith will obtain bonding for the subdivision improvements at Seven Falls and this should free up enough cash in A&D to repay the $2 million above and re-purchase the lots that we used as collateral." What bonding are you talking about here?
A. Seven Falls bonding. That is if the developer fails, then this bonding insurance company comes in and gives the money to the county and the county then hires the contractors to finish the project.
Q. Okay. Number five. Number five is talking about that Candler property and the $6.5 million A&D loan. What was Mr. Vinson supposed to do with that?
A. Well, what was supposed to happen is that, I guess with the downturn of the economy, Waightstill Mountain -- Windsor Autrey kind of disappeared. And so now we've got -- that wasn't the deal. So now we've got this amount of money that we had at closing, and we're taking interest carryout and we're not doing the project. Well it doesn't take long and the interest carry eats up the ability to actually finish the project.
Q. Okay. And then there's some, like, writing in bold there. Why is that particularly important? Is this a critical milestone since this impacts Buck, Four C's and Zeus's ability to complete any other financial

transactions?
A. Because our overall credit exposure was too high.
Q. Was that impacting everything else you were doing?
A. Everything.
Q. Okay. Could you get out -- of to these other projects, could you get past this if AML didn't fund?
A. Could we get past the A&D loan of Candler or the lot program?
Q. All -- the whole thing together. If A&D didn't fund and you had the money at the Bank of Asheville, $6.5 to $10 million at NBSC, what was that going to do to your business?
A. It would destroy it.
Q. Was that a concern to you and your partners?
A. Yes.
Q. Finally, we see that Odin would get paid its financing from the aircraft. Is that right?
A. That's correct.
Q. And what about number seven? We skipped that. "Keith has instructed Jason to begin paying the 2.5 percent overrides on closings as they occur." What are the "overrides?"
A. When a -- I'm not real familiar with this.
Q. Well then don't talk about it. If you're not familiar with it, let's just not go there.

A. But I can tell you what it was.
Q. Well, how do you know?
A. I'm just saying that a 2.5 percent override means that if you sold the lot for $100,000, we would get $2,500.
Q. Per loan?
A. Per transaction. Yeah, per lot.
Q. Per transaction. Okay. And your name is on there and Mr. Vinson's name is on this.
A. Right.
Q. Did Mr. Vinson follow through with any of those promises?
A. No.
Q. Even as modified, did he follow through on the promise with respect to the $2.5 million and were those lot loans paid off --
A. No, they were not.
Q. -- in 60 days?
A. They were not.
Q. If we can go back to 1323. Now, looking at those lot loans right after the -- if we can enlarge those. As you can see, the last -- the first batch closes in April. And within a week or so, you're over at the Southern Community Bank and Trust.
A. That's right.

Q. Whose relationship was that over there?
A. There was a guy named Jason Chambers that was very close friends with Andrew Hager.
Q. Okay. And how about BB&T and Old Town?
A. Well Old Town Bank was also a Hager contact, and then BB&T was mine and Ray's contact.
Q. Who's Andrew Hager?
A. Andrew Hager is -- he's a friend of mine. He used to be a banker at Carolina First, then he went to work for Dr. Credit and got fired from there. And then I went and asked Keith if Keith would hire him because he couldn't feed his family, and Keith was gracious enough to hire him.
Q. Okay. Well, let's go back to Mr. Hager. In addition to being his banker -- I mean you invested money in Dr. Credit, did you not?
A. I did.
Q. Okay. How much money did you have in Dr. Credit?
A. Probably $1.5 million.
Q. Okay. And around this time, when you say Mr. Hager couldn't feed his family, he was living in a house that you were paying on, weren't you?
A. That I owned, yeah.
Q. And what was the price of that house?
A. The price of the payment or price of the house?

Q. What was the -- how much was he supposed to pay you a month?
A. I think it was around $4,500.
Q. In rent? $4,000 a month in rent?
A. No. That was the payment.
Q. The payment was $4,000?
A. Yeah.
Q. So he was --
A. My deal with him was he had to make the payment. See, I wanted to sell the house but he wanted to move in because it was such a great thing. But then we helped him make a lot of the payments.
Q. So he was going to make the mortgage payments while he lived there?
A. Yes, because he wanted to buy the house. The goal was for him to buy the house.
Q. How much was the house, approximately?
A. I don't know, 450 or 500. About 450.
Q. But the payments were $4,000 a month?
A. I think they were $4,500, actually.
Q. $4,500. Was he able to make those payments?
A. No. I made a lot of them. But he made -- he didn't really end up owing me money because he took some other debt.
Q. Okay. So he goes over to work at Seven Falls.

Did you have a conversation with Mr. Vinson about having Mr. Hager at Seven Falls?
A. About what?
Q. Did you have a conversation with Mr. Vinson about Mr. Hager working for Seven Falls?
A. I did.
Q. Okay. And what was the -- what was the conversation and the arrangement with Mr. Hager?
A. I said Keith, would you please hire Hager? Because he really needs to feed his family.
Q. Okay.
A. And Keith said I would be glad to.
Q. Okay. And what was Mr. Hager supposed to do for Seven Falls?
A. Well, his job was to -- the only job I know of -- Keith may have given him a hundred jobs, I don't know, but the job I knew is that he was supposed to go and collect money for Seven Falls.
Q. What do you mean "collect money?" Money that people owed to Seven Falls?
A. No. He was -- he was trying to go back and get more investors to Seven Falls to, again, help in any way possible to get to this AML loan.
Q. Okay. Did you discuss with Mr. Hager the arrangement that you had with the Pisgah Community Bank?

A. Yes.
Q. Okay. Did you tell him all the details, including that it wasn't exactly kosher?
A. I probably didn't tell him that.
Q. Okay. Well, Mr. Hager went out to lend the lot loans. What were the purpose of -- what did you tell him the purposes of soliciting these loans were?
A. Oh. For bridge loans for Seven Falls.
Q. Okay. And was he clear about that when he went out to these banks?
A. I doubt it. I mean -- ask the question another way.
Q. Who sent Mr. Hager out to these different banks?
A. He and I were doing it together.
Q. Were you present with him when you talked to these bankers?
A. Sometimes.
Q. Did you explain to these bankers the same thing as you explained to the bankers at Pisgah Community Bank?
A. No.
Q. Okay. Why not?
A. Because they might say no. Keith needed the money. AML was going to fund. Once again, if it had been our money it would have been a good deal. It wasn't our money. It was a bad deal.

Q. Was there some urgency to these loans?
A. Very much so.
Q. Okay. What was the urgency?
A. Well, we're trying to get AML funded. We don't want liens on the property. Keith has payrolls and other vendors that he's trying to do the right thing by. We needed to get money into his coffers so he could pay bills. And some of those bills he paid were ours.
Q. Some of the bills were whose, Zeus'?
A. Zeus and Four C's.
Q. Let's scroll down on the chart. And we're going to get to -- there are additional loans to Pisgah Community Bank for Mr. Konstantinos Rantzos. Who was Mr. Rantzos associated with?
A. You're talking about Gus?
Q. Yes, Gus. Who did Gus have an association with?
A. He was certainly a friend of mine and a friend of Keith's. His son was a friend of mine.
Q. Okay. Did Gus agree to take out loans for the bridge loan?
A. I did not speak to him directly, his son did.
Q. Okay. What did you tell his son, Mr. Paul Rantzos?
A. It was a little bit longer story than that. The bottom line is they needed cash. And this was an

opportunity, I thought, for them, because Keith was willing to pay one percent of their loan amount cash each month, and that would actually -- because ours was accrued. That was actually Paul's idea, and Keith approved it.

Q. Okay. Who is Dion Holdings?

A. That is Paul Rantzos and Nick Dimitris.

Q. And did you -- at that time, did you also have a business relationship with Mr. Dimitris?

A. Yes.

Q. Okay. Did he owe you money?

A. Yes, he did.

Q. Okay. And why did he owe you money?

A. Because I borrowed $750,000 with him to help him finish his Spicewood project, and he got all that in cash.

Q. Okay. Was he able to make his payments to you?

A. Well, not -- he didn't make -- he was making the payments directly to BB&T.

Q. Was he able to make the $5,000 you were charging him for your guarantee?

A. He did for a while. Then he came to me and said since Keith was not paying the one percents, how about, you know, let's make this fair-fair. And I said you're right. Let's not -- I won't -- you don't pay me the five

until Keith starts paying you the one percents.
Q. Did you have any conversations with the people over at Pisgah Community Bank about taking these loans as well?
A. Taking which loans?
Q. Taking the Konstantinos Rantzos and the Dion Holdings loans.
A. I didn't have very much -- those six loans for those six lots. I didn't have a whole lot to do with the who, what, when, where and why.
Q. Okay.
A. All the rest of them I did, but those six I basically made a recommendation and they were -- they knew these people. They knew Pisgah Community Bank and Bank of Asheville and all that.
Q. Okay. You mentioned that Mr. Paul Rantzos and Mr. Vinson had an agreement to pay one percent of the loan amount for the amount of time that they were holding the lots -- the loans. Is that correct?
A. That's right.
Q. Okay. How do you know that?
A. Well, because I helped them structure -- what Paul wanted, he came to me and he said I can't approve this one percent. It's not worth doing. I need to get this one percent per month in cash and so accruing it. The

other people, us and the rest of us, we were accruing that one percent. And Keith had an option to buy back. If he exercised that option, then we would have got our 12 percent per year.
Q. Okay. Mr. Rantzos wanted his money up front.
A. He.
Q. All right. And did Mr. Vinson agree to that?
A. Yes, he did.
Q. So you paid them to take out a loan?
A. Yes, we did.
Q. Okay. Now, how about at the Bank of Asheville? Did you have a relationship there?
A. Yes.
Q. Okay. And what was your relationship at the Bank of Asheville?
A. Keith, back during that -- long ago, for the $2 million, introduced me to Buddy Greenwood.
Q. Okay. Did you have a conversation with Buddy Greenwood about these loans?
A. Yes.
Q. Okay. And who was present when you talked to him, if you remember?
A. Probably just me. I don't remember.
Q. Okay. And what conversation did you have with Buddy Greenwood about taking lot loans?

A. That this was funding for Seven Falls.
Q. Okay. Did you discuss that Seven Falls had a need for funding at that time?
A. Yes. And he was quite aware of it because of the problems in his bank.
Q. Okay. What problems did he have in his bank at this time?
A. Keith had too much money with him, and I had too much money with him.
Q. Okay. And were those loans all being paid?
A. Are you talking about the lot loans?
Q. No. I'm talking about the other loans and other money you had extended at the Bank of Asheville. Was there a concern about you and Mr. Vinson being able to pay your loans at the Bank of Asheville?
A. Sometimes they were being paid.
Q. Okay.
A. It was more that we'd catch up -- Keith would get in some money and then he would catch up some of those loans.
Q. Okay. That $2 million loan was still over there. Right?
A. It was.
Q. Okay. And that had been extended. Was that what you had intended?

A. No.
Q. Okay. Mr. Greenwood. Did he know that these were bridge loans and not lot loans? Did you discuss that with him?
A. I mean, I think so.
Q. Okay. If you --
A. But I don't know.
Q. Did you discuss this funding with Mr. Greenwood and this would be funding for Seven Falls for these lots?
A. I think it's one of those where I may get objected. I don't know.
Q. Okay. Now, with respect to these lot loans, let's go back to -- let's just talk about one of these. We'll talk about yours. I'm going to ask you to go to Exhibit 103A. Before we go back to the Bank of Asheville. Did you meet a young loan officer by the name of Eric Morris?
A. Yes.
Q. Did you tell him these were bridge loans?
A. No. But I wasn't really working with him, Andrew was.
Q. Okay. But you talked to him.
A. Yeah, I did.
Q. On a number of occasions, did you try and hurry him along?
A. Oh, yeah.

Q. Did you tell him in any of those conversations we really need the money for our bridge loan?
A. No.
Q. Did Mr. Vinson -- did you have a conversation with Mr. Vinson about the fact that you were borrowing money on lots at the Bank of Asheville?
A. Yes.
Q. Okay. And incidentally, before we leave that subject, were you present during the closing of the Dion loan at Mr. Peltz's office?
A. I think I was present in all of them.
Q. Okay. Was there an occasion when you were present at a closing and Mr. Vinson was also there?
A. Yes. Usually, he would come in and sign early but sometimes he was there.
Q. Okay. Is there an occasion when you went to one of these lot loan closings and you had an argument with Mr. Vinson?
A. That I did?
Q. Yes.
A. Was it a Monday, a Wednesday or Thursday?
Q. I don't know. Did you have --
A. He was either mad at me or I was mad at him a lot.
Q. Okay. And what was usually the subject of your angst?

A. I don't have any idea. I don't remember that.
Q. Okay. Let me go back to your particular loan. Is this your loan at the bank at the Pisgah -- at the Community Bank of Rowan.
A. Community Bank of Rowan?
Q. Yes. Which would have been the very first of the lot loans.
A. Let me find the lot number and I'll tell you. Oh, lot -- yes.
Q. Okay. And I'm going to go to the loan memorandum which is Government's Exhibit No. 103B.
Your Honor, I think that the Court has already seen this. It's been previously published.
THE COURT: 103B?
MR. SAVAGE: It's admitted. It is a record of the Community Bank of Rowan and/or the Pisgah Community Bank.
THE COURT: Are you seeking for it to be published to the jury?
MR. SAVAGE: Yes, Your Honor.
THE COURT: You may.
BY MR. SAVAGE:
Q. Mr. Cashion, you wouldn't have seen this document. This is an internal document at the bank.
A. Okay.
Q. Let's go through some of the terms. First of all,

it appears that you were going to buy two lots at the -- borrow money for two lots at the Community Bank of Rowan. Is that correct?
A. That's correct.
Q. If we could enlarge the "Purpose" part. Okay. Were you looking to fund the purchase of this residential lot? What was the purpose, true purpose, of the loan?
A. A bridge loan for Seven Falls.
Q. Okay. And let's go down so that would necessarily be -- at least as far as it states it's not completely true. Right?
A. As far as what?
Q. The statement we just saw there. It omits an important fact, does it not?
A. Yes. That it was for Seven Falls.
Q. Okay. The repayment terms. When would you -- when did you tell Mr. Gourlay and Mr. Smith you were going to repay this?
A. With the AML funding.
Q. Okay. And that was going to be when, a matter of weeks or months?
A. I certainly thought so.
Q. Okay. And then the repayment source is there. So the repayment source was going to be AML, not necessarily the sale of the property.

A. That's right. Because the sale of the property isn't going to be worth anything unless you finish the project.

Q. Okay. Thank you. And let's kind of continue down. It talks about the collateral. And if we could keep going down. What was the -- what was the -- you can see where it says "Loan Amount will not exceed $307,000 or the lesser of 75 percent of the cost of the property of the appraised value." Were these 75 percent LTVs?

A. There's a difference between loan to value and appraisal to value.

Q. Okay.

A. These were supposed to be appraisal to value, 75 percent of the appraisal.

Q. Okay. Well that's not what it says in the bank's records, does it?

A. Okay.

Q. Were they going to be, actually, 100% LTV?

A. They were.

Q. Okay. Did you discuss that with the people at the Pisgah Community Bank? Did they think you were putting any money down?

A. No, they didn't.

Q. Now is that different than what you were telling the other banks that we had on our list: Old Town,

Southern Community Bank and those people? Did they think --
A. Well they were all familiar with the 25 percent credit. The problem was their definition of it wasn't necessarily the same as mine.
Q. All right. Did you point out to them that you weren't actually going to bring anyone?
A. I did not.
Q. Now you mentioned to me that -- you mentioned before that you didn't read the appraisals. Right?
A. I didn't read what?
Q. Okay. You've looked at appraisals before, haven't you?
A. Oh, yeah, a little bit.
Q. Okay. Well, I mean, you had been in real estate for a while, and your mother and your wife were in the real estate business. I mean, did you know what an appraisal looked like?
A. Yes.
Q. Okay. Let me go to the appraisal on this one which, I believe, is 103C. Actually, while we're doing that, find that book. I'm going to ask you to look at a demonstrative exhibit that we put together. This is on a different lot. 1325. Okay. Can you see Exhibit No. 1325?

A. Yes, I can.
Q. Okay. Does that -- I mean it's really small, but does that appear to be an appraisal form?
A. Yes, it does.
Q. And it has Seven Falls, Lot 133.
A. Okay.
Q. Is that one of the lots that you purchased over at Southern Community Bank?
A. I believe it is.
Q. Why don't we use this one instead? Will this help you explain your testimony with respect to the appraisal and the terms of the loan at Southern Community Bank?
A. I don't think I understood your question. I'm sorry.
Q. Would this help you -- would this help to explain your testimony with respect to what occurred over at the Southern Community Bank?
A. Sure.
Q. Okay. Your Honor, request permission to publish number 1325.
THE COURT: You may.
BY MR. SAVAGE:
Q. Okay. I'll give the jury a second to look at that. We're not going to go back through all these documents because the jury has seen them all before. But

I'm going to ask you: Lot 133. The value on that, according to -- the part that is on the chart that's larger -- and I'll ask Agent Seres to enlarge the part where the blue box is. There you go. Okay. Now, this -- the subject property here is 133.
A. Okay.
Q. And this is an enlargement of that portion of the form that performs the comparable, the market comparable, isn't it?
A. Mm-hmm. ("Yes.")
Q. You've seen this on appraisal forms before.
A. Right.
Q. Okay. And if you could look there, it says that the sales price of your property was $850,000?
A. Right.
Q. And it's comparing against three other properties: Lot 131, 141 and 142. Were those all part of the Lot Loan Program?
A. Yes, they were.
Q. Okay. Were those what we would call "arm's length transactions?"
A. Absolutely not.
Q. Did you negotiate -- did Mr. Vinson, to your knowledge, negotiate the price of those lots with you or your partners?

A. No.
Q. Okay. How was the price set?
A. I don't know. The only thing I could -- well, I'm not allowed --
Q. If you don't know, you don't know.
A. No, I don't know.
Q. Were these prices -- were these the price that you would have bought the property for -- if you were out on your own and you were looking for a good lot to build a house on, would you have paid these prices?
A. At the end of the development? Probably.
Q. No. I mean on this day in 2008.
A. No.
Q. Did you think that they were worth what they were -- would you have bought those for those prices if you were going out to shop for a lot on your own nickel?
A. On Seven Falls the way it is today?
Q. No. The way it was on 5/2/2008, would you have paid this price if you had negotiated the price?
A. No. On that day I'd have paid $10,000 for it.
Q. Why?
A. Because there wasn't any roads, water, sewer, amenities, golf course, etcetera.
Q. Okay. Now, in each of these, was the same -- did each of these lots -- these comparables, did Mr.- -- did

yourself or Mr. Gabler put any money down?
A. No.
Q. In fact, if you look at the block there where they were, they all had significant sales concessions.
A. Yes, they did.
Q. Including that Zeus was going to get paid on an accrual bases on the back end. Right?
A. Right.
Q. That's not in here, is it? Is that listed at any of the sales or financing?
A. No, not on the appraisal.
Q. If we could highlight the row. We've seen that a lot, and I'm going to move on.
Your Honor, at this point I'm happy to keep going but we're going to take up a whole new subject. I note the hour. I can keep going or --
THE COURT: That's the end of that block of information?
MR. SAVAGE: Yes, Your Honor.
THE COURT: Let's go ahead and take the lunch break here then, since it's a logical stopping point.
Ladies and gentlemen of the jury, we're going to take the lunch break at this time. We are going to resume at 2:00 p.m. so, please, be in the jury room a couple of minutes before 2:00 p.m. Please, remember no

discussions with anyone regarding this case, even among yourselves. As you're gathering back in the jury room at the end of the lunch break, don't talk about this case. Talk about other things. Leave your notes in the jury room. Be aware of your surroundings and anybody who may be talking about this case around you as you leave the building or as you're eating lunch. Please, remember to be in the jury room a couple of minutes before 2 o'clock.

Marshal, please, take the jury out. Please notify the Court when the jury has cleared the building.

(Jury excused at 12:48 p.m.)

THE COURT: Anything we need to address while the jury is out? Or anything that we can address while we have them out, to save us some time? Anything for the government?

MR. SAVAGE: No, Your Honor, not at this point.

MR. FISCHER: No, Your Honor.

THE COURT: Okay. Well, we'll wait to hear that the jury has cleared the building. I don't want anybody from in the courtroom to run into them and make things more uncomfortable. One question I have. Mr. Savage, since you've now distributed copies of, I think, 1328 to the jury, do you need to leave up the timeline?

MR. SAVAGE: No, Your Honor. I'll take it down.

THE COURT: If you could take it down during the

lunch break, because it does block my view of being able to see when the jury has actually cleared the courtroom.

MR. SAVAGE: Yes, Your Honor. I apologize.

THE COURT: Marshal, please, recess us to 2:00 p.m.

(Off the record at 12:57 p.m.)

(On the record at 2:00 p.m.)

THE COURT: Is there anything we need to address before we bring the jury back in?

MR. SAVAGE: No, sir.

MR. FISCHER: No, sir.

THE COURT: Marshal, please, bring us the jury.

(Jury returns at 2:02 p.m.)

THE COURT: Ladies and gentlemen of the jury, good afternoon.

THE JURY: (In Unison) "Good afternoon."

THE COURT: Thank you again for returning on time so that we can start on time. Let me ask, as I have done before, did anything occur during the lunch break that any of you need to bring to the attention of the Court? Seeing that there are none, we will continue.

Mr. Cashion, please, return to the witness stand. You were sworn earlier. You remain under oath until this trial is over.

(Witness resumes the stand at 2:03 p.m.)

THE COURT: Mr. Savage, you may resume your direct examination.

MR. SAVAGE: Thank you.

BY MR. SAVAGE:

Q. I think the members of the jury still have the Exhibit 1328. When we left, Mr. Cashion -- do you have a copy of that document still?

A. Yes, sir.

Q. We were talking about the Lot Loan Program which was the fourth entry on the table. How much did you raise throughout the entire program?

A. About $10,800,000.

Q. Okay. And how much of that went to the seller in this case, Mr. Vinson and Seven Falls?

A. Well, it all goes to him. Then we've got to -- he's got to pay releases. He paid us, but it all goes to him.

Q. What was your understanding of how much -- after the releases were paid -- to whom would the releases be paid to?

A. To NBSC.

Q. Would that pay down the loan?

A. It does pay down the loan.

Q. It was supposed to, anyway?

A. That's right.

Q. Did you understand it was paying down the loan?
A. I did.
Q. And then after that, how much would have been left over for Mr. Vinson to use to bring Seven Falls and pay its contractors until AML could come in?
A. $6 or $7 million.
Q. Okay. Did you think that would be good enough?
A. Yes.
Q. Okay. Before we leave that. You mentioned earlier that Mr. Vinson had agreed to pay certain investors monthly. Do you recall that testimony?
A. In the lot program?
Q. Yes.
A. Yes, sir.
Q. And that included Dion and the Rantzos family. Is that right?
A. That's correct.
Q. Did he honor that promise?
A. Did what?
Q. Did he honor that promise?
A. I think he paid once or twice.
Q. Okay. Did you hear about it -- did you hear when he stopped paying?
A. I did.
Q. Who came to you?

A. Paul and Nick.
Q. And did you go and speak to Mr. Vinson about that?
A. I did.
Q. Okay. And what did you say?
A. Well, we ended up not getting along that day and he called the police.
Q. Okay. Well, what did you -- before he called the police, what did you say to him?
A. Well, that he needed to pay those guys; that that's the reason they invested in the thing is they needed that cash payment.
Q. And what was his response?
A. He didn't have the funds.
Q. Did he say he didn't agree to pay them?
A. No.
Q. Did he say he didn't understand what you were talking about?
A. No.
Q. And after that, were the -- did the payments continue after that?
A. No.
Q. Okay. Now let me draw your attention to another loan. If you look on the chart. On July 23rd 2008, did your friend Ed Worlund take out another loan for Seven

Falls?
A. He did.
Q. At what bank was that at?
A. Pisgah Community Bank.
Q. Okay. And what were the circumstances behind that loan?
A. Well, this was a very positive thing. It looked like the AML just needed to be paid $650,000 and that they were going to issue a final commitment letter.
Q. Okay. And what do you mean it looked like they were going to get paid? That it looked like they were going to pay out?
A. Well, I mean, they were just documents.
Q. Okay. Did you see the documents?
A. I did.
Q. Let me show you what has been marked as Government's Exhibit 607. I believe that may have been published before. Your Honor, request permission to publish to the jury.
THE COURT: You may.
BY MR. SAVAGE:
Q. Mr. Cashion, can you see what's been admitted as Government's Exhibit No. 607?
A. Yes.
Q. Okay. Have you ever seen that before?

A. I don't know that I've seen this specific copy before.
Q. Okay. I understand but.
A. It's very familiar to me.
Q. Okay. And did you ever see anything from AML saying that they would fund?
A. I did.
Q. Okay. You did not?
A. I did.
Q. You did. And what -- were there some fees that had to be paid in order to get that done?
A. Yes, there was.
Q. And what were the fees that had to be paid to get that done?
A. $650,000.
Q. Okay. And how did you know it was $650,000?
A. There was a document that stated that it had to be $650,000.
Q. Okay. Well, let me ask you to go back. we're going to go to page eight. Okay?
A. Okay.
Q. We're going to make that larger so everybody can see it. And I think -- actually, it's the page before. There we go. Now, do you see there that there was -- the borrowers agree upon acceptance to wire transfer the

amount of $550,000 to AML?
A. That's right.
Q. Okay. So where did the 650 come from?
A. In the beginning it was $650,000 on some document. Then, I think, Keith was able to negotiate a $100,000 reduction to that, so it turned out to be $550,000.
Q. Well, did you have a discussion when it was 650, with Mr. Vinson, about where that money was going to come from?
A. Yes, I did.
Q. Okay. And did he come to you?
A. He did.
Q. Okay. And what did he say?
A. He said we're almost ready to get to our funding. I need to be able to send, at that time, $650,000 to AML and which he got changed to 550.
Q. Okay. Well you had just gotten $10 million, of which he should have had five. Did you ask him what happened to the money?
A. Bucket with a hole.
Q. Okay. Well, did you ask him?
A. I did.
Q. Okay. And what did he say?
A. He just had all these things that were going on in his project.

Q. Okay. And this was in July of 2008. Right?
A. Yes, sir.
Q. Okay. Was there another event around that timeframe, another event to promote Seven Falls?
Q. A marketing event.
A. Are you talking, like, the Blues Brothers or Kenny G or whatever. What do you remember?
A. I don't know the dates of which one but, yes, sometime during that timeframe there was a big marketing --
Q. Well, did Seven Falls keep a newsletter that published the dates and the various events?
A. Yes, I think, it did.
Q. Okay. And if you were to see that, would that refresh your recollection?
A. Probably.
Q. Okay. Your Honor, I previously provided this document -- a copy of this document to the defense. If I might approach? And I also have a copy for the Court.
THE COURT: You may.
BY MR. SAVAGE:
Q. Mr. Cashion, if you could look through that document. And I would refer you specifically to page -- the bottom of page 2, beginning of page 3. Just read it to yourself.

A. I guess it was the Kenny G.
Q. Wait a minute. Does that refresh your recollection as to whether there was an event in this timeframe?
A. It does.
Q. And if you would go ahead and put aside the document. Tell us about -- what was the event and about when was it, if you can remember?
A. Well, it was the middle of June and it was the -- Kenny G came and Arnold Palmer came. They were kind of opening up the -- cutting the ribbon, if you will, for the fabulous golf academy thing. He had a great big tent. And I mean, it was --
Q. About how many guests came out to that? How many people were attending that event?
A. Well I'd be guessing, but probably 500.
Q. Okay. Were you there?
A. I was.
Q. And were there expenses associated with that that you could observe?
A. Oh, of course.
Q. Okay. What kind of expenses, things that you'd see that would cost money?
A. Well the tent itself and all the -- I mean lots of alcohol. I mean, it was just set up beautifully in this

great big, huge festive tent. And then I obviously got to pay for Arnold Palmer to come visit and then.
Q. Mr. Palmer didn't come out to see his golf course for free?
A. I don't think he does anything for free. No. I'm pretty sure he got paid.
Q. Okay. Afterwards, was there yet another event at a different location associated with that? Where was the Kenny G concert?
A. Oh. That was in downtown Asheville.
Q. In the theater?
A. In the theater, yes.
Q. And did Mr. Kenny G, did he donate his services?
A. I don't know but I don't think so.
Q. Okay. How many people attended the concert?
A. 300, maybe.
Q. Okay. And did you know where the money was coming to fund these expenses?
A. I did not.
Q. Okay. But after that, in -- looking back on your chart. So it was around July of 2008 when AML needed the downpayment, the $550,000?
A. That's right.
Q. Okay. So, Mr. Vinson didn't have it. He didn't have the money?

A. Correct.
Q. Okay. Well, did you have the money?
A. I did not.
Q. Were you able to borrow anymore money at Pisgah or anywhere else?
A. I wasn't.
Q. Okay. What did you do?
A. Well, we went into the bank and -- well what we were going to try to do is borrow it under Zeus, but Zeus was tapped out. It couldn't -- that particular loan would have taken us over their legal loan limit.
Q. Let me show you what's been marked as Government's Exhibit No. 608. I'll ask you if you recognize that document.
A. I do.
Q. Okay. And was that a record of Zeus, your business?
A. Yes.
Q. Your Honor, this has been previously stipulated and admitted. We request permission to publish it.
THE COURT: You may.
BY MR. SAVAGE:
Q. And I'm going to give the jury just a minute to read that short memo. Okay. Now, first, it's Zeus agrees to lend Keith Vinson $550,000 to be used for the

escrow account. That's what we just talked about; right?
A. Right.
Q. And then Keith agrees to pay Zeus the cost of the loan while it was outstanding. What was the cost of the loan to Zeus?
A. I would say it was probably seven or eight percent.
Q. Okay. What is the $6,500 for the investor? What does that mean?
A. That's the guy that put up his annuity, Robert Dowling.
Q. Okay.
A. And since it was $650,000 that was covering his annuity then we paid him one percent. So, that was $6,500 a month.
Q. Okay. Well, tell us about that. Who is Mr. Dowling?
A. A great guy. He moved -- he was up here from Leicester or -- no. Weaverville, I think, is where he lives. He was introduced to the group by Andrew Hager.
Q. And what was Mr. Dowling's association with Seven Falls at this time?
A. None, I don't think.
Q. Well, what did he have to do with borrowing money then so Seven Falls could get investor funding?

A. Well, what he was doing it for was to get $6,500 a month for his investment.
Q. Okay. And how was he going to do that?
A. He was going to be paid by Keith the $6,500.
Q. Let me show you what's been marked as Government's Exhibit 614.
Your Honor, this is a record of the Pisgah Community Bank. We'd request permission to publish it. It's been previously stipulated and admitted.
THE COURT: You may.
BY MR. SAVAGE:
Q. Do you see Exhibit 614? Can you see that on your screen?
A. Yes, I can.
Q. It say, "Hypothecation Agreement." What does that mean?
A. Well, a hypothecation means that you retain ownership of whatever asset, a lot of an annuity or whatever and you're giving somebody else the right to use that as collateral, but you retain the ownership of it.
Q. And you were going to pay Mr. Dowling for this privilege?
A. That's correct.
Q. $6,500? Who was going to pay him? It wasn't going to be you; it was going to be who?

A. Well it was going to be me but through Keith, yes.
Q. Okay. And then let's go back to Exhibit No. 608 and look at number three. It says, "Keith intends to repay this loan from proceeds of the refinancing of Seven Falls, a new A&D loan." Is that the AML loan?
A. That is.
Q. And if this doesn't work out, where is he going to repay the loan from?
A. From sales at $100,000.
Q. Were lots selling?
A. No.
Q. Okay. And what is the -- once the $1.8 million loan from NC Four C's is repaid, what loan is that?
A. I think that's the same $1.7 million from Bank of Asheville.
Q. Okay. All right. Originally, it had been two?
A. Originally what?
Q. This was yet another loan we're going to talk about. Right?
A. Yes.
Q. Okay.
A. But the 1.8 was what we originally requested, and I think it turned out to be 1.7.
Q. Okay. We're going to talk about that one next. Did this loan go through, according to the agreement you

have here at 608? Did Zeus borrow the money?
A. Yes. No, Zeus did not. Zeus couldn't because we didn't meet their loan limits. And then apparently, Robert was asked to do it. And he didn't want to do it. So Ed Worlund was asked. And Ed Worlund said he'd love to do it and he did.
Q. Okay. Well, who asked him if he wanted to do it?
A. Me.
Q. Okay. So he said I'd love to do that?
A. He did.
Q. All right. Were you going to pay him for that?
A. No.
Q. Okay. If you go to the next one -- I missed one exhibit. If you go to 609, that's the agreement between you and Mr. Dowling isn't it? I'd request permission to publish Exhibit No. 609.
THE COURT: You may.
THE WITNESS: That is correct.
BY MR. SAVAGE:
Q. Let me show you what has been marked as Government's Exhibit No. 618. Your Honor, this is a document of the Pisgah Community Bank and I believe it's been previously published.
THE COURT: Which number?
MR. SAVAGE: 618, Your Honor. 618.

THE COURT: You may.

BY MR. SAVAGE:

Q. Okay. Can you see 618?

A. I can.

Q. Okay. What is this?

A. This loan presentation?

Q. Well this is a promissory note, isn't it?

A. Okay.

Q. I mean it says "promissory note" on it?

A. Yes.

Q. Okay. And whose promissory note is this?

A. To pay Pisgah Community Bank.

Q. Okay. But whose note is it? Who is the borrower?

A. Ed Worlund.

Q. It says Mr. Worlund promises to pay, doesn't it?

A. It does.

Q. Okay. Is it Mr. Worlund who promised to pay? Who promised to pay this loan back?

A. Probably me.

Q. Okay. Well, in fact, was it probably or --

A. Yes.

Q. Okay. Well who did you promise to pay it to? Who did you promise?

A. Who did I promise?

Q. Who did you promise that this loan would be

repaid?
A. I promised Ed.
Q. Okay. Did you also -- did you tell -- did you talk to anyone at the Pisgah Community Bank?
A. About paying this back for Ed?
Q. Yeah.
A. I don't know the answer to that question.
Q. Okay. Well, did you -- how often were you in the Pisgah Community Bank?
A. Very.
Q. How often?
A. Very, very.
Q. Okay. Were you in the bank on a regular basis at this time?
A. I was.
Q. Who would be your contact while you were in the Pisgah Community Bank?
A. Well it would either be Ted, Craig or Dave.
Q. And would you talk to all three or one of those at different times?
A. Yes.
Q. Okay. What were the length -- how long did you intend to have this loan out?
A. No longer than 60 days.
Q. Okay. Did Mr. Worlund have a separate

arrangement with Mr. Worlund? Did Pisgah have -- did Mr. Worlund have a relationship with Pisgah or was it you?
A. I'm the one that had the relationship with Pisgah.
Q. Okay.
A. They knew him quite well because he was with me a lot, but I had the relationship.
Q. How were you going to get the money to repay Mr. Dowling's loan to Pisgah?
A. There's two ways. 1. If AML does not fund, then the $550,000 was going to be returned to Jason Peltz's trust account.
Q. Okay.
A. The second way was to have it refunded when the AML loan closed.
Q. Okay. And who do you think the -- let me show you what's been marked as Government's Exhibit 634. I'll ask you, is that a letter you received from the Pisgah Community Bank in October of 2009?
A. Okay.
Q. Is it? Is that what it is?
A. Can you make that a little bit larger? I'm having trouble reading that. What did you ask me then?
Q. Is that a letter you received from the Pisgah Community Bank?

A. Yes, it is.
Q. On October 2nd 2009?
A. Yes, it is.
Q. Your Honor, this is a record of the Pisgah Community Bank. It's stipulated and admitted as Exhibit 634. We would request permission to publish it.
THE COURT: You may.
BY MR. SAVAGE:
Q. Now, what is the subject of this letter? Let's scroll up so that you and the jury will have a chance to review it.
A. Well the subject is they wanted us to move two loans from the bank --
Q. Okay.
A. -- because they had too much concentration in Seven Falls.
Q. Okay. Look at the second paragraph there. What loan did they want you to move?
A. The 650 for Ed Worlund, and Joan's 850.
Q. Okay. Your wife took out a loan there also?
A. She did.
Q. Okay. What happened to that loan? Where did that go, that 850?
A. Well, 400 of it was a loan that was given to Keith in October of 2008.

Q. Okay.
A. And then we got a deal from NBSC that they would release the three Founders' lots that we had with NBSC for -- I think from a $1.2 million down to $500,000 --
Q. Okay.
A. -- which means that -- and so we used that to secure the $400,000, and they would only give us 850. So we had to take 500. So that would make the 850. But we had to bring to the table the closing cost, plus $50,000 -- about $62,000.
Q. So that went, basically, to Seven Falls, pretty much.
A. Yes.
Q. Okay. Now read the last sentence of that second paragraph.
A. Read the -- say that again.
Q. The last sentence of that second paragraph beginning, "We are experiencing."
A. "These are the first two of the multiple loans with both of you. We are experiencing intense regulatory scrutiny and need immediate relief."
Q. Did you have a conversation with Mr. Durham about intense regulatory scrutiny?
A. Well, not until I got the letter.
Q. Well, after you got the letter did you have one?

A. Yes. Yes, we did.
Q. What was the intense regulatory scrutiny?
A. I guess they had some kind of inspection.
MR. FISCHER: Objection.
MR. SAVAGE: Don't guess.
THE COURT: Sustained.
BY MR. SAVAGE:
Q. Do you know?
A. They had an inspection.
Q. How do you know?
A. They used me.
Q. You use a word "guess" a lot. Are you guessing, or is that a turn of phrase?
A. That is a phrase I use all the time. It would be like changing my vocabulary.
Q. If you could refrain from that --
A. I'll try.
Q. -- it would speed things up immensely.
A. I'll try.
Q. Let's go back to Government's Exhibit -- well, let's just finish with this. Did the AML loan come through as you had hoped in the summer of 2008?
A. It did not.
Q. Okay. Did you get the $550,000 back?
A. No.

Q. Okay. What happened to the $550,000 if the loan didn't go through? Do you know?
A. I don't know.
Q. Did you talk to Mr. Vinson about that?
A. I did.
Q. Did you ask him what happened to the $550,000 that went for the AML loan that never happened?
A. He said he didn't get it back.
Q. Now with respect to this loan we talked about, this being a Zeus loan. They sent you a letter. They didn't send Ed Worlund a letter, did they?
A. No.
Q. Okay. Why did you get the letter from the Pisgah Community Bank?
A. Because Ray and I were the main points of contact with the bank.
Q. Okay.
A. I mean I was in there every day. So, I mean --
Q. Whose loan was it?
A. Ed Worlund's.
Q. Okay. Whose loan was it?
A. Probably mine --
MR. FISCHER: Objection. Asked and answered.
THE WITNESS: -- as it turned out.
THE COURT: Wait a minute. Wait a minute.

There's an objection that's been made. When you hear the word "objection," that's your cue to stop talking.

THE WITNESS: I'm sorry.

THE COURT: Basis of your objection?

MR. FISCHER: Asked and answered, Your Honor.

THE COURT: Sustained.

BY MR. SAVAGE:

Q. Did you talk to Mr. Vinson about repaying the Ed Worlund loan?

A. Yes.

Q. Okay. Why did you talk to Mr. Vinson about repaying the Ed Worlund loan?

A. Because it needed to be paid back and the money went to Seven Falls.

Q. Why was that Mr. Vinson's problem if it was Ed Worlund's loan?

A. Because the benefit went to Seven Falls, and he was supposed to pay it back.

Q. Okay. Well let me go back to Exhibit No. 608 which we've previously seen. Is this the same loan that was made to Ed Worlund?

A. Yes, it was.

Q. What did Mr. Vinson agree to do with respect to this loan?

A. Pay it back.

Q. Okay. Did it make any difference whether it was in Zeus' name or Ed Worlund's name?
A. No.
Q. Was it the same loan?
A. No.
Q. Thank you. Now, once that happened, was that it? Was that all the money that Mr. Vinson needed?
A. No, it wasn't.
Q. Okay. Going back to the chart, which is Government's Exhibit No. 1328. Okay. We're having trouble retrieving that electronically, so I'd ask you to refer to the copy. The next entry after the Ed Worlund loan is what?
A. "Plastics plant."
Q. Okay. And what's the date on that transaction?
A. What was -- say that again.
Q. What is the date on the plastics plant transaction?
A. On the 18th of August 2008.
Q. Okay. And who was that loan with?
A. That loan was Bank of Asheville.
Q. Okay. Did you have any conversations with Mr. Vinson before this loan was requested?
A. Yeah. There was a need for some money a little bit quicker. We weren't sure when this loan was going to

close because of appraisals and so on. And so what we did was we borrowed from some investors, paid them a ten percent return, and then we were going to pay those investors back when this loan closed.
Q. Okay. Let me show you what's been marked as Government's Exhibit No. 200. Now if you look at this, this is a document that you signed on behalf of NC Four C's. Right?
A. Yes.
Q. Who would have written this document?
A. Ray.
Q. Okay. And was this the same kind of arrangement that you had with Mr. Chapman on all the other loans or agreements he wrote?
A. Yes.
Q. Okay. And the date is what?
A. The 6th of August.
Q. Okay. Is this about the time of the plastics plant loan?
A. It's just before it.
Q. Okay. And is this -- was this a record of your company, NC Four C's, LLC?
A. A record?
Q. Yeah. Is this a record of your company? Is this like one of your business records?

A. Yes.
Q. Okay. Your Honor, this has been previously stipulated and admitted as Government's Exhibit No. 200. We would like permission to publish it.
THE COURT: You may.
BY MR. SAVAGE:
Q. And what is -- in the first paragraph it talks about a loan in the amount of $1,800- -- or $1.8 million, I'm sorry, from the Bank of Asheville. And it was going to be between Seven Falls and NC Four C's for a period of 90 days. First of all, what led up to that? What conversations did you have with Mr. Vinson about that before this date?
A. Well, he needed more money to get to the AML funding.
Q. Okay.
A. Okay?
Q. Well let me ask you this.
A. Okay.
Q. You'd already given up $10 million?
A. Right.
Q. You should have had five?
A. Right.
Q. You gave him another $650,000 from the Ed Worlund loan. Where was the money going?

A. I don't know.
Q. Did you ask him?
A. I asked him, but he just said he had to pay bills.
Q. Well you'd already asked him several times and he keeps on wanting more money. Why do you keep borrowing more money to give to Mr. Vinson?
A. To get to the AML loan.
Q. Why?
A. Because the AML brings -- we won't be sitting in here -- I still may have done some things wrong, but everybody would have been taken care of: Friends, family, property owners.
Q. You?
A. Me.
Q. Okay. And did you go along with this request?
A. Yes, I did.
Q. Okay. And who did you talk to over at the Bank of Asheville about this?
A. Buddy Greenwood.
Q. Okay. And was Mr. Vinson present when you talked to Mr. Greenwood, if you recall?
A. I don't recall.
Q. Okay. What did you talk to Mr. Greenwood about?
A. About getting this loan, this $1.7 million loan, to help with things going on at Seven Falls.

Q. Well you had significant loans over there, did you not?
A. I did.
Q. Okay. How much had you already borrowed over at the Bank of Asheville?
A. I still had that original $2 million.
Q. Okay.
A. And I think I had another -- some other loan in there.
Q. The Dr. Credit loan?
A. The Dr. Credit loan.
Q. Okay. Did you also have a lot loan over there?
A. I didn't have a lot loan.
Q. How about your company, NC Four C's? Had it borrowed money over there?
A. NC Four C's on its own? I don't think so.
Q. How about Zeus? Zeus was the $2 million?
A. Well that was really in my name but it was carried in Four C's. You're talking about the $2 million?
Q. Okay. Were you a guarantor on those loans that Zeus had taken out?
A. A guarantor on which loan?
Q. On the $2 million loan.
A. I was.
Q. Okay. Were you a guarantor on the Dr. Credit

loan?
A. I was.
Q. Okay. Was the Bank of Asheville considering that an aggregation for the purposes of determining its loan limit?
A. Yes, it was.
Q. And did that become a problem when you wanted to borrow another $1.8 million?
A. Yes, it did.
Q. Okay. And what was your conversation with Mr. Greenwood? Was he happy to lend more money to Seven Falls?
A. Well, I got the impression --
MR. FISCHER: Objection.
THE COURT: Sustained.
BY MR. SAVAGE:
Q. Did you talk to Mr. Greenwood about it?
A. I did.
Q. Okay. Did Mr. Greenwood -- was Mr. Greenwood enthusiastic about lending more money to Seven Falls?
A. I don't know about "enthusiastic," but he felt he need to do it, and he was willing to do it.
Q. Okay. What was the need?
A. Seven Falls needed funding.
Q. Okay. Did you tell him Seven Falls needed

funding?
A. I did.
Q. Was Seven Falls a significant consideration for the Bank of Asheville, if you know?
A. Yes, it was.
Q. And how do you know it was?
A. Actually, Buddy told me.
Q. Okay. What did he tell you?
A. I don't remember the specifics.
Q. Okay. What do you recall? To the best of your recollection, what did Mr. Greenwood tell you?
A. In regards to the need for more money at Seven Falls or that Seven Falls was tapped out?
Q. Either one. Well, first, take them one at a time. Did he say Seven Falls was tapped out?
A. He did.
Q. Okay. What do you mean by "tapped out?"
A. It means that you can't -- because you have loan limits in the bank, too many eggs -- you don't want all your eggs in one basket. You can only loan so much money to a specific person or entity.
Q. Okay.
A. And he couldn't loan any more money to Seven Falls, according to him.
Q. Okay. And let's talk about -- did you have a

conversation about Seven Falls needing more money?
A. Yes, we did.
Q. Okay. Can you tell the jury about that?
A. Well that was what brought up this $1.7 million. I went in and told him that there was a need for more money at Seven Falls.
Q. Were the vendors being paid at that time?
A. A lot of them were not.
Q. Okay. And how do you know that?
A. Well, a lot of it came from Keith.
Q. Mr. Vinson told you. Who --
A. Well, I mean, I, at least, heard in conversations. I don't know that Mr. Vinson just came right out and told me but, certainly, I was involved with conversations that I knew that was a problem.
Q. All right. Are you familiar with a company called Taylor and Murphy?
A. Very.
Q. Who's Taylor and Murphy?
A. Well, that's a big construction company. Bill Newman was the president and that's who I knew.
Q. Okay. And Mr.- -- did you learn whether or not Taylor and Murphy was owed money by Seven Falls?
A. I did.
Q. Okay. How much were they owed?

MR. FISCHER: Objection. Without a time period, Your Honor.

THE COURT: Sustained.

BY MR. SAVAGE:

Q. Okay. And what time period are we talking about here, Mr. Cashion?

A. We're talking about the summer in 2008.

Q. August of 2008?

A. Probably July, August of 2008.

Q. Okay. And what did -- did you understand -- how much did Seven Falls owe to Taylor and Murphy?

A. The only way I would have found that out was if Bill Newman would have told me.

MR. FISCHER: Objection, then. Hearsay.

THE COURT: Sustained.

MR. SAVAGE: Without saying what Mr. Newman said, do you know how much they owed him?

MR. FISCHER: Objection. Hearsay. That's the only way he could have known.

THE COURT: Sustained.

MR. SAVAGE: Your Honor, it's not offered for the truth of the matter asserted. It's offered to show what the witness did after that.

THE COURT: You can ask him about what he did in response, but you can't ask him what he learned by way

of.

MR. SAVAGE: Yes, Your Honor.

BY MR. SAVAGE:

Q. What did you do with the information that you received from Mr. Newman?

A. I talked to Keith.

Q. What did you talk to Keith about?

A. Well it wasn't so much about Taylor and Murphy. It was that, here's Taylor and Murphy owed money; Landscapes Unlimited owed money. You know, we've got to get to this AML funding.

Q. If Taylor and Murphy was not paid, what recourse would they have had if you know?

A. They could have put a lien on the property.

Q. If that had occurred, what would have happened to your hope for the AML funds?

A. It would have been reduced significantly.

Q. To your knowledge, was Seven Falls able to make its payroll at this time?

A. It continued to make it but it needed help each time.

Q. Okay. How do you know that?

A. Because I was the help a lot.

Q. Who asked you to help Seven Falls make its payroll?

A. Keith.
Q. Okay. Did you relay this information to Mr. Greenwood at the Bank of Asheville?
A. I do not remember.
Q. Okay. What was the need that you told the Bank of Asheville? According to what did Seven Falls need? What did you tell Mr. Greenwood that Seven Falls' need was?
A. I'm pretty sure what I was talking about was operations money.
Q. Okay. What do you mean by "operations money?"
A. To pay your vendors.
Q. And the vendors were who?
A. Well they were the people that were building the golf course.
Q. Okay.
A. I mean truck drivers that were moving dirt.
Q. Was Taylor and Murphy a vendor?
A. Yes.
Q. Thank you. Did you talk to Mr. Greenwood about -- what did you talk to Mr. Greenwood about?
A. I did not talk to him about Taylor and Murphy, if that's what you're asking.
Q. Well, what did you talk to him about?
A. I told him that we needed more money for Seven Falls' operations.

Q. Was the bank able to lend more money to Seven Falls?
A. According to him, no.
Q. Okay. What was -- did you have another plan?
A. Yes.
Q. What was the plan?
A. That we would borrow the money and give it to Keith.
Q. Who was "we?"
A. That was going to be Four C's, but then it was going to be me and Ray.
Q. Okay. And why wasn't Four C's and you and Ray agreeable to the Bank of Asheville?
A. Because I was at my limit.
Q. Okay. Whose limit?
A. The Bank of Asheville's limit.
Q. So then what happened?
A. Then I asked my wife if she would sign.
Q. Was that acceptable to the Bank of Asheville?
A. Yes, it was.
Q. Okay. Did you have any conversations with Mr. Keith Vinson about that arrangement?
A. That Joan sign?
Q. That there was going to be a loan to Joan and Mr. Chapman to pay Seven Falls' bills?

A. Oh, yes.
Q. Thank you. And what was that conversation about?
A. He needed more money. He's getting very close to his AML funding, and he was willing to hypothecate the plastics plant.
Q. Okay. And what does "hypothecate" mean again?
A. "Hypothecate" means that Keith would continue to own the property, but it would act as collateral for that $1.7 million loan.
Q. Okay. And what was the "plastics plant?"
A. Well it used to be a plastics plant, but it was 20, 30, 40 acres, and it's this big huge building.
Q. Okay. Let me stop you there. Let me show you Exhibit 1 again. This has been previously published, Your Honor. Can you indicate just by showing us -- if you touch that, it will make a mark. Where -- is the plastics plant anywhere on this -- where this map would be?
A. It is. I'm going to be guessing a little bit, but I think it's in this area right here. (Indicating.)
Q. Okay. That has -- all that area there that has the town homes or the buildings that are on it, was that actually constructed at that time? Was that there?
A. Where the village is?
Q. Yeah.

A. No.
Q. Was the village there?
A. No.
Q. What was there?
A. Well, what was there at that point is they were bringing in lots and lots and lots of dirt to lay it out so that the village could be built.
Q. Okay. Now, what was on that land before it became part of Seven Falls?
A. It was a dairy farm.
Q. Okay. And how did the plastics plant get involved in that?
A. Well, he bought both the plastics plant and the dairy.
Q. Okay. Was the plastics plant a parcel adjoining the dairy?
A. I don't think so. It was adjoined to it, but I don't think it was owned by the same people.
Q. Exactly. Okay. Exactly. Okay. Tell us about the plastics plant. What was he was pledging, Mr. Vinson, to the Bank of Asheville in 2008, associated with this development?
A. I believe that it was 18 to 20 acres --
Q. Okay.
A. -- and the building.

Q. Okay. And had you been in that building before?
A. Many times.
Q. Can you describe the building?
A. Well, it had a pond out front, a nice pond out front. You walked into the building, and in the building it had offices, office space. And then you kind of walk out the back of the offices and you come into this great big, huge warehouse.
Q. Okay. And was the warehouse used by Seven Falls for any function?
A. It was used by the maintenance people.
Q. And did Mr. Vinson, at one time, have an office in the plastics plant?
A. He did. There is an office section and he did have an office there.
Q. Okay. And was there a boardroom in there?
A. A boardroom?
Q. Yeah. Was there, like, a conference room in there?
A. There was a conference room, yes.
Q. Did Mr. Hager work in the conference room?
A. He did.
Q. And this land was pledged to the Bank of Asheville. If we could go back to Exhibit 200. What agreement did you have with Mr. Vinson as to how that

loan would be taken out and repaid?
A. Well, the loan was going to be taken out once again by the AML funding.
Q. Okay. Now, number two. Meanwhile, Seven Falls had made agreements with NC Four C's. In paragraph two, what did they agree to do?
A. Let's see. Seven Falls will pay NC Four C's a one-time fee of $200,000 for the 90-day duration of this loan.
Q. What happens if it isn't paid within 90 days?
A. Then Seven Falls will pay NC Four C's the interest for the Bank of Asheville and two percent per month for the remaining amount of the loan until the loan is repaid.
Q. Now, while this loan was in the works was there an even more immediate need for money than this was going to provide?
A. There was. I mean, he needed -- the problem with this particular loan is we didn't really know when it was going to close, and he needed money prior to that. So, NC Four C's went out and borrowed money from people that we knew and give them a ten percent return, and we got paid by Keith. I don't know how much, but we got paid by Keith to do that. And then those investors were to be paid out with this loan.

Q. Okay. And let me show you what's been marked as Government's Exhibit 214. And that's not a document you created, is it?
A. It's certainly not one I created, no.
Q. Do you recognize the names and information on that document?
A. I do.
Q. Your Honor, this is a stipulated record of the -- I believe it's a stipulated record of Mr. Gabler and it's been previously admitted. We request permission to publish it.
THE COURT: You may.
BY MR. SAVAGE:
Q. If we could enlarge the top part. Now, who were the investors in this?
A. These were all people that we knew.
Q. Okay. And who asked these people for money?
A. George did some and I did.
Q. Okay. And when it says "Total Investment," what does that mean that column?
A. Well the total means that we -- if they gave us a hundred, we'd give them 110.
Q. Okay. And so they're already at 100, The return was 100, and you owed them 110. How long were you going to keep that up?

A. 30 to 60 days.
Q. The next column says, "Paid with $500K." What is $500,000 does that refer to?
A. What is that $500,000.
Q. What is that $500,000, if you know?
A. I don't think I know.
Q. What's the "Must Pay" and "Work With Us" columns? Are you familiar with those?
A. I'm familiar with them, yes.
Q. Pardon me?
A. I know what those two mean.
Q. Okay. What do they mean?
A. Well, some of them people just absolutely had to be paid back. Other ones were going to work with us.
Q. Okay. If you go down that list, who's Mr. Redfearn?
A. Harry Redfearn. He was the sales and marketing person for Seven Falls.
Q. Who was Jamie Babb?
A. Jamie Babb worked for Jason Peltz.
Q. Was she a lawyer or paralegal?
A. Paralegal.
Q. The Peltz Law Firm threw in $50,000. Right?
A. They did.
Q. Zeus threw in another 150. Where did that come

from?
A. We just had money. I don't know.
Q. Okay. Let's go down: George Gabler, Kenneth Porter-Shirley. And if we could scroll down the list. Bill Newman? He is with Taylor and Murphy?
A. Yes, he was.
Q. Okay. George Gabler, again, another $15,000. The total amount of money that you borrowed from these people was how much?
A. I guess $1,731,000.
Q. Okay. And how much did you owe them?
A. $1,904,000.
Q. Okay. Did you talk to Mr. Vinson about the fact that you had borrowed money from all these people for his company?
A. Oh, of course.
Q. Okay. Well, what did he say?
A. Thank you.
Q. Okay. What did he say he -- well, did he say he was going to pay them back?
A. Yes, he did.
Q. Okay. Did he say how he was going to pay them back?
A. He knew we were going to pay a bunch of them back by that $1,700,000.

Q. Let me show you what's been marked as Government's Exhibit 1318. That's a chart. I'm going to ask you if -- first of all, did I ask you to look at that before coming here to court today?
A. Yes, I have.
Q. And there are a number of voluminous documents that tie to this. Would this help you explain what had happened --
A. It will.
Q. -- with the money from the plastics plant?
Your Honor, at this time we would move to publish Government's Exhibit No. 1318.
THE COURT: You may.
BY MR. SAVAGE:
Q. We're going to switch back and forth between this and the documents. If we could put up 1318 first. So this loan did in fact close, did it not?
A. It did.
Q. Okay, and if we look at the first pink box on the top there -- or the whole thing there. It closed. And it was closed by who? Who closed this loan?
A. The Bank of Asheville and Jason Peltz.
Q. The same people who were going to get repaid from the loan?
A. Yes.

Q. Okay. And that was -- let's go to Exhibit No. 221. That's a wire transfer, so it would show that the money in fact went to the -- it's hard to see that but -- let's go to Exhibit No. 201 first.
Okay. And you're familiar with HUDs; right?
A. I am.
Q. Is this the closing statement for this loan?
A. I'm pretty sure it is. Can you make it go up a little bit?
Q. Okay.
A. Yes, it is.
Q. Okay. And who are the borrowers on this transaction?
A. They are -- well the actual borrower was Four C's, but then that was done with Ray Chapman and my wife Joan.
Q. Okay. Why didn't Ray just do it himself?
A. I don't think he qualified, according to Buddy.
Q. Okay. Well, now, let's talk about you and your wife. Did you have joint financial statement?
A. We did.
Q. Okay. Did she have money that was her own and apart from you? Did she have money in a different place than you had money? Did you share your money?
A. We do share our money, yeah.
Q. Okay. Was it the same financial statement? Do

both of you rely on each other for the financial statement? Are you one person when it comes to that?
A. That's an interesting question. I'm not sure I know how to answer that question.
Q. Okay. Did you have a joint financial statement?
A. We did.
Q. How much was she earning outside of the -- outside of NC Four C's at that time?
A. Quite a bit. Two, three, $400,000 a year.
Q. Were you also depending on that income as well?
A. Income from her?
Q. Yes.
A. Yeah.
Q. Were you sharing that income?
A. Yes.
Q. Did she share your income?
A. Yes.
Q. Okay. Did you share the same house?
A. Yes.
Q. Thank you.
All right. Let's go down and look at the settlement charges to the borrower. They were how much? $415,000, is that right? At the end of the loan, how much did you net after all those expenses?
A. About $1,250,000.

Q. Okay. Were you short?
A. We were short.
Q. Okay. And let's go and look at the disbursements for those and see where that money went. And if we could make that larger. You had to pay the tax man. There was a payment of $344,000 in the Bank of Asheville. What was that for?
A. That was, in the commitment letter, required to go back to the bank. It was put into three accounts.
Q. Okay. For what?
A. I think for overdrafts.
Q. Okay. Whose overdrafts?
A. Keith's.
Q. Okay. And excess cash to close. $1.2 million went to your wife Joan. Right?
A. Went to Four C's, yes.
Q. Went to Four C's. And then let's look at this -- that went to the Peltz Law Firm before it went to your wife. Right?
A. Correct.
Q. Okay. And then that was disbursed from the Peltz Law Firm. And if we could look at Exhibit No. 201. Well, actually, we're going to have to go to Exhibit -- let's look at some of these individual ones. Let's go to Exhibit 232. Whose account is that?

A. Waightstill Mountain.
Q. Okay.
A. I am assuming that that is --
Q. Well, don't assume.
MR. FISCHER: Objection.
THE WITNESS: -- Keith's account.
MR. SAVAGE: Your Honor, this is a record.
MR. FISCHER: Objection. Motion to strike, Your Honor.
THE COURT: Sustained. Ladies and gentlemen of the jury, you will disregard that last answer that was given.
BY MR. SAVAGE:
Q. Okay. Well, let me back up. Who is Waightstill Mountain?
A. I'm afraid to answer. Keith.
Q. Okay. And how do you know that?
A. We've done transactions with him and even done projects with him, and Waightstill Mountain has been what he's used.
Q. Okay. Has he written you checks and signed checks on Waightstill Mountain?
A. Probably.
Q. What do you mean "probably?" Did you not get a check?

A. I don't know. I'm sure he did but I don't know.
Q. Okay. Do you know of anybody else associated with Waightstill Mountain other than Keith Vinson?
A. No.
Q. Okay. Your Honor, at this time we would move to admit -- it's already been actually stipulated and admitted -- Government's Exhibit No. 232 and publish it to the jury.
THE COURT: You may.
BY MR. SAVAGE:
Q. And if we could -- before we go further, let me show you what's Government's Exhibit 226. Okay? And do you recognize the type of document that that is?
A. Yes.
Q. What kind of a document is that?
A. It's a banking resolution. It's a Limited Liability Company.
Q. Signature card?
A. I'm sorry?
Q. It's a Signature Card?
A. Okay.
Q. Is it? Let's go down and --
A. You're going to have to move it more then for me to see. Yeah I think that is a Signature Card.
Q. Okay. Your Honor, this is a record of the Bank of

Asheville. We move to publish. It's previously been stipulated and admitted as Government's Exhibit No. 226.

THE COURT: You may.

BY MR. SAVAGE:

Q. Who's the account holder on that account?

A. Waightstill Mountain, LLC.

Q. And who is the authorized manager of Waightstill Mountain, LLC according to this record of the Bank of Asheville?

A. Keith Vinson.

Q. Do you see any other name on there?

A. No.

Q. Okay. Let's go all the way down to the bottom. Is that signed on behalf of Waightstill Mountain?

A. Yes.

Q. Do you recognize that signature?

A. Oh, yes.

Q. Okay. How do you recognize that signature?

A. I've seen it a thousand times.

Q. Okay. Whose signature is that?

A. That's Keith's signature.

Q. Okay. Thank you. And who is he signing on behalf of there?

A. As the manager of Waightstill.

Q. Okay. So when we go to the Waightstill Mountain

account at the Bank of Asheville, account 9463, is there anyone else who could have received that money except for Keith Vinson on behalf of Waightstill Mountain?

A. No.

Q. Thank you. If we could go to Exhibit 223. Your Honor, this is a record of the Bank of Asheville and we ask to publish it.

THE COURT: You may.

BY MR. SAVAGE:

Q. And we'll wait for that to come up. Okay. And can you see Exhibit 223 on your screen? I know it's not the best copy.

A. I can see it, yes.

Q. And is that a check from the Peltz Law Firm?

A. Yes, it is.

Q. Okay. And what is the -- if you can see it, what is the date on that check?

A. August 18th.

Q. Okay.

A. 2008.

Q. Is that about the same time as the loan we've just been talking about?

A. The exact date.

Q. And in fact, if we go back to exhibit -- just to make this a little shorter, let's see if we can go back

to Exhibit 1318. Okay. Did you know how the Peltz Law Firm was going to trace all this out at the time, how they were going to spend all this money?
A. I knew that in the commitment letter that money was going back to Bank of Asheville.
Q. Okay. Well let's go and look at which accounts were paid on that. We can go through the blocks on the bottom. Starting with -- we just talked about the Waightstill Mountain. That was $39,000; is that right?
A. Correct.
Q. Okay. Then there's a second account there, a Bank of Asheville account, number 1646.
A. Okay.
Q. Do you know whose account that was?
A. It says "KV account," so I'm sure it's Keith Vinson.
Q. Let's go to Exhibit 222 and look at that. Your Honor, request permission to publish Exhibit 222.
THE COURT: You may.
BY MR. SAVAGE:
Q. Okay. And if we can make that larger. That's -- that deposit has a number on it. You can see it handwritten there. Right? Account number 16- -- ending in 1646?
A. Yes.

Q. Okay. Thank you. And let's go to the -- if we could go to Exhibit 229. I'll ask you if you recognize the kind of document that that is.
A. Some kind of signature document.
Q. Okay. And without spending too much time on that, does that also purport to be a Keith Vinson account?
A. Yes.
Q. Let's go to exhibit -- going back to the chart 1318. Approximately $10,000 went into that account?
A. Yes.
Q. Okay. Then the next one is Bank of Asheville Vinson account 3042. That gets $344,718.96. If we could go to Exhibit 224. And I'll ask you if you could -- Your Honor, can we publish Exhibit 224?
THE COURT: You may.
BY MR. SAVAGE:
Q. Okay. Is that another check from the Peltz Law Firm on the same date?
A. It is.
Q. In the amount of $344,718?
A. Yes.
Q. Can you see the last four digits of the account written on that?
A. 3042.
Q. And if we could go to Exhibit 228. And if we can

enlarge that. Request permission to publish Exhibit 228, Your Honor. It's a record of the Bank of Asheville.

THE COURT: You may.

BY MR. SAVAGE:

Q. Who are the signatories on account 3042?

A. Keith and Paula.

Q. Thank you. Let's go back to Exhibit 1318. Do you see the block at the bottom? Do you know anything about those particular loans at the Bank of Asheville for Mr. Vinson?

A. I do not.

Q. Okay. Did Mr.- -- did you have any conversations with Mr. Greenwood about what the -- some of the proceeds of this loan would be used for?

A. I don't think I talked about what he was going to use. I just knew that he had to use them for Keith.

Q. You didn't know specifically what they were going to go to.

A. No.

Q. Let's go back to the larger chart, then. You're familiar with NC Four C's. Correct?

A. I am.

Q. This is NC Four C's is the big block. It got $1.2 million excess cash to close.

A. That's right.

Q. It went into account 6088 at Mountain 1st Bank.
A. Yes.
Q. Where did NC Four C's have its bank account?
A. Mountain 1st.
Q. Do you see the summary of bank balances that were in that account? There was $3,000 on there on the 15th. Right?
A. Yes.
Q. Okay. And then afterwards this was a substantial amount of the balance in that account, was it not?
A. Yes.
Q. Okay. What did you do with that money?
A. Paid investors.
Q. Okay. Let's go back to that previous exhibit, 214, the investor list which has been previously published. So you had $1.2 million. You're about $400,000 or better short, weren't you?
A. Yes.
Q. Well, what -- where was that money going to come from?
A. Keith.
Q. Okay. Well did you talk to Mr. Vinson about being short?
A. Yes.
Q. What did he say?

A. He wrote me a check.
Q. What account did he write you a check on?
A. I guess -- I think it was out of the Bank of Asheville.
Q. Are you guessing?
A. I am guessing.
MR. FISCHER: Move to strike, Your Honor.
THE COURT: Allowed.
MR. SAVAGE: Let me show you --
THE COURT: Wait a minute. Ladies and gentlemen of the jury, you shall disregard that last answer. Any guesses are not evidence. Therefore, they cannot be regarded by you as evidence in your deliberations.
MR. SAVAGE: Thank, Your Honor.
THE COURT: You may continue.
BY MR. SAVAGE:
Q. Your Honor, let's go to Exhibit -- if we can refer the witness to Exhibit 301. Okay. Can you see that document, Mr. Cashion?
A. A little bit -- yeah, that's better.
Q. You can see it now?
A. Yes.
Q. Does this refresh your recollection on whether or not you received a check from Mr. Vinson?
A. Yes.

Q. Okay. Your Honor, this is a record of the Bank of Asheville and it's been previously stipulated and admitted. We request permission to publish it.

THE COURT: You may.

BY MR. SAVAGE:

Q. And this $400,000 check, it is dated what date?

A. 8/18.

Q. Is that the same day as the plastics plant loan funded?

A. It is.

Q. Okay. Let me show you what's been marked as Government's Exhibit 1327. Did we show you this chart before you came to testify today?

A. Yes.

Q. Okay. And have you reviewed it before coming into court?

A. I did.

Q. Okay. And would this assist you -- first of all, are there voluminous documents underlying this chart?

A. Is there what?

Q. Are there a lot of documents that underlie this chart that explains it?

A. Are there a lot of documents? Yeah.

Q. Would this help explain and demonstrate your testimony before the Court today?

A. It would.
Q. Okay. Your Honor, at this point we wish to move into evidence Government's Exhibit 1327 as a demonstrative under Rule 1006.
MR. FISCHER: No objection.
THE COURT: Let it be admitted.
MR. SAVAGE: Thank you. And if we could just go to the top of the chart and show that there was a copy of the check we just looked at, which was Exhibit 301. And let's -- Your Honor, I beg your pardon, I did not publish 1327.
THE COURT: You may.
MR. SAVAGE: We request permission to do so.
BY MR. SAVAGE:
Q. We'll show the whole chart. First of all, is this the whole chart which has been admitted now as Government's Exhibit No. 1327? Is that the chart?
A. I'm sorry?
Q. Is that the chart on your screen we were just talking about?
A. Yes.
Q. Okay. And if we could go and enlarge the top part of the chart. Is that the same check that we just saw as Exhibit 301?
A. It is.

Q. Okay. Do you recognize the signature on Exhibit No. 301?
A. I do.
Q. Okay. Where did you -- what did you do with that check? Well, let me see, I forgot to ask you: Whose signature is it?
A. That's Keith's.
Q. Thank you. What did you do with that check?
A. We paid investors.
Q. Okay. Well, first of all -- I mean, what did you actually do with the check when you got it?
A. Well it went into the Zeus account. But it was made out to the wrong group, so it was transferred to the Four C's account to pay the investors.
Q. Okay. And these are internal documents of those banks. You didn't actually see these particular debits and credits, did you?
A. I didn't see the debits and credits but I authorized the transfer of the money.
Q. Okay.
A. Is that what you're saying?
Q. Yes.
A. Okay.
Q. Let's keep going down. And we'll go down to the bottom of the chart. And then did you cash this check?

A. The $400,000?
Q. Yes.
A. It was deposited.
Q. Okay. Did you subsequently write checks from it?
A. We did.
Q. Okay. Now you're not the check writer person, are you?
A. I'm am not.
Q. Who is the check writer?
A. Ray Chapman.
Q. Did you know Mr. Chapman was going to write these checks?
A. I did.
Q. If we can go over to the column to the right. Okay. Are these the checks that were paid from the plastics plant loan and the money that was received from Mr. Vinson on the $400,000 check?
A. They are.
Q. Okay. Who's Betty Zeiger?
A. That's my mother.
Q. Okay. And she got $110,000. Why is that?
A. Well she was owed $400,000, and that was just a payment to her.
Q. Zeus got money out of this check, didn't it? Or this check and this transaction.

A. Zeus Investments, yes.
Q. Okay. Pisgah Property Solutions. Who is that?
A. That is George and Ken Porter-Shirley.
Q. Okay. And in fact, if we look down, Mr. Porter-Shirley got $11,000 out of this.
A. That's right.
Q. And Jason Peltz got paid back out of the transaction that he closed.
A. That's right.
Q. $55,000.
A. That's right.
Q. Now if we could go to Exhibit 202. Your Honor, at this time, Exhibit 202 is a record of the Bank of Asheville. We wish to -- it has been stipulated and admitted. We wish to publish it.
THE COURT: You may.
BY MR. SAVAGE:
Q. This is the credit memorandum for the Bank of Asheville. You wouldn't have seen this. Did you see this document? It's an internal bank document; right?
A. Right.
Q. Well, let's go through it. You're familiar with the terms of this transaction, are you not?
A. I am.
Q. Okay. The total exposure of your wife and

Mr. Chapman at the bank at this point is almost $3 million. Whose exposure is that, primarily?

A. That probably, because I don't think Joan had any --

Q. You knew generally where your wife was borrowing money from. If she owed $3 million you'd know that, wouldn't you?

A. That's her total exposure everywhere or at the Bank of Asheville?

Q. No. The total exposure of these parties at the Bank of Asheville was $3 million.

A. Are we including Ray plus Joan?

Q. Yes.

A. Okay.

Q. What is the purpose of this particular loan?

A. The purpose was always for money to go into Seven Falls' operations.

Q. More specifically, what was the purpose of this loan?

A. Oh. To pay back the investors of the money that had already gone into Seven Falls.

Q. Did you tell that to Mr. Buddy Greenwood?

A. I did not.

Q. Okay. Is this -- did Mr. Vinson know that this money was going to pay back investors?

A. Yes, he did.
Q. Okay. Is the statement that this went to Seven Falls then for bridge funding, is that true specifically?
A. One step removed. So, no.
Q. Okay. The money went to -- didn't go to Seven Falls at all. It went to the people who were on that list.
A. That's right.
Q. Did you know that at the time? Did you know that?
A. Did I know that they were getting that money?
Q. Yes.
A. Absolutely.
Q. Did you know it was coming out of this loan?
A. Yes, I did.
Q. And if we could scroll on down. It says that this loan would be paid in full within 180 days. Was it?
A. No.
Q. Okay. And we talked about banking relationships. Let's move down a little bit further. Who has the other banking relationships, in addition to this loan at the Bank of Asheville?
A. I do.
Q. Well, no. Read the document. Out of this loan, who has the other notes, your wife or Mr. Chapman?
A. Oh. Ray Chapman.

Q. Okay. So that doesn't indicate that your wife had any other loans at the Bank of Asheville, just this one.
A. That's right.
Q. Okay. And if we could go down to the bottom. This was approved by Mr. Greenwood and the board at the Bank of Asheville, was it not?
A. Yes, sir.
Q. Let us go back to Exhibit No. 1328. And Exhibit No. 13- -- before we move on to that, let me go back to this exhibit just to finish this part up. Exhibit 200, which has been previously published. If we could begin at three and enlarge three. This document is the original memo that we just talked about. Right? And it talks specifically about raising money in advance of the closing; correct?
A. Mm-hmm. ("Yes.")
Q. And it talks about these disbursements of that money and where it went. $249,000 went to Seven Falls. $200,000 went to pay off the Carolina First bank note. $306,000 went to Zeus Investments. What was the purpose of that?
A. Those were probably monthly invoices.
Q. Well "probably?" It says what? It's for what?
A. July invoice.
Q. Okay. So, I mean, was it probably, or was it?

A. It was the July invoice.
Q. Okay. Who's Jerry Denson?
A. Jerry Denson was a very good friend that was, I think, the broker in charge at -- for a while at Seven Falls. He worked at Seven Falls.
Q. Okay.
A. And he left Seven Falls and got in some financial pinch. I signed a note with him at NBSC and, I believe, that $25,000 is for -- is probably for the payments of that note.
Q. Okay. And then $812,000 went to Mr. Vinson at Seven Falls, did it not?
A. Okay.
Q. Did it?
A. Yes.
Q. Okay. And if we curser down. Mr. Vinson very well knew that, did he not, that that was going to be the deal?
A. Yes.
Q. And when was the loan -- because he signed it.
A. Right.
Q. Okay. And when was the loan going to be repaid?
A. It was a 90-day note.
Q. And from what proceeds?
A. AML.

Q. Okay. Did the A&D loan -- by the end of 2008 had the A&D loan come through?
A. From AML?
Q. From anyone?
A. No.
Q. What position did that put you in with respect to your obligations at Pisgah Community Bank, National Bank of South Carolina and the Bank of Asheville?
A. I was toast.
Q. You were what?
A. Toast.
Q. Okay. And what position did that put your partners in?
A. Same.
Q. Okay. And what was going on at Seven Falls? First of all, were you going out to Seven Falls during this timeframe?
A. I was.
Q. What was going -- happening out at Seven Falls in September, October, November and December of 2008?
A. I mean, the project was pretty well stalled.
Q. Okay. Were there -- was there anybody moving dirt?
A. Not that I'm aware of.
Q. Did there come a time when Mr. Vinson came to you

in 2009, early 2009, and asked for even more money?
A. He did but I don't remember what for.
Q. Okay.
A. So unless you can help me --
Q. If we can go to Exhibit 1328 again. That's not on there. You're going to have 1328 in front of you, but our screen is not producing it. That's the last entry on this chart, is it not? Do you have 1328?
A. I've got it.
Q. Is that the timeline?
A. Yes.
Q. Okay. What's the last entry on the timeline?
A. March 5th 2009. Betty Zeiger: $50,000 loan.
Q. Where was that loan taken out of?
A. Pisgah Community Bank.
Q. How much was it for?
A. $50,000.
Q. Who, again, is Betty Zeiger?
A. My mother.
Q. Let me show you -- meanwhile, let me show you Exhibits 624 and 625, just to tie things up here. The plastics plant loan, or the Dowling loan -- Your Honor, we request permission to publish 624 and 625. They're both records of the Pisgah Community Bank.
THE COURT: You may.

MR. SAVAGE: Okay.
MR. FISCHER: What number is that, again, Mr. Savage? I'm sorry
MR. SAVAGE: 624.
MR. FISCHER: Thank you.
MR. SAVAGE: Then we're going to go to 625.
BY MR. SAVAGE:
Q. This is a renewal memo for the Dowling loan; is that right?
A. Yes.
Q. Which is actually the Worlund loan, which is actually the AML deposit loan --
A. That's right.
Q. -- and which was supposed to be paid off in 90 days. Right?
A. That's right.
Q. But it wasn't paid off as of that time, was it?
A. No.
Q. Okay. Let's go to Exhibit 625. Let me enlarge that. Okay. And this is another extension -- if we can scroll down -- of that loan, is it not?
A. Yes.
Q. And that's Mr. Worlund and Mr.- -- and the Pisgah bank are extending that loan yet again, are they not?
A. Yes.

Q. So this still hadn't been paid off in 2008.
A. That's right.
Q. Let me show you what's been marked as Government's Exhibit 703. We'll make that larger. Do you recognize that document?
A. I do.
Q. What is it?
A. It's a check made out to my mother.
Q. And what's the date on it?
A. 2/25/09.
Q. And that's record of the Pisgah Community Bank. Your Honor, it's been previously stipulated and admitted, and we move for its publication.
THE COURT: You may.
BY MR. SAVAGE:
Q. And if we could scroll down. That's a picture of the back of that check, is it not?
A. Yes.
Q. And I don't know if we can -- let's see if we can rotate it. If we can't, then I'll just ask you to read it sideways. Do you recognize the signature -- your mother's signature on that?
A. Yes, I do.
Q. And do you recognize some handwriting underneath that?

A. I do.
Q. What does it say?
A. "Made payable to Keith Vinson."
Q. Okay. And do you recognize the signature on that check?
A. Yes.
Q. Okay. Whose signature is that?
A. Keith Vinson.
Q. Okay. Why did your mother give a -- sign a $50,000 check over to Mr. Keith Vinson?
A. Keith was very concerned about making payroll. He was very worried about his people. And I needed -- he needed it absolutely immediately. I don't know if he sent it off to some place that does payroll, but he had to get the money in that afternoon. So I asked my mom if she would do it, and she said she'd love to. She came and met at the coffee shop and I got the check. Okay? I gave it to Keith.
Q. How old is your mother at this point?
A. Probably 83.
Q. Okay. And did she have -- was she still working out at Mountain Lake Realty?
A. She was and still is.
Q. Okay. And how old is she today?
A. 89.

Q. Okay. Thank you. With respect to this check, who was it that was still on the payroll over at Seven Falls in February of 2009?
A. Who was what?
Q. You said nothing was happening out there; right?
A. Nothing's happening but there's still people working.
Q. Okay. And who was working out there, if you know?
A. Well, I know the maintenance people were out there. I don't know who else was out there, but I know we had maintenance people out there.
Q. Okay. If we could go to Exhibit 704. And is that the closing document?
A. Can you scroll up? Yes, it is.
Q. Okay. How fast did this loan happen?
A. Three hours.
Q. Who did you call to get a loan -- if we can publish Exhibit 704.
THE COURT: You may.
THE WITNESS: I called Craig.
BY MR. SAVAGE:
Q. And how did this -- did you have to go to the bank to make this happen?
A. No. I think I met him at a coffee shop.
Q. Okay. Did your mother come with you to the coffee

shop?
A. She met me there.
Q. And they came over. And did Mr. Gourlay bring a check with him?
A. He did.
Q. Okay. And did you meet Mr. Vinson over there at some point after that?
A. I'm not sure whether he came but I think he did.
Q. Okay. Well, who gave him the check?
A. Well, I mean, he could have sent an assistant.
Q. Okay. Did you talk to him about the fact that you were going to -- your mother was going to borrow $50,000 from the Pisgah Community Bank to make his payroll?
A. Yes. And he thanked her.
Q. Okay. And did he agree to pay her back?
A. He did.
Q. Okay. How was he going to pay her back?
A. Well, at that time, he was working with a guy named McCarthy. McCarthy owed him some money, and that's where the money was going to come from.
Q. We'll get to that in just a little bit. If we could show Exhibit 700. Now this is a document from the Pisgah Community Bank, Your Honor, and it's been previously stipulated and admitted. We wish to move it into evidence or into -- publish it.

THE COURT: You may.

BY MR. SAVAGE:

Q. This particular loan. This is your mother's loan for $50,000; right?

A. Correct.

Q. It says the purpose is to provide the borrower with short-term working capital support. Did your 83 year-old mother need short-term working capital support out at her realty business?

A. No.

Q. What was this loan really for?

A. For payroll.

Q. For who?

A. Payroll.

Q. Whose payroll?

A. Seven Falls'.

Q. So it doesn't say providing the borrower with short-term working capital support for Seven Falls, does it?

A. No.

Q. Okay. Did you say that to -- tell that to Mr. Gourlay?

A. I told him it was for payroll.

Q. Okay. You didn't tell him your mother needed the money?

A. No.
Q. Okay. And the check, obviously, was issued by Pisgah and endorsed by Mr. Vinson and went back to Pisgah.
A. Right.
Q. Okay. If we could scroll down. The repayment sources were going to be a real estate closing. What real estate closing was that? What was the repayment source going to be? Was your mother looking to close a big loan and she needed, like, something to tide her over?
A. You know, I don't think -- I mean no. I don't know of any closing that she had coming up at that time.
Q. What did you tell Mr. Gourlay the source of the repayment of this loan was going to be? Who was going to repay this loan?
A. In this particular case, there wasn't more than two sentences.
Q. Okay.
A. Can my mom borrow $50,000 to help Keith with the payroll?
Q. Okay.
A. That's it. That's the whole discussion.
Q. All right. And the money went to Mr. Vinson. Did your -- did Mr. Vinson agree to repay the loan for

your mother?
A. Yes, he did.
Q. Thank you. Did he?
A. No.
Q. By this time, how deep was Pisgah into Seven Falls?
A. It was pretty deep.
Q. It had made six lot loans. Right? It had made the Porter -- if we could show Exhibit --
A. Now the six lot loans went to the Bank of Rowan, their sister bank.
Q. Okay. Do you know whether or not the Pisgah Community Bank bought some of those loans when it became its own bank?
A. I think -- it was supposed to buy them all back, but I think it ended up buying one or two.
Q. Around this time, did you also have a series of -- begin a series of transactions in order to shore up this credit while you were waiting for another big investor to pay off Seven Falls?
A. Yes. I established -- we made an agreement called "the Impact Deal."
Q. Okay. What was "the Impact Deal?"
A. Well, "the Impact Deal" was Nick Dimitris, Paul Rantzos and Dan Collier. And then they made a deal with

us and Four C's and we would give them cash and then give them unencumbered land for them to borrow against. And what they would do for us is that they would take out some of our property loans because they -- and then what they would do is sell them or, you know, build on them or whatever.

Q. Okay. Was this just a convoluted way of shoring up these credits at Pisgah bank until Mr. Vinson could pay?

A. Yes.

Q. Okay. Now you mentioned before that Mr. Vinson was talking about yet another source of immediate payment that was going to come his way around this time in 2009, and you mentioned a man by the name of McCarthy. Who is "McCarthy?"

A. Well, his name is Devin McCarthy and he was a developer --

Q. Okay.

A. -- for Queens Gap.

Q. Okay. Let me stop you there. What is "Queens Gap?"

A. It's -- I mean, I think it's almost a 4,000 acre piece of property that is in, I don't know. It's got part in Rutherford County and part in McDowell County.

Q. Okay. Did you buy any lots in Queens Gap?

A.     I did.
Q.     And when did you buy your lot at Queens Gap?
A.     I bought it real early on.  I don't know the date, though.  I don't know the year.  But it was -- I was one of the first few people to buy a lot there.
Q.     Okay.  And had you met Mr.  Devin McCarthy by that time?
A.     I had.
Q.     Okay.  Did Mr.  Vinson begin talking to you about Mr.  McCarthy in 2009?
A.     I had owned -- well, I mean, I'm not going to answer your question "probably," but I think I had owned that lot -- actually, Pisgah Partners owned that lot for probably two or three years before Keith got involved with Devin.
Q.     Okay.  When did you find out that Keith got involved with Devin?
A.     I don't know the date.  I can tell you how and where.
Q.     How did Keith get involved with Devin?
A.     I walked into his -- Keith's office and Devin was in there, and they were -- had slides on the thing looking at it.  And then Keith told me that he was going to buy Queens Gap.
Q.     Okay.  And was this sometime in 2009?

A. I don't know. I don't remember the year; that sounds right.
Q. Okay. Well, was it -- were you talking to him about -- when you were trying to finance Seven Falls throughout all of 2008, were you talking to Mr. Vinson about Queens Gap?
A. Yes.
Q. You were talking to him in 2008 about Queens Gap?
A. No. It must have been 2009, then.
Q. Okay. So about that time, in February when your mother gave him $50,000?
A. '09.
Q. '09?
A. Right.
Q. If we can go back to -- just to refresh your memory on the dates -- I know there's a lot there -- let's go back to 1328. What was the date on your mother's $50,000 loan?
A. March 5th.
Q. Okay. Did Mr. Vinson say how he was going to pay back your mother?
A. Yeah. He was going to pay her back with funds that he was expecting from Devin McCarthy.
Q. Okay.
A. And he was also working another deal to have Seven

Falls funded, but I don't remember what that deal was. At that point, money owed Keith by Devin McCarthy was where the source was.
Q. The immediate source of money?
A. Yes.
Q. So this would have been around March of 2009?
A. Yeah, something like that.
Q. Okay. How is Mr. Vinson, if he can't afford to fund Seven Falls, going to buy an entirely different subdivision? Did he tell you?
A. He told me that he was getting an unbelievably good deal and that he was going to own this project without having to pay anything.
Q. Okay.
A. And he said the reason was that Devin was really tired of doing what he was doing and just wanted out. That was the explanation.
Q. Okay. Well, how is that -- even if he acquired the property without paying money, how was that going to earn him money?
A. My understanding was that he was going to get paid money to do this.
Q. And how -- where did you get that understanding?
A. I got that from Keith.
Q. So he told you that he was going to get paid by

Devin McCarthy and he was going to use that money to pay back your mother for Seven Falls?
A. Yeah, and also to develop Queens Gap.
Q. Okay. And to develop Queens Gap? Okay. And was that going to -- do you know whether or not there were any restrictions on the use of the money that Mr. McCarthy was going to give him for Queens Gap?
A. I do not.
Q. Did there come a time shortly thereafter where it was -- you were no longer able to sustain Zeus?
A. Yes.
Q. About when did that occur?
A. When we had two major events that hurt us greatly in the first quarter or so of 2009. A guy that owed me $5 million for purchasing the *Dirty Dancing* property basically went bankrupt and didn't pay me. And we didn't owe anything; I was just $5 million in cash -- I lost it. And then David Payne, who owed us $10 million, didn't pay us. He was on his way down and wasn't going to pay us.
Q. Let's go back to Exhibit No. 1328.
A. Okay.
Q. Okay? How much did Mr. Vinson owe you, your partners and your company in March of 2009?
A. It was a lot of money.
Q. Okay. Is there a number at the bottom there all

added up?
A. $26 million.
Q. Over $26 million? Did that have a -- cause you -- in addition to the other $5 or $10 million, did that cause a problem?
A. It did.
Q. Okay. Had Mr. Vinson paid any of the money that you had borrowed on his behalf since 2006? Did he pay back any of that $26 million in principal?
A. In principal? He had paid us a lot of interest --
Q. Okay.
A. -- but in principal, no.
Q. Okay. Did you still owe all that money?
A. Unfortunately.
Q. Yeah. Did the banks and the investors and the people who took out the loans and all of the people we've been talking about all day long, did they want to be paid in 2009?
A. They did.
Q. Okay. What happened?
A. Well, NBSC foreclosed on Zeus and Candler Dogwood.
Q. Okay. Did that cause problems for you?
A. Yeah.
Q. Okay. And how did you find out they were getting ready to foreclose?

A. They sent us a letter.
Q. Okay. And what did you do about that?
A. Well, I didn't really do anything. Ray went to see Mr. Blainak [ph], who was a civil lawyer here in town to start working on that. But where I got involved is by accident I discovered that there was about a --
Q. Let me stop you there.
A. Okay.
Q. Your Honor, at this time I think we need to have a bench conference.

THE COURT: Okay. Please, come up here.

(At the bar of the court.)

MR. SAVAGE: Your Honor, at this point this letter is to Mr. Blainak which we're not intending to use as evidence but as background. I anticipate that the witness is going to say that he learned from NBSC that another $1.3 million had been drawn out of the Candler Dogwood accounts and that when he learned that he confronted Mr. Vinson about that, who agreed that he had drawn the money out and used it for purposes without his approval. And the documents that accompany this show that those draws were made that Mr. Cashion and his partners owed the money.

At the end of the day Mr. Vinson signed an agreement to repay all of these funds, including the

funds to Candler Dogwood. We believe that this is evidence, one, that he admits that he owes the debt for the straw loans. More importantly, we think it shows that he deceived Mr. Cashion with respect to money that was supposed to be paid to Candler Dogwood and to other projects. We think this shows an absence of mistake, good faith, reliance, those types of things. Also, it's integral to this transaction because it's all tied up in this mix of money.

THE COURT: Mr. Fischer.

MR. FISCHER: I think it -- part of this myriad, I think the jury is --

COURT REPORTER: I can't hear you, Mr. Fischer.

THE COURT: The microphone is right from there.

MR. FISCHER: The jury is quite confused and this adds a another level of confusion. I think there is very little motive or intent that is already before the jury.

THE COURT: The first point, though, is that it shows consciousness of owing the debt.

MR. SAVAGE: It's signed right here. It's part of all of this all together.

MR. FISCHER: Yeah. But it's a separate debt from what we have been dealing with before into Seven Falls and/or Queens Gap. So what? Again, minimal relevance. It's certainly outstanding and possible prejudice under

403.

MR. SAVAGE: Your Honor, I anticipate -- you know, we could recall this witness, but I think that that would be incredibly a waste of time. What we anticipate is going to happen is the witness has already testified that Mr. Vinson came to him and said that I'm going to repay you with money I'm going to get from Mr. McCarthy. Mr. McCarthy is going to testify -- and there's documents in evidence -- that the only thing the money for Queens Gap could be used for was for Queens Gap, and it was supposed to have a dual signature on it and his authority.

The evidence on that fraud is that the defendant took that money, nevertheless, and spent it on Seven Falls without Mr. Devin -- Mr. McCarthy's knowledge and spent it on things other than what it was intended for. This is exactly the same thing with respect to Candler Dogwood and it's inextricably intertwined with all of these other transactions.

THE COURT: See, that's the point. What you're doing is you're trying to use it -- the only way you're trying to tie it to these transactions, then, is as 404(b) evidence. In other words, you did it before. Therefore, you knew what you were doing. Therefore, you knew what you were doing this time. That's essentially

the relevance that you're showing. Correct?

MR. SAVAGE: It's part of the relevance.

THE COURT: What's the rest of the relevance?

MR. SAVAGE: Well the rest of the relevance shows all of these different transactions were interchangeable and for Mr. Vinson. The other part of the relevance is, I think, that it is inextricably intertwined. It's part of the relationship. I mean I can't offer this document shows the entire relationship between Mr. Cashion and Mr. Vinson, how much money they changed back and forth. I think it goes to rebut the idea that the defense has said here today that Mr. Cashion is totally the person responsible for this and not Mr. Vinson.

THE COURT: You may end up with a foundation for that to where that becomes important, but right now the 401 relevance of this is relatively low. The possibility of confusion from this is tremendous. Therefore, I'm going to say under 403 that the prejudice substantially outweighs the relevance, based on the foundation that you have at this time.

MR. SAVAGE: Okay.

THE COURT: Based on what the defense is later, you may be able to bring this in in rebuttal. But with what you have right now, I'm not going to let it in.

MR. SAVAGE: Your Honor, I respect the Court's

decision. Can we redact this document though? This document is important for not only Candler Dogwood, but it shows basically all of the amounts all of the straw loans here today. And all of these other loans that are here show that Mr. Vinson signed and agreed that he owed and was responsible for those debts. If we redacted out Candler Dogwood there would still be the remaining part of the document which we think is really important to our case.

THE COURT: Are you familiar with this document?

MR. FISCHER: I've seen it, Your Honor. I would think certainly redacting is better, but I still think that's pretty cumulative from all the documents and everything that we've seen thus far.

THE COURT: Well, it is cumulative but it does summarize things in one place. Therefore, it tends to alleviate confusion as opposed to lend to confusion.

MR. FISCHER: I understand.

THE COURT: In a redacted form I will let it in with what you have in it.

MR. SAVAGE: Your Honor, if I can have a minute when I go back to the agent to make sure I can show this on the screen without publishing the wrong part. I'll need just a minute to do that.

THE COURT: Okay.

(Back in open court.)

BY MR. SAVAGE:

Q. Mr. Cashion, while we're working on getting another document, let me show you show you a couple more documents. First of all, let me go back to the AML check for $550,000 and show you what's been marked as Government's Exhibit 620. Its's an exhibit out of one of the exhibits I neglected to show you.

THE COURT: What's the number?

BY MR. SAVAGE:

Q. Okay. The number, Your Honor, is Exhibit 620.

Can you see that document?

A. Yes, sir.

Q. Okay. Your Honor, this is a record of the Southern Community Bank. Request permission to publish it. It has been stipulated and admitted.

THE COURT: You may.

BY MR. SAVAGE:

Q. Okay. And can you see the "payee" line on that exhibit?

A. "AML & Associates."

Q. Okay. And that is, in fact, for Seven Falls. And what's the last name on that?

A. "Keith Vinson."

Q. What's the date on it?

A. The date? August 8th 2008.
Q. Okay. And it says "escrow account;" Is that correct?
A. Yes.
Q. Okay. And that was, in fact, the money that was paid out of the Worlund loan, was it not? Or was supposed to be paid out of the Worlund loan.
A. I am struggling. Southern Community was not where we got that money.
Q. Okay. Where was -- do you know where Mr. Peltz kept his trust account?
A. No.
Q. Okay. Was the Peltz Law Firm going to distribute that money?
A. What was supposed to happen is his 550 was supposed to go into his trust account and he was supposed to send it to an AML lawyer's trust account. And then if they didn't fund, it comes back to Peltz's trust account. That's what was supposed to happen. I'm not sure what you're asking me here. I'm sorry.
Q. Is this the check that actually came out of the Peltz checking account? I mean out of that closing. Do you know?
A. I'm sure it is.
Q. Okay. Thank you.

Could I show you Exhibit 622? And, Your Honor, if I could -- this is a record of Capital Bancorp PCB. If we could -- it's been previously stipulated and admitted. If we can move to publish it?

THE COURT: You may.

BY MR. SAVAGE:

Q. And if I could ask -- now this isn't an e-mail chain that you're on because you don't do e-mail. Right?

A. Correct.

Q. But it is -- do you know Dave Smith?

A. I do.

Q. Who is Dave Smith?

A. He was the loan officer at PCB.

Q. Okay. And is this about the time, June 30th 2008, about the time -- July 30th 2008. Is this about the time that you were working with PCB on the Worlund loan?

A. Well, I think it closed 23 July.

Q. Okay. So this would have been right after that. Right?

A. That's correct.

Q. And if you could go down to the reading it from the bottom up. It's from Mr. Smith to Keith. And if you could go ahead and just read that part that begins "incidentally."

A. Talking about "incidentally?"

Q. Yes.
A. "The $650,000 for the AML & Associates' escrow account will be going out tomorrow. Both the bank and the Orange Street Mafia, Buck, Ed, Ray, etcetera, and all really humped to get that approved and funded. So I hope you thank those guys the next time you see them. Take care, Dave."
Q. What is the "Orange Street Mafia?"
A. Well, I guess a pet name from Dave. 32 Orange Street was where Ray and George Gabler had their offices. That's where all the mail went.
Q. Okay. If you could scroll up. Did Mr. Vinson appear to reply on that e-mail?
A. It says, "Please do not send to anyone until you have written authority. We are finishing up the commitment letter and will send this upon its execution. Please confirm. Sincerely, Keith Vinson."
Q. And Mr. Smith did indeed confirm on that, did he not?
A. "I won't send it until I have your authorization."
Q. Okay. And in addition to Mr. Vinson having talked specifically and personally with officers of the Pisgah Community Bank, did you discuss with him the purposes of the Worlund loan personally? You personally talked with him about it, did you not?

A. Talked to Keith?
Q. Yes.
A. Oh, yeah.
Q. Did he know the purpose of this?
A. Yes.
Q. Okay. And let me refer you to Government's Exhibit 215. Your Honor, this is a record of the Bank of Asheville. It's been previously stipulated and admitted. We'd request permission to publish.
THE COURT: You said 215?
MR. SAVAGE: 215, Your Honor.
THE COURT: Okay. You may.
BY MR. SAVAGE:
Q. And if we could enlarge the bottom part of that. Again, you don't use e-mail and you're not an e-mail person. Is that correct?
A. Yes, sir.
Q. Who did a lot of the emailing for your company?
A. Ray.
Q. And Sandy White? Do you know her?
A. Sandy White?
Q. Yeah. Did you know a Sandy White?
A. Huh-uh. ("No.")
Q. Okay. Well, what does it say in the subject line?
A. "From Gordon Greenwood."

Q. And?
A. "Sandy White." Was that his secretary?
Q. I don't know. I wasn't there.
A. I think it was.
Q. Okay. You mentioned before that you didn't know exactly how it was that the money was going to be spent. With respect to the plastics plant loan, did anyone talk to you about still owing that money in February of 2009?
A. Owing the $1.7 million?
Q. Right.
A. Yes.
Q. And if we could go -- and we're going to read from the bottom over to the next page. If you could highlight just the bottom there. Go ahead and just read that.
A. "When these loans were made, it was our understanding that other financing arrangements were to be made in order to pay these loans out at maturity. We realize that there has been considerable effort to arrange for this financing. And given the current economic conditions it has been a challenging effort. However --"
Q. Let me stop you there. Did you have discussions with Mr. Greenwood personally about financing arrangements to take these loans out?
A. Yes.

Q. Okay. And did you have discussions with Mr. Vinson about taking loans out at the Bank of Asheville?
A. Yes.
Q. Okay. How many discussions had you had on this subject?
A. Oh. This was one of those things that Buddy would call me almost every day and I'd call Keith almost every day.
Q. Okay. And which loans are these that they're talking about here?
A. Well, the 4436 loan is the original $2 million loan from August of 2006. The 1.7 is the plastics plant. And let's see. The $500,000, I believe, was additional money borrowed at Bank of Asheville, of which Four C's got some money and Keith got some money.
Q. And then going on: "However, based on --" we're going to go to the next page. "Based on our conversation, it appears" what?
A. "It appears that these other sources of financing are beginning to materialize. So, given this information, will you communicate to Keith that we are willing to look at extending the maturity on note 4436 for 90 days in order to complete closing on funding -- on funds to pay out this loan."

Q. Okay. And were you indeed looking for yet another white knight, hard money lender investor loan to pay off all of these debts that you were accumulating at these various banks in and around Western North Carolina?
A. No. This was trying to get Seven Falls funded. There was no other way that we could have paid that back.
Q. Okay. And what -- when you say "I want you to communicate to Keith," what were you to communicate to Keith about what?
A. Well he knew that Keith had his fingers in all those loans, and he wanted -- he realized Keith was the best chance for getting it paid back because of getting the AML funding, or whatever funding, for Seven Falls was available at the time.
Q. Let's make this clear. Whose name is on these notes?
A. Mine.
Q. Okay. And Mr. Vinson wasn't, at least on the paper, the beneficiary of these notes according to the books and records of the Bank of Asheville, was he?
A. No.
Q. Your Honor, at this point we're very nearly done. We have that one document and it may take me just a minute to make absolutely certain that's correct. I see the hour.

THE COURT: Let's go ahead and take the afternoon break a little bit early and that will give you an opportunity to do that during the break.

Ladies and gentlemen of the jury, we're going to take the afternoon break at this time. The marshal will take you into the jury room for approximately 15 minutes and then we'll resume.

Marshal, please, take the jury out.

(Jury excused at 3:54 p.m.)

THE COURT: Anything we need to address while the jury's out?

MR. SAVAGE: Your Honor, if we could show you the document just to be sure. I do not want to run amok on this point.

THE COURT: That's the entire document?

MR. SAVAGE: Yes. It's redacted.

THE COURT: You're talking about 1167, with the top paragraph and heading for that top paragraph redacted. Correct?

MR. SAVAGE: Yes, Your Honor.

THE COURT: Okay. Mr. Fischer, any objection to 1167?

MR. FISCHER: No, sir. It's removed the parts I was concerned with.

THE COURT: Okay.

MR. SAVAGE: Thank you, Your Honor. We're going to show him that and then turn the witness over for cross.

THE COURT: Okay. Anything else before we take the recess?

MR. FISCHER: No, Your Honor.

THE COURT: Marshal, 15 minutes, please.

MR. SAVAGE: Your Honor, this isn't required for the record. I'm going to speak to the witness so he understands your ruling, and I would like everyone to know that.

THE COURT: I appreciate you putting that on the record.

(Off the record at 3:56 p.m.)

(On the record at 4:15 p.m.)

THE COURT: Are we ready for the jury?

MR. GAST: Just one housekeeping matter for the Court, Your Honor. Our next witness, Mr. Burnett, has very bad back issues. So with the Court's permission, I'd ask the Court's patience so that we allow him -- he's literally laying flat on the U.S. attorney's couch downstairs in our office, and there's just a hard bench out in the hallway. I'm hoping that the Court will permit us to have a little extra time to get him up here when it's his turn to testify, rather than having him on

deck on the hard bench.

THE COURT: In other words, when you call your next witness, you're going to need, what, three minutes, five minutes to get him here?

MR. GAST: He's going to need the elevator to get up here. So, yeah. You don't need to excuse the jury. I just wanted to explain to the Court that it's not for a lack of planning, it's just for his health.

THE COURT: I appreciate that explanation. We will -- we'll deal with that accordingly.

MR. GAST: Thank you, Your Honor.

THE COURT: Anything else?

MR. SAVAGE: No, Your Honor.

THE COURT: Marshal, please, bring us the jury.

(Jury returns at 4:19 p.m.)

THE COURT: Mr. Cashion, please return to the witness stand. You're still under oath.

(Witness resumes the stand at 4:19 p.m.)

THE COURT: Mr. Savage, you may resume your direct examination.

MR. SAVAGE: Thank you, Your Honor.

BY RR. SAVAGE:

Q. Mr. Cashion, I just to wrap this up. Let me show you what's been marked as Government's Exhibit 1167. Do you recognize that document?

A. I do.
Q. Who prepared that?
A. Ray.
Q. Your Honor, this is -- we're going to publish this -- we'd like to publish this. It's been stipulated and admitted, subject to the Court's earlier ruling, and we would move to publish 1167.
MR. FISCHER: No objection, Your Honor.
THE COURT: Let it be admitted, and you may publish it to the jury.
(Whereupon, the aforementioned exhibit was admitted into evidence without objection.)
MR. SAVAGE: Thank you.
BY MR. SAVAGE:
Q. The date on this is 11/09/09. What was happening on 9/11/09 with respect to your business and Seven Falls?
A. Zeus was transferred to Keith. The property, the Fulliam Dairy property, was transferred to Keith.
Q. Okay. Were you in favor of that decision?
A. No.
Q. Okay. And were you outvoted?
A. I was.
Q. By who?
A. Ray and George.
Q. And what was going to happen when Zeus went back

to Keith?
A. Well, as I understand it, they were going to put it together and that would help him get funding by having the whole project together.
Q. Well Zeus was only supposed to be -- the Fulliam Dairy property was only supposed to be out for 90 days beginning in 2008. Right?
A. 30.
Q. 30. And why is it that you didn't want to let it go at the end?
A. Well, at the end, that was the only asset that we had any control over.
Q. And then did you make an agreement with Mr. Vinson with respect to that and all the other things we've talked about here today? All these other loans, did you make an agreement with him when that happened?
A. I did.
Q. Okay. And let me -- and is this -- does this memorialize that agreement?
A. I mean, it does. Yes.
Q. Okay. Let's deal with the bottom part first. Key deal points for Zeus. And if we could scroll down to that there.
A. Okay.
Q. Who's "KV?"

A. Keith Vinson.
Q. And Seven Falls and Zeus agree to provide indemnification and hold harmless Cashion, Chapman and Gabler from all claims of any creditors of Zeus, including NBSC and other lenders, and any lien holders who perform services under Zeus property. What is that provision about?
A. Well, Keith had been and he was allowed to -- he was doing construction on the project. But if vendors -- and the vendors were hired and the contractors were hired by him. We wanted to be held harmless for people that were not paid --
Q. Okay.
A. -- because they didn't work for us.
Q. Okay. And were they being paid?
A. Many of them were not.
Q. The legal fees speaks for itself.
Number three: KV hereby agrees to support the loans obtained by Buck, George, Ray, Ken Porter-Shirley, Ed Worlund, Andrew Hager, purchase Seven Falls lots under the Seven Falls Lot Buyback Program. We don't have the enclosure here, but what is that talking about? Are those the lot loans?
A. I'm pretty sure they are.
MR. FISCHER: Objection, unless he is sure.

THE COURT: Sustained.

BY MR. SAVAGE:

Q. Did you take any other loans out with buyback provisions from Seven Falls?

A. No.

Q. Okay. So is there anything else it could have been?

A. No.

Q. Thank you. KV will repurchase lots as scheduled beginning in April 2010, will pay the taxes for these lots as well as provide assistance as necessary to keep the lots from being in default. Keith is committed to paying each owner his profit of one percent per month at closing which would be 24 percent of the loan value at closing. Was that an agreement that you signed?

A. It is.

Q. Is that an agreement that Mr. Vinson signed?

A. It is.

Q. Did you discuss that with Mr. Vinson?

A. Yes.

Q. Did he say oh, no, those aren't my lots?

A. No. We signed this together at the same time.

Q. Okay. And then going up -- scrolling upwards. KV will require that NBSC reverse the adverse credit admission they submitted on B/R as part of any lawsuit or

negotiation with NBSC. Is this bankruptcy?
A. I think so. I actually don't know.
Q. All right. Who is "Gillespie" in number two? Keith will either pay the Gillespie note that Buck and Ray have guaranteed or will renegotiate the note and remove us as guarantors.
A. We borrowed -- I was a guarantor on a $2 million note to Mr. Gillespie. The note went to Seven Falls or Keith.
Q. Now what happened with respect to the -- that takes $10 million off of your list as far as the lot loans, still leaving $16,748,000 approximately that you borrowed on behalf of Mr. Vinson or Seven Falls. What happened with respect to those loans? Did you ever pay them?
A. No.
Q. Did you ever get paid for them?
A. No.
Q. Thank you. Nothing further, Your Honor. I would pass the witness.
THE COURT: Cross-examination.
MR. FISCHER: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. FISCHER:
Q. Is it Mr. Cashion or Colonel Cashion?

A. Mr. Cashion.
Q. Okay.
A. But thank you.
Q. Mr. Cashion, you were in the Army for 20 years?
A. Yes.
Q. And you primarily spent your time -- was it in procurement?
A. No. I was in Special Forces, and then I got into finance.
Q. Paying soldiers?
A. Paying soldiers.
Q. And you retired as a Lieutenant Colonel in 1995?
A. I did.
Q. And how, in 1995, as a senior field grade officer, could you not know how to use a computer?
A. When I was in the military -- at the time I was in the military they had secretaries, and they've since done away with that. So if I was still in the military I'm sure I would be better at it.
Q. And after you got out and returned back to Lake Lure, you decided to basically go off into some different ways to try to support yourself and make some money.
A. That's right.
Q. And that would include real estate development?
A. Right.

Q. And hard money lending?
A. Correct.
Q. Okay. In terms of hard money lending, I believe we've heard that those are lenders who aren't subject to the rules that banks are.
A. That's correct.
Q. They aren't subject to the same competitive pressures as banks are?
A. That's right.
Q. And they charge a premium for the loan. Is that right?
A. That's correct.
Q. And would it be accurate, sir, that you were on many occasions a hard money lender to Keith Vinson?
A. Often.
Q. And the rates that you charged him would exceed 30 percent on some of these deals. Is that right?
A. Yes, they would.
Q. And in terms of your overall, you know, business activities, let's say from 2002 to today, how much of that was dealing with Keith Vinson or any entity that Keith Vinson was involved in?
A. A lot.
Q. But you did have other folks and other deals going on as well; is that correct?

A. We did. We did.
Q. And we heard the phrase "Orange Street Mafia."
A. Yes.
Q. Okay. And was that kind of a nickname for your group here in Asheville?
A. No. This guy named Dave Smith made up that particular thing. I guess he thought that was cute. But George had an office there.
Q. And "George" is George Gabler?
A. George Gabler. Ray Chapman had an office there. And Keith and I came and went from there because he was our accountant and CPA.
Q. And Mr. Smith, I believe, was an officer of Pisgah Community Bank. Is that correct?
A. That's right.
Q. Now, you are here today pursuant to -- after, rather, pleading guilty to one count. Is that correct?
A. That's correct.
Q. A conspiracy charge?
A. That's right.
Q. I believe the jury earlier saw the superseding Bill of Indictment to which you've pleaded guilty to.
A. Right.
Q. Now you were charged with a large number of counts in that indictment, weren't you?

A. I was.
Q. Something like 25 or thereabouts, perhaps a few more?
A. I think it was 39.
Q. I quit counting. But you only pled guilty to one?
A. That's right.
Q. And you are currently, and were, represented by Mr. Sean Devereux. Is that correct?
A. Right.
Q. And Mr. Devereux's been present throughout your testimony here today.
A. Yes, sir.
Q. And you understand what the term "substantial assistance" means, do you not?
A. "Substantial assistance?"
Q. You've heard that phrase in conjunction with your guilty plea, what substantial assistance is.
A. I'm not familiar with the term.
Q. Do you understand that -- strike that.
You're currently awaiting sentencing. Is that correct?
A. That's right.
Q. I mean, you understand that one of the possibilities at sentencing is you could go to prison for a term of years?

A. I expect to.
Q. And you understand that by cooperating with the government, if the government informs the Court of your cooperation, the Court might give you a lesser sentence.
A. Well, I've been offered a maximum of five years.
Q. Okay.
A. That's it.
Q. And you'd like to get less than that, wouldn't you?
A. I would.
Q. And I believe we saw what's called a superseding Bill of Indictment. There, actually, was an earlier Bill of Indictment that you and Mr. Vinson were named in when the federal charges began. Is that correct?
A. Correct.
Q. And, actually, your wife Joan was named in that indictment, wasn't she?
A. She sure was.
Q. She wasn't named in the superseding Bill of Indictment.
A. That's right.
Q. Do you have any expectation, by your testimony here today, that she will not be charged in the future?
A. Well, I don't think it has anything to do with me. What I was told by the government was that Joan Cashion

is Joan Cashion and Buck Cashion is Buck Cashion.
Q. You certainly don't want her to get charged.
A. God, no.
Q. You've been married how long?
A. 35 years.
Q. And you have two grown children at this point?
A. I do.
Q. Now, do you recall, actually, several years ago, back in June of 2011 being, interviewed by IRS Special Agent Eric Veater and some other investigators about this matter?
A. I'll never forget it.
Q. And where did that interview take place, sir?
A. In this building.
Q. And Mr. Devereux was present for that, wasn't he?
A. He was. Yes, sir.
Q. And that was a pretty long interview, wasn't it?
A. Yes, sir.
Q. And you have read through the summary of that interview that was made, have you not?
A. Yes, sir.
Q. And it covered a wide variety of topics related to what we've been talking about here today?
A. Yes, sir.
Q. And in that interview, you told the investigators

that you had never gone to the bank with bank employees who didn't know what was going on. Is that correct?
A. You know, Mr. Fischer, the hardest thing that I've ever done is to admit that I did something wrong, the hardest thing. I didn't admit it there.
Q. Okay. So back in June of '11, when you were interviewed with your attorney present, you did state that for all these deals we've been talking about that all the bank employees knew what was going on?
A. I did not tell the truth.
Q. Wouldn't it be true that Gordon Greenwood certainly knew that these various loans from the Bank of Asheville were going, at least partially, to Seven Falls? Is that correct?
A. There were a number of bankers that knew a lot of things. But the answer to the question was, did everybody I talked to in banking? And the answer is no. Everybody did not know everything that they should have known.
Q. So when you told them back in the 2011 interview that all the banks you borrowed from were told the structure of the deals in advance, are you saying that was not true?
A. What I am saying is they were certainly not given the benefit of all the information they should have been

given.

Q. But you personally -- let's just talk about some of these lot loans. You appeared at meetings with bankers from Old Town bank and other banks about the lot loans, did you not?

A. About the lot loans?

Q. Yeah, about whether the banks would take out the lot loans.

A. Yes, sir.

Q. And Andrew Hager was basically working at that point, after you had asked Mr. Vinson to hire him.

A. Right.

Q. And Mr. Vinson had hired Mr. Hager as a favor to you, had he not?

A. He did, yes.

Q. Because you had told him that Mr. Hager's circumstances were pretty dire and he needed to feed his family.

A. That's right.

Q. And at least one of the things he was doing, once Mr. Vinson hired him at your request, was to try to find financing for Seven Falls.

A. Right.

Q. That wasn't just from banks but that was from hard money lenders as well, was it not?

Cross - Cashion

A. That's certainly what I understood.
Q. And to your knowledge, Mr. Hager did -- let's just use Old Town bank as an example. Did he arrange a meeting with Mr. Bourque and Miss Cioce and perhaps some other folks from Old Town bank about whether they were interested in doing lot loans at Seven Falls?
A. Right.
Q. And you recall attending such a meeting, do you not?
A. Not that meeting.
Q. Do you remember attending any meeting with Old Town Bank officials about lot loans?
A. Yes, I do.
Q. Okay. And that meeting was arranged by Mr. Hager, was it not?
A. It was.
Q. And who -- first, when do you recall this meeting taking place? The one that you attended.
A. Well, there was two meetings.
Q. Talk about the first one.
A. Well the first one Andrew drove me over to this because it's in Waynesville or somewhere. We drove over there and went to the bank to meet with the president of the bank, which was a man named Mr. Stiles. And there, the reason I remember, is he was in a cowboy suit and

because they had some kind of a function going on. So he came to his office, sat down, put his feet up on the desk and we talked.

Q. And there was a discussion about whether or not their bank would fund some lot loans at Seven Falls?

A. That's right.

Q. And it was you and Mr. Hager and the president in the cowboy suit. Who else was there for this first meeting?

A. There was a lady there and there was Tommy Bourque there.

Q. Okay. Keith Vinson wasn't there, was he?

A. He was not there.

Q. As a matter of fact, did Keith Vinson attend any meeting with you and any banker about these lot loans?

A. Not one.

Q. And you're aware of what the word "pitch" means.

A. "Pitch?"

Q. Do you know what that means in conjunction with a business meeting to pitch an idea or to pitch the lot loans?

A. Okay.

Q. Trying to sell the bank on the notion of loaning the money?

A. Mm-hmm. ("Yes.")

Cross - Cashion

Q. And that's what this meeting was about, was it not?
A. That's right.
Q. And who did most of the talking?
A. It depended on the situation and who knew what, but I would say I probably did the majority of the talking.
Q. And in that meeting about the lot loans, you didn't say anything to any of these bankers that was untrue did you?
A. I didn't tell them the whole truth.
Q. My question is, did you tell them anything that was not true?
A. I don't know how to define that question, Mr. Fischer. I apologize, but I don't -- if you don't tell somebody the whole truth, you didn't tell the truth.
Q. Well did you put anything down on any loan application for your loans at Old Town Bank that was not literally true?
A. Not that I'm aware of.
Q. And when the bankers would ask you questions, and you responded to them about these lot loans, you responded truthfully, did you not?
A. I'm not avoiding your question. I'm really trying to figure out what the right answer is.

Q. The answer is the truth, sir.
A. At the time I didn't think I'd said anything wrong, not one thing. But when I look back and I evaluate the whole picture -- when I step back from it, I didn't give them the whole story and I should've.
Q. But?
A. I didn't do it.
Q. Do I understand when this first meeting was going on you didn't think there was anything about the input you provided to them, or the answers you gave to their questions, that was in any way wrong or left out something that made it wrong.
A. It was definitely some information left out.
Q. Okay. Now, would there have been any reason why Mr. Bourque couldn't have, or somebody from Old Town Bank, couldn't have gone and done their own investigation before funding these loans?
A. Investigation of the property?
Q. Sure.
A. I think most of them did.
Q. Or investigate the overall financial condition of Seven Falls if they'd wanted to?
A. If they'd wanted to sure.
Q. To your knowledge, they just didn't do that.
A. The problem is that I didn't tell them that it was

for Seven Falls. I told them that it was an individual lot loan. So the people that -- that's the whole problem. You evaluate it differently. If it was for Seven Falls they would be looking at this set of criteria. But if you're looking as an individual, they're looking at it for my criteria. I was giving them the idea that it was my criteria and not the Seven Falls' criteria. It's two different animals.
Q. But the term of your individual loans and the other loans you pitched at Old Town and, really, at these other banks that we've seen on this chart, as well, was for lot loans at Seven Falls for a fairly short period, a couple of years. Is that correct?
A. Yes.
Q. With the notion on many of the contracts that there would be a 25 percent purchase credit.
A. That's right.
Q. And there would be an interest reserve --
A. That's right.
Q. -- to the bank to fund the payments?
A. That's right.
Q. And you are an experienced real estate -- I'm not going to say developer but, perhaps, real estate financier. Would that be accurate?
A. The word -- I can't type. The word experience is

a different.
Q. I'm not saying you're a good typist. But in terms of --
A. I don't know what you're saying.
Q. I don't mean to interrupt you. I'm so sorry.
A. That's all right. I know what you're saying. I don't know how to answer your question.
Q. You've bought and sold lots before?
A. Yes.
Q. On a number of occasions. Correct?
A. Yes.
Q. And based upon that experience, Mr. Cashion, you're only funding these loans for two years?
A. Right.
Q. You know, they're lots. They're not built. Correct?
A. That's right.
Q. Nobody thought the development was complete at that point --
A. Correct.
Q. -- or anywhere close to complete. Correct?
A. I agree.
Q. So the only logical reason to get a loan for two years is you hope to either sell that, hopefully, for a profit or refinance in two years. Correct?

A. Right.
Q. Okay. And to sell it for a profit, you'd have to figure real estate is going to keep going up. Right?
A. That's right.
Q. And in the April-May timeframe of 2008, in this local area, there was still a feeling among those who dealt in real estate that it was going to keep appreciating. Correct?
A. That's right.
Q. It was only later on, in the late summer and early fall, that everything came crashing down.
A. Right.
Q. Now, in terms of the appraisals. And, you know, you can use the Old Town lot loans but, really applicable to most of these, Aaron Ollis did a number of those. Correct?
A. Correct.
Q. How do you know Mr. Ollis?
A. I've known him for a number of years.
Q. Okay.
A. He's done a lot of work for us.
Q. A lot of appraisal work?
A. A lot of appraisal work.
Q. Are you social friends with him?
A. No.

Q. Is he just somebody you hired to do the appraisals?
A. Just somebody we worked with a long time.
Q. And with regard to these specific lot loans. You never told him to come up with some specific figure, did you?
A. No.
Q. Did you have any input at all into his appraisal work or the preparation of the appraisal documents that were submitted to the banks?
A. No.
Q. And, to your knowledge, did Keith Vinson have any involvement with him in the appraisal process for these various lot loans?
A. To my knowledge, no.
Q. You attended some number of closings of these lot loans. Is that correct?
A. I think all of them.
Q. Okay. Mr. Vinson didn't, though, did he?
A. No. He usually came in and signed early.
Q. And by "sign," that would mean you could sign the HUD, that form we've seen?
A. Right. Exactly.
Q. And, of course, the deed to the property.
A. Right.

Q. But generally, in terms of the closing itself, that was conducted in Mr. Peltz's office by Mr. Peltz. Right?
A. That's correct.
Q. And Mr. Peltz, as the closing attorney, was largely in charge of making sure all the documents were submitted and signed. Correct?
A. Right.
Q. And other than Mr. Vinson signing the HUDs generally before and signing the deed, Mr. Vinson didn't have anything to do with the closings, did he?
A. That's right.
Q. He certainly didn't have anything to do with preparing the information that was on the HUDs.
A. That's correct.
Q. Did Mr. Vinson have anything to do -- let's talk about the Bank of Asheville loans right now. Do you remember the closings for the first batch of the Bank of Asheville loans where Mr. Morris, from the bank, was present?
A. Right.
Q. Do you remember those?
A. I do.
Q. Okay. There were three of them. There was, I believe, two for Porter-Shirley?

A. Right.
Q. And who were the other two?
A. Gabler and Chapman.
Q. Okay. You weren't buying on that but you were present.
A. Now you got me. I'm not sure on those.
Q. Okay.
A. I mean I didn't miss very many, but I'm not positive about those.
Q. Okay. You don't have any information that Mr. Vinson instructed Mr. Peltz to put something that was untrue on a HUD statement?
A. No.
Q. Now, how did it happen, if you know, that Mr. Peltz was the fellow who was the closing attorney for all this?
A. He was Keith's attorney.
Q. Okay. And hadn't Mr. Peltz been involved in some earlier Seven Falls closings?
A. He had.
Q. With regard to that initial batch from Founders -- the Founders' event?
A. Right.
Q. If I could, Agent Seres, could you pull up 112-A for me, please? Sir, do you have 112-A in front of you?

A. I do.

Q. And I believe this has already been admitted and published before, but I would ask to publish again, Your Honor. And if you could scroll down to the bottom, please, Agent. A little bit more. Yeah. Do you see where it says "seller" on the right-hand side of that HUD document?

A. I do.

Q. Now you've indicated you are very familiar with Mr. Vinson's signature.

A. Very.

Q. It's kind of a pointed little V thing. Right?

A. That's not his.

Q. Okay. Can you tell whose signature that is?

A. Maybe it's says "attorney in fact, Peltz."

Q. Okay. Do you have any knowledge as to how Mr. Peltz would be signing that as opposed to Mr. Vinson for this particular transaction?

A. As I recall, Keith was out of town.

Q. Okay.

A. And I don't know that.

Q. If you don't know then don't answer.

A. Yeah. But for some reason he was not available.

Q. Okay.

A. Jason signed all the Old Town Bank ones.

Q. Seven Falls, as it was initially contemplated, was a really good idea, wasn't it?
A. A great idea.
Q. It's just beautiful property out there, is it not? Is that correct, sir?
A. Yes.
Q. And if you wouldn't mind speaking up just a little bit. Maybe get a little closer to the mike.
A. I'm sorry.
Q. That's fine. It's a big courtroom. And it got off to a really great start with the initial Founders' event.
A. It did.
Q. And all those were funded at -- all those loans for the Founders was funded -- or at least there was a program to fund them -- at a hundred percent financing by the National Bank of South Carolina. Is that correct?
A. I don't know about all of them but a lot of them.
Q. There was a program that NBSC had?
A. There was a program, yes.
Q. And 100 percent financing was pretty common in the boom years of real estate, wasn't it?
A. It was.
Q. Okay. And when you bought your lot, did you use the NBSC financing?

A.     I'm pretty sure I did.  I used NBSC, yes.
Q.     And this was a very nice event.  Is that correct?
A.     Nice what?
Q.     This was a catered and very nice event?
A.     Oh, it was great.
Q.     And it was by invitation only.  Is that accurate?
A.     That's right.
Q.     And would it be accurate, sir, that the people who were invited had pretty much been pre-screened as having the financial juice to come in and purchase lots at this level?
A.     I don't know about everybody but there was certainly a lot of people.
Q.     A lot of the movers and shakers, so to speak?
A.     There were some movers and shakers, yes.
Q.     Now, after the initial Founders' celebration there were some other promotional events.  Correct?
A.     Mm-hmm.  ("Yes.")
Q.     And would it be your observation -- again, to market and sell property such as Seven Falls, you know, you've got to spend some money to do it, don't you?
A.     You certainly do.
Q.     You can't just, you know, put a sign at the front of the property "Lots For Sale," because nothing's going to happen then.  Right?

A. No question.
Q. As late as June of 2008 there was a very nice event, was there not?
A. Was that the Kenny G one?
Q. I think that's the one we're speaking about. Yes, sir.
A. Okay.
Q. I think you answered some questions from Mr. Savage. That was an appropriate promotional event for Seven Falls, didn't you think?
A. I did.
Q. At that point in time there was some additional contracts signed for more lot sales.
A. I didn't know that.
Q. You didn't have any information one way or another?
A. No.
Q. Now, you have made reference to having some conversation with Mr. Vinson about some problems with bills being paid at Seven Falls?
A. Yes.
Q. And as you sit here today, can you say with any certainty when that conversation took place?
A. Mr. Fischer, that conversation took place 2,500 times.

Q. The first time, can you say when that would have been with any certainty?
A. The first time?
Q. Yes, sir.
A. I don't have any idea.
Q. It's kind of hard to remember days after all these years, isn't it?
A. I mean, I've known him 12 years and we've worked closely for 12 years. You know, we've had 10,000 conversations. So I don't -- I know that there's no question in that period of time that bills were not being paid. I mean everybody knew it. I knew it.
Q. And what I'm trying to clarify is, now, what period of time are we talking about?
A. This is probably April, May of 2008.
Q. Could it have been June or July?
A. Could have been.
Q. August, even, possibly?
A. Well, no. I mean probably -- the lot program was completely established because Keith needed money to pay vendors. That was the whole purpose of it.
Q. And in terms of your conversation with Keith. You pretty much talked to him daily, sometimes multiple times a day. Is that correct?
A. Yeah. I used to drive him crazy.

Q. I'm sorry?
A. I used to drive him crazy.
Q. And actually, wasn't there a time that you kind of went out to the practice facility and told everybody to get off your property --
A. I did.
Q. -- and that you would put in mobile homes?
A. I didn't say anything about mobile homes. I don't know where this came from. I heard that rumor once before but that wasn't me. I just said get off.
Q. Okay. When was that, if you recall?
A. I mean I don't remember. I know Keith was hotter than heck.
Q. Was it before or after these various lot loans we've gone through?
A. Do you know when it was? Mr. Fischer, I don't know.
Q. I'm sorry, sir, I can't answer questions.
A. I don't know how to answer that question.
Q. If you don't know, you don't know.
A. Okay.
Q. But, it certainly did happen.
A. It did happen, yes.
Q. You were upset about something and came out there and said everybody get out of here.

A. I think it had to do with the foreclosure.
Q. But you're just not really sure, as you think about it?
A. No, I don't remember.
Q. And I think you mentioned another incident when Mr. Vinson called the police on you?
A. Well, it wasn't him. His secretary.
Q. Okay. Actually that was in 2009, wasn't it, at Biltmore Forest?
A. It was at Biltmore Park. I don't remember the date. Yeah.
Q. Long after all this lot loan stuff was finished?
A. I don't know the date or what I was angry about. I just don't know.
Q. And was your relationship with Keith Vinson the kind that you-all really did argue a lot?
A. We would be great friends all the time and argue a lot.
Q. And were the arguments usually one way or another about money?
A. Almost always.
Q. You were a major creditor of Keith Vinson and his various entities. Is that correct?
A. I was.
Q. And actually -- going back to that interview that

you did back in June of 2011. Did you indicate then that you had made something like 150 different loans to --

A. Yes. That's an incorrect statement. I noticed that reading it that weekend. That number is probably 40. Now, remember, on 302s -- the first time I read that 302 was two and a half years later and about two weeks ago. We don't sign them. So there was some kind of a miscommunication, and there's a number of errors in there, quite frankly. But the answer is probably 40, 45.

Q. What's a 302?

A. Some kind of FBI investigation report. Right?

Q. You're familiar with that term, that number?

A. I am.

Q. But regardless of whether it was 40 or 50 or 150, you had had a lot of different loan deals with him over the years.

A. Absolutely.

Q. Correct?

A. I did.

Q. And actually, even after, let's say -- with Seven Falls, you started having some concerns about how much money he was spending.

A. Very true.

Q. You still kept loaning him money. Right?

A. I did.

Q. More than once?
A. Yes, I did.
Q. Because you determined, I presume -- and correct me if I'm wrong -- in consultation with your partners that that was an economically good deal for you.
A. It didn't turn out to be a good economic deal at all. Keith had the need, and I still felt like he could get the funding done for Seven Falls. And then it would have been a good deal.
Q. And in terms of funding. We have had some reference to a line of credit from AML.
A. Mm-hmm. ("Yes.")
Q. And I believe there was some evidence about the Worlund loan being involved for the commitment fee.
A. Right.
Q. And a commitment fee for a hard money lender is what exactly?
A. A commitment fee?
Q. Yes.
A. I'm not familiar with that term.
Q. Why would Keith have had to pay either $550,000 or $650,000, as the case may be, to borrow money?
A. Well, that's not an unusual thing. You'd have to ask Keith that question.
Q. Well, as a hard money lender, have you ever

charged somebody a commitment fee?
A. Never a commitment fee.
Q. You've charged other fees.
A. I charge other fees.
Q. And would those other fees be separate and distinct from an interest rate on whatever the loan might be?
A. That's right.
Q. In other words, if you want to borrow $100,000 for you, are you going to give me -- I'm just picking numbers now -- $5,000 and then pay me two percent a month?
A. Right.
Q. Would that be the kind of deal you might make as a hard money lender?
A. Yes.
Q. How involved was Mr. Chapman in these various dealings with Mr. Vinson?
A. Mr. Vinson?
Q. Yes, sir.
A. Very.
Q. Were you-all pretty much, you know, together on a daily basis dealing with your various business activities?
A. Well, he did -- I was with Keith a lot more than Ray was. But then, you know, Ray spent a good deal of

time with Keith also.
Q. And Mr. Worlund. What was his role with you and Mr. Chapman?
A. What Ed was is -- I don't want to use the word "flunky," because that's not true. But it's --
Q. Right-hand man?
A. Yeah. I mean he did everything for us, but he did it for a number of organizations. You know, he did it for Keith. He did it for David Payne. He did it for Zeus. He did it for Pisgah Partners. He did it for Four C's, you know, etcetera.
Q. You mentioned Mr. Payne. I think you said he was an attorney in the local area?
A. He's an attorney.
Q. Was he an attorney for you?
A. He was.
Q. For what kind of work?
A. Well, he was a real estate attorney.
Q. And did I understand that you made a business decision to loan money to him at some point?
A. I did.
Q. It was a whole lot of money, wasn't it?
A. I did.
Q. About 10 million bucks?
A. Well, after accumulated interest and other things.

But, yes, it was around $10 million.
Q. And did that turn out to be a good business decision?
A. Horrible.
Q. And that was, obviously, separate and distinct from anything related to Mr. Vinson?
A. Say that again. No.
Q. Mr. Vinson didn't have anything to do with your deal with David Payne.
A. Did not.
Q. And, I believe, you also invested in something called Dr. Credit?
A. Yeah.
Q. And that was --
A. A mistake too.
Q. -- a company being started by Mr. Hager. Is that correct?
A. No. It wasn't started by Mr. Hager but, when he left the bank, he went to work for them.
Q. Okay. And so why would you have invested in that company that was already ongoing?
A. Well, George Gabler and Ken Porter-Shirley had, And then Andrew started working for them. And Andrew came to me to see if it would be a good investment -- if I would think it would be a good investment. And so we

made an investment.
Q. And how much was that?
A. Our part of it was probably six or $700,000.
Q. And was that, basically, a loan to Mr. Hager for him to get some interest in it?
A. It had nothing to do with Hager. It had to do with -- he was just -- he might have got paid for bringing the money into Dr. Credit, but it didn't go to Hager. It went to Dr. Credit.
Q. Did you ever get paid back on that?
A. No.
Q. And then Mr. Hager, for these lot loans that we've heard about, was certainly with you on a regular basis, was he not?
A. Yes, he was.
Q. Okay. And was it correct that he was kind of the point person in terms of making the contacts and going into the banks and getting everything set up?
A. I'm not going to put that off on him because I did the same thing.
Q. Okay.
A. He really did -- I did it for Pisgah and Bank of Asheville, but he did it for Old Town Bank and Southern Community, because those were -- he had contacts there.
Q. And in conjunction with Mr. Hager, you -- besides

the hundreds of thousands you just mentioned for Dr. Credit, you were letting him basically what amounted to living rent-free in a house you owned. Correct?
A. Yeah. But it's a little more complicated than that because he did assume some debt to pay back that $4,500. That turned out to be a bad situation because he had to -- he wanted to buy the house, and his family had to leave the house, and I had to pay him $10,000 so that he could move. But I don't consider that he owes me any money for that house.
Q. So you just kind of forgave that?
A. Well, I did.
Q. And did you just kind of forgive the Dr. Credit loan?
A. No. I'm probably going to go after them. But I did forgive Keith's loan.
Q. As a matter of fact, you never have filed any civil legal action against Keith, have you?
A. Never would.
Q. And you said that despite the, whatever, $26 million and change that was listed on one of those charts you --
A. It wouldn't have mattered. He couldn't have done it. If he could have done it, he would have done it. The bottom line is, no, I wouldn't sue him. I haven't

sued hardly anybody. I don't believe in suing people.
Q. Now let's go back to Pisgah. You were pretty well friendly with several officers there. Correct?
A. I was.
Q. That would include Ted Durham?
A. It would.
Q. And Ted Durham's role at Pisgah was what?
A. He was the president.
Q. The head honcho of the bank. Right?
A. He's the man.
Q. And Craig Gourlay?
A. Right.
Q. And what was Mr. Gourlay's role?
A. He was the credit officer.
Q. And I think we've seen a letter that's previously been offered into evidence about you being contacted by the bank to try to get some loans off their books --
A. That's right.
Q. -- because the bank was having regulatory scrutiny about some of their loans.
A. That's right.
Q. Did you think it was unusual that a bank is contacting you about their own regulatory problems?
A. Absolutely.
Q. That was very unusual, wasn't it?

A. I thought it was ridiculous.
Q. And with regard to the Bank of Asheville. You were acquainted with Mr. Greenwood; is that correct?
A. Yes.
Q. And Mr. Greenwood was the president of that bank; is that accurate?
A. He was.
Q. He had been in banking, to your knowledge, for many decades?
A. Yes.
Q. And you were introduced to him by Keith Vinson. Is that correct?
A. That's right.
Q. And after that initial meeting, most of your contacts with Gordon Greenwood were not with Keith Vinson around. Is that correct?
A. That's true.
Q. Your dealings with him were pretty much individual?
A. That's right.
Q. Now, in terms of the lot loans that we have been going over. At some point before that first sell took place, I think it was, what, April 24th '08, or thereabouts -- I think April 24th 2008, you came to Keith and said, hey, we need to get some money. You owe us

some money. We need to get paid.
A. No. That's not what happened. Keith --
Q. You never had that conversation?
A. Yeah. But Keith came to me and said I need help.
Q. And he said he needed to sell some lots. Right?
A. He did.
Q. And it was at that point that you and Mr. Hager went to these banks to see if they would do these various deals?
A. There's a missing step in there but, yes.
Q. What's the missing step?
A. The missing step is Keith may have tried to get -- George and Ray had tried very hard at the bigger institutions to get an A&D loan for Keith, which is what he needed. The whole problem with the project was that he was always underfunded. You know, it just didn't get funded right. So that caused all the other money that needed to go into the project.
But he came to me when that didn't happen and he said, Buck, I got all these properties. I got -- you know, I need to get these people paid. I'm really close to the AML loan. It all made sense. It totally made sense to me. And immediately, I went to Pisgah Community Bank to try to get a loan, a $2.5 million loan using Seven Falls as the borrowing entity. I mean I didn't

care if I was a guarantor, but the borrowing entity would be Seven Falls. They turned me down.
Q. Who did you talk to?
A. Either Craig or Ted or both, or Dave, or all three of them. I don't know. I mean this -- I went in and out of their bank a lot too. So I went in there and -- but I mean, that was turned down in a matter of moments because they really didn't want to give a loan to a development. But they came up with this idea that we could split these lots and have individuals buy these lots.
So I went -- when they said that, I said okay. So I went to Keith and I said, Keith, there's a way to circumvent what we're really trying to do. But what it caused -- what it has to do is we've got to take your inventory and sell them to -- to us to people just like us, and that's what we ended up doing. But he had to approve it. I said he approved it, and we went and did it.
Q. And at that point -- well, how long a conversation was that with Mr. Vinson?
A. Five minutes.
Q. Very short. Were most of your conversations with him kind of short?
A. A whole lot of them were, yeah.
Q. He has trouble paying attention to things for any

length of time, doesn't he?
A. No. He's probably one of the smartest people I've ever met. He pays attention quickly.
Q. I understand that. But he likes to go from one subject to another, doesn't he?
A. Yes.
Q. He doesn't like to just sit in business meetings and agonize over details?
A. That's right.
Q. That's more Mr. Chapman and Mr. Gabler's side of it, isn't it?
A. I would agree.
Q. So it was a five minute conversation and you told him what you told him.
A. Well, there's two conversations.
Q. I'm talking about the first one right now, the one you just mentioned.
A. The first one he says, I need some help. I've got to go get some vendors paid. I'm close to getting the AML loan. Help me. So, we did.
Q. And it was then that you first went to Pisgah to try to borrow --
A. It was that night or afternoon, or it was the next morning. And trying -- because at that point we were talking about a number of about $2.5 million.

Q. And then after Pisgah said I don't think so and took a pass, that's when you came back and had a conversation, well, we can do it as individual loans.
A. That's right.
Q. That was a five minute conversation.
A. Well, that one -- that one might not have been five minutes. I don't know how long that conversation was, because the issue was that we're not going to be going and getting an A&D loan for Seven Falls. We're going to be taking Seven Falls' inventory and going and having people go out on a limb to buy this -- to buy these lots at whatever the market price would come in at, 75 percent of the appraised value, and then that stuff would stay back into the inventory.
So, we really weren't -- that's on me where I made the mistake. That's what I'm trying to explain to you. The banks is -- it's a different way for a bank to evaluate. And I didn't go there. I found a solution to Keith's problem, found a solution to my problem, and that's what I executed.
Q. Okay. And when you had this second conversation with Keith, longer than five minutes -- how long was it, the best you can recall?
A. Oh, the second -- 20 minutes?
Q. Okay.

Cross - Cashion

A. I don't have any idea.
Q. And at that point in time you didn't consider there was anything wrong with this, did you? At that point in time.
A. You just said -- you asked me the question that I'm a pretty experienced real estate person. That's what you asked me.
Q. A while ago, yes, sir.
A. You're damn right. I knew that there was something wrong.
Q. Well, this is what had been suggested to you?
A. It was suggested to me.
Q. By Pisgah bank officials?
A. Well they're in trouble, too.
Q. And would it be accurate that the folks at Pisgah knew a lot more about banking than you did?
A. I'm beginning to wonder but, yeah, they're supposed to.
Q. And when you have the discussion with Keith, you basically related to him that this is what the bank said how it ought to go. Right?
A. Yeah that's what I said.
Q. And that's pretty much the extent of the conversation. He said fine, and then you and Mr. Hager went to these various meetings.

A. I mean I don't know how to respond. Yes, that's fine.
Q. Is that basically accurate?
A. Yeah, that's basically accurate.
Q. And after that second meeting, Keith's role in these various lot loans was basically to sign the HUDs and sign the deeds. Is that true?
A. No. That is definitely not true. That's the problem. The problem is he's the head honcho. Everybody worked for him, not necessarily directly or indirectly, but everybody came to him. He was who -- the only one that could make Seven Falls work was Keith Vinson. So everything we were doing to get money had to go through him on a daily basis and it did.
We were constantly -- not that there's anything wrong -- I'm not saying there's anything wrong with this. I'm saying that constantly, you know, on every single transaction, I called and talked to him about it. I don't know what Hager did. I never know what Hager does. But I was all -- because we were excited about getting something what I thought was good done. Because, see, all this would have been hidden if the AML had funded. And if this had been all of our money, there'd have been nothing illegal with what we did. The risk we took is we borrowed money from banks that isn't our money, and we

risked it on the betting on the come of AML. That's wrong.
Q. Well now --
A. And we knew it was wrong.
Q. I'm sorry. I didn't mean to interrupt you.
A. Sorry.
Q. No. Please, finish your answer.
A. And we knew it was wrong.
Q. And in terms of the AML loan. You've seen some documents, and we've seen the $550,000 from the Worlund loan that didn't go out until later in the summer. Isn't that correct?
A. That is correct.
Q. And as a matter of fact, there hadn't been any discussion about AML until after these lot loans were almost complete. Isn't that correct?
A. Mr. Fischer, if there wasn't any hope for funding in Seven Falls, we would have rolled up the sheets. We knew we had this funding. Keith knew he had this funding. I believed Keith. Keith believed the people. Everybody believed. We believed this funding was coming in. AML had been involved with us for some time. And if it wasn't AML, it was a number of other hard money lenders because he knew that that was the solution to his problem. NBSC wouldn't raise their number high enough so

he could finish the project. So he had to get this money from somewhere else. That's why we did the lot program. We had to get -- he had to get his project moving again. He had -- he couldn't have liens on the property or no one's going to loan to you.

Q. And at the time of the first lot loan in April of '08, who was getting ready to put a lien on the property?

A. Well, I couldn't tell you.

Q. You couldn't name one specific vendor, could you?

A. No, I couldn't, because I didn't look into that.

Q. Well, you didn't think it was important. You just related that that was a major concern. Couldn't you have asked to look at the books?

A. Look at Keith's books? Not a chance.

Q. Did you ever ask?

A. Absolutely not. And I mean Keith keeps everything close to home. You don't look at Keith's books.

Q. So you didn't think, even though you loaned him $26 million bucks, that you could do a little due diligence and look at his books?

A. And that's why I'm a criminal.

Q. Mr. Gabler, your partner, was his accountant. Isn't that correct?

A. Maybe he looked at the books. Ask him.

Q. Well he was your partner, sir. Did you talk to

him about it?
A. Absolutely not. I don't talk to George.
Q. So George is your partner. You're involved in the lot loans with him. You end up -- you owe $26 million and you don't even talk to him about Keith Vinson's books?
A. Correct.
Q. Never occurred to you?
A. Never thought it would be possible.
Q. In terms of the initial development of Seven Falls. You said there was $2 million that was initially advanced that NBSC needed?
A. Yes.
Q. And you did have some dealings with NBSC about it?
A. I'm sorry.
Q. About the $2 million and what that would be for?
A. I didn't talk to NBSC about it.
Q. You didn't talk to Ms. Mode about it?
A. Not about the $2 million.
Q. You do know who Kim Mode is, don't you?
A. I do.
Q. She was a loan officer at NBSC. That might not have been her exact title but that was the area she worked in?
A. That's right.

Q. She was involved in the initial Seven Falls funding, was she not, sir?
A. She was.
Q. And the $2 million was for Keith to put into the project; is that correct?
A. That's right.
Q. And, you know, to acquire real estate for the project.
A. I agree.
Q. Correct?
A. I don't know exactly what he was going to use it for, but that's what I recall is that he said he was going to go buy -- put it into land. But I don't have any idea what he actually did with it.
Q. Okay. And NBSC was well aware that you were using your financial wherewithal to borrow the money for Keith. Correct?
A. That's right.
Q. That's what they told you to do or they wanted to get done. Is that correct?
A. Well, I don't know so much about they wanted me to do -- on the $2 million? Are we talking about the $2 million or the $4 million.
Q. Let's talk about $2 million first.
A. All right. The $2 million, Keith came to me -- I

did it for Keith, period. What Keith said was that this was going to be seed money or equity money into the project. And he used that $2 million to do whatever he did. I asked -- that conversation also took about three minutes.

Q. And what about the $4 million? Did you have any conversations with NBSC about that?

A. Absolutely.

Q. And that was with Ms. Mode again?

A. Well, the first conversation was with Keith. The problem Keith was having is that he only -- they only gave him $25 million at NBSC.

Q. Would that mean that this project was underfunded from the start?

A. Isn't that the number one reason that things fail in our country: Undercapitalization?

Q. Well, let's specifically talk about this project.

A. I mean this project needed $100 million. They gave him 25, and it ain't gonna work. NBSC came up with ways to keep Keith at whatever limit he was at and that's why we did the $4 million at Zeus. But it was only going to be for 30 days because it was going to be taken out of the Founder's program. That was the reason for the 30 days. When those started closing, his numbers would come down with the release fees and the $4 million slides back

over to Keith.
Q. How much dealings did you have with NBSC in terms of their initial investment in Seven Falls, if any?
A. Not much at all. As far as -- are you talking about the $25 million loan?
Q. Yes, sir.
A. No, I haven't had any.
Q. Okay. And you would agree, would you not, that the $20-plus million came in a series of loans? It wasn't one lump sum that was started.
A. Yeah, that's a better question for Ray. I know that they came in pieces, yes.
Q. And it really would have taken a $100 million to do the project right, in your opinion?
A. I think if he'd got $100 million he'd have made $100 million. That's what I think.
Q. Now, did you have any conversations with NBSC about trying to get them to go to Synovus, their parent bank?
A. I certainly did. I said you're killing him.
Q. Who did you talk to at NBSC?
A. Kim Mode.
Q. And just to make sure I'm clear. Why was your role to be having those conversations with NBSC about the Seven Falls financing?

A. Well I don't know why it would be my role to have any conversations about anything that we've talked about right now. I mean,

Q. But you did?

A. The bottom line is Keith and I were friends and we worked together all the time. It's very seldom that I was out doing something on my own trying to help Keith without Keith knowing it.

Q. Now, I think you had mentioned that there came a time when the activity of the development out at Seven Falls actually slowed down or pretty much stopped, I think, was your word. Is that correct?

A. Stopped. I mean it slowed down significantly, yeah.

Q. Now there was that June 2008 event we've talked about, the Kenny G and Arnold Palmer thing.

A. And that's great for the future, but it wasn't helping then.

Q. And wasn't it several months after that that the golf academy itself was completed?

A. It never was completed. It's still not completed.

Q. Well there was a lot of work done on the golf academy in the months following the June 2008 event, was there not?

A. I think so. I think Windsor Autrey got a contract

to go build on that.
Q. There was some additional road work done; is that correct?
A. I don't know.
Q. How often were you out at Seven Falls?
A. I don't know. Once a week? But I wasn't running around on Seven Falls. I was typically going to see Keith in his office.
A. But, I mean, it's not hard to tell whether there's much going on or not. I mean that's not a difficult task.
Q. If I can have just one moment, Your Honor.
THE COURT: You may.
(Discussion held off the record between Mr. Fischer and the Defendant.)
(Back on the record.)
BY MR. FISCHER:
Q. Sir, do you have any knowledge of -- and given the spring of 2008 -- what draws NBSC was making to Seven Falls from their funding?
A. I have no knowledge of any draws ever coming from NBSC to Seven Falls.
Q. Okay. That's just -- you don't -- that's just nothing you have knowledge about one way or another?
A. I mean, I don't see it.

Q. If you know, sir, how much work was being done at the time of these lot loans in April, May and June of '08?
A. How much work?
Q. How much work out at Seven Falls?
A. Well, it's very possible that when we started getting money in -- I don't know. I didn't pay any attention to that. If you looked at what happened during the four months, five months, what we were doing in terms of getting money, the only place I was ever at was at a bank or with investors trying to get things done. But I can -- I would think that Keith might be able to get things moving again with the money that was injected into the project.
He got his bonding on July 17th. Supposedly, that was going to free up money with NBSC. So my guess is that money was going and paying the vendors that needed to be paid so they wouldn't put any liens and the project would continue to move. And then unfortunately, what happened is AML didn't fund. If AML had funded, it would have been a different story.
Q. And the final determination that AML wasn't funding wasn't until, basically, the fall of 2008. Isn't that correct?
A. I think that's correct.

Q. They gave their commitment letter, the money got sent, and it just kind of fell apart. It just didn't happen for whatever reason.

A. Didn't happen.

Q. And even after that, Keith continued to go to other hard money lenders to try to get money to keep the project going. Isn't that correct?

A. He did. He did.

Q. He went to a place called -- well, he went to other places. Isn't that correct?

A. Right.

Q. You were aware of those ongoing efforts.

A. I knew that Andrew, he, and George were working on those kinds of fundings quite extensively. I didn't know what they were.

Q. Thank you, sir.

A. Do what?

THE COURT: Any redirect?

MR. SAVAGE: No, Your Honor.

THE COURT: May Mr. Cashion be released?

MR. SAVAGE: Your Honor, we would like Mr. Cashion to be subject to recall by telephone, but he need not wait in the courthouse.

THE COURT: Okay. Mr. Cashion, you may step down. You have not been released from your subpoena.

That means that you are subject to being recalled in this trial. You need to be aware of how the U.S. Attorney's office or how Mr. Fischer may contact you to bring you back to this trial.

THE WITNESS: Okay. Glad to.

THE COURT: But you may step down.

THE WITNESS: Thank you, Your Honor.

(Witness excused at 5:20 p.m.)

**CERTIFICATE**

I, Tracy Rae Dunlap, RMR, CRR, an Official Court Reporter for the United States District Court for the Western District of North Carolina, do hereby certify that I transcribed, by machine shorthand, the proceedings had in the case of UNITED STATES OF AMERICA versus KEITH ARTHUR VINSON, Criminal Action Number 1:12-CR-20 on October 10, 2013.

In witness whereof, I have hereto subscribed my name, this 4th day of June 2015.

__/S/__Tracy Rae Dunlap__
TRACY RAE DUNLAP, RMR, CRR
OFFICIAL COURT REPORTER