UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Asheville Division)

---------------------------x
UNITED STATES OF AMERICA, :
Plaintiff :
:
:
vs :Criminal Action:1:12-CR-20
:
KEITH ARTHUR VINSON, :
Defendant. :
---------------------------x

Wednesday, October 9, 2013
Asheville, North Carolina

The above-entitled action came on for a Jury Trial Proceeding before the HONORABLE MARTIN K. REIDINGER, United States District Judge, in Courtroom 1 commencing at 9:06 a.m.

**APPEARANCES**:
On behalf of the Government:
DON GAST, Esquire
Office of the United States Attorney
100 Otis Street
Asheville, North Carolina 28801

MICHAEL E. SAVAGE, Esquire
U.S. Attorney's Office
227 W. Trade Street
1700 Carillon
Charlotte, North Carolina 28202

On behalf of the Defendant:
JOHN C. FISCHER, Esquire
Randolph and Fischer
318 Indera Mills Court
Winston-Salem, North Carolina 27101

Tracy Rae Dunlap, RMR, CRR 828.771.7217
Official Court Reporter

# I N D E X



| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ken Porter-Shirley | | 455 | | |
| Andrew Hager | 468 | 586 | 636,657 | 653,659 |
| Kostantinos Rantzos | 660 | 691 | 693 | |
| Nicholas Dimitris | 695 | 776 | 795 | 798 |



# E X H B I B I T S



| | Page |
|---|---|
| Government's Exhibit 143-A | 524 |
| Government's Exhibit 162 | 689 |
| Government's Exhibit 163 | 689 |

| | Page |
|---|---|
| Reporter's Certificate | 803 |

**P R O C E E D I N G S**

THE COURT: Good morning, everyone. Is there anything we need to address before we bring the jury back in? Anything for the government?

MR. GAST: No, Your Honor.

THE COURT: Anything for the defense?

MR. FISCHER: No, Your Honor.

THE COURT: Marshal, please bring us the jury.

(Jury returns at 9:08 a.m.)

THE COURT: Ladies and gentlemen of the jury, good morning. Thank you for being here on time so that we can get started on time. I apologize for leaving you in the jury room a few extra minutes this morning. We had a couple of technological difficulties to contend with, but I believe that we have solved those and we are able to continue.

Before we resume let me ask, as I have done before, has anything occurred since we recessed for the evening yesterday that any of you need to bring to the attention of the Court? Seeing that there are none, we will continue.

Dr. Porter-Shirley, I'll ask that you, please, return to the witness stand. You were sworn in yesterday as a part of this proceeding and you remain under oath until this trial is over.

(Witness resumes the stand at 9:09 a.m.)

THE COURT: Mr. Fischer, you may cross-examine this witness.

MR. FISCHER: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. FISCHER:

Q. Dr. Porter-Shirley, how are you doing this morning?

A. I'm doing well. Thank you.

Q. I just want to ask you a few questions to follow up on some of the things we went over yesterday. You have met} with the government and their attorneys several times prior to your testimony; is that correct?

A. That's correct.

Q. About how many times?

A. I believe it's three, maybe four.

Q. And if you added it all together, about how long would those meetings have taken?

A. Six hours, maybe.

Q. You and I have never had a chance to talk until now; is that correct?

A. That's correct.

Q. Now did I understand, Doctor, that your first knowledge that there might be a purchase of this lot 130 at Seven Falls was while you were overseas?

A. No, it would have been after that.
Q. When, actually, you were you in Senegal?
A. I believe it was April or March.
Q. Of what year?
A. 2008.
Q. And you were traveling with who?
A. Buck Cashion and Ed Worlund.
Q. And this was with regard to an investment opportunity in Senegal?
A. That's correct.
Q. It had nothing to do with real estate like we're talking about here.
A. Not real estate in the United States. No.
Q. And did I understand that Mr. Gabler had been your accountant for some time?
A. That's correct.
Q. And when did you give him the power of attorney that was referenced yesterday?
A. It would have been right before we went -- that I went out of town. So, like, a week before or a couple of weeks before.
Q. How long were you out of town on this trip?
A. A week.
Q. And when you returned did the power of attorney continue in effect?

A. I don't know the technical details. I don't believe so. I think it was specific to this arrangement.
Q. Let me make sure I'm clear. When did you first hear about the opportunity to purchase lot 130?
A. It probably would have been about a month or so before the closing.
Q. And from whom did you hear this opportunity?
A. It was either Andrew Hager or Buck Cashion.
Q. Certainly, it was not from Keith Vinson.
A. No.
Q. As a matter of fact, did you deal with Mr. Vinson at all in conjunction with your purchase of lot 130?
A. No.
Q. Did you ever have any discussion with him about your purchase of lot 130?
A. No.
Q. At any point did he tell you to lie to some bank or some banker about anything in conjunction with this sell?
A. No.
Q. And I believe you had indicated that you had initially met Mr. Vinson a few years earlier; is that correct?
A. That's correct.
Q. And how did you meet him, sir?

A. George Gabler introduced me to him because of the Waightstill Mountain deal.
Q. And as a matter of fact, Mr. Vinson tried to sell you a lot out there, didn't he?
A. He did.
Q. And you thought the price was too high and took a pass on that one?
A. That's correct.
Q. When did you first hear about the Seven Falls development, Doctor?
A. I'm not a hundred percent sure. Probably 2006, maybe, or 2007.
Q. But you did in fact purchase a lot at the Founder's Day event; is that correct?
A. I did.
Q. Okay. You were invited to that event by Mr. Peltz, the attorney who closed a number of these loans, is that right?
A. That's correct. Well he introduced me to -- I had a meeting with Keith, and I believe that Keith invited me to the -- like, Peltz arranged the meeting for me to meet with Keith.
Q. And had Mr. Peltz been somebody you had dealt with prior to that?
A. Yes.

Q. In what connection?
A. He had closed a number of loans for me on previous deals that were unrelated to Seven Falls.
Q. Did you and Mr. Peltz have any social relationship, or is this purely professional?
A. No, no. We're friends.
Q. Now with regard to the lot you purchased at Founder's Day. Did I understand there was kind of a lottery?
A. Yes.
Q. And once your number was called you were able to pick which lot that you wished?
A. That's correct.
Q. And was there a kind of map up so you could kind of see where your lot was and compare it to the other lots?
A. Yes.
Q. And there was an incentive program in effect to buy lots with NBSC at this event. Is that accurate?
A. Yes.
Q. And that included certain provisions that made the sell more attractive to you. Is that correct, sir?
A. Yes.
Q. And that would include a discounted price.
A. Yes.

Q. And it would include an interest carrier provision; is that correct?
A. Yes.
Q. It also included 100 percent financing. Is that accurate?
A. Yes.
Q. And as you considered all those things you thought it was a good deal for you.
A. Yes.
Q. Was it your intention at that point to build on the lot, or was this more an investment for you?
A. It was more of an investment but I believed there was a provision that you had to build on it over a period of time.
Q. What was the term of your loan with NBSC?
A. I'm not sure.
Q. It wasn't a 30-year mortgage, was it?
A. No.
Q. Now once you had purchased your lot did you have occasion, in the months that followed, to see the development at Seven Falls? See what was going on out there?
A. Yes.
Q. And there was work being done; is that correct?
A. Yes.

Q. Roads were being cut.
A. That's correct.
Q. Other infrastructure was put in?
A. Yes.
Q. At some point there was a golf practice facility constructed; is that right?
A. Yes.
Q. Now I believe you said you aren't really a golfer.
A. Not a very good one, no.
Q. Did you use that practice facility?
A. Maybe once or twice.
Q. Okay. And this was a very nice piece of work. Would you agree with that?
A. Yes.
Q. Now with regard to, again, your purchase of lot 130. Mr. Hager was the one that -- do I understand that Mr. Hager is the one you primarily dealt with?
A. Him and Buck.
Q. And by "Buck," you're referring to Buck Cashion?
A. That's correct.
Q. And before the subject of lot 130 came up you had had some prior business arrangements with Mr. Cashion. Is that accurate?
A. Yes.
Q. And could you describe those business

arrangements, please, sir?
A. The biggest one was the investment in Seven Falls, me and Buck. That was, I believe, the first interaction financially with Buck.
Q. And which investment in Seven Falls would that have been?
A. That would have been the Green River property and the equity that was raised at Green River and then given to Seven Falls via Zeus.
Q. And did that somehow relate to your company Pisgah Properties?
A. That was independent of Pisgah Properties.
Q. Well what was Pisgah Properties set up for?
A. It was set up years before. I set it up specifically just to develop real estate.
Q. And you borrowed some money to do that; is that correct?
A. Yes.
Q. And that was from whom?
A. There was a number of loans and a number of different deals within Pisgah Properties.
Q. I believe you mentioned that you had borrowed some money from -- at one point about $1.6 million from one particular bank?
A. I believe it was $1.8 but, yeah.

Q. Something in that range. Which bank was that, sir?
A. That was Home Trust. But that was not part of Pisgah Property Solutions. That was the Green River deal.
Q. Okay. So that was a totally separate situation?
A. Yes.
Q. But, again, for development of real estate.
A. Right.
Q. What money did Pisgah Properties borrow and from whom?
A. That was from Carolina First. It was a lot -- or about 400 acres out in the Old Fort area next to Queens Gap.
Q. And did you have some dealings with a gentleman named Devin McCarthy with regard to that deal?
A. Yes. We had --
Q. Who is "we?"
A. Me and George Gabler. We had purchased about 400 acres right next to the Queens Gap development, and he wished to acquire it to make his development bigger.
Q. Talking about "he" being Mr. McCarthy?
A. That's correct.
Q. And what year would that have been, sir?
A. I believe it was 2007. It may have been 2006.

Q. And you and Mr. Gabler worked together to acquire this property adjacent to Queens Gap?
A. Yes. It was introduced to us via one of the partners in the Green River deal.
Q. And when you borrowed the money from Carolina First for this acquisition, what sort of process did you have to go through?
A. We met with the bank and just explained the deal and told them what we were thinking.
Q. And was the plan, then, to acquire the property with the hope of reselling it at a profit to Mr. McCarthy at Queens Gap?
A. Initially, no. We just thought it was a very good deal and heavily discounted, so we thought that we could likely move it fairly quickly.
Q. Okay. And do I presume in the process of your dealings with Carolina First bank you fully disclosed that this was the purpose of the loan?
A. That's correct.
Q. Now with regard to lot 130 again. Do I understand you did not actually attend the closing for that?
A. That's correct.
Q. Okay. And was Mr. Gabler acting as your attorney -- through that power of attorney at that closing, as far as you know?

A. That's correct.
Q. Okay. Did you even know for sure what the purchase price was to be?
A. I believe I had seen the HUD statement prior. Yes.
Q. And do you recall what purchase number was on that HUD statement that you saw prior to closing?
A. You know, I've been shown the materials so many times the numbers get jumbled up. I mean I specifically remember the loan amount, but the actual purchase price I'm not sure. I had that in my memory, you know, prior to this conversation.
Q. And I believe you reviewed the purchase and sell contract yesterday when Mr. Gast was examining you?
A. That's correct.
Q. And I believe you discussed a provision in that contract that was entitled "Repurchase Option."
A. That's correct.
Q. Okay. And do I gather you had not actually read that contract prior to closing?
A. I think it was given to me prior to closing. Not at the day of closing but prior to me leaving on my trip. I believe I had read through, you know, cursorily. I hadn't really picked it apart.
Q. Do you recall reading that repurchase option

provision?
A. My memory of what the deal structure was was different than that paragraph.
Q. But having read that paragraph yesterday, you would agree it clearly gives the seller, Seven Falls, the option but not the obligation to repurchase the property.
A. That's how it reads, yes.
Q. But you understood that there was going to be a guaranteed buy back at the end of the loan period?
A. That was my understanding.
Q. And you understood that from whom?
A. I believe it was Buck Cashion or -- and Andrew. I think it was common knowledge, at least between those two. And George Gabler also had that assumption.
Q. You never had any dealings with Mr. Vinson in which that subject even came up; is that correct?
A. That's correct.
Q. This all came from either Cashion, Gabler or Hager?
A. That's correct.
Q. Actually, it was these gentlemen that you mostly dealt with over the course of the entire process by which lot 130 was purchased.
A. They were the only ones I dealt with.

. That would be all the questions I have. Thank you.

THE COURT: Any redirect?

MR. GAST: No, Your Honor. Thank you.

THE COURT: May Dr. Porter-Shirley be excused?

MR. GAST: Yes, Your Honor.

THE COURT: Any objection?

MR. FISCHER: No, sir.

THE COURT: Thank you, Dr. Porter-Shirley. You may step down. You've been released from your subpoena. You are free to go.

(Witness excused at 9:22 a.m.)

MR. GAST: The United States calls Andrew Hager.

THE COURT: Come forward to be sworn.

(Witness duly sworn at 9:22 a.m.)

THE COURT: You may proceed.

MR. GAST: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. GAST:

Q. Good morning, sir.

A. Good morning, sir.

Q. If you would, please tell the members of the jury your full name.

A. My name is Andrew Quinn Hager.

Q. All right. And how are you currently employed,

sir?
A. I am employed with Guthy Rinker Fulfillment Services in Arden, in the warehouse, and I also drive a commercial truck in the evenings.
Q. Okay. And how long have you been doing that work?
A. Approximately two years.
Q. And how were you previously employed?
A. I was previously employed as a banker, starting in 1996 through 2007. Got out of that and then did some financial consulting, and tried to start an Internet company.
Q. Okay. Tell me a little bit about your banking background.
A. Started out in consumer banking issuing consumer loans for cars, boats, an occasional home equity loan. Did that for many years and then transitioned into investment sales with the bank. So I wore many hats as a consumer banker. And then I left Wachovia -- that's where I was -- First Union became Wachovia, and then I left and went to Carolina First bank where I was a commercial lender.
Q. All right. And when did you end your time working at banks?
A. In 2007, approximately July.
Q. All right. Do you know the defendant seated here,

Mr. Vinson?
A. I do.
Q. How do you know him?
A. I met Mr. Vinson in a financial -- banking transaction in the fall of either 2002 or 2003 in Brevard.
Q. Okay. And at some point -- do you know Buck Cashion and Ray Chapman?
A. I do know Mr. Cashion and Mr. Chapman.
Q. How did you come to know them?
A. I knew them through -- I inherited their loan portfolio when I was with Carolina First bank.
Q. That was what time period?
A. That was in '03 and early '04.
Q. Okay. How about George Gabler? Do you know him?
A. Yes, I know Mr. Gabler.
Q. How did you meet him?
A. I met Mr. Gabler through a financial transaction with Mr. Cashion.
Q. Okay. Finally, about how about Ed Worlund?
A. Yes, I know Mr. Worlund.
Q. How do you know him?
A. Mr. Worlund worked very closely with Mr. Cashion. I believe he served under him in the military and continued to work with him outside the

military.
Q. Okay. So when did you meet Mr. Worlund?
A. Approximately the same time that I met Mr. Cashion.
Q. Okay. I want to show you what's been marked as Government's Exhibit 1,309. Do you see that on your screen?
A. No, sir, I do not.
Q. Do you see that now?
A. It says "No Signal Detected," and now it went blank.
Q. Okay. Sometimes it takes a second.
A. Okay.
Q. Is it up there now?
A. No, sir.
Q. All right. Well while we're waiting for it. Did you plead guilty to a Bill of Information here in federal court?
A. Yes, sir, I did.
Q. And was that a conspiracy count, conspiracy to defraud the United States, and a conspiracy to commit crimes against the United States, those being violations of Sections 1014 and 1344, bank fraud?
A. Yes, sir, they were.
Q. All right. And did you do that pursuant to a plea

agreement with the United States?
A. No.
Q. You didn't have a plea agreement?
A. No, no, no. "Pursuant." I misunderstood. I'm sorry.
Q. Right.
A. Yes, I did.
Q. All right. And we'll have -- is the Bill of Information up on your screen?
A. It is.
Q. All right. Great. And it's a four-page document. Can you just briefly describe what it is you pled guilty to in your own words? I know I stated the statutes. But if you just in the your own words state what you pled guilty to.
A. One of the things I pled guilty to was falsifying my loan application, overstating my income and my assets.
Q. All right. And you did so conspiring with whom?
A. Mr. Cashion and Mr. Chapman.
Q. Okay. And also stated in the Bill of Information -- is that Mr. Vinson, Mr. Gabler and Mr. Ollis?
A. Yes.
Q. Can you see that in your Bill of Information?
A. I do.

Q. All right. And prior to pleading guilty you signed this plea agreement; is that correct?
A. Yes, I did, sir.
Q. All right. And it, too, is a long document, is it not? The plea agreement is a multi-page document?
A. Yes, sir.
Q. I certainly won't ask you to read all that to the jury right now, but is there a provision in your plea agreement about the providing assistance to government if called upon to do so?
A. Yes, sir.
Q. Okay. And if you would, just in your own words, explain to the jury what you understand your requirements under the plea agreement to be.
A. My requirements are to be absolutely truthful about my actions and involvement in this case.
Q. Okay. And in the plea agreement are there -- does it set forth what the consequences are of testifying falsely under oath?
A. Yes, sir, they do.
Q. And what's your understanding of those consequences?
A. I'll be faced with additional imprisonment.
Q. All right. And have Mr. Savage or I or anyone else from the government, you know, told you what to say

other than to testify truthfully?
A. No, sir, you have not.
Q. All right. Thank you, sir.
Now you talked about meeting Mr. Vinson and Buck Cashion and Ray Chapman at some point in the past. At some time in 2007 did you come to work for those folks?
A. It was actually in 2008.
Q. Okay. I'm sorry. I interrupted you.
A. In the spring of 2008.
Q. That's right. And tell me how that came to be.
A. Mr. Cashion approached me and asked me to assist with closing loan transactions at Seven Falls as a contractor with a salary, or monthly fee, of about -- approximately $8,000.
Q. Okay. And so was that to be part of the sales force or is this something else?
A. It was something entirely different. I was responsible for taking loan packages and shopping them to the banks to get transactions closed.
Q. All right. And was it because of your prior banking experience that they hired you, or was it some other reason?
A. I would assume that was the reason.
Q. Okay. And you said you were going to be paid a monthly stipend. Who was supposed to be paying you?

A. Mr. Vinson.
Q. Okay. And where exactly did you work?
A. I worked at the facility at Seven Falls. They had a large warehouse but also had an office component to it, and I was working from the boardroom table upstairs. I didn't really have my own office.
Q. And is that building -- is that the Liberty Plastics plant building?
A. Yes, sir.
Q. All right. And did Mr. Chapman and Mr. Cashion work there as well?
A. On occasion. Their office was at 32 Orange Street at the time.
Q. And what's 32 Orange Street?
A. Gabler Molis and Company, Certified Public Accountants.
Q. Okay. And did that accountant firm also have some office space to rent?
A. Yes.
Q. All right. And I asked you who was supposed to be paying you. Did you in fact get paid?
A. I believe that I did get one payment and a partial payment, but it was not consistent and made things very difficult for me financially.
Q. All right. So did you get paid as you were

promised?
A. No, sir.
Q. All right. When -- and did Mr. Vinson work -- we've heard some testimony about Mr. Vinson working at a couple of different places. At the time you were working with Mr. Vinson, was he still working at the Liberty Plastics building?
A. Yes.
Q. All right. Now at that time -- and you said -- I'm sorry. Did you say what month it was you started?
A. It was either late April or early May of 2008.
Q. Okay. What was happening at Seven Falls when you joined the team? And by that I mean the development work.
A. Things appeared to be full steam ahead. They were moving forward with construction at the golf course. They had many of the holes laid out and a lot of the site work done. The site itself was very favorable to a golf course. There wasn't a ton of site work that needed to be done. They were busy cutting in roads and working on the practice facility.
Q. Okay. And what was the level of completion? If you could express that in a percentage, if you know.
A. When I started probably between 20 to 30 percent tops.

Q. Okay. Did it ever exceed that level of completion in your time there?
A. It might have crept a little bit more but not a whole lot.
Q. And at the time you started, were there any apparent financial concerns that you observed?
A. Not at the onset, sir.
Q. Okay. And how were lots selling in 2008?
A. They had cooled off dramatically from what they did in 2007. Had a very remarkable first six months out of the gate with the Founder's lots closing and then some additional sales pursuant to that, but things definitely started slowing in 2008.
Q. All right. I'm going to show you what's previously been entered as Government's Exhibit 1322. Ask to publish that to the jury again, Your Honor.
THE COURT: You may.
MR. GAST: Is this -- I'm sorry. We have to wait until it comes up on the screen.
THE COURT: Ladies and gentlemen of the jury, do you have that exhibit on your screens now?
THE JURY: (In unison.) "Yes."
BY MR. GAST:
Q. Can I see if I can go turn that TV on? It looks like that one's not on. That's my cue to know when it's

on over there. There we go okay.
Can you see that on your screen, sir?
A. Yes, I can.
Q. Now you previously testified that you were hired to assist with a series of loan closings. Is this that series of loan closings that you were describing?
A. Yes, sir, it is.
Q. Now were you there from the very beginning on April 24th, or did you start a little later?
A. I started a little bit later.
Q. All right. About -- approximately what bank did you start with?
A. I believe it was Southern Community Bank and Trust.
Q. All right. And the very last loan there it says, "Hager and E. W." Is that a loan that you took out?
A. Yes, sir, it is.
Q. And who's E.W.?
A. That would be Mr. Worlund. Ed Worlund.
Q. All right. And would you agree that this is a lot of loan activity in a very short period of time?
A. Yes, I would.
Q. Okay. And had these -- had all these loans been in the works for months and just happened to close around the same time, or did all this -- did all of this get

done in a hurry?
A. It was done in a hurry, sir.
Q. Okay. What was the rush?
A. To raise capital for the development.
Q. Okay. Now, you've been a banker. What effect, if any, would this rate of speed have on the quality of underwriting?
A. It would go down dramatically, sir.
Q. And why is that?
A. Because the bank wouldn't have time to properly assess the risk composed with each transaction or potential risks.
Q. And were you and Mr. Cashion and Mr. Chapman, Mr. Gabler, were you putting pressure on the banks to go more quickly?
A. Yes, sir, I was.
Q. All right. And how did you do that?
A. By just constant contact. Asking them if they needed any information. What's the status? Getting updates. Making sure they had all the information that they needed. Facilitating any questions that they had. I would get them to the appropriate party to get the answer to get back to the bank so they could reach a decision.
Q. All right. Did you have any conversations with

Mr. Vinson specifically about the speed or pace of these closings?

A. Not that I recall.

Q. Okay. And what were these loans for?

A. These were to purchase lots from Seven Falls, but they were to remain in inventory. If Customer A came off the streets to buy one of the lots that was sold here to an insider that lot would be available for sale to that person.

Q. All right. And what was the purpose then of the money?

A. To continue funding the development operations.

Q. Okay. Why not just sell them to folks coming in off the street?

A. As I said, the market had slowed down at that point and there was traffic coming in but it wasn't sufficient to keep up with this volume.

Q. All right. We've heard some testimony previously that approximately 90 lots or so had sold in 1997 -- you said it dropped off or cooled. How many lots had been selling to people other than -- excluding this list.

A. It was very few, maybe ten to 12 subsequent to that, if I recall correctly.

Q. And that was for all of 2008; is that right?

A. Yes, sir.

Q. And I take it you know what a "lot release fee" is?
A. I do, sir.
Q. All right. Did you hear any conversations with -- from Mr. Vinson about lot release fees being an issue with respect to these closings?
A. Not that I recall. There were some conversations during the course of the time that I worked there where I could overhear him in the office next door discussing, but I don't know which particular lot. But that was -- did take place to my knowledge.
Q. And when you heard Mr. Vinson discussing the lot release fees, what was the nature of the conversation?
A. Generally, trying to either get it reduced or eliminated or make it up some other way.
Q. Okay. Now I want to show you Government's Exhibit 126. We'd move to publish this to the jury, Your Honor.
THE COURT: You may.
BY MR. GAST:
Q. Can you see that?
A. Yes, sir.
Q. All right. Now at the time you began shopping these loans to banks, was this -- had you seen this document?
A. No, sir, I had not.

Q. All right. But you've seen it since that; is that correct?
A. That is correct.
Q. Okay. Now even if you weren't familiar with this document at the time, were you familiar with some of its terms?
A. Yes.
Q. All right. For example, that -- let's zoom in on three if we could.
Q. That all the costs associated with the loan be borne by Seven Falls. Were you familiar with that term for these loans?
A. Yes.
Q. Okay. And by Seven Falls, who did you mean by that?
A. Mr. Vinson.
Q. All right. And that these would be 24-month interest only loans. Correct?
A. Yes, sir.
Q. Okay. And that there would be an interest carry account that came from closing the proceeds.
A. Yes, sir.
Q. And that -- did that in fact occur on every one of these closings?
A. To my knowledge it did.

Q. All right. And that money would be paid that was owed to Zeus Investments? Did you know whether or not that occurred?
A. I was aware of some discussions about that. I don't know exact dollar amounts but I do know that there were discussions.
Q. All right. And if you'd just remind the members of the jury. Who is Zeus?
A. Zeus Investments was Mr. Cashion, Mr. Gabler and Mr. Chapman.
Q. Okay. And you previously mentioned 3D there -- that Seven Falls will continue to market these sold lots in the developer inventory as if they were still unsold. Is that right?
A. Yes, sir.
Q. Did that in fact occur in these transactions?
A. Yes, it did.
Q. And that Zeus Investments would be paid some money back for holding these loans.
A. Correct.
Q. All right. And did you in fact receive in your deal -- and we'll talk about that in detail in a few minutes, but did you in fact receive all those terms in your deal?
A. To my knowledge, yes, I did.

Q. All right. Now with respect to this -- if we can go back to 1322, please. With respect to this list of transactions. Did you or anyone else on this list, you know, haggle over the price with Mr. Vinson or try to get a better deal for your lot?
A. No, sir. Never even came up.
Q. Why not?
A. As I understood the transaction there was very little risk to the borrower with the buy back provisions. No money down on the transaction. The borrowers had very little skin in the game, had nothing to lose, so the price didn't really matter.
Q. Is it fair to say that's unusual from a typical real estate transaction, that the price doesn't matter?
A. Yes.
Q. In fact, was it actually better for a higher price?
A. It was indeed.
Q. Why is that?
A. Because more money was available to go back to the development.
Q. Okay. And how did it being a higher price benefit you if at all?
A. It didn't.
Q. What were -- well, were you getting a percentage?

A. I was supposed to but I did not.
Q. Okay. Had the deal followed through, would it?
A. It would have been beneficial, yes, sir.
Q. All right. So at the time you signed the dotted line, did you see it as a benefit or --
A. It was definitely an incentive.
Q. All right. To have a higher price?
A. Yes.
Q. And prior to -- did you or anyone else on this list -- prior to purchasing a lot, did you go out to Seven Falls and select, you know, your favorite homesite?
A. I only did that with the founding lot. I was allowed through the lottery that they had there to select my lot, but this did not occur on any of these transactions to my knowledge.
Q. Okay. Again, why not? Why not pick a lot that you wanted?
A. Because the idea wasn't going to hold forever. Either they're going to be taken out with the master loan, or the developer was going to buy them back. So it didn't matter.
Q. Okay. We haven't talked about the master loan. What is that? What do you mean by that?
A. There was -- concurrent with this, there was planning from multiple different sources. But there was

a $60 million alleged commitment letter from AML Associates out of -- or near Chicago that had supposedly committed to funding Seven Falls $60 million, which was going to being the ultimate source of takeout for these loans.

Q. All right. And what is AML, if you know? Is that a bank?

A. It was kind of a hedge fund type of environment.

Q. Was it a bank or was it private investors?

A. It was private equity.

Q. Okay. You have you heard the term "hard money?"

A. Yes.

Q. Or hard money end lenders?

A. Yes.

Q. What does that term mean to you?

A. Hard money lenders are lenders who overlook normal banking criteria in terms of income and assets and make loans based on low loan to value at very high interest rates. And what I mean by that is someone may be cash poor or showing very little income, but they may have assets such as a beach front lot or something that they would pledge as collateral. A hard money loan would take that -- that lender would take an abundance of collateral and literally give you very tough terms hoping that you would trip up so that the money he extended you would be

easily covered by the collateral that he just zapped from you.
Q. All right. So we've heard some testimony in your absence about banking and about how in banking the primary source of repayment -- the preferred source of repayment is always that the borrower pay it back.
A. Correct.
Q. And would you agree with that in your experience as a banker?
A. Yes, sir, I would.
Q. And although a bank would prefer -- once it had collateral they would prefer not to be owners of property. Would you also agree with that assessment?
A. Yes, sir, I would.
Q. And is that different from how you described from a hard money lender?
A. Yes, it is.
Q. All right. Would -- under the definition you provided, or your understanding of the term "hard money lender," were Buck Cashion and Ray Chapman hard money lenders?
A. Yes, sir, they were.
Q. How about AML Associates?
A. Yes.
Q. All right. Let's back up then to where we left

off then. You talked about a master loan being taken out. So these loans -- then your understanding of how these loans would be repaid was by a master loan or what? I'm sorry. I forgot --
A. Or Mr. Vinson, or the development repurchasing the lots back.
Q. Okay. All right. As is it for that reason that it didn't particularly matter which home sites you had?
A. Yes, sir.
Q. Okay. Did you or anyone else on this list ever build a house on these, either for yourself or for speculative purposes?
A. No, sir.
Q. And again, why not?
A. I didn't have the money to do so.
Q. Well even if you had the money to do so, would you have built a house on it?
A. Not with the infrastructure not in place. No, sir.
Q. All right. So if you were expecting AML or some other hard money lender to come and invest $60 million in the project, was this -- was this a lot loan or was this more like a bridge loan?
A. More like a bridge loan.
Q. And I believe we heard some testimony but, again,

if you would tell us what a bridge loan is.
A. A bridge loan is typically a short-term source of financing to bridge a gap between operating needs now and the time it takes for the master transaction to take place.
Q. All right. Now when you and the others went to these banks, did you tell them this was a bridge loan or did you tell them these were lot loans?
A. I told them they were lot loans, sir.
Q. Okay. And if we could go to 126 and go to the first page of that e-mail. We'd again move to publish what's been previously published as Government's Exhibit 126.
THE COURT: You may.
BY MR. GAST:
Q. At the time, did you ever tell any of these banks that -- this list of banks that the project was -- looks great but it was out of money and that -- or that Messrs. Cashion, Chapman and Gabler needed to fill their coffers to get through this time period until Mr. Vinson had closings?
A. No, sir, I did not.
Q. Now on that list of loans -- and we can go back to 1322. Thank you. So on that list of loans, what were the loan terms for these? And I don't mean the

percentage rates. I imagine that would vary slightly from bank to bank. But what were the terms, generally?
A. Typically, there was a 25 percent developer credit which was ultimately a reduction in the purchase price. There was two years' worth of interest carried for each transaction put in the bank at -- in the deposit account at the bank that closed the loan, a two year maturity, and typically a developer repurchase agreement.
Q. Okay. So did you or anyone else on this list have to put any money down on these transactions?
A. Not to my knowledge, sir.
Q. Okay. And you were a banker. Is there an underwriting difference between a borrower putting 25 percent cash down in a deal versus getting a 25 percent seller's credit?
A. Yes, sir.
Q. Okay. And just describe for us in your own words as a former banker what effect that would have on underwriting had that offer been made to you as a banker?
A. Lenders typically like to see borrowers that have skin in the game. And what I mean by that is, if I come to the table on an $800,000 lot purchase I would be normally required to put 20 percent down or have $200,000 cash of my own that I put at risk that basically tells the bank I've got skin in the game. I have a vested

interest and will desire to pay you back so I don't risk losing my $200,000.
Q. And if a seller knocks 25 percent off the contract price, does that affect loan to value?
A. It does indeed.
Q. And if it affects loan to value, should that be reflected on appraisals?
A. It should be.
Q. All right. We're going to go over your appraisal in particular. But was it so particular reflected in the appraisals in these cases?
A. I don't recall that it was.
Q. Why was it done that way?
A. Because they were trying to get the maximum value for the lots to generate.
MR. FISCHER: Objection to the "they," Your Honor.
THE COURT: Sustained.
BY MR. GAST:
Q. Okay. Well what was your purpose when you did it?
A. I didn't argue with the amount that was there. I just went ahead and executed it because it didn't matter to me.
Q. Were you trying to get these loans closed?
A. Yes, sir.
Q. Okay. Now was it easy to find banks to do these

loans?
A. Not particularly.
Q. I mean it took a lot of work, isn't that true?
A. Yes, sir, it did.
Q. Did you get turned down at many banks?
A. I did.
Q. Okay. Did you have a lot of e-mails back and forth between yourself and Mr. Vinson and Mr. Cashion and Mr. Chapman kind of updating them on the progress of all this work?
A. There were some e-mails, but most of the conversations were either in person or on the phone. Mr. Cashion did not like to use e-mail.
Q. Okay. How about with Mr. Vinson?
A. There were some.
Q. Some e-mails or some phone conversations?
A. Some e-mails. And obviously I would give updates in person because he was in the same building as I was at the time.
Q. Okay. Well we have some of the e-mails, so let's go ahead and go through some of those. I'm going to start with Government's Exhibit No. 128. This is an e-mail between yourself and Mr. Vinson, and it's later forwarded to Mr. Chapman.
We would move to publish this previously admitted

exhibit to the jury, Your Honor.

THE COURT: You may.

BY MR. GAST:

Q. I believe it's -- let's zoom in on the bottom of the page there of your e-mail between yourself and Mr. Vinson.

Your Honor, if I may just be silent for a minute to give the jury time to read that for a minute. Your Honor, while they're reading, with the Court's permission I would like to publish with a board copy 1322, the list of lot loans. And I think the only place to put it is right about here, if that's all right with the Court.

THE COURT: Are you talking about putting it in the well of the court so that the back of it is to the defendant?

MR. GAST: Yes, Your Honor. It's the chart that's in the Bill of Indictment. He has his own copy. I just want the witness and the jurors to be able to see two exhibits at once, if that's all right.

THE COURT: Any objection to that?

MR. FISCHER: No, Your Honor. I guess I might need to step over, with the Court's permission, depending on the questioning.

THE COURT: Well try to set it up in a way that it does not block traffic in the courtroom.

MR. GAST: I'll do my best. It's difficult with our space.
BY MR. GAST:
Q. Is that an angle where you can see that at all, Mr. Hager?
A. I believe I can see that.
THE COURT: Can you turn it a little bit so that I can see it, too? You don't need to turn it too far.
MR. GAST: Is that all right?
THE COURT: That's fine.
BY MR. GAST:
Q. Okay. Now I can't see. Mr. Hager, I'm going to have to do something else. It seemed like a good idea at the time. I think that will work. Okay.
All right. Can you still see that all right, Mr. Hager?
A. Yes, sir.
Q. All right. Starting then with this e-mail to Mr. Vinson. First of all, did Mr. Rantzos end up buying lots 82, 85 or 102?
A. I don't believe he did.
Q. Okay. Where did they end up going, if you know?
A. There were a lot of changing of the lot numbers with different borrowers, and I don't recall exactly where they ended up. I don't see any of them on the list

there.
Q. Okay. All right. And did Mr. Porter-Shirley end up buying lot 130 at Bank of Asheville?
A. He did indeed. Yes.
Q. I'm sorry?
A. Yes, he did.
Q. Okay. Now this e-mail talks about going to Pisgah Community Bank. Why not Pisgah Community Bank?
A. Pisgah Community Bank did not have an appetite to do additional lot loans.
Q. Okay. And who ended up buying lot 139?
A. That would be myself and Mr. Worlund.
Q. Okay. And did that -- the e-mail references Mr. Porter-Shirley having some interest in it. Did you end up outbidding him on it? Or how did you get it?
A. No, sir, I did not have to outbid him. Mr. Cashion asked me to do it and I did it.
Q. Okay. Lot number 127. Well, first of all, who or what is Dion?
A. Dion Holdings was a real estate holding company that was founded by Nick Dimitris and Paul Kostas Rantzos?
Q. Okay. Now the e-mail talks about lot 127; that perhaps Buck Cashion was going to buy it. Is that right?
A. As I recall, yes.

Q. And it looks like it moved to a couple of different banks unsuccessfully to try to get it sold to him. Is that right?
A. That's correct.
Q. Now, in fact, lot 127 was sold to whom or to what entity?
A. It went to Dion Holdings.
Q. All right. Again, did Dion outbid Mr. Cashion to get that lot or get it in some kind of capitalist competition -- competitive way?
A. Not to my knowledge.
Q. Okay. And did Mr. Gabler end up buying lot 132?
A. I don't believe so. Let me -- no.
Q. Okay. And now your e-mail references that you were going to try to sell that lot, or that Mr. Gabler was going to take a loan on it anyway to lot 132. Do you know why he didn't?
A. Didn't qualify.
Q. Okay. And then lot 138 in the e-mail references Buck Cashion. Who ended up buying it or taking a loan out anyway?
A. That was again Dion Holdings.
Q. Okay. And again, same question. Did Dion outbid Mr. Cashion to get it?
A. No, sir.

Q. Okay. Is it fair to say that there are people -- that these folks didn't particularly care much which one they ended up with?
A. That's a fair assessment.
Q. All right. Now, did -- I asked if you were a salesman at Seven Falls and you said no. Did Mr. Vinson or Seven Falls have a sales staff?
A. They did.
Q. Okay. And were they participating in any of this?
A. Not to my knowledge.
Q. All right. Do you have a real estate license or anything like that, or a Realtor?
A. No, sir.
Q. All right. At the very bottom of this e-mail, that last comment: "I will build a new spreadsheet with loan amounts tonight." Do you see that there?
A. Yes.
Q. So this spreadsheet that you're talking about, were you keeping track of lot sales or were you keeping track of bank loans?
A. I was more keeping track of bank loans.
Q. Okay. So I guess -- I guess my question is, is that a spreadsheet that, for example, the sales staff needed in the ordinary course of business? Or was this something for yourself, Mr. Cashion, Mr. Chapman, and

Mr. Vinson?
A. The latter, sir.
Q. Okay. Now just reading this e-mail, it looks like it's a lot of banks. Is this a lot of work?
A. It's an incredible amount of work, sir.
Q. All right. Did you tell the bankers that -- any of these bankers that you were also shopping all these loans to all these other places?
A. I did not.
Q. Okay. As a former banker yourself, should it matter to the underwriting process if these people that are coming to your bank to take out loans are also taking out loans at a whole host of other banks?
A. It certainly should, sir.
Q. Why would that have affected your underwriting if you had been the banker in that circumstance?
A. I would have been concerned about the borrower's capacity to repay the debt.
Q. And is that why you didn't tell the banks that?
A. It is.
Q. Did you provide financial statements on behalf of Mr. Cashion, Mr. Chapman and Mr. Gabler to these banks and on behalf of yourself?
A. I did.
Q. Did these personal financial statements, did they

report these additional loans from these other banks?
A. I don't recall that they did, sir.
Q. Okay. All right. Let me show you another e-mail, Government's Exhibit 129. This has been previously entered into evidence, and it is an e-mail between yourself and Mr. Vinson and Jamie Babb dated May 30th. We would move to publish that to the members of the jury.
THE COURT: You may.
BY MR. GAST:
Q. And before they start reading. Who is Jamie Babb?
A. Jamie Babb was the loan assistant to Mr. Peltz.
Q. Okay. And that's the closing attorney who did these loans?
A. That is correct, sir.
Q. All right. Your Honor, if I could be silent for a moment to allow everyone to read.
THE COURT: You may.
BY MR. GAST:
Q. I see most people looking up, so I'll go ahead and continue. And before I get into this. We've shown that e-mail that was sent to Mr. Vinson. At any time, did Mr. Vinson ask you, you know, Mr. Hager why are you doing all these things? Or why are these lots flipping between people? Did he express any surprise about this?

A. No, sir.
Q. Now in this e-mail, first -- we're talking about, in the first portion, about the lots 128, 129 and 130. Did those loans end up closing at Bank of Asheville?
A. Let's see. Mr. Chapman's 128 did. Mr. Gabler's 129 did. I don't see 130. Oh. 130? Yes, it did. Ken Porter-Shirley.
Q. All right. Now there's a reference here to getting Mr. Ollis, Aaron Ollis. Is that who "Aaron" is?
A. Yes.
Q. All right. Getting him on the approved list. What's the "approved list" first?
A. The banks had to have appraisers, real estate appraisers, on their approved list. They had some internal qualifications to make sure that he was qualified. And they had seen his work and it was acceptable to be on their list.
Q. Why was it important to get Mr. Ollis on the approved appraiser list?
A. To make sure that the lots appraised for the value that they needed.
Q. All right. And did you believe that Mr. Ollis was the person who could get that done?
A. Yes.
Q. Now there's also the next paragraph about

Mr. Rantzos. That's Paul Rantzos. Is there another Mr. Rantzos?
A. Yes, his father, Kostas Rantzos.
Q. And lots 82, 85 and 102, according to this e-mail, did not get approved. Is that in fact true?
A. To my knowledge, yes.
Q. Okay. Now, let's see. This sentence here: "Paul will void out the contract on those three lots and substitute it for Buck's lot 138." I'm curious why you used the word "substitute" in that sentence.
A. Basically, he wasn't going to do the three lot loans previously, 82, 85 and 102. He was going to replace it with lot 138.
Q. And did Mr. Rantzos -- I'll try to use the first names because I know there's two Rantzoses, and we said there's Paul Rantzos. You said he was part of Dion; is that correct?
A. That is correct, sir.
Q. And so KNR, who is that? That's Q, R and S on this list here?
A. KNR would have been his father, Kostas Rantzos.
Q. All right. Now, did Mr. Rantzos -- and that's Paul Rantzos with Dion. Did he receive the same 25 percent seller's credit?
A. He did.

Q. Okay. And that sentence in that last paragraph or second to last, I guess, that he needs confirmation -- but needs confirmation that Paul is to receive the 25 percent credit so that he does not have to come to the table with any cash.
Q. Was that in fact what occurred in his loan?
A. Yes, to my knowledge.
Q. And why was it important that he not have to bring any cash to the table?
A. Because I don't think he had 200 and whatever was needed to put down.
Q. Okay. Even if he had had the money, did he have any desire or intent to do so?
A. No, sir.
Q. Okay. Why not?
A. Because if he can get it for free why would he put his money at risk.
Q. Okay. Was Mr. Rantzos buying this piece of property because he wanted to build his house on it?
A. No, sir.
Q. Okay. Did he get paid money to take out that loan?
A. Yes. He received the same deal as the others.
Q. Okay. Let's go to Government's Exhibit No. 130. This is also an e-mail between yourself and

Mr. Keith Vinson; is that correct?
A. It's blowing up. One second. Yes, sir.
Q. Your Honor, we would move to publish Government's Exhibit 130.
THE COURT: You may.
BY MR. GAST:
Q. I would ask permission to be silent to let the jury have time to read it. I think I see everyone looking up so I'll continue. First -- in that first paragraph with the bullet points, who is Eric Morris?
A. Eric Morris was a commercial loan officer for the Bank of Asheville.
Q. Okay. And there's reference in there to Buddy. Who's Buddy?
A. That would be Mr. Buddy Greenwood. Gordon Greenwood.
Q. Speak up a little bit. You trailed off at the end there.
A. That would be Mr. Buddy Greenwood. Gordon Greenwood.
Q. What was his title?
A. He was Eric's boss at the bank. He was the president at the Bank of Asheville.
Q. Okay. All right. And some loans, in fact, did get approved at Bank of Asheville; is that correct?

A. Yes, sir.
Q. All right. And Blue Ridge Savings Bank did those. It says here in this e-mail that those loans were -- or those loans were declined. Is that in fact what occurred?
A. Yes, sir.
Q. If we could zoom in on the paragraph that begins with the word "So." This -- you called it Plan D. Did Plan D go through as described in this e-mail?
A. Yes, sir.
Q. Okay. Why don't you just read into the record this paragraph, if you would?
A. Yes, sir. "So we have implemented Plan D. Paul Rantzos and Nick Dimitris are signing contracts that Jamie prepared, in quotes -- in parentheses (Within the next hour on lots 127 and 138). They will be hand delivered to you this afternoon for approval and signature. It is the exact deal you cut for Gus and Emily. Paul and Nick have agreed to let NBSC handle the financing because Paul has moved his lot loan from there to another bank. Nick has over a million dollars cash on hand right now and several hundred thousand in annual income. Should be a no-brainier."
Q. In fact, Mr. Paul Rantzos and Nick Dimitris, again, that's Dion. Is that correct?

A. Yes, sir, that's correct.
Q. Did that in fact occur? Did they end up closing on lots 127 and 138?
A. Yes, sir, they did.
Q. At the same bank or a different bank?
A. They were actually different banks.
Q. Okay. What were those two banks?
A. The names of the banks were Pisgah Community Bank and the Bank of Asheville.
Q. Okay. And that referenced the exact deal you cut for Gus and Emily. Now again, who is this e-mail to?
A. To Mr. Vinson.
Q. Okay. And who is Gus and Emily?
A. That is Gus and Emily Rantzos. That was Mr. Paul Rantzos' parents.
Q. Okay. I believe you called him Kostas Rantzos?
A. Kostas Rantzos, that's correct.
Q. Does he also go by Gus?
A. He does, sir.
Q. Is his full name Konstantinos, I believe it is?
A. Something to that effect, yes.
Q. All right. And what deal did they get?
A. The typical 25 percent down, guaranteed buy back within two years, two years' worth of interest carry, and then a one percent per month fee for using their credit.

Q. All right. So that's money they got paid monthly?
A. For doing the loan, yes.
Q. Now how often did you see Mr. Vinson in person when you were -- during this time period?
A. Fairly regularly. I mean he was in and out of the office. He was on site meeting with contractors and doing his typical thing.
Q. Is it daily? Weekly?
A. I would say a couple of times a week I would see him with some regularity but not necessarily every day.
Q. Okay. At any time did Mr. Vinson approach you and say, what deal? I didn't cut any deal. Or, what are you talking about? I don't know what you're talking about. Anything like that?
A. Not to my knowledge.
Q. Okay. And from whom did you know about this deal that he cut for Gus and Emily?
A. Mr. Cashion.
Q. Did you talk to Mr. Vinson about it directly, other than in this e-mail?
A. Not that I recall.
Q. Okay. Did he ever deny to you in any way that he cut that deal with Gus and Emily?
A. Not to my knowledge.
Q. Okay. And did Mr. Gabler end up buying lot 132?

A. 132. Bear with me. No. It doesn't appear that he did, sir.
Q. Okay. And again, who ended up buying lot 139?
A. That would be myself and Mr. Ed Worlund.
Q. Okay. Was Dr. Porter-Shirley upset that you ended up with it instead of him?
A. No, sir.
Q. Okay. This has previously been entered into evidence. Your Honor, this is an e-mail between Mr. Hager and Mr. Vinson. We'd move to publish that to the jury.
THE COURT: You may.
MR. GAST: If I can give the jury just a minute to read that. (Exhibit 131.) I think I see people looking up so I'll continue.
BY MR. GAST:
Q. Mr. Hager, what does this e-mail mean? Explain this to us.
A. The borrowers on those transactions were looking for their payment for tying up their credit. They were looking to be compensated under the terms of the agreement.
Q. Okay. Now Gus Rantzos -- again, just so we can be clear, is that the father or the son?
A. That is the father.

Q. Okay. And so this calculation is -- so this per diem figure, this daily figure, what does that mean?
A. It should have been one percent of the -- one percent per month of the outstanding loan amount.
Q. Okay.
A. So one month would have been $6,712.50, but there was some additional days there so the number was slightly larger. There was one extra day, so it's $6,936.25.
Q. And again, did Mr. Vinson ever call you or confront you at the office and say, I don't owe these people any money. What are you talking about? I'm not paying them to take any loans.
A. To my knowledge, he didn't respond.
Q. Ever deny any of the contents of this e-mail?
A. No, sir.
Q. Okay. Let me show you Government's Exhibit 132.
Your Honor, this is an e-mail thread between Mr. Hager and Ms. Cioce who testified yesterday. We would move to publish this to the jury.
THE COURT: You may.
BY MR. GAST:
Q. And let me -- go ahead and focus on -- first on the bottom. If you can center on the photo.
This is a request that Ms. Cioce had made of you; is that right?

A. That is correct.
Q. And without reading into the record word for word, what is she asking you for?
A. She's just asking for the status of the development, with particular concern about the infrastructure, the road and utilities.
Q. And she testified yesterday. Would you remind the members of the jury who Ms. Cioce is?
A. Mrs. Cioce was a loan officer for Old Town bank in Waynesville.
Q. I believe they saw this yesterday, so I'll keep going. But this in response to her question?
A. Yes, sir, it is.
Q. Without reading it word for word, for the record, what type of assessment are you giving her about the Seven Falls project?
A. That progress is happening, that it's moving forward.
Q. Okay. Did you give her any information about any financial concerns that might threaten that if progress comes to a halt?
A. No, sir, I did not.
Q. Okay. Had Mr. Cioce known that information -- you were a banker -- would that have been material to her decision making as to whether or not she should recommend

approval of that loan?
A. Yes, sir, it would have been.
Q. Let me show you Government's Exhibit 133. This is an e-mail -- I believe it was shown to the jury yesterday. But it's an e-mail between you and Ms. Cioce; is that correct?
A. That is correct.
Q. We would move to publish to the jury Exhibit 133, Your Honor.
THE COURT: You may.
BY MR. GAST:
Q. And this makes reference -- there was some discussion about this yesterday. But there was a reference to you making $100,000 deposit in that bank; is that right?
A. Yes, sir.
Q. Where did that $100,000 come from?
A. It came from my father.
MR. FISCHER: I didn't hear.
THE WITNESS: It came from my father.
BY MR. GAST:
Q. Specifically, was it a gift or --
A. I was going to use it to try to fund my business venture at the time I had going.
Q. And was Old Town bank your bank at the time?

A. No, sir, they were not my bank.
Q. Okay. But Old Town is one of the banks that provided a series of loans in this transaction; is that correct?
A. That's correct.
Q. Again, you're a former banker -- and this is a silly question -- but are deposits important to a bank?
A. Yes, sir, they're very important to a bank.
Q. Generally speaking, do the lure of deposits sometimes factor into a banker's lending decisions?
A. They do.
Q. Part of lending is establishing those relationships; is that fair to say?
A. That's correct.
Q. And is that why you selected Old Town Bank to be the bank that would hold that?
A. In part, yes. But I also had previously worked with Tommy Bourque. They were a young bank, and I wanted to see them be successful.
Q. Okay. Did that money remain in the bank for very long?
A. No, sir.
Q. Let me show you Government's Exhibit 134. This has been previously published to the jury yesterday, Your Honor, and we would ask to publish it again, Your Honor.

THE COURT: You may.

BY MR. GAST:

Q. If we could go first go to page two. Like all e-mail threads, sometimes it makes more sense to read it from the bottom. Do you recall sending this e-mail to Mr. Bourque after the loans closed with their bank?

A. Yes, I do, sir.

Q. And what was the offer you were suggesting or pitching to Mr. Bourque?

A. That they give a loan to Mr. Vinson, receive half a point origination fee, and then open a new deposit account for the bank.

Q. And this was suggesting that Mr. Vinson buy a lot where?

A. At Seven Falls?

Q. Okay. So Mr. Vinson wanted to buy one of his own lots?

A. That's correct.

Q. If he already owned those lots, do you suppose he could have just given himself a lot if he wanted one?

MR. FISCHER: Objection.

THE COURT: Sustained.

MR. GAST: All right. I'll withdraw that.

BY MR. GAST:

Q. Who ended up buying lot 139?

A. That was myself and Mr. Ed Worlund.
Q. Okay.
Q. Did Mr. Vinson ever express to you, gosh, I wish I got to buy that before you, you outbid me, or anything like that?
A. No, sir, he did not.
Q. So if I understand correctly, lot 139, according to these e-mails -- and correct me if I'm wrong. First, Mr. Porter-Shirley was going to buy it. Then Mr. Vinson was going to buy it. And then eventually, you and Mr. Worlund ended up buying it at the end of the day.
A. Yes, sir.
Q. Okay. Let me go to Exhibit -- I'm sorry. Just to finish this thought. Did Mr. Bourque end up doing that loan?
A. Not to my knowledge.
Q. Because you ended up buying it; right?
A. No. It went to another bank. That's correct.
Q. All right. This is an e-mail between yourself and Craig Gourlay; is that correct?
A. That is correct, sir.
Q. Your Honor, we would move to publish this to the members of the jury. It's previously been entered.
THE COURT: You may.
BY MR. GAST:

Q. While that's coming up on their screens. Who is Craig Gourlay,
A. Craig Gourlay was the Chief Credit Officer for Pisgah Community Bank.
Q. Okay. If I could give the members of the jury just a moment to read that. I think I see people looking up so I'll continue.
First, who's "Keith" in this e-mail?
A. Referring to Mr. Vinson.
Q. And it says Keith wanted me to pass along the following information. Did you in fact speak to Mr. Vinson, and did he in fact want you to pass on that information? Or was this something that you made up?
A. I was spoken to by Mr. Vinson.
Q. Okay. And he said he will get the Biltmore Forest contract to you today. What is that?
A. Mr. Vinson had a home and it was under contract to be sold in the Biltmore Forest.
Q. Okay. And was Pisgah Community Bank involved in that somehow?
A. I believe that they were. I can't say for sure, but I do believe they were.
Q. All right. So is this information that was conveyed to you by Mr. Vinson?
A. Yes.

Q. All right. Okay. And then this list of deposits. Tell us about what that's suggesting.
A. That Mr. Vinson would open up a quarter of a million dollar deposit with personal funds, as well as company funds from Seven Falls.
Q. All right. You testified a few minutes ago about the importance of deposits to a bank. Is Pisgah Community Bank any different in that regard?
A. No, sir.
Q. All right. Do you know -- do you know whether or not Mr. Vinson and/or Seven Falls followed through with this half million dollars deposits?
A. I do not know. No. No.
Q. Do you know why this bank in particular was selected to be the place to deposit this money, if it occurred?
A. To make themselves look good in the bank's eyes, I'm sure.
MR. FISCHER: Objection. Motion to strike.
THE COURT: Sustained. Ladies and gentlemen of the jury, you will disregard that last answer in any deliberations that you make in this matter.
BY MR. GAST:
Q. Were you dealing -- you and Mr. Cashion and Mr. Chapman, were you dealing with Pisgah Community Bank

in this series of loans?
A. Yes, we were.
Q. And in fact, at that time the first six loans to -- CBR is Community Bank of Rowan. Were they affiliated with Pisgah Community Bank?
A. Yes, they were.
Q. Can you just briefly describe that relationship?
A. Pisgah Community Bank was a start-up bank. And it's my understanding that the Community Bank of Rowan was warehousing loans -- was issuing loans for them.
Q. Okay. If it's -- if a bank is a new bank, are deposits more or less important to a new bank?
A. They're very much more critical.
Q. Okay. And did you end up following through with the $100,000 deposit yourself?
A. No, sir. I had to take money to the closing table to get my house sold.
Q. Okay. So what motivated you then to pass this information and this promise on to Pisgah Community Bank?
A. I was asked to do it.
Q. Okay. If we could go to Exhibit -- asked to do it by whom?
A. Mr. Vinson.
Q. Okay. Let's go to Exhibit 137. This is an e-mail between yourself and Keith Vinson in July of 2008; is

that correct?
A. Yes, sir.
Q. This has previously been entered, Your Honor, and we'd move to publish it to the jury.
MR. FISCHER: Which number was that?
MR. GAST: 137.
THE COURT: You may.
MR. GAST: Thank you.
BY MR. GAST:
Q. I see folks looking up so I'll resume my questions. Again, it probably makes more sense going from the bottom up. I won't ask you to read the whole thing into the record, but if you could just describe for us what's going on in this e-mail.
A. At the bottom, the -- apparently, Mr. Gourlay did not receive the copy of the purchase contract on the house in Biltmore Forest.
Q. Okay. And were you attempting to take care of that?
A. Yes.
Q. Okay. And this third paragraph, I guess, in the top e-mail starting with, "Due to your current exposure there." Well I'll just read it -- or why don't you read that paragraph to us?
A. Yes. "Due to your current exposure there, they

will have to participate a portion of this loan that exceeds their $1 million in house limit per customer. Dave, Mr. Smith, said that there could be some issue with how many lot loans that a participating bank has in their portfolio. Not a problem. Just wanted you to be aware."

Q. All right. You mentioned the name "Dave Smith." Who's that?

A. Dave Smith was a Commercial Loan Officer for Pisgah Community Bank.

Q. Okay. And you used the term "participating bank." What does that mean?

A. Each bank has an in house legal lending limit per borrower. Because this was a newer bank, I guess it was established that it was a --

MR. FISCHER: Objection.

THE COURT: Sustained.

THE WITNESS: Okay. The limit was at $1 million. So anything -- any request that went beyond $1 million, another institution had to participate in the funding of that because the initial bank could not have that much direct exposure to one borrower.

BY MR. GAST:

Q. And who was the participating bank for Pisgah Community Bank?

A. I believe it was Community Bank of Rowan.

Q. Okay. Did you have any other conversations with Mr. Vinson about loans to one borrower that you can recall?
A. Not to my knowledge.
Q. Let me show you Government's Exhibit 142.
Your Honor, this has previously been admitted. This is an e-mail between Mr. Hager and a Paul Olson. We would move to publish it to the members of the jury.
THE COURT: You may.
BY MR. GAST:
Q. Who was Paul Olson?
A. Paul Olson was a hard money lender or a broker for a hard money lender.
Q. Okay. And why were you sending Mr. Paul Olson, a hard money lender, a list of available lots in Seven Falls?
A. So we could seek additional funding.
Q. All right. This is that -- is it a "master loan," I believe, is the term you used earlier?
A. Yes.
Q. This is a prospective lender for that master loan?
A. That's correct.
Q. And was that, therefore, someone that's going to take out all of these loans if that went through?
A. That was my understanding, sir.

Q. Okay. Now, then attached are some attachments that give the -- well, why don't you tell me what the attachments are? Go ahead and go to page two of that, if you can. There you go. We'll stay on that page. What is this?
A. That was a list of total inventory that included unusable, sold, and available lots for sale.
Q. Okay. Now let's go through a couple of these. And this might be a little easier with color. There's some shaded blocks; correct?
A. Yes, sir.
Q. And the darker shaded blocks represent what?
A. Lots that were available for sale.
Q. And the lighter shaded blocks, what do they represent?
A. They were off the market or unsellable.
Q. Okay. Let's go through some of the ones that were part of this, what's identified in 1322, as the lot loan program. Starting with lot 98. On this list, is it showing available or unavailable?
A. It is showing available for sale.
Q. Okay. And that had previously been sold to Mr. Cashion on April 24th; correct?
A. That is correct, sir.
Q. Okay. How about lot 110 that was sold to

Mr. Chapman on April 24th?
A. It was showing as available for sale.
Q. Okay. How about lot 118 sold to Mr. Gabler on April 24th?
A. Yes, it was showing available for sale.
Q. Okay. Rather than switch pages, I'll stick with some of the lower numbers. How about lot -- let's see. Let's go to lot 66. It says that was sold to Mr. Chapman at Old Town Bank?
A. Yes.
Q. All right. And I could go on. But these lots -- this e-mail was sent in July; is that right?
A. Yes, sir.
Q. And that was after several of those lots I -- of those lots I just described; right?
A. Yes, had just closed.
Q. I believe you testified earlier that even though those lots were purportedly sold they would remain in dealer inventor. Say Mr. Savage or Mr. Seres walked in off the lot, they would be available for sales if they had never sold. Is that correct, sir?
A. That's correct, sir.
Q. Is this listing of what's available in Phase One consistent or inconsistent with that term of the agreement?

A. It was consistent.
Q. Let's go to Exhibit 888.
THE COURT: What number, Mr. Gast?
BY MR. GAST:
Q. 888. I might have typed it wrong. I'll just move on. Let's go to Exhibit 144. Exhibit No. 144. 143 is the one I want, excuse me.
This is Exhibit No. 143. This is an e-mail between yourself and Caroline Dixon with some attachments; is that correct?
A. Yes, sir.
Q. This has previously been entered, Your Honor, and we would move to publish this to the members of the jury.
THE COURT: You may.
BY MR. GAST:
Q. Okay. Who is Caroline Dixon?
A. She was the staff accountant for Seven Falls.
Q. I'm sorry. Speak up a little bit.
A. She was the staff accountant for Seven Falls.
Q. Okay. And you sent to her -- I'm sorry. She sent to you a list of lot sales; correct?
A. That is correct.
Q. Okay. Let me go to the first page of the attachment -- second page of the exhibit. And what does this report reflect?

A. Lot sales at Seven Falls.
Q. Okay. And through what time period?
A. I'm having a very difficult time reading it.
Q. Sure. Focus on the very top, if you would, Agent Seres. There we go.
A. August 1st through November 6th of 2007.
Q. Okay. Go ahead and just kind of scroll through it. As he's scrolling, just kind of pay attention to -- under the Memo line, who is that?
A. That is the purchaser.
Q. Okay. And scrolling through there, just kind of look at those names. And there do you see any of the names that are reflected in Government's Exhibit 1322 on the poster board up here? Cashion? Chapman? Gabler?
A. I do not, sir.
Q. Okay. I believe you testified earlier that 2007 sales were relatively strong, or at least stronger than 2008. Is that fair?
A. Yes.
Q. All right. Now there's another attachment. Agent Seres, if you could kind of scroll through. Now the way -- now the way QuickBooks prints, when it's bigger than a piece of paper it's a little difficult when it's attached in this manner. I'm going to show you Government's Exhibit No. 143-A. I've taken the liberty of just taking

that attachment and just printing them and then taping them together. If I could approach the witness?

THE COURT: You may.

BY MR. GAST:

Q. I just want you to look this over and assure yourself that I've done that accurately. That is, that I've taken the attachments to that e-mail that's already been introduced and cut and folded them and taped them in a way that's readable.

A. You have, sir.

Q. So is that a fair and accurate depiction of the document if you had sufficient room to print it and view it?

A. Yes, sir.

MR. GAST: Your Honor, we'd move to admit Government's Exhibit No. 143-A.

MR. FISCHER: No objection.

THE COURT: Let it be admitted.

(Whereupon, Government's Exhibit 143-A was admitted into evidence without objection.)

MR. GAST: I'd move to publish it to the jury using the document camera.

THE COURT: You may.

MR. GAST: It's not showing on the jury monitors,

Your Honor. Oh. I think it's going.

THE COURT: I didn't quite get it triggered. It should come up now.

BY MR. GAST:

Q. Let me zoom out. Now this is a report -- let me zoom in on the date so you can see that. All right. What date range is this report?

A. January through December of 2008.

Q. And these names that I've highlighted on this list, what lot sales are those?

A. Those are the ones that re sold that are still marketed to the end user.

Q. All right. These are the sales that are exhibited on the poster board in front of the jury and yourself as Government's Exhibit 1322; is that correct?

A. Yes, sir, that is correct.

Q. All right. So I'll scroll back out then. If we were to exclude those sales that are on 1322, how are lot sales in 2008 to other folks as compared to 2007?

A. Drastically slower.

Q. Thank you. Also, I want to start in 2008 and focus on this again.

I'm sorry. If I could publish that again, Your Honor.

THE COURT: You may.

BY MR. GAST:

Q. I'm going to zoom in a little bit. I'll try not to make you seasick moving this too quickly, but I want you to kind of look here. I'm going to scroll through these on the document camera. I kind of have to do that manually, so I'll do that kind of slowly. But if we can kind of get a sense for yourself, first of all, as to the lot prices. Can you see that okay or do I need to zoom in more closely?

A. I can see them clearly.

Q. I'll just sort through them, and you just kind of make a note to yourself as to the typical price ranges for these lots. Okay? And then if you can switch back to the first attachment of Government's Exhibit No. 143. If we could do the same thing here and just kind of scroll through and take notice -- and I'm not going to ask you to pull out a calculator and give us average prices. But if you can draw some generalizations and tell us how the lot prices tended to compare in 2007 versus 2008.

A. The lot prices in '07 were definitely lower than they were in 2008.

Q. All right. Did you attend any of these closings yourself, the closings on Government's Exhibit No. 1322?

A. Yes, I did.

Q. I'm sorry?
A. Yes, sir.
Q. And where were those closings typically?
A. At Mr. Jason Peltz's office.
Q. Okay. Who else would attend these closings?
A. A lot of times, Mr. Cashion and Mr. Chapman and Mr. Vinson.
Q. Okay. When Mr. Vinson and Mr. Cashion attended at the same time, did anything unusual occur at any of these closings?
A. There were typical disagreements about where the money was going to go from the closing.
Q. Okay. When you say "disagreements," what do you mean? Describe that for us.
A. Mr. Cashion had his own idea of where the money should go and Mr. Vinson would want to do something different, and they would typically argue.
Q. Okay. Could you characterize the nature of the argument? Not the subject matter. But was it a calm, collected conversation, or was it heated?
A. Less than pleasant. It was heated.
Q. Okay. All right. Thank you.
Let's switch gears a little bit and talk about lot 139, your loan. And this is collectively Government's Exhibit No. 124. First of all, before I get to showing

exhibits, how did this loan come about?
A. I was asked to do the loan by Mr. Cashion. And Mr. Worlund brought me the financial statement to fill out.
Q. Okay. So you didn't approach them and say I'd love to buy a lot?
A. No, sir.
Q. Did you want to buy a lot at that time in your life?
A. Not necessarily.
Q. Was that -- kind of describe for us briefly what your financial status was at that time.
A. I was struggling very, very hard. I wasn't getting paid. I had a family to support. Making ends meet was extremely difficult.
Q. Is that a good time to buy expensive --
A. No, sir it's not.
Q. -- hundred thousand dollars' worth of piece of property?
A. No, sir, it is not.
Q. So why did you agree to do this?
A. The interest incentive -- the fee for doing so would have -- was very attractive to me.
Q. Okay. And the fee for doing so? The fee for borrowing this money?

A. Yes, sir.
Q. All right. And this is the same lot that you tried to shop for Mr. Porter-Shirley first and then Mr. Vinson. Correct?
A. Yes, sir.
Q. And then later, you and Mr. Worlund ended up purchasing it?
A. Yes, sir.
Q. Now why Ed Worlund?
A. He was Mr. Cashion's right-hand man. Helped him get things done, worked for him in the military. And he -- he, at the time, had decent income.
Q. I guess more broadly: Were you and Mr. Worlund business partners or --
A. No.
Q. Are you related --
A. No.
Q. -- or anything like that?
A. No.
Q. Okay. So why would you and Mr. Worlund be buying a lot together?
A. Because Mr. Cashion asked us to.
Q. And what deal did you and Mr. Worlund have with respect to purchasing this piece of property?
A. It was the same deal that the others got, the

insiders got, just supposed to get the one percent fee on the loan amount paid monthly, two years' worth of interest carry, and with the buy back provision at the end -- within two years.

Q. Okay. All right. Let's go -- let's start with Exhibit 124-A. We would move to publish this to the jury, Your Honor. This is the HUD-1 for the transaction.

THE COURT: You may.

BY MR. GAST:

Q. And is this in fact the HUD-1 for you and Mr. Worlund buying lot 139 on July 22nd 2008?

A. Yes, sir.

Q. And what bank was that?

A. The Bank of Asheville.

Q. Okay. Your Honor, if I may, I'm going to step up and move this poster board so I can see everyone.

THE COURT: You may.

BY MR. GAST:

Q. All right. On the lower portion of the HUD-1 we see the terms of the deal. What was the contract sales price?

A. $850,000.

Q. Okay. And again, did you haggle or negotiate over this price?

A. Not even -- no.

Q. Okay. The higher the better?
A. Yes, sir.
Q. And that actual loan amount was how much?
A. $637,500.00.
Q. Okay. And that was after you received what?
A. The purchase credit of $212,500.
Q. Okay. And that -- is that a credit from the seller, Mr. Vinson?
A. Yes, sir.
Q. Okay. As a consequence of that credit did you have to put any money down on this transaction?
A. Zero.
Q. Okay. So I believe you used the term "skin in the game" earlier. Did you have any skin in the game in this loan?
A. No, sir, I did not.
Q. Okay. And go on to page two. Page two has some of the closing fees and things of that nature; correct?
A. Yes.
Q. Let's see. The closing attorney's fees were how much? You'll have to zoom in on that, Agent Seres. You might have to zoom a little more, I think.
A. Attorney's fees: $4,600.
Q. Okay. Thank you. And then we'll go on to page three of that exhibit. Is this the list of

disbursements?
A. Yes, it is.
Q. Okay. The first looks like $52,000 and some change went to Seven Falls Realty. Was Seven Falls Realty actually involved in this transaction at all?
A. Not to my knowledge.
Q. Okay. And Seven Falls Realty, do you know who runs or owns that LLC?
A. Seven Falls.
Q. Okay. And who owns Seven Falls?
A. Mr. Vinson.
Q. Okay. Then we have two recording deeds' fees. And then we have a Bank of Asheville interest incentive of $82,875.00. What is that?
A. That was the two years worth of interest carrying to service the debt of the loan.
Q. Okay. And that money came out of money that otherwise would have gone to the seller, Mr. Vinson, is that right?
A. Yes.
Q. In other words, is that money that you brought to the table to put in to pay interest?
A. No, sir. I had no skin in the game.
Q. So during the life of this loan would you have had to pay any money to take out this loan?

A. No, sir.
Q. Okay. Then there's a property owner's association fee and some sports membership and club dues. Did you pay those?
A. Yes.
Q. Did you have any -- did you use the membership fee or the club dues? Did you play golf or anything?
A. Well I had those -- through a family member's lot.
Q. Did you need another one?
A. No, sir, I didn't.
Q. The closing fees. That's the profit to the seller; is that right?
A. Yes.
Q. The $92,226?
A. Yes.
Q. Now there's also $368,907.60. Where did that go?
A. That was the release fee paid to the National Bank of South Carolina.
Q. Okay. Now do you happen to know for sure whether or not that actually got applied to the principal of the balance such that --
A. No. I have no idea.
Q. -- to release anything?
A. I have no idea.
Q. Okay. All right. And then some tax stamps to the

Register of Deeds.
A. Yes.
Q. If we can go to Government's Exhibit No. 124-B. I would ask to publish that. It's the credit memo.
THE COURT: You may.
BY MR. GAST:
Q. While we're waiting for it to come up on the jurors' screen. There we go. Now, you're a former banker. Are you familiar with what a "credit memorandum" is?
A. Yes, sir.
Q. Did you use a similar document? I mean every bank has their own but something similar at your bank?
A. Yes.
Q. All right. And typically, the credit memorandum -- does the borrower usually see this document, or is that something just for the bank?
A. Typically, it's bank prepared and for bank use.
Q. Okay. And did you see this one before closing?
A. No.
Q. Okay. Nevertheless, I'm going to go through this. Now the investigation -- that information that's contained in this credit memoranda, where does that ordinarily come from?
A. The borrower.

Q. It contains financial information, things like that, correct?
A. Yes, sir.
Q. Okay. All right. So just kind of briefly summarize the top portion there. That's identifying information; correct?
A. Yes, sir.
Q. And does it correctly reflect the loan amount?
A. Yes.
Q. Okay. And under the "purpose" section, what's the purpose in this credit memorandum?
A. To purchase lot 139, Seven Falls subdivision, for the purpose of investment.
Q. And that is, in fact, what you told the bankers at Bank of Asheville. Isn't that right?
A. That is correct.
Q. And was that in fact the true purpose of this loan?
A. No, sir.
Q. What was the true purpose of this loan?
A. To raise capital for the development.
Q. Okay. And under "source of repayment," what was the primary source of repayment?
A. Sale of the property.
Q. And secondary source of repayment?

A. Cash flow from Edward Worlund and Andrew Hager.
Q. And those are typically the primary and secondary -- well, strike that.
Anything in there about Mr. Vinson repurchasing it or a master loan coming in to take out these loans?
A. No, sir.
Q. Did you tell those things to the bank?
A. Yes. I mean they were aware. It was in the contract, so I assume that they were aware.
Q. The buy back was. Was there anything about -- and we'll get to that in a minute.
A. I'm sorry. You're correct.
Q. That's my fault because I combined two questions. Break that down. We'll get to the buy back provision in a minute. Was there anything in here about either the primary or secondary source of repayment being a take back loan from a hard money lender?
A. No, there was not.
Q. All right. Thank you. All right. Then going on down to collateral. Loan to value ratio, or LTV ratio. Do you see that in that top section?
A. Yes, I do.
Q. And what does that say?
A. "At or below 75 percent."
Q. Okay. And then that's -- is that repeated again

in the "background history" section? If you would, just read that sentence to the members of the jury for us.
A. I will. "The loan amount from the Bank of Asheville will be 75 percent of the lesser of the purchase price of appraised or of appraised value and an appraisal that has been ordered from Roberts Appraisal Service."
Q. Okay. And is that -- does that appear to be a typo? It probably should be "or?"
A. Yeah, I would assume so.
Q. All right. Now is that requirement familiar to your experience as a banker?
A. Yes, it is.
Q. All right. And so how would -- if you had gotten 25 percent off the contract price, then what becomes the purchase price?
A. The purchase price should have been $637,500.00.
Q. Okay. So according to this, then the loan amount should have been 75 percent of that lesser amount. Is that fair to say?
A. That is fair to say.
Q. All right. Go on to the next page, please. This is financial information from yourself and Mr. Worlund; is that right?
A. Yes.

Q. Now did you provide some financial information to the bank that --
A. I did.
Q. -- got reduced to this?
A. I did.
Q. Okay. Now, at this time -- you just testified a minute ago that you had some problems paying your bills at this time. Is that fair to say?
A. It is very fair to say.
Q. Was your net worth in fact almost a million dollars at that time?
A. No, sir.
Q. Okay. Was your income in fact $208,900 at this time?
A. No, sir.
Q. Who did your financials? Did you do those? Or how did that work?
A. I think I completed a financial statement for the Bank of Asheville.
Q. And is this what you told the Bank of Asheville?
A. Yes.
Q. Okay. And why did you tell them that if it wasn't true?
A. Because I wasn't -- I did what was wrong. I didn't do what was right. I shouldn't have done it.

Q. Was the purpose to try to get the loan closed?
A. Yes, sir, it was.
Q. Okay. Let's look at Government's Exhibit No. 124-C. And go to the third page, if you would. It's the appraisal. We would move to publish this to the jury, Your Honor.
THE COURT: You may.
BY MR. GAST:
Q. Is this the appraisal for your transaction on lot 139?
A. Yes, sir.
Q. All right. Let's talk about, first of all, that -- in the neighborhood section of the written commentary at the bottom. If you'd highlight the middle sentence of that. "Consisting of higher end custom homes of excellent quality." Was that true?
A. There were no homes there, sir.
Q. Are there any homes there today, excellent or otherwise?
A. No, sir.
Q. And you didn't do this appraisal, of course, is that correct?
A. That's correct.
Q. Let's go to the comparables section, if we could. And are you familiar with this section of appraisals from

your training and experience in banking?
A. Yes, sir, I am.
Q. Okay. The left-hand most column that says "subject property." What is that?
A. That is my lot, lot 139.
Q. Okay. And then there's comparable number one, comparable number two and comparable number three. The jury's heard some testimony, so you don't have to go into great detail. But briefly, what does that mean? What's the purpose of using the comparables?
A. Those are used to try to determine the value of the lot that I was purchasing, the subject property.
Q. Okay. And what are those comparables? What lots were used to help evaluate the fair market value of your piece of property?
A. Lots 133, 134 and 135 at Seven Falls.
Q. Okay. Let me jump to the -- back to Exhibit 1322 for a moment and especially G through I. 133, 134 and 135 were sales of lots to whom?
A. 133 was to Mr. Cashion, 134 was to Mr. Chapman and 135 was to Mr. Gabler.
Q. Okay. Did Mr. Cashion, Mr. Chapman and Mr. Gabler get the same deal that all the folks did on that list and that you yourself got in? That is the 25 percent off and the interest carry account and things of

that nature?
A. To my knowledge they did.
Q. Okay. Now if we could go back to 124-C. Now, is there a row on this form that allows an appraiser to include information as to sales or financing concessions?
A. Yes, there is.
Q. Okay. And what does it say for all four columns, both on your subject property and all three comparables?
A. "None known."
Q. And at least on yours -- I believe you testified a minute ago there were some concessions that were in your contract. Is that right?
A. That is correct.
Q. And if all of those comparables had actually 25 percent knocked off the purchase price, what effect, if any, should that have on their comparable price?
A. It would have adjusted the comparable value down by the amount of the concession.
Q. Okay. So by failing to do so, what does this appraisal -- what effect does this appraisal have on the apparent value of your subject property?
A. It overstates the value.
Q. Okay. By how much at least?
A. By the amount of the concession.
Q. Okay. An in this case 25 percent?

A. Yes, sir.
Q. Okay. Let's go to Exhibit 124-D.
THE COURT: Mr. Gast, before you go to that, is this a logical time for us to take the break?
MR. GAST: Yes.
THE COURT: Ladies and gentlemen of the jury, at this time we're going to take the morning break. I'm going to have the marshal take you into the jury room for approximately 15 minutes.
Marshal, please take the jury out.
(Jury excused at 11:00 a.m.)
THE COURT: Is there anything we need to address while we have the jury out?
MR. GAST: Not from the government, Your Honor.
MR. FISCHER: No, your Honor.
THE COURT: Marshal, 15 minutes, please.
(Off the record at 11:01 a.m.)
(On the record at 11:18 a.m.)
THE COURT: Are we ready for the jury?
MR. GAST: Yes, Your Honor.
MR. FISCHER: Yes, sir.
THE COURT: Please bring us the jury, marshal.
(Jury returns at 11:19 a.m.)
THE COURT: Mr. Hager, if you would, please return to the witness stand.

(Witness resumes the stand.)

THE COURT: You were previously sworn. You remain under oath until this trial is concluded.

(Witness resumes the stand.)

THE COURT: Mr. Gast, you may resume.

MR. GAST: Thank you, Your Honor. I think we left off on Government's Exhibit No. 124-D and, Your Honor, we'd move to publish that to the jury.

THE COURT: You may.

BY MR. GAST:

Q. I believe it's on their screen now. If you can, tell us what that is?

A. That's the loan application for the transaction.

Q. Did you fill that out or did Mr. Worlund fill that out?

A. It's not my handwriting.

Q. All right. And the purpose as stated on the application is what?

A. To purchase lot 139 at Seven Falls.

Q. And as you previously testified, was that your true purpose?

A. No, sir, it was not.

Q. Okay. Let's go to 124-E. And can you tell us what this document is?

A. It's a purchase and sale agreement with a

developer exemption.
Q. Okay. We would move to publish what's previously been admitted, Your Honor, as 124-E.
THE COURT: You may.
BY MR. GAST:
Q. And did you prepare this or did someone else?
A. It was prepared by someone else.
Q. Okay. Do you know who prepared it?
A. Not with certainty, but Peltz Law Firm.
MR. FISCHER: Objection.
THE COURT: Sustained.
BY MR. GAST:
Q. If you don't know, "I don't know" is fine.
A. Okay.
Q. How was this presented to you, this contract?
A. Through Mr. Worlund.
Q. Okay. All right. So the front page has some identifying information; correct?
A. It does.
Q. Let's go to page three if we could. And on this page, what does it say the purchase price is?
A. $850,000.
Q. Okay. And are those your initials above that?
A. They are.
Q. Okay. All right. Now I want to flip through --

there are a lot of terms, and I'm sure they're all important, but I want to jump on to almost the very end. First, to paragraph 21. Can you read that for the members of the jury?
A. "Special provisions if any. In consideration of closing prior to August 2008 and in further consideration of purchasing multiple lots within Seven Falls, seller shall give purchaser a credit at closing in the amount of $212,500.00."
Q. And is that in fact what occurred --
A. Yes.
Q. -- in your transaction?
A. I got a credit.
Q. All right. And then go on to paragraph 23, please. And what is paragraph 23? I won't ask you to read the whole thing, but what is the purpose of this paragraph?
A. It's the repurchase option showing me the seller agrees to repurchase the property within two years.
Q. Okay. Actually I said I wouldn't, but I'm going to change my mind. If you would go ahead and read this paragraph to the jury, please?
A. I will. "Repurchase option. By executing this agreement and acquiring the property, Purchaser hereby grants to Seller the right to reacquire the property for

a period of two years from the date of closing. Seller hereby agrees to repurchase the property no later than the expiration of the two year period referenced herein. Seller shall give Purchaser written notice of such election, and the closing of the reacquisition of the property shall occur within 30 days of such notice. The purchase price to be paid by the Seller to Purchaser shall be the purchase price provided in paragraph three herein, less any discounts given by Seller to Purchaser at closing.

In addition, Seller shall pay to Purchaser monthly payments of an amount equal to 12 percent simple interest per annum on the discounted purchase price amount. Such payments by Seller to Purchaser shall be made on the first day of each month beginning the first day of the month on the month immediately following the closing. The repurchase option and obligation described herein shall survive the closing of the property."

Q. All right. Now the jury's read another one that's similar but has some different provisions. This one -- this one here is the repurchase option an option -- or is there language that indicates that the defendant -- that Mr. Vinson in fact will repurchase the property?

A. There's language in it where he agrees to do so, to repurchase the property.

Q. And the payments you are to receive. Is that upon the repurchase, or is that during the life of the loan?
A. That is during the life of the loan.
Q. So while you're holding this loan on your credit you're getting paid essentially one percent per month.
A. Correct.
Q. All right. And the one percent, is that on the $850,000 or on the discounted sales price?
A. No. It's on the amount borrowed, sir, $637,500.00.
Q. And that's -- that corresponds with the amount of the loan; is that correct?
A. That is correct. That is the loan amount.
Q. Okay. Thank you. Now let's go to Exhibit 124-F.
Your Honor, this has previously been entered. This is a promissory note for this transaction. We would move to publish it.
THE COURT: You may.
BY MR. GAST:
Q. Am I correct that this is the promissory note for your transaction?
A. Yes, sir, you are.
Q. And you're a former banker. Just briefly remind the jury, please, what a promissory note is?
A. Evidences the investment on property and has the

terms of the loan repayment.
Q. Okay. And the very opening language of the document: "Promise to pay." It says -- well why don't you read that first sentence, or that -- I guess that whole paragraph there?
A. "Promise to pay. Andrew Q. Hager and Andrew H. Worlund (Borrower) jointly and severally promise to pay the Bank of Asheville (Lender) an order and lawful money of the United States of America the principal amount of $637,500 together with interest on the unpaid principal balance from July 22nd 2008 until paid in full."
Q. And if we could flip to the end just to show that. Did you sign it?
A. I did, sir.
Q. And did Mr. Worlund sign it?
A. Yes, he did.
Q. And who signed on behalf of the Bank of Asheville?
A. I believe that's John Hamrick.
Q. Did you know John Hamrick to be an employee of the bank?
A. I did.
Q. Okay. Now at the time that you signed that promise to pay, did you in fact have any intention of paying anything on this loan?
A. No, I did not, sir.

Q. Who was going to pay for this loan?
A. Seven Falls.
Q. Okay. And who is Seven Falls?
A. Mr. Vinson.
Q. Did Mr. Vinson sign this document?
A. No, sir.
Q. Is there anything in this document that says that Mr. Vinson promises to pay?
A. No, sir.
Q. Again, as a former banker, would it be important for the bank to know who was actually paying back the loan?
A. Yes, it would, sir.
Q. Okay. Let's go to Exhibit No. 124-G. What is this?
A. A commitment letter from the Bank of Asheville.
Q. This has previously been admitted, Your Honor, and we'd move to publish it at this time.
THE COURT: You may.
BY MR. GAST:
Q. I frankly don't recall if the jury has seen a commitment letter or not yet. What is a commitment letter?
A. It just evidences the bank's willingness to fund the transaction and describes the terms of the agreement.

Q. Okay. Does this come before or after the closing of the loan?
A. Before, sir.
Q. Okay. The stated purpose -- it says the loan amount, is that right, $637,500?
A. Yes, sir.
Q. What does it say the purpose is?
A. "The proceeds of this loan will be used for the purpose of purchasing real estate loan known as lot 139 in Seven Falls subdivision."
Q. Again we've kind of asked this question with purpose on several documents. But is there anything in this letter that indicates that you or anyone else advised the Bank of Asheville that the purpose was to provide bridge funding to Seven Falls?
A. No, sir.
Q. Okay. Where is 85 Fairway False Drive in Mills River? What -- is that a --
A. That was my former residence in High Vista.
Q. And let me show you now Exhibit 141-H. Do you see that in front of you?
A. Yes, sir.
Q. Your Honor, this has been previously admitted. We'd move to publish this to the jury. It's an invoice from Mr. Hager.

THE COURT: You may.

BY MR. GAST:

Q. I believe the members of the jury can see this now. What is this document?

A. That is my invoice for the -- my fee for using my credit to purchase that lot.

Q. Okay. And to whom is this invoice addressed?

A. Seven Falls.

Q. Okay. And so just so we're clear. Is this for work you were doing for him or for something else?

A. This was for my fee for tying up my credit with the purchase of lot 139.

Q. Okay.

A. One percent.

Q. Is this to reflect the one percent for the $637,500 that you borrowed?

A. It's my half of one percent. Yes.

Q. Okay. And again, you said you saw Mr. Vinson several times a week. Did he ever come to you and say what in the world is this invoice for? I don't owe you any money. I don't owe you one percent or anything like that.

A. Not to my knowledge.

Q. Did you in fact get paid for taking out this loan?

A. No, sir, I did not.

Q. Did you ever get any payments?
A. Not for the loan.
Q. Okay. And what happened to this loan?
A. It was foreclosed on, sir.
Q. Okay. What happened to the interest carry account?
A. I used part of the proceeds to support my family.
Q. Okay. So you took that out before the term expired?
A. Yes, sir, I did.
Q. Okay. And then after that interest carry money disappeared, did the -- is that when the loan went into default?
A. Yes, sir.
Q. Did you make any payments?
A. At some point, I think I did make one payment. But they were not regular and I had to borrow money to do that.
Q. Okay. How about Mr. Worlund? Did he continue paying?
A. Not to my knowledge.
Q. Okay. Do you know -- do you know a person by the name of Charles Burnett?
A. I do.
Q. Who is he?

A. Mr. Burnett is a retired contractor that had spent some time brokering hard money.
Q. Brokering hard money. Is that different from being a hard money lender, or is that a different way to say that?
A. It's different because he would actually -- he had lenders that he would go to. He would put people that needed hard money in contact with the lenders for a fee.
Q. Okay.
A. So it wasn't his money.
Q. So a middleman between a hard money lender and a potential borrower?
A. Correct.
Q. Okay. And did you have any type of professional relationship with him?
A. I met Mr. Burnett and we tried to find money for Seven Falls and other projects in town. Yes.
Q. And by "find money," do you mean through a hard money lender?
A. Yes, sir, hard money loans.
Q. So was there a period of time where you were either working with or for him or alongside him?
A. Yes, sir.
Q. Tell us, kind of, exactly what that arrangement was.

A. I would go to Mr. Burnett's house. He had a big kitchen table, and he would sit at one end and I would work at the other end writing up deals. He would give me contacts to forward those deals to try to get them funded.

Q. Okay. Are you familiar with his $500,000 loan to Bank of Asheville?

A. Yes, I am.

Q. How did that begin?

A. With a phone call from Mr. Vinson.

Q. Okay. And was he calling Mr. Burnett, or did he call you?

A. He called me.

Q. When was that?

A. It was in March of 2009, if memory serves me correctly. He needed somebody to fund -- be the borrower on a $500,000 transaction.

Q. Okay. What exactly did he ask you?

A. He needed someone to basically provide a financial statement and credit worthiness to get the deal done.

Q. Okay. Now was he asking you to do this or was he asking you to find somebody?

A. He was asking me to find someone because he knew I couldn't do it.

Q. Okay. Why couldn't you take out another loan?

A. Because I already had exposure at the Bank of Asheville with my lot loan and a prior loan with Mr. Cashion.
Q. All right. Now you've said Bank of Asheville. Is that the institution that Mr. Vinson suggested or was there some other reason you brought it up?
A. It was suggested that we use Bank of Asheville.
Q. Okay. So what did you tell him then?
A. I told him that I couldn't do it. Mr. Burnett was there, heard the conversation and heard that there was a fee offer to do it, and he proceeded to jump into the transaction at that point.
Q. All right. And when you say "proceeded to jump into the transaction?"
A. He agreed to proceed forward with it.
Q. All right. Did Mr. Vinson and Mr. Burnett then have a telephone conversation? Or how did that go?
A. I recall that they did speak. And I do recall him, Mr. Burnett, speaking with Mr. Greenwood at the bank.
Q. Okay. Let me show you Government's Exhibit No. 411. This is an e-mail between yourself and Mr. Burnett; is that right?
A. Correct.
Q. This has previously been entered, Your Honor.

We'd move to publish.

THE COURT: You may.

BY MR. GAST:

Q. And I'm going to give the jury a second to read it in just a minute. But before I do that. You said this is an e-mail between you and Mr. Burnett, yet it appears to be addressed to Jason and Keith. First of all, who is Jason and who is Keith?

A. Jason is Mr. Peltz, the attorney. And Keith is Mr. Vinson.

Q. Okay. So why is it authored in this manner? That is, addressed to Jason and Keith but yet sent to Mr. Burnett?

A. Charles did not like to type on the computer, and he dictated to me the terms that he would enter into the agreement on.

Q. All right. So he dictated to you so that you could then do what with it?

A. I could type those up. And he did not want any e-mails or anything going out without his prior approval. He wanted to review what was said.

Q. Okay. So what did you type up then? What was --

A. This e-mail.

Q. Okay. And how did you come by these terms? Did you come -- did you come up with these terms or did

someone else?
A. Mr. Burnett and Mr. Vinson -- let me take that back. Mr. Burnett told me what the terms were, what he would do it for.
Q. All right. So did you reduce to writing then what Mr. Burnett told you to reduce to writing?
A. I reduced it to what Mr. Burnett said.
Q. All right. Since it's relatively short, why don't you go ahead and just read it?
A. Okay. " Jason and Keith, Charles has requested that an agreement that states the following be drafted in simple form and signed prior to closing per the request of the attorney. In the contract it will be noted that Mr. Charles R. Burnett is to collect a $40,000 fee at closing for the use of his credit worthiness on the lot -- on lot 29 deal for a period of 30 days. Extensions are available for a maximum of three months at a cost of $10,000 per month. This fee is over and above the escrowed interest payments for the transaction.
Mr. Burnett will be paid $11,500 for the past due fees associated with the Shelley Rogers closings on lots 103, 132 and 143 in the fall of 2008. Andrew Hager receives a $17,000 finder's fee to be paid at closing. Thanks in advance. Andrew."
Q. All right. Now, that last part, "Andrew Hager

receives a $17,000 finder's fee to be paid at closing," whose idea was it to include that provision?
A. That was mine and Charles' idea.
Q. Okay. All right. Now, do you -- did you then send this on Mr. Burnett's behalf to Mr. Vinson?
A. I don't believe -- I don't recollect doing that. I remember sending it to Charles.
Q. All right. And did you see Mr. Burnett then forward it on to Mr. Vinson?
A. I have no knowledge if he did or didn't.
Q. Okay. Did, however, Mr. Vinson soon thereafter have a conversation with you about that $17,000?
A. Yes and it was less than pleasant.
Q. Okay. Before we get to the substance of that conversation. Did you and Mr. Vinson have a conversation where you brought it up independently?
A. No.
Q. I'm sorry?
A. No, sir.
Q. Okay. All right. So you said it was less than pleasant. Tell us about that conversation.
A. He flat out refused to pay it stating that he was not going to pay a daisy chain of brokers for people getting involved and getting these transactions done. So I did not get paid.

Q. All right. So you, Andrew Hager, didn't get paid your $17,000. But do you know whether or not the deal went through and whether Mr. Burnett got paid?
A. Yes, sir. It did go through and he did get paid.
Q. Okay. Let me show you Government's Exhibit No. 410. This has previously been entered, Your Honor. We'd move to publish it to the members of the jury.
THE COURT: You may.
BY MR. GAST:
Q. And what is this document?
A. The contract between Charles Burnett and Mr. Vinson. Seven Falls, LLC.
Q. All right. Let me -- it's a little hard to read like this. So I think, with the Court's permission, I'm going to have Agent Seres blow up certain paragraphs and then give the jury time to read it.
THE COURT: You may.
BY MR. GAST:
Q. All right. Now that the jury's had time to read that. Were you familiar with this document at the time this loan was closed?
A. No. I knew it was being created but I hadn't seen it.
Q. Okay. So you're familiar with the terms but not necessarily the actual document.

A. Correct.
Q. Are these terms consistent or inconsistent with those that were at least set forth in the e-mail we just described?
A. They were consistent.
Q. Okay. Now, the -- Mr. Burnett is the borrower in this transaction; is that right?
A. Yes.
Q. Okay. And does this contract indicate who the beneficiary is?
A. Mr. Vinson and Seven Falls, LLC.
Q. Okay. And the piece of property that's going to be involved to secure the loan is what?
A. Lot 29, Phase One of Seven Falls.
Q. Okay. And the borrower, is that Mr. Burnett? What money was he to receive for taking out this loan?
A. He was to receive $40,000 for that particular transaction and then $11,500 in past due fees from prior transactions.
Q. Okay. The $40,000 is called a borrower's fee in this contract. What's a "borrower's fee?" If you know what that is.
A. Just his fee for pledging his credit.
Q. Okay. Now you've been a banker before. Is there such a thing in banking as a borrower's fee that is -- is

that a standard thing in lending that the person who borrow's money from the bank gets paid to do it?
A. No, sir.
Q. Okay. And let's go on down a little bit. And there's a provision -- there was a provision that was for $17,000 that was stricken?
A. Correct.
Q. What was that $17,000?
A. That would have been my fee for my involvement.
Q. But did the transaction go forward without that portion?
A. It did, sir.
Q. All right. Let's see. And then is there a repurchase option in this agreement?
A. Yes.
Q. Now the lot actually wasn't sold to Mr. Burnett, was it? Or do you know?
A. I don't -- I think he just borrowed against it.
Q. Okay. Are you familiar with the term "hypothecation?"
A. Yes.
Q. What does hypothecation mean?
A. Hypothecation is when an individual other than the borrower substitutes collateral for the borrower.
Q. And let me show you Government's Exhibit No. 408

and then we'll come back to this. Your Honor, this is the hypothecation agreement. We would move to publish it to the members of the jury.

THE COURT: You may.

BY MR. GAST:

Q. Is this the document that does as you described? That is, it hypothecates lot 29 to Mr. Burnett so he can borrow against it?

A. Yes, it does.

Q. Okay. Thank you. If we could go back to -- I guess go ahead and go to the signature at the bottom. And who signs that?

A. That's Mr. Vinson's.

Q. Okay. If we can go to 410 -- back to 410. All right. So Plan A to repay this loan was what?

A. The sale of Mr. Vinson's Citation jet 555-Kilo-Whiskey.

Q. Let's, if you would, read into the record that sentence that begins "at the time" in that bullet point?

A. "At the time of the aircraft's sale, the beneficiary's total credit exposure with the Bank of Asheville will be below their in house legal lending limit of $3.1 million which will allow him to obtain credit there and pay out this loan."

Q. All right. And we heard some testimony yesterday.

But just briefly, if you would, describe or remind the jury what a legal lending limit is.
A. That is the limit that the bank sets as a maximum that they can have extended in credit to any one borrower.
Q. All right. And do you know whether or not Mr. Vinson's jet was financed through Bank of Asheville?
A. I don't know.
Q. Okay. And then there is -- the last provision is a kind of a penalty clause, is that fair?
A. Yes.
Q. If we could go to number 403, please. We would move to publish to the jury Exhibit No. 403, Your Honor. It's the appraisal of lot 29.
THE COURT: You may.
BY MR. GAST:
Q. Mr. Hager, am I correct that this is the appraisal report for lot 29?
A. Yes, sir.
Q. Agent Seres, if you would, go to the bottom and show the witness who prepared this report.
Who prepared this report?
A. Mr. Ollis.
Q. That's Aaron Ollis?
A. Yes, sir.

Q. Okay. Let's go straight to the comps, if we could. And this is the same form that was used in your transaction; correct?
A. Yes.
Q. All right. And again, looking at the comparables, the subject properties on the left-hand column. Correct?
A. Yes.
Q. And then there's three comparable properties; is that right?
A. Yes, sir.
Q. Okay. Lots 134 and 135, do you recall them being part of the list of loans that you helped to -- do you need to see that list?
A. You said -- I'm seeing 133 and 134 on this.
Q. I'm sorry. Excuse me. 133 and 134; correct?
A. Yes.
Q. So lots 133 and 134 were to whom?
A. Mr. Cashion and Mr. Chapman, respectively.
Q. And that was at what bank?
A. Southern Community Bank and Trust.
Q. And did Mr. Cashion and Mr. Chapman get the same terms of the deal like everyone else did on that list?
A. Yes, sir.
Q. All right. If we can go back then to Exhibit 403. So is there anything in the row indicating sales or

financing concessions that illustrates how those 25 percent credits?
A. No, sir.
Q. And again, would that have the same effect on this appraisal that it did on the appraisal in your loan?
A. Yes, sir.
Q. Okay. And which is what? What is that effect?
A. The effect is that it would adjust the purchase price down to the net of the concession.
Q. So would the appraisal value in this instance be too high or too low or just right?
A. It would be too high.
Q. Okay. Now if we could go to the bottom of the appraisal and that language in there about the sales history.
A. Okay.
Q. Do you see that language there? Sales history subject acquired by developer within prior three years but due to multiple acreage purchases exact date is unknown and revenue stamps not reported. No other sales exchanges of comps within prior year. Subject is offered for sale by developer for $775,000. Do you see that language?
A. I do sir.
Q. Do you know whether or not that lot had been

previously sold to someone else in 2007?
A. It was owned by Mr. and Mrs. Vinson.
Q. Okay. Let me show you Government's Exhibit 412. 412 has previously been entered into evidence as the appraisal of lot 29 that occurred in 2007. We'd move to publish it to the jury.
THE COURT: You may.
BY MR. GAST:
Q. Okay. Does this appear to be an appraisal for lot 29 for a person by the name of Emil Hurtak?
A. Yes, sir, it does.
Q. Are you familiar with this transaction from 2007?
A. No.
Q. Let me go ahead and go to bottom. Who performed this appraisal?
MR. FISCHER: Objection. Your Honor, he said he wasn't familiar with the transaction.
MR. GAST: The document speaks for itself, Your Honor.
THE COURT: Overruled at this time.
BY MR. GAST:
Q. Who is the appraisal here? Is it Mr. Ollis or someone else?
A. It says Tom Best and Mickey Foster.
Q. And does it indicate on the document when this

appraisal was performed?
A. It says, "Estimate the market value as defined of the subject property as of June 30th 2007 to be $275,000."
Q. Okay. All right. And what comps were used -- were the comps used here, were these comparables from the Seven Falls development?
A. No, sir.
Q. And did they use comparables to -- that were sells to insiders? That is, to Mr. Chapman, Mr. Cashion, and Mr. Gabler?
A. I don't see their names on the document so I would say no.
Q. And this one -- let's look at the bottom under "Sales or Financing Concessions." On comparable number one, is there anything entered there for a sales concession?
A. Club -- I guess club membership discount.
Q. Okay. And is this what you would expect to see if -- you know, again, you've been a banker. Is this what you would expect to see if there was some type of concession during a land transaction?
A. Yes.
Q. Okay. All right. So let's go back to our exhibit, Exhibit 403 of the appraisal for the Burnett

transaction. So, what's -- what was the final appraisal value for Mr. Ollis for this same piece of property?
A. $853,000 as of February 19th 2009.
Q. Okay. So the price went from $275,000 to $853,000 in roughly, what, a year and a half?
A. That appears to be correct, sir.
Q. Okay. Now you were -- is it fair to say you were following real estate and banking trends pretty closely at this period of time?
A. Yes.
Q. Is that what the market was doing generally at that period of time?
A. I don't think it was increasing at that level.
Q. Okay. Was it increasing at all at that time?
A. Increasing or decreasing?
Q. Was it increasing at all? I'm sorry if I said decreasing?
A. I don't think they were increasing. You were lucky if they were holding steady.
Q. Okay. And yet, was the level of completion of the development appreciably different? I mean were there roads and golf courses for this second appraisal or anything like that that might explain such a rapid increase?
A. They were under construction, sir, but not

complete.
Q. Okay. Let me show you Exhibit 400d. This has previously been entered into evidence. We'd move to publish it.
THE COURT: You may.
BY MR. GAST:
Q. This is the HUD-1 for the transaction.
And did this loan in fact close to Mr. Burnett?
A. Yes, it did.
Q. Okay. Was it for the agreed upon amount of money of half a million dollars?
A. Yes, sir.
Q. Okay. Did you attend the closing?
A. I think I took Mr. Burnett, but I didn't actually attend it.
Q. Okay. You took him like you provided him transportation?
A. Yeah.
Q. Did you drive him home?
A. Yes.
Q. And did Mr. Burnett get paid his money as promised?
A. Yes, he did.
Q. Let me show you Government's Exhibit No. 413.
And, Your Honor, this is a bank check from the Bank of

Asheville to Mr. Burnett in the amount of $40,000. We'd move to publish it to the members of the jury.

THE COURT: You may.

BY MR. GAST:

Q. Now is this the same day as closing or is it the day after?

A. The closing was March 30th, and this is dated April 1st of 2009. So the day after.

Q. Actually, two days after, I guess.

A. Yes. The 31st would be two days. That's correct.

Q. March has 31 days? I want to make sure I'm right.

MR. FISCHER: I'll stipulate to that.

BY MR. GAST:

Q. All right. Thank you. And is this a pay out of closing proceeds from Mr. Peltz's trust account or from some other source?

A. It was from the Bank of Asheville. So it must have been another source.

Q. And then if I could show you Government's Exhibit No. 414. This is another check to Mr. Burnett in the amount of $11,500 the day after that April 2nd. We'd move to publish that to the members of the jury.

THE COURT: You may.

BY MR. GAST:

Q. Is this the check for the other amount that

Mr. Vinson promised to pay Mr. Burnett?
A. $11,500? Yes, sir.
Q. Okay. And again, same question. Was this paid out of closing proceeds out of Mr. Peltz's trust account or from some other source?
A. From some other source.
Q. Okay. We're going to change subjects again. Do you know a gentleman by the name of Robert Dowling?
A. Yes, I do.
Q. Who is he?
A. Robert Dowling is a young man who retired early and had befriended me to a piece of property I owned at Wolf Laurel one weekend.
Q. Does he live here in Buncombe County?
A. He lives in Weaverville, sir.
Q. Okay. And about what time did you get to know him?
A. Probably in '06 and -- '07 was when I got to know him the best. I think we had a men's retreat at my cabin, and he was up there for that night. That's when I met him.
Q. Okay. Did you used to live in Weaverville yourself?
A. I did, sir.
Q. Okay. And at some point, did you introduce

Mr. Dowling to some of the other folks you've been talking about during your testimony?
A. Yes, sir, I did.
Q. When was that and who was that?
A. I introduced him to Mr. Cashion, to Mr. Chapman, and ultimately Mr. Gabler. And at some point he met Mr. Vinson.
Q. Okay. And what was the purpose of those introductions?
A. Robert had money and was a potential source to fund some deals.
Q. Okay. Let me start with Government's Exhibit No. 601.
Q. This is an e-mail from you to Tommy Bourque. It's been previously entered into evidence, Your Honor, and we'd move to publish it.
THE COURT: You may.
BY MR. GAST:
Q. And this e-mail from yourself to Mr. Bourque, when's it dated?
A. July 1st 2008.
Q. Okay. And this sentence -- it's going to go into the next page, so I'm going to have to pause and flip pages. Can you read the sentence that begins with "also?"

A. "Also, I have a friend that has a $1,015,000 annuity he would like to pledge to get a line of credit for various real estate and/or other types of investments. Let me know. Cash is king, my friend. Talk to you soon."
Q. Okay. Now again, remind the jury who Tommy Bourque is?
A. Tommy Bourque was a commercial loan officer with Old Town Bank.
Q. Okay. And so what was the purpose of this e-mail? Explain -- at least that part of that e-mail. If you could explain that, please?
A. To see if they could use the annuity as collateral to establish a line of credit to fund various real estate transactions.
Q. Okay. And this is an e-mail that -- I'm sorry, an annuity that belonged to whom?
A. Mr. Dowling.
Q. Let me show you Government's Exhibit 602. This is an e-mail from you to -- let's see, to Mr. Vinson. July 9th 2008. This has previously been entered into evidence, Your Honor. We'd move the publish it.
THE COURT: You may.
BY MR. GAST:
Q. Again, it makes sense to read it from the bottom.

If I could be silent for a moment and give the jury a chance to read that.
I think I see everybody looking up, more or less. If you'd tell us, what's this e-mail for? Why did you e-mail this information to Mr. Vinson?
A. To let him know how we were progressing with getting Mr. Dowling's commitment to move forward.
Q. Okay. And what -- you say Mr. Dowling's commitment. What was that commitment?
A. To pledge or hypothecate his annuity.
Q. Okay. To do what with it?
A. For a loan transaction.
Q. Okay. And who was to be the beneficiary of that loan, if it came to fruition?
A. Seven Falls.
Q. Again, who is Seven Falls?
A. Mr. Vinson.
Q. So is this Mr. Dowling borrowing money against his annuity for his own personal expenses?
A. No, sir.
Q. Okay. And if you go -- and did Mr. Vinson acknowledge to you that he understood?
A. He responded. Yes.
Q. What was his response?
A. "It's time to get this done. Thanks. Sincerely,

Keith Vinson."
Q. All right. Let's go to Exhibit No.- -- and before we do. I'm sorry. This is July 9th 2008. What time period is this in relation to other things that have been going on?
A. Real estate sales were really starting to slow.
Q. Okay. Was this in the middle of this series of transactions?
A. No, sir. It was toward the latter end of it.
Q. Okay. During that time period. Thank you.
All right. Let me show you Government's Exhibit No. 607. This has been previously admitted, Your Honor. This a commitment letter from AML and Associates. We'd move to publish it.
THE COURT: You may.
BY MR. GAST:
Q. Again, you testified earlier about AML. Again, if you just remind us what AML is,
A. They're an equity firm that provides hard money loans.
Q. Okay. And the purpose of trying -- attempting to get a loan from AML was to do what?
A. To pay off all the debt, the acquisition development, all the loans at Seven Falls.
Q. Okay. To include the list that was on 1,3- --

Exhibit 1,322?
A. Yes, sir.
Q. Okay. All right. And I'm not going to go through this item by item. But to whom -- let's just focus on the first half of this page, if we could. So the amount of money that's being proposed in this letter is how much?
A. $60 million, sir.
Q. Okay. And to whom is it addressed?
A. Mr. Keith Vinson.
Q. Okay. And it's for what purpose?
A. To provide a commitment to provide financing and an equity investment in Seven Falls.
Q. All right. And any mention of any other development other than Seven Falls?
A. I don't recollect that there was.
Q. Okay. And are you familiar with generally what the terms of this were? Or do you know?
A. Not particularly.
Q. Okay. And how important was this, if at all, to Seven Falls and to the things that you and Mr. Vinson and Mr. Cashion and Mr. Chapman and Mr. Gabler were trying to accomplish?
A. It was the Ace in the hole. It was the way out.
Q. And the way out of what? I mean how -- describe

for us.
A. It was the way to pay everything off and be done with it.
Q. Okay. Fair to say this was pretty important?
A. Yes, sir.
Q. Okay. I want to flip to page seven of this agreement, if you would, Agent Seres. And if you would highlight the section that says "acceptance of loan commitment," those two paragraphs. Thank you.
Now the acceptance of this loan commitment. Did you understand that there was a precondition to AML's agreement to fulfill the obligations that are set forth in this agreement?
A. Yes.
Q. What was that precondition?
A. "The board agrees to deposit $550,000 into escrow with Bank of America within five business days of execution of the commitment letter and escrow agreement."
Q. Okay. And to your knowledge, if you know, did Mr. Vinson have $550,000 to hand out to AML or anybody else at that time?
A. Not to my knowledge.
Q. Do you know if he tried to borrow the money?
A. I don't recall, sir.
Q. Okay. I hate to spoil the ending but I'll jump

way ahead. Did this loan ever fund?
A. No, sir.
Q. Okay. Was it for lack of trying on Mr. Vinson's part or anyone else's part?
A. No, sir.
Q. In other words, did it not fund because Mr. Vinson said no thanks?
A. No, sir.
Q. What did they do then to try to raise the $550,000 to provide this advance fee to AML?
A. They used Mr. Dowling's annuity.
Q. Okay. Let me show you Government's Exhibit 608. It's a memorandum of agreement between Mr. Vinson and Mr. Cashion on behalf of Zeus Investments that's been previously entered into evidence. We'd move to publish.
THE COURT: You may.
BY MR. GAST:
Q. With the Court's permission, I'm going to give the jury a minute to read that. I think I see most people looking up so I'll continue.
Again, we're still learning the names of folks. But again, remind us who Zeus is.
A. Zeus Investments, LLC was Mr. Cashion, Mr. Gabler and Mr. Chapman.
Q. Okay. And in this agreement, Zeus agrees to lend

Mr. Vinson $650,000. Is that the case?
A. Correct.
Q. Let me show you Government's Exhibit No. 609. This has previously been entered into evidence, Your Honor. This is a memorandum agreement between Buck Cashion on behalf of Zeus Investments and Robert Dowling. We'd move to publish this to the members of the jury.
THE COURT: You may.
BY MR. GAST:
Q. I'll give the jury a chance to read that as soon as it comes up on their screen. So is it your understanding that Zeus would borrow money using Mr. Dowling's annuity and pay him for the use of his collateral, and then loan that money to Mr. Vinson?
A. That is correct, sir.
Q. Okay. Now I'm going to show you Government's Exhibit No. 610. This is a loan presentation that's previously been entered into evidence for Zeus Investments and Pisgah Community Bank. We'd move to publish this to the members of the jury.
THE COURT: You may.
BY MR. GAST:
Q. Now, in accordance with this agreement, at first did Zeus attempt to borrow the money in its own name from Pisgah Community Bank?

A. Correct.
Q. All right. Now I'm going to show you Government's Exhibit No. 611. It's an e-mail that involved David Smith and Jason Peltz that's previously been entered into evidence. We'd move to publish 611.
THE COURT: You may.
BY MR. GAST:
Q. Okay. And remind us again who David Smith is.
A. David Smith was a commercial loan officer at Pisgah Community Bank.
Q. And Jason Peltz is who?
A. An attorney.
Q. Okay. And could you just read this e-mail from Mr. Smith to Mr. Peltz?
A. I can. "Subject: Ed Worlund. Hi, Jason. Would you please redraft the hypothecation agreement substituting Ed Worlund for Zeus? We changed borrowers. Thanks. Dave."
Q. Is it your understanding that in fact occurred? That is, that Mr. Worlund ended up being the borrower on the loan rather than Zeus?
A. Yes.
Q. I'm going to show you Government's Exhibit No. 612. This is the loan presentation for the $650,000 loan to Mr. Worlund. We'd move to publish this. It's

previously been entered into evidence.

THE COURT: You may.

BY MR. GAST:

Q. I won't go through all the terms of this. But is this the loan presentation for the $650,000 loan to Ed Worlund?

A. Yes, sir.

Q. Unlike the other one, this one was signed. Is that correct?

A. Yes. It has approvals and dates.

Q. Okay. Now did you or Ed Worlund tell the Bank of Asheville that Worlund -- Mr. Worlund's borrowing another $650,000 at Pisgah -- well, let me back up. This time period, this June 2008, is when this loan presentation is. And if we can go to Exhibit No. 618 for just a moment.

And we'd move to publish 618. It's previously been admitted, Your Honor. It's the promissory note for the $650,000 loan.

THE COURT: You may.

BY MR. GAST:

Q. Mr. Hager, this is the promissory note for the $650,000 loan to Mr. Worlund. When did this close?

A. One day after Mr. Worlund's loan -- mine and Mr. Worlund's loan closed.

Q. Okay. Your loan through Bank of Asheville on lot 139?
A. Yes, sir.
Q. Okay. If we can go to 1322 briefly.
Just so we know we're clear. What we're talking about is this loan here; is that right?
A. Yes, sir.
Q. Okay. So did you or Mr. Worlund inform the Bank of Asheville that Mr. Worlund was borrowing -- this is Bank of Asheville, this loan. Did either of you inform the Bank of Asheville that a day apart that you are also borrowing $650,000 from Pisgah Community Bank down the street?
A. I did not. I don't know if he did.
Q. Okay. Did you or Mr. Worlund, sort of on the flip side of that, tell Pisgah Community Bank that in the same week that you and he are borrowing $850,000 over at Bank of Asheville for $139,000?
A. No, I did not.
Q. I'm sorry. $850,000. Excuse me.
A. I did not, sir.
Q. All right. And again, would that have been material information for either or both of those banks?
A. Yes, sir.
Q. And I've already showed you. But both loans

closed; is that correct?
A. Yes, sir.
Q. Let me show you Government's Exhibit No. 620. And did that $550,000 from that Ed Worlund loan secured by the annuity of Mr. Dowling, did it in fact get paid to AML Associates?
A. Yes, sir.
Q. Okay. I'm sorry. We'd move to publish Government's Exhibit No. 620.
THE COURT: You may.
BY MR. GAST:
Q. And I spoiled the ending before. But despite this going to AML Associates, did that loan ever fund? That is, did AML provide $60 million or any amount of money for the Seven Falls project?
A. No, sir.
Q. What happened with Mr. Worlund's loan, if you know?
A. I don't know the answer, sir.
Q. Okay. Do you know what happened to the other $100,000?
A. No, sir.
Q. Okay. Did Mr. Dowling get paid the money he was owed for pledging his annuity?
A. It seems I recall that he did receive the first

month's check. But after that, I'm not aware that he did.
Q. Okay. Let me show you an e-mail. This is Government's Exhibit No. 636. This is an e-mail between you and an e-mail chain between you and Mr. Dowling. Is that correct?
A. Yes, sir.
Q. This has previously been admitted, Your Honor, and we'd move to publish 636.
THE COURT: You may.
BY MR. GAST:
Q. Actually, it makes more sense to start from the bottom. Go to the very bottom for just a second. So that's from Andrew Hager to Robert Dowling. Is that correct? At the very bottom there.
A. Yes.
Q. Let's go to the body of that on page two. And if we could just blow that whole angle up. If I can give the members of the jury a few minutes to read that. I think we have most people looking up.
This appears complicated to me. Would you explain, please, what's going on in this e-mail? What's being proposed?
A. Yes. Mr. Dowling was worried about his annuity and getting the loan paid back, and to the point where

Mr. Cashion and I were trying to come up with an idea or a way to get that paid back so he could get his annuity released from collateral. And that plan, according to Mr. Cashion, was to use four or five lots at Queens Gap subdivision as collateral through a hard money lender to get the transaction done.

Q. Okay. And we're going to talk more about this later. They've heard a little bit. But just as a preview, what is Queens Gap?

A. Queens Gap is a subdivision -- another large community that Mr. Vinson acquired in -- I believe it's in Rutherford and part of McDowell County.

Q. All right. And did you attempt to do this deal? Did you attempt to try to make that happen?

A. Yes.

Q. Did it in fact happen?

A. No, sir.

Q. And let me show you Government's Exhibit No. 641. This is an e-mail between you and Mr. Vinson dated July 14, 2010. It's previously been admitted. We'd move to publish, Your Honor.

THE COURT: You may.

BY MR. GAST:

Q. I believe we've given enough people enough time. If you would describe what's going on in this e-mail.

A. The incoming CD check. There was a small loan that Mr. Dowling had made to Mr. Vinson or Seven Falls to cover some short-term expenses, payroll and whatnot, and it was supposed to be repaid from the CD that Mr. Vinson apparently had from Queens Gap. It never happened, to my knowledge.

Q. Thank you, sir. Those are all my questions at this time.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. FISCHER:

Q. Mr. Hager, you are familiar with the term "substantial assistance" in connection with your case. Correct?

A. Yes.

Q. You pleaded guilty pursuant to an information. Correct?

A. Yes, sir.

Q. To one count of conspiracy to defraud the United States?

A. That is correct.

Q. You have not been sentenced at this point, have you?

A. That is correct.

Q. Are you represented by an attorney?

A. Yes, I am.
Q. And has a sentencing date for you been set?
A. Not to my knowledge, sir.
Q. And you understand one of the possible things that could happen at your sentencing is a term of imprisonment?
A. Yes, sir.
Q. You'd like to avoid that, would you not?
A. Certainly.
Q. And you understand that if the prosecutors informed the Court that you have provided substantial assistance for the government, the Court can take that into consideration and possibly give you a reduced sentence.
A. That is correct.
Q. And that's what you'd very much like to happen; isn't that correct?
A. Certainly.
Q. And you have met with the prosecutors or other agents of the government prior to today some number of times, have you not?
A. Yes, sir.
Q. About how many times would you say?
A. Five to six, maybe a few more.
Q. What was the most recent time?

A. The most recent time was last week.
Q. And that takes some number of hours?
A. Yes, sir.
Q. And did that include reviewing a lot of these documents and discussing matters that you have testified to today?
A. It did.
Q. And you understand that it's only up to the prosecutors whether or not to inform the Court that you have provided substantial assistance?
A. I'm aware of that.
Q. Now with regard to your dealings with Seven Falls. You were basically recruited by Buck Cashion; correct?
A. Correct.
Q. Prior to -- well, when did Mr. Cashion recruit you to work at Seven Falls?
A. In late April, early May of 2008.
Q. About the time a lot of these loans we've been discussing were subsequently made. Correct?
A. Correct.
Q. And it was Mr. Cashion who told you that you would be paid $8,000 a month.
A. Yes.
Q. You didn't have any recruitment by Keith Vinson, did you?

A. No.
Q. Basically, Buck Cashion sent you out to Seven Falls to come up with money for Seven Falls.
A. Yes.
Q. And you were aware at that time that Buck Cashion was owed a great deal of money for investing in Seven Falls.
A. I'm sure. Yes.
Q. You wanted to get paid back?
A. Yes.
Q. And a big part of your job, and the reason for your recruitment, was to get Buck Cashion and, I suppose, Avery Chapman, as well, paid back.
A. Yes.
Q. Now once you got out to Seven Falls, I understand you only met with Keith Vinson once or twice a week?
A. Something like that, yes.
Q. What were his day-to-day activities during the time you were out there?
A. A lot of time he was out on the property with contractors doing what developers do.
Q. He was very busy, was he not?
A. Appeared to be.
Q. Okay. And when you had these once or twice a week dealings with that, they were generally very short

conversations. Correct?
A. Correct.
Q. Okay. And you have reviewed -- and the jury has seen -- a number of e-mails that you sent to Mr. Vinson about these various transactions.
A. Yes.
Q. And would you agree that on most of them there's not even a reply from Mr. Vinson?
A. That was common.
Q. Now once you got out to Seven Falls, you weren't paid $8,000 a month were you?
A. I think I did receive the first payment. But after that, it was done.
Q. You got converted basically to a commissioned salesperson or a commissioned -- well you were on a commission; is that correct?
A. That would imply that I did get paid for the work that I did. I never got paid for the work that I did. So saying I'm on commission is -- that was intended, yes, but it didn't happen.
Q. So in terms of what you got paid for your efforts at Seven Falls. There was one additional payment of $8,000 and nothing else?
A. I think there was an $8,000 initial payment. It might have been five. And then when I got the

transaction funded for Dr. Gillespie, it was a small payment but, like, $5,000. But that was for back wages or back obligations.
Q. How long in all were you out at Seven Falls?
A. From late April, early May until the fall, late fall of that year. And then I went over to Mr. Burnett's house and continued to try to find money for the development and other projects.
Q. I believe you mentioned you were -- when you were at Seven Falls you were set up, kind of, in a boardroom rather than a private office?
A. That's correct.
Q. Okay. So you had a telephone and a computer, I presume?
A. Yes.
Q. And so you were there for -- from the spring of 2008 until about the fall?
A. That's approximate, yes.
Q. And after that you began working on a full-time basis out of Mr. Burnett's house?
A. To raise money, yes, for this project and others.
Q. During the initial time you were at Seven Falls, was that a full-time job for you? Or did you still have other jobs you were working on?
A. I was out there, but I was working on other jobs

in conjunction with that.
Q. And is it normal for somebody who obtains funding from some other sources to get a finder's fee?
A. Yes.
Q. Okay. And that was part of what you wanted to get out of this Charles Burnett loan; is that correct?
A. Yes.
Q. And do I understand that what your role was -- at least initially with the Charles Burnett matter -- was you were talking to Mr. Vinson on the phone, and then would hand the phone over to Mr. Burnett when he heard what you were talking about.
A. Yes.
Q. And that was what you wanted to get $17,000 for.
A. That's correct.
Q. Okay. And that would have involved, what, two minutes of actual involvement?
A. Correct.
Q. And you thought that was worth $17,000?
A. Prior to that, I had done a lot of work for Mr. Vinson and hadn't gotten the compensation for it. So, yes.
Q. Okay. Now what you had put in that initial e-mail wasn't Andrew Hager is going to receive $17,000 for a finder's fee and past due work. It was just for a

finder's fee on the Burnett project; is that correct?
A. That's correct.
Q. And again, your role was about two minutes. You're handing the phone over to Mr. Burnett?
A. Okay. Correct.
Q. Now let's talk about Mr. Cashion for a little bit. He was generally accompanied by Mr. Chapman when he was conducting his business; is that correct?
A. And Mr. Worlund.
Q. And Mr. Worlund.
A. Yeah.
Q. And what exactly was Mr. Worlund's relationship to Mr. Chapman?
A. I think Mr. Worlund worked in the armed forces under Mr. Cashion or Mr. Chapman, I can't remember which one. But he'd been in the military with them to my knowledge.
Q. And from your observation, Mr. Chapman and Mr. Cashion had a very close relationship.
A. With Mr. Worlund?
Q. Yes sir.
A. Yes, sir.
Q. Basically, you had heard that Mr. Cashion almost thought of Mr. Worlund as a son?
A. That's a fair statement.

Q. And in terms of your involvement with Seven Falls. You dealt much more with Mr. Cashion than you did with Mr. Vinson; is that correct?
A. Yes.
Q. And Mr. Cashion was constantly telling you he needed to get money from Vinson to get repaid on loans that he had given to Vinson.
A. That is true.
Q. That was a recurring subject of conversation.
A. Yes, sir.
Q. And he was putting a lot of pressure on you to help get financing so Vinson could pay him. Correct?
A. Correct.
Q. Now, in terms of Mr. Cashion. Based on what you said, he certainly was not a passive investor in Seven Falls was he?
A. No, sir.
Q. He was out there almost every day, at least when you were there.
A. He was out there a significant amount but not every day.
Q. And did you -- did I understand that he basically had some sort of office arrangement at Seven Falls?
A. No. That was at 32 Orange Street.
Q. Okay. So he didn't have -- did he have, like you

did, a section of the boardroom to work out of at Seven Falls?
A. No, not really.
Q. He and Mr. Vinson would argue on a regular basis, would they not?
A. Yes, sir.
Q. I think you mentioned one argument earlier about disbursement of the Burnett loan proceeds.
A. I don't know if that was that one. In general, yes, there were many disagreements.
Q. They had loud knockdown, drag-outs pretty often, didn't they?
A. Fairly common. Yes, sir.
Q. Was there one time when Mr. Cashion came out to Seven Falls and went to the practice facility they constructed and there was an argument?
A. Yes.
Q. And at that point, Mr. Cashion told everybody to get off of his land and threatened just to put in mobile homes?
A. That's correct.
Q. You personally witnessed that?
A. I was in the building, and Mr. Cashion.
Q. You could hear it?
A. Yes. Well I don't know that I could hear it.

Mr. Cashion told me that he did it.
Q. Okay. And knowing Mr. Cashion as you did, and knowing his involvement and interest in Seven Falls, that really didn't surprise you.
A. Not in the least.
Q. Now you've gone through a number of transactions -- and we'll go through some in more detail in a moment -- including that chart that the government put up about all of these various lot loans.
A. Yes.
Q. And that would include the lot 139 that you and Mr. Worlund purchased.
A. Okay.
Q. And you've indicated you were also involved in the Burnett loan and the -- the Burnett hypothecation loan and the Andrew Dowling matter?
A. Robert Dowling.
Q. Robert Dowling, excuse me. And it is true, is it not, Mr. Hager, that in none of these transactions did Mr. Vinson tell you to lie to any bank or banker about what was going on?
A. That is true.
Q. Never came up in any discussion with Mr. Vinson about any of these loans we've talked about?
A. Never -- not to my knowledge, sir.

Q. Now let's just kind of go in reverse order here. With regard to the Dowling matter, how did you find out about his annuity?
A. Mr. Dowling told me that he had an annuity.
Q. I mean how did you even happen to be discussing subjects like that?
A. Mr. Dowling had considered making an investment. He had done some investments in some companies in Asheville prior to this and was looking for some potential investment opportunities and that's how the discussion came up. He was looking to generate income.
Q. Okay. And you thought that the potential for that generation of income could take place by using the annuity to help Zeus, help Seven Falls?
A. I introduced him to Mr. Cashion, and what their specific plans were decided between them. I just know that was the end result.
Q. So you did not participate in any of the discussions that Mr. Cashion may have had with Mr. Dowling.
A. That's correct. If I would meet with them -- like, they would go to a coffee house and then I would go to another table while they would sit and talk particulars.
Q. So would you set up the meeting at the coffee

house or wherever?
A. That's where Buck usually liked to meet. Meet me at Greenberry's or meet me at Starbucks. That's what he liked to do.
Q. But whatever they talked about at the table was between them, and you couldn't hear them.
A. For the most part, that's correct.
Q. And at none of these coffee house meetings was Keith Vinson present.
A. To my knowledge, that is correct also.
Q. And besides Mr. Chapman and Mr. Dowling, were there any other people present at any of these coffee house meetings?
A. Occasionally, Mr. Chapman. Mr. Worlund was usually there.
Q. When Mr. Cashion was off meeting with prospective investors or other business prospects, was Mr. Worlund very often with him?
A. Yes, sir.
Q. And if I could ask Agent Seres to pull up Exhibit No. 609, please.
Do you have that on your screen, Mr. Hager?
A. Yes, sir.
Q. And, Your Honor, may the jury see that as well, please?

Okay. That particular document dated August 1st 2008 about the agreement between Zeus and Dowling. You've seen that before, obviously?
A. Yes, sir.
Q. You're aware of that while that was being negotiated and finalized?
A. No. I saw this much, much later.
Q. When did you first see that, sir?
A. When the government presented it to me. I haven't seen it before that.
Q. Did you know about it?
A. No, sir.
Q. And as you look at that document you don't see Keith Vinson's name anywhere on that.
A. No, sir, I do not.
Q. And in terms of your contacts with Mr. Dowling after the loan was finalized, what were those?
A. They had started to diminish.
Q. Well what were they?
A. We were working on a website together trying to sell certain specialty Bibles and some covers and --
Q. I'm sorry. Specialty what?
A. Bibles and local handmade covers, and we weren't able to sell them enough to stay in business.
Q. And in terms of this particular business

transaction though. Once it was funded, did you have any further involvement with that?
A. Not -- no.
Q. Did you have any further discussions with Mr. Cashion about it?
A. At the very end, when they were trying to find another home for it for the loan, I did have some discussion but not in the interim.
Q. And what other home for the loan was being sought?
A. Just a source of repayment. The lots at Queens Gap and coming up trying to get it paid out.
Q. And who owned the lots at Queens Gap that were being discussed at that point?
A. I'm assuming Mr. Vinson.
Q. You don't know?
A. Well, he owned the subdivision.
Q. Did you ever have any discussion with Keith Vinson about using those lots to go to a hard money lender and secure some repayment for Dowling?
A. No.
Q. And with regard to the term "hard money lender." That's something you are very familiar with. Correct?
A. Yes.
Q. And I believe you have described that as private individuals or firms who don't operate under the same

rules as banks.
A. Correct.
Q. Would -- are you familiar with the term "desperation lender?"
A. Yes.
Q. Is there a difference between a desperation lender and a hard money lender in the economic community out there?
A. Not really.
Q. Basically, it's a lender of last resort?
A. It's one of the last resorts. Correct.
Q. Kind of like a loan shark, basically.
A. Sure.
Q. When you can't get a loan anywhere else, that's where you go.
A. Correct.
Q. And the terms are very onerous.
A. Very.
Q. As a matter of fact, you described Mr. Cashion and Mr. Chapman as hard money lenders. Is that correct?
A. Yes.
Q. And you're familiar with a number of the financial transactions these gentlemen were involved in.
A. Correct.
Q. And the terms they imposed on Mr. Vinson were very

strict in terms of repayment and interest rate and things such as that. Correct?
A. Yes.
Q. Now did you ever know Mr. Vinson to have any specific conversation with Mr. Dowling about this loan or anything?
A. No.
Q. Well let's go to Mr. Burnett.
A. Okay.
Q. How did you happen to be working with him at his kitchen table?
A. We were -- the drive out to Seven Falls for me was very, very long, and I was -- funds were tight. And I spent most of my time on the phone with Mr. Burnett trying to find lenders to create packages to get to those lenders, and it made sense for me to work out there.
Q. And you described Mr. Burnett -- correct me if I'm wrong. Was it a hard money broker?
A. Yes.
Q. Okay. And what exactly does a hard money broker do, as opposed to a hard money lender?
A. The lender actually had the money. The broker found the people that had the money.
Q. And how much of your time, once you went out there, was involved working with Mr. Burnett as opposed

to working on Seven Falls?
A. Well those kind of went and hand-in-hand, sir. A lot of the time I spent working with Mr. Burnett we were trying to find funding for Seven Falls.
Q. And in terms of the Burnett loan. Once you handed the phone to him and the connection was made, what were your specific contacts with Keith Vinson about that matter?
A. Very limited.
Q. We have seen a contract about this matter between Mr. Burnett and Seven Falls. You recall looking at that.
A. Yes.
Q. It provided for the borrower's fee of $40,000 and some additional $11,000 for some other payments.
A. Yes.
Q. Now, from your experience as a commercial banker -- you were at Wachovia and Carolina First and some other places?
A. That's correct.
Q. Banks like that don't have borrower's fees?
A. Correct.
Q. But the hard money lenders generally do, don't they?
A. Yes.

Q. So there was nothing unusual about the fact that Mr. Burnett was going to get a $40,000 borrower's fee.
A. What was unusual to me was it wasn't on the HUD.
Q. Okay. And in terms of the HUD. I believe if we could -- Agent Seres, can you pull up, I believe it's Exhibit 400, please. Do you have that in front of you, sir?
A. I do, sir.
Q. And may I ask the jury to be able to see that, Your Honor?
THE COURT: You may.
BY MR. FISCHER:
Q. This, in fact, is the HUD, the closing summary for the Charles Burnett loan. Correct?
A. Yes, sir.
Q. And you actually attended that closing.
A. I took Mr. Burnett to the closing, yes.
Q. Okay. So, besides you and Mr. Burnett, who else was present at that closing?
A. I don't recall who else was there. I know the attorney was there.
Q. And the attorney was Mr. Peltz?
A. Yes, I believe that's correct.
Q. Okay. He wasn't there was he? (Indicating the defendant.)

A. I don't think so.
Q. Did you ever have any discussion with Mr. Vinson prior to closing about what was on the HUD?
A. No.
Q. And if you could review that document, sir. There isn't anything on the HUD about the $40,000 borrower's fee or the other $11,000, is there?
A. No, sir.
Q. Okay. And did you notice that at the closing?
A. Yes, I did.
Q. Okay. And did you call that to the closing attorney's attention?
A. No, sir, I did not.
Q. Did Mr. Burnett say anything about that?
A. No, he, did not.
Q. And did you -- no representative of the bank was there; is that correct?
A. I don't remember seeing anyone from the bank there.
Q. You didn't notify the bank that, well, there's some additional revisions here. Is that correct?
A. That is correct.
Q. And Mr. Vinson never told you not to tell the Bank of Asheville about the borrower's fee and the $11,000. Correct?

A. Correct.
Q. So why didn't you say anything?
A. It's a horrible answer. I don't know.
Q. You were hoping that Mr. Burnett would give you some portion of that for your role in this transaction?
A. I was hoping to get something from Mr. Burnett for past work that I had done for him.
Q. So is the reason then, Mr. Hager, that you stayed silent because you wanted to get some money from this?
A. That wasn't -- that wasn't the reason, sir.
Q. Okay. Then let me ask you again. What was the reason?
A. The reason was I was very afraid of making something blow up that was so many people were dependent on. I was scared and ashamed and embarrassed.
Q. But you stayed silent anyway, didn't you?
A. Yeah, I did.
Q. And if you look at some other documents about this loan. There was also an hypothecation agreement; is that correct?
A. I believe that's correct.
Q. Okay. And from your time as a commercial banker you are familiar with the concept of hypothecation. Correct, sir?
A. Yes, sir.

Q. And that's basically when one person lets another borrower use their collateral.
A. Correct.
Q. Is that kind of a fair statement?
A. Yes.
Q. And as long as it's disclosed there's nothing illegal about that, is there?
A. I'm not an attorney. But it was done, yes.
Q. From your banking days, regular commercial banking, occasionally you had hypothecation loans. Correct?
A. Yes.
Q. And at the closing, did Mr. Peltz, the attorney, voice any concerns about the way this transaction was being handled?
MR. GAST: Objection. Hearsay.
THE COURT: Sustained.
BY MR. FISCHER:
Q. In terms of the hypothecation. You are familiar with the loan presentation that was made to the Bank of Asheville?
A. Yes, I saw that.
Q. It was clearly disclosed that Mr. Burnett was hypothecating his collateral for the benefit of Mr. Vinson, correct, to obtain this loan?

A. I think Mr. Vinson was hypothecating his collateral.
Q. Excuse me. I'm doing it -- I got it backwards. Thank you. Yes. But again, that was clearly disclosed to the Bank of Asheville. Correct?
A. It appeared to be.
Q. And the -- in terms of the closing and stuff. How long did that actually last?
A. I'm sorry. The question?
Q. The closing itself -- when you were at Mr. Peltz's office -- how long did that last?
A. It was very short. Very brief.
Q. Pretty routine.
A. Yeah.
Q. Okay. And it was after that, the next day or two, that Mr. Burnett received his money.
A. Yes.
Q. By certified funds from the Bank of Asheville drawn on the Seven Falls account?
A. Correct.
Q. And did you go down and get those certified checks?
A. I took Mr. Burnett to the bank to pick them up. I drove his car.
Q. So clearly, since they came from the bank and were

certified, somebody at the bank knew they were going to him.

MR. GAST: Objection. Calls for speculation.

THE COURT: Sustained.

BY MR. FISCHER:

Q. In terms of these other lot loans that were on that big chart that Mr. Gast had up there --

A. Yes.

Q. -- that you were involved in. What conversations did you have with Mr. Cashion about those?

A. They were numerous. Here, get this done. Take this one here. Do this. Do that.

Q. So would it be fair to say that Mr. Cashion, based upon your observation and participation, was kind of orchestrating them?

A. That would appear to be the case, yes.

Q. You had a lot more communication with Buck Cashion about these various lot loans than you did with Keith Vinson.

A. Correct.

Q. You had very little conversation with Keith Vinson about them; right?

A. Correct.

Q. And in terms of the way these loans were set up. You also dealt with Mr. Chapman some?

A. A lot less than Mr. Cashion, yes.
Q. Okay. And who else did you deal with about these various lot loans in terms of, say, the Zeus group?
A. Mr. Worlund.
Q. In terms of, again, Mr. Worlund and Mr. Chapman, you dealt with them a lot more than you dealt with him, right, about the lot loans?
A. Yes.
Q. And actually, you have referred to them in some prior interviews as "investor loans." Is that correct?
A. Yes.
Q. And what's an investor loan, sir?
A. An investor loan in this particular case was a loan that was issued to raise capital with the lot remaining available to sell to hopefully an end user one day.
Q. Okay. Well let's talk about your loan.
A. Okay.
Q. The lot 139 loan. Why did you ultimately decide that you wanted to participate and get one of these investor loans?
A. Mr. Cashion asked me to do it, sir, and I did it.
Q. Did you have any dealings individually with Keith Vinson about your purchase of lot 139?
A. No, sir, I did not.

Q. When was the -- rather, who attended the closing of your loan?
A. I know I was there. Mr. Worlund was there. It was the same day that the two for Dion closed as well. I think Mr. Cashion was there, and possibly Mr. Chapman.
Q. Mr. Vinson wasn't there at your closing, was he?
A. Not that I recall, sir. It was many years ago.
Q. I understand. But you specifically remember these other individuals being present.
A. Right.
Q. And the purchase price was $850,000.
A. Yes.
Q. And you did in fact have a signed purchase contract with Mr. Vinson.
A. Correct.
Q. Right, sir?
A. Yes.
Q. Okay. And did you and Mr. Vinson sign that purchase contract at the same time, or were those signed at separate times?
A. I believe they were signed at separate times.
Q. Okay. So you didn't actually see him sign as the seller for that.
A. That's correct.
Q. But you did in fact read that contract, did you

not?
A. I did.
Q. Okay. And if I can ask Agent Seres to pull up 124-E, please. Just looking at the front page there. That does appear to be the start of that particular contract?
A. Yes.
Q. Okay. And if we go down -- I think it might be 3.1. If we could go there to paragraph -- okay. It does show the purchase price being $850,000.
A. It does.
Q. Okay. And that wasn't anything that you negotiated with Keith Vinson or any of the sales staff at Seven Falls.
A. Correct.
Q. You never even had a discussion with Keith Vinson about the sales price for the lot you were purchasing -- you and Mr. Worlund were purchasing.
A. That is correct.
Q. If we go down -- I think it might have been paragraph 23, please. It would be 21. If we could highlight that, please.
Do you have that in front of you?
A. I do, sir.
Q. Okay. Your Honor, may the jury see that, please?

THE COURT: They may.
BY MR. FISCHER:
Q. That shows in fact that you are getting the purchase credit of $212,500.
A. Yes.
Q. And if we did the math, that's the 25 percent of the $850,000 sale price.
A. Yes.
Q. That's accurate. Now who'd you discuss that credit with prior to the closing of this particular loan?
A. It was pointed out by Mr. Cashion but that was it. No further discussion.
Q. So would that be something that you also never discussed with Mr. Vinson?
A. Yes.
Q. Yes, you did discuss it or yes, you did not?
A. Yes, I did not.
Q. Okay. And if we can go down to the next page, please. Yeah. That number 23, please. If we could highlight that.
Your Honor, I'd ask to show that to the jury, please.
THE COURT: You may.
BY MR. FISCHER:
Q. Okay. This was the paragraph specifically dealing

with your repurchase option or the repurchase option that was granted, rather, to Mr. Vinson, if I can express that a little bit better.
A. Okay.
Q. You read that prior to closing, did you not?
A. Yes.
Q. Okay. Now it's title "Repurchase Option." But if you go down there to the third line it says, "Seller hereby agrees to repurchase the property no later than the expiration of the two year period referenced herein."
Does that seem to be inconsistent -- that sentence -- with the repurchase listed as an option?
A. Yes.
Q. Because this contract looks like he's definitely agreeing to buy it back.
A. That's what I thought.
Q. And from an investment standpoint, if real estate goes up based on your experience as a banker that could be a good deal for Mr. Vinson.
A. Yeah.
Q. If it goes down, he's screwed. Right? He's lost money.
A. Yeah.
Q. Now this contract was provided to the Bank of Asheville, was it not?

A. Yes.
Q. There was nothing hidden about that particular portion of this transaction.
A. Not to my knowledge.
Q. And to your knowledge, who actually drafted that contract?
A. I don't know who drafted the contract.
Q. But that contract was part of the closing package that you reviewed at Mr. Peltz's office?
A. Right.
Q. And if I could have -- well if we could hold off for a second.
Mr. Gast asked you a number of questions about the appraisal on your property and a number of the other appraisals that were done for these investor loans.
A. Yes.
Q. And your property appraised by Mr. Ollis, I believe, at $850,000.
A. 853 or something like that.
Q. Somewhere right in that range. Did you review that appraisal --
A. No, sir.
Q. -- at or prior to closing?
A. No, sir, I did not.
Q. You didn't have a clue what it appraised at; is

that fair?
A. That's fair.
Q. Did you know what any of these other appraisals for the investor loans appraised at?
A. No.
Q. Did you ever observe Keith Vinson having any contacts with Mr. Ollis, the appraiser, who did a number of these?
A. No.
Q. Did Mr. Vinson ever tell you we've got this appraiser and he's in our hip pocket and he'll come up with an inflated figure so the banks will loan more money?
A. No, I did not.
Q. And there was a different appraiser -- was it Mr. Best? -- on another one of these?
A. I believe it was Tom.
Q. That we went over?
A. Yes.
Q. And he also came back with 850 for that particular lot, or thereabouts. I'm sorry. It might not have been. It was a different appraiser but I'm forgetting the name right now. Do you remember the name?
A. It was done for the Bank of Asheville. If I heard it, I would recognize it.

Q. But there was a separate appraiser --
A. Yes.
Q. -- besides Mr. Ollis on at least one of these deals.
A. To my knowledge, that's correct.
Q. Okay. And he also came back with 850 or thereabouts.
A. That's correct.
Q. Okay. And you never observed Mr. Vinson say anything about any other appraiser with regard to these investor loans?
A. No.

THE COURT: Mr. Fisher, is this a logical place for us to break for lunch?

MR. FISCHER: Yes, sir.

THE COURT: Ladies and gentlemen of the jury, we're going to take the lunch break at this time. As I have told you before, please make sure that there are no discussions that you have with anyone regarding this case during the lunch break and don't allow anyone to have discussion with you. Certainly if anyone attempts to have a discussion with you that is something that you would need to bring to the attention of the Court.

Please make sure that you leave your notes on the table in the jury room. Nobody will disturb them. Be

careful as you exit from the building and as you return and also while you are eating lunch to make sure that you are not overhearing anything that anyone is discussing about this case.

Marshal, please take the jury out. Please inform the Court when the jury has cleared the building.

(Jury excused at 1:00 p.m.)

THE COURT: Anything we need to address while we have the jury out? Anything for the government?

MR. GAST: No, sir, Your Honor.

MR. FISCHER: No, Your Honor.

THE COURT: Marshal, please recess us until two p.m.

(Off the record at 1:01 p.m.)

(On the record at 2:02 p.m.)

THE COURT: Good afternoon, everyone.

MR. GAST: Good afternoon, Your Honor.

MR. FISCHER: Good afternoon, Judge.

THE COURT: Anything we need to address before we bring the jury in?

MR. GAST: Not from the government, Your Honor.

MR. FISCHER: No, Your Honor.

THE COURT: Marshal, please bring us the jury.

(Jury returns at 2:03 p.m.)

THE COURT: Ladies and gentlemen of the jury, good

afternoon.

THE JURY: (In unison.) "Good afternoon."

THE COURT: Thank you for being on time so that we can get started on time. Before we resume, let me ask did anything transpire during the lunch break that any of you need to bring to the attention of the Court? Seeing that there are none, we will continue.

Mr. Hager, please return to the witness stand. I remind you that you were sworn earlier as part of this trial and you remain under oath until the trial is over.

(Witness resumes the stand at 2:04 p.m.)

THE COURT: Mr. Fischer, you may resume your cross-examination.

MR. FISCHER: Thank you, Your Honor.

**FURTHER CROSS-EXAMINATION**

BY MR. FISCHER:

Q. Agent Seres, could you please pull up 411, please? I'm sorry. Thank you, Mr. Savage.

Mr. Hager, do you have Government's Exhibit No. 411 in front of you there?

A. I do sir.

Q. And that is the e-mail dated March 30th 2009 directed to Jason and Keith. Is that correct?

A. Yes, sir.

Q. And this is the e-mail that Mr. Burnett wanted

you to put together about the terms of his deal, what he wanted out of the arrangement to get the loan.

A. That is correct.

Q. And I believe you indicated that he didn't like doing e-mail but he kind of dictated this --

A. That's correct.

Q. -- and reviewed it prior to you sending it.

A. That's correct.

Q. And the Jason that you are sending that to, that in fact is Jason Peltz who was the closing attorney. Is that correct?

A. Yes. I didn't send it. I sent this to Mr. Burnett and that's who he intended it to go to.

Q. Okay. In your discussions with him, he wanted it to go to the closing attorney.

A. That's correct.

Q. Okay. In fact, Mr. Peltz obviously was the attorney who closed the loan.

A. That's correct.

Q. And in terms of dealings with Bank of Asheville about the agreement here. Could you, please pull up 408, Agent Seres? Do you have that in front of you?

A. Yes, sir.

Q. Okay. And Your Honor, could I publish that to the jury, please?

THE COURT: You may.

BY MR. FISCHER:

Q. That, in fact, is in fact the hypothecation agreement we talked about this morning?

A. That is correct.

Q. In which Mr. Vinson is using his collateral, basically, for Mr. Burnett's loan.

A. Correct.

Q. Okay. And does it appear to be on the letterhead of the Bank of Asheville?

A. It does.

Q. Okay. Do you know how it happened to actually get drafted on Bank of Asheville stationery?

A. No, I do not.

Q. Okay. Did you have any dealings with any individual at the Bank of Asheville about the drafting of the hypothecation agreement?

A. No, I did not, sir.

Q. Do you have any idea who actually drafted that agreement?

A. No, I do not, sir.

Q. Did you see that agreement at closing?

A. No, I did not, sir.

Q. Now you indicated this morning that these various investor loans, the lot loans, whatever you want to call

them, tended to move faster than the normal loan that you had been involved with in your commercial banking days.
A. Correct.
Q. In fact, they often closed in a few weeks. Is that correct?
A. Some of them. Or less than that.
Q. All right. And I believe you indicated part of your job was to put pressure on the banks to get these loans to close fast.
A. My job was to see where they were in the process and see what I could do to help expedite. I didn't put any pressure on the banks. It doesn't do anything but slow them down. That's been my experience.
Q. This morning didn't you use the words "pressure the banks to move fast?"
A. I was pressured to move fast but I didn't pressure the banks.
Q. Who pressured you to move fast?
A. Mr. Cashion.
Q. He was very aggressive about getting these loans processed; is that correct?
A. That is correct.
Q. And you recall previously being interviewed in this case? Actually, several times by various agents of the government.

A. Yes.
Q. Okay. And some of the subjects of those interviews dealt with Mr. Cashion and his role in these various loans. Is that correct?
A. Yes.
Q. And in fact, you indicated in one of your interviews that Mr. Cashion was in fact trying to pressure the banks, perhaps with Mr. Worlund's assistance, to move faster than they might normally and in the course of their normal commercial endeavors.
A. He had relationships with some of the bank presidents, yes, and he was not afraid to meet with them and deal with them. Many of those meetings I wasn't involved with. But he was not the type of person that, if he wanted something done, he would let it rest. There would be -- Ed would be on me. There would be phone calls: Where are we? Get this done. Get this done.
Q. And in the presentation of these loans to various banks, including the ones that did fund the lot loans and some of the ones that did not, basically it's Mr. Cashion doing the pitch. Do you know what that means?
A. Yes.
Q. What's the pitch? If you'd explain that to the members of the jury.
A. Mr. Cashion would come to me describing what he

wanted -- take this lot loan to this bank. I knew the terms of the deal because I had the contracts there. But take this to the ban Bank of Asheville. Take these three loans there. And then if they didn't go through with -- if they weren't approved I would let him know through Mr. Worlund, and then he would say, okay. Take them here. Take them there. So I was very active in that part.

Q. And in terms of Mr. Cashion, though, did you not indicate in your -- one of your interviews on November 13, 2012 that Mr. Cashion was the one that would actually pitch the loans to the banks in various meetings that were held?

A. That's correct.

Q. Okay. And that pitch by Mr. Cashion would involve his presentation of the loan and urging the bank to fund the loan. Is that correct?

A. That's correct.

Q. Okay. Mr. Vinson never did anything like that, did he?

A. Not in my presence, sir.

Q. And I believe you also indicated in that November 13th interview that after the bank indicated they might do the loans that Mr. Worlund}'s job is to kind of stay on the bank to make sure it got done as quickly as possible.

A. That's correct.
Q. And based on your observation, and to your knowledge, Mr. Worlund was acting under Mr. Cashion's direction.
A. That's correct.
Q. Now we had some discussion about the Old Town Bank loans in this case. Did I understand that you did in fact have some prior acquaintance with Mr. Bourque or some other folks out at Old Town?
A. Mr. Bourque.
Q. And how did do you know Mr. Bourque, sir?
A. Mr. Bourque and I were commercial lenders together at Carolina First.
Q. Were you social acquaintances or just professional associates?
A. Mostly just professional. We just saw each other during business hours.
Q. But you thought that they were a young bank and this would be something good for them and good for you and Mr. Cashion and the rest?
A. That's correct.
Q. Would it be accurate that Mr. Vinson never participated in any of the meetings with anybody at Old Town Bank about these loans?
A. Representatives from Old Town Bank did come and do

a site visit.
Q. Right.
A. But as far as Mr. Vinson traveling to the bank? To my knowledge, he did not.
Q. Were you present at that site visit?
A. I was at the site. I took Karen around in one of the mules to show her the property.
Q. I take it a "mule" is not a four-legged animal?
A. No. It's one of the four-wheel drive vehicles the farmers use.
Q. Okay. Since the roads were not paved at that point?
A. That's correct.
Q. And in your presence were any of the discussions between Mr. Vinson and Mr. Bourque or Karen Cioce, I think, the young lady from the bank, dealing with financing? Or mostly just here is the property. Go and take a look.
A. That was pretty much it.
Q. Now in terms of the various closings. You indicated that Mr. Vinson was present at some of them with regard to the investor loan closings?
A. Correct.
Q. Okay. He wasn't present at most of them, was he?
A. I don't think he was at most of them. No.

Q. Was he present at more than one?
A. I'm sure that he was. I don't know. There were a lot of loan closings in a very short period of time.
Q. Well I think if we look at the Government's Exhibit No. 13 -- was it 22? Mr. Gast, the chart. If you could -- if we could pull that up. Okay. That shows 1, 2, 3, 4, 5, 6, 7, 8 -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26. Do you have that in front of you?
A. Yes.
Q. As you recollect, sir, how many of those closings did you attend?
A. The majority.
Q. And as you think about it, just as to the ones you attended, is it more than two or three, maybe, that Mr. Vinson attended?
A. That -- I don't think it was more than that.
Q. And Mr. Chapman, on the other hand, was at the majority -- excuse me. Mr. Cashion. The majority of these closings that you were present at?
A. As I recollect, yes.
Q. And Mr. Chapman was present at some of them as well?
A. Some of them as well.
Q. And is it accurate that all of these were closed

by Mr. Peltz?
A. As I recall, yes, sir, they were.
Q. And if you know, who selected Mr. Peltz as the closing attorney?
A. I'm assuming Mr. Vinson, because he closed all the founding members' lots.
Q. But you don't really know about these loans?
A. I don't know.
Q. Did you and Mr. Cashion ever discuss using Mr. Peltz as the closing attorney?
A. Yes.
Q. And in terms of these various loans that you have in front of you there. Do you know how many of those used Mr. Ollis as the appraiser?
A. I would say the vast majority.
Q. Okay. And Mr. Gast has pointed out a variety of issues about comparables and such on the appraisals. Did you personally have much dealing with Mr. Ollis?
A. I would call him to let him know that we were going to be putting a financing package together. The banks will typically order the appraisal or approve the appraisal for the transaction.
Q. And what was the process, if you know, how the banks approved the appraisals?
A. It varies from bank to bank.

Q. Well from your experience as a commercial lender at these various places, who normally picks the appraiser?
A. At the bank that I worked at we had a commercial appraisal and review department, and they would submit bids out to multiple appraisers to get a time frame and a cost to do the appraisal. They would submit it back, and then the bank would decide which one was done.
Q. In this case, did you have any particular conversation with Mr. Ollis telling him what figure you wanted the appraisal of any of these lots to come back at?
A. He would ask me what the purchase contract value was, Mr. Ollis would, in some cases.
Q. Okay. So let's look at, let's say, Loan H. Chapman, SCBT, $850,000. And obviously, we've seen a number of $850,000 sales?
A. Yes.
Q. Is it your testimony that Mr. Chapman would ask you what the purchase price was?
A. Mr. Chapman or Mr. Ollis.
Q. Mr. Ollis. Excuse me. I'm sorry. Thank you.
A. If he -- he would ask me if I had a purchase contract -- he would need a copy of that to do his appraisal -- and either I would have that or Ed Worlund.

So it was not uncommon for him to ask. It wasn't uncommon that I was -- a banker for them to ask for a copy of the purchase contract if that in fact was the type of transaction.
Q. And based upon these conversations you had with Mr. Ollis, then would it be fair to say he knew how much money needed to be funded in these deals?
A. I can't answer that.
Q. Okay. But he knew what the first price was?
A. Yes, of course.
Q. And to your knowledge, Mr. Vinson never had any conversation with Mr. Ollis about the purchase price on any of these various loans you have in front of you?
A. To my knowledge he did not.
Q. If I can ask you, Agent Seres, please to pull up 401. And if you could highlight that "purpose" portion, please, sir, up at the top.
A. Yes.
Q. Do you have that in front of you?
A. Yes, I do.
Q. Mr. Hager -- and if could publish that, Your Honor.
THE COURT: You may.
BY MR. FISCHER:
Q. This was part of the credit memorandum issued to

the Bank of Asheville for this particular transaction; is that correct?
A. Yes.
Q. It very clearly states the purpose of the loan was short-term working capital for Seven Falls?
A. Yes.
Q. So there was never any attempt by anybody to hide that as to this particular transaction.
A. Correct.
Q. Did the Bank of Asheville and, really, all of these other banks that were involved in this series of loans, generally get origination fees of some thousands of dollars for each of these various loans?
A. I'm sure they did.
Q. And the banks all made money. And you've reviewed these various HUDs, haven't you?
A. There were fees paid, yes.
Q. That was a normal part of any commercial transaction such as this.
A. Yes.
Q. Now some of the people that these loans banks -- I guess I should say "financial institutions" that these loans were pitched to said no. Correct?
A. Yes, sir.
Q. Who said no?

A. I remember First Citizens said no. Blue Ridge Savings Bank said no. NBSC said no on some of the transactions.

Q. Okay. And with regard to NBSC, there's been some testimony about release fees and things like that. And you remember being interviewed back in August of 2010 by agents of the government and discussing, among other things, release fees.

A. Yes.

Q. Do you recall relating that you were basically upset about the way NBSC had handled the release fees.

A. Yes.

Q. And you specifically stated that Mr. Vinson "stepped up to play ball," but NBSC "changed the rules" on him and "set him up to fail." Do you remember saying that?"

A. I don't remember those exact words. But if that's my testimony, then I said it.

Q. Do you remember saying those words or something like them?

A. It's normal for a bank -- on an acquisition and development loan their source of payment is typically from the release fees for the sale of lots. The first 40 lots that were sold under the founder's program, if I remember correctly, did not require a release fee. So

there was ten, $11 million worth of sales on lots that didn't result in any pay down to the principal of the loan.
Q. And do you believe, based as you related in that interview, that that caused some problem with the overall viability of the project because the loan wasn't getting paid down?
A. In one respect, yes.
Q. Do I understand that you have lived or currently live on -- is it Fairway Drive?
A. Fairway Falls Drive. Yes, I used to.
Q. That was an address listed on one of these loan applications, I believe?
A. Yes.
Q. And where is that or was that, I guess I should say?
A. It's in High Vista Subdivision in south -- it's actually in Henderson County.
Q. Okay. And who owned that property?
A. Steven E. Libby, II. I had signed a lease to purchase agreement with him. I think Mr. Cashion was guaranteeing the note for Mr. Libby. And then when Mr. Libby got into financial trouble, the next thing I know the home was owned by Buck -- Mr. and Mrs. Cashion --
Q. Okay.

A. -- and I was to be leasing.
Q. You basically were living in a home that they owned for some period of time.
A. That's correct.
Q. And what period of time would that have been?
A. Late June of 2008 was about 24, 25, maybe 26 months. A considerable time.
Q. A little over two years?
A. Yes.
Q. Was this a pretty nice place?
A. Very nice.
Q. Could you describe it, please?
A. It was on the fourteenth fairway, had a circular drive, around 4,000 square feet. It was a very nice house.
Q. And were you paying rent?
A. I was for the first month. And then I was unable to pay because I wasn't being paid.
Q. And a fair market rental for that would have been some thousands of dollars; is that correct?
A. Yes.
Q. And so you basically lived there rent-free at Mr. Cashion's house for almost two years?
A. Correct.
Q. Mr. Cashion had also loaned you some money

previously, had he not?
A. Yes, he had.
Q. Okay. When did he first loan you money?
A. I don't remember the exact first time. It was either in late 2007 or early 2008.
Q. And how much was that loan?
A. I can't recall.
Q. Is it more than a few thousand dollars?
A. Typically it was a couple thousand dollars, like, at Christmas or whatever to help me get through.
Q. Was that loan for you to start some business or to assist some business you were attempting to start?
A. No. That was -- you're talking about the Bank of Asheville loan for Dr. Credit.
Q. "Dr. Credit?" What's that?
A. That was a business that I was trying to start with some friends. Mr. Cashion was a financial backer on that transaction. Yes, we signed a note together.
Q. So as you sit back and think about it now, how much money did Mr. Cashion loan you from that first loan until present?
A. Approximately half a million dollars. That loan was, I think, $475,000 or $500,000 that we took out at the Bank of Asheville. And then there were little bits here and there, a thousand here, a thousand there.

Q. But half a million's a pretty good round figure?
A. That's as best I can recall, sir. That's close.
Q. And he continually wanted you to pay that back, did he not?
A. Oh, yeah.
Q. Did you ever pay it back?
A. No, sir. I haven't been able to.
Q. Did he put pressure on you during the time you were involved in these investor loans to pay it back?
A. Always. He wanted his money.
Q. And from your observation that wasn't just from you. That was from Keith Vinson and anybody else he had loaned money to?
A. That's fair and true.
Q. Thank you, sir.

No further questions, Your Honor.

THE COURT: Any redirect?

MR. GAST: Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. GAST:

Q. Mr. Fischer asked you about finders fees and whether finders fees were ordinary or typical -- I don't remember the word -- in brokerage circumstances or with hard money lenders. Do you recall that question?
A. Yes, I do.

Q. What about a borrower's fee? That is the borrower actually getting money from a loan transaction at a bank?
A. That was not common. That was the first time I had seen it, to be honest with you.
Q. And what about loans of hypothecation? Now you testified that hypothecation agreements by themselves are not illegal; correct?
A. That's correct.
Q. And when -- as a banker, when did you typically see a hypothecation agreement? I mean they're not common generally, are they?
A. They're -- I don't remember -- I might have done two in seven years of lending, commercial lending. They were typically when a family member was supporting another family member. They were more closely knit transactions.
Q. So if I had a child that wanted to start a business and I hypothecated my house --
A. Sure.
Q. -- that child could take out a loan and start a business, for instance.
A. Yeah, that would work.
Q. Would that be a hypothecation agreement as well?
A. Yes.
Q. Is that the -- was that more common than having

persons or just business associates or friends doing it? In other words, is it more common in family?
A. Yes, I would say.
Q. When it's not a family member -- I mean is that -- in your experience, does that tend to be a red flag?
A. It would raise some concerns as to what the consideration was for the person doing it.
Q. And with respect to the Burnett loan?
A. Yes.
Q. There was a question about something to the effect of whether getting paid as a broker would be -- would be uncommon for a hard money lender. Is Bank of Asheville a hard money lender?
A. No.
Q. And in this case Mr. Burnett may be a hard money lender, but was Mr. Burnett loaning his money to Mr. Vinson?
A. No, he was not.
Q. Okay. Whose money was it?
A. It was the Bank of Asheville's money that he had borrowed.
Q. Have you ever heard of a bank ever paying someone money merely for taking out a loan?
A. No.
Q. On this issue of appraisals. I think you were

asked if you looked over the appraisals very carefully, and I think you said the answer to that was no. Am I correct?
A. That is correct.
Q. Did you care what the appraisals came out at?
A. I didn't care at all.
Q. Why didn't you care what they appraised at?
A. Because in my particular case -- because, as I said earlier, my intention was not to pay the loan back. It was supposed to be taken care of by someone else.
Q. Okay. And would you ordinarily expect that Mr. Vinson would know the value of his own lots?
A. Yes. He was very well abreast of what the lots were.
Q. Okay. And I won't put them up on the screen again unless you have questions about it. But the -- would you expect, for example, that Mr. Vinson would know that the price of his lot that he hypothecated to someone else to borrow money off of had escalated drastically in value in a year and a half from all the way up to $850,000 from --
A. $270,000.
Q. -- from $275,000 at a time when the real estate market was not doing very well?
A. Correct.
Q. Would you expect him to know that that probably

was not right?
A. Yes.
Q. Okay. Now when Old Town bank came out to the property -- now you showed Ms. Cioce around; correct?
A. Yes.
Q. You had previously sent her an e-mail about essentially presenting a rosy picture about the development. Isn't that fair?
A. That's fair.
Q. We went over that in your direct testimony?
A. Yes.
Q. Now in the time that the Old Town bankers were there talking to Mr. Vinson, did you hear him paint a more realistic picture of what was occurring?
A. No, I did not.
Q. Did you hear him tell them, for example, that he was having a hard time paying his vendors and if he didn't find some way to pay them that the dozers would stop moving?
A. No, I did not.
Q. Did he tell them that he was actually having a hard time making payroll and that bank employees were having to race to the bank in order to get paid first?
A. No.
Q. Did he tell them that he needed bridge funding?

A. No.
Q. Did he tell them the purpose for these lots were to make a bridge loan so he could hold out until AML came through?
A. No.
Q. You didn't tell them that either though?
A. No, sir.
Q. Let me show you Government's Exhibit 1107. You were asked on cross-examination about contacts with Mr. Ollis.
A. Yes.
Q. You had some e-mail exchanges with Mr. Ollis, isn't that true?
A. Yes.
Q. And you also helped facilitate getting Mr. Ollis to be put on to the preferred appraisal lists in some of these banks, isn't that true?
A. Yes, sir.
Q. All right. Your Honor, 1107 has previously been admitted. We would move to publish it to the jury.
THE COURT: You may.
BY MR. GAST.
Q. I'll give the jury just a second to read that. Your e-mail to Mr.- -- the AppraisalGroup@Charter.net. Who is that?

A. That is Mr. Aaron Ollis.
Q. Okay. And your e-mail that starts, "Aaron, good morning. I'm heading over to take pictures right now."
A. Yes.
Q. What was that about?
A. I was taking pictures of the lot. I would get a street scene and one of the subject property and one of the surrounding area.
Q. Okay. Now is that something ordinarily that the borrower or the borrower's agent would do for the appraiser?
A. No, sir, it was not.
Q. Is that something that the -- well who would normally do that?
A. The appraiser would do it himself.
Q. So in this case you were helping perform the part of the appraisal. Isn't that fair?
A. Yes.
Q. Okay. Let me show you Government's Exhibit No. 1109.
This has previously been entered into evidence and we'd ask permission to publish it.
THE COURT: You may.
BY MR. GAST:
Q. Okay. Start with the bottom up on that.

If you could, tell us what it is that Mr. Ollis is asking you in this e-mail.
A. Mr. Ollis is asking me to assist him to collect payment for his services on appraisals that were done months prior.
Q. Could you go ahead and read for us the last line of the full paragraph there?
A. The last line?
Q. Beginning with the word "now."
A. Okay. "Now I'm beginning to feel like the old prostitute that doesn't even get a kiss."
Q. And that's an e-mail from whom to who?
A. That is from Mr. Ollis to myself.
Q. Okay. And did you help him get paid?
A. I tried. I don't know that he ever did.
Q. And that he -- who was responsible for paying him?
A. Mr. Vinson.
Q. Okay. Showing you Government's Exhibit No. 1110.
Q. Is this another e-mail exchange between you and Mr. Ollis?
A. Yes, it is, sir.
Q. Okay. Your Honor, we'd move to publish what's previously been entered as 1110.
THE COURT: You may.
BY MR. GAST:

Q. If we could just highlight the -- blow up the first e-mail, Agent Seres, the top one.
Now Mr. Hager, in your prior experience as a banker, of course, you closed a lot of loans that involved appraisals. Is that true?
A. Yes, sir.
Q. And in your experience as the appraisal -- waiting for the appraisal, is that one of the things that usually happens right away? Or is that one of the slower parts or somewhere in the middle?
A. Typically, one of the slower parts and one of the last to get completed for closing.
Q. And did Aaron Ollis meet that trend? That is, did he tend to take a while to get his appraisals done?
A. No, sir, he did not.
Q. In fact, sometimes he would turn them around in a day or two. Isn't that true?
A. Yes, sir.
Q. And is that unusual for an appraiser?
A. It's pretty quick.
Q. Is that very unusual for an appraiser --
A. Yes.
Q. -- to do an appraisal the next day or couple of days after?
A. Yes.

Q. Is that one of the reasons that you and Mr. Cashion and Mr. Chapman and Mr. Vinson liked to use Mr. Ollis?
A. Yes.
Q. Did he ever miss a number for you? And by missing a number, I mean you came up with a contract price and he came up with an appraisal that was short of that.
A. Not to my knowledge. No.
Q. Okay. On any of the loans in 1322, did you have to renegotiate the figures because the appraisal number came down too low?
A. No, sir.
Q. Did you ever witness him make a mistake on a appraisal that caused the amount to be too low, rather than too high?
A. No, sir.
Q. Let me show you Government's Exhibit No. 1113. This is an e-mail between Mr. Ollis and Mr. Vinson that's previously been admitted. I ask to publish it to the jury.
THE COURT: You may.
BY MR. GAST:
Q. Okay. Probably again makes a little more sense to start from the bottom. Who is "Buddy?"
A. Mr. Greenwood.

Q. Okay. The president of the Bank of Asheville?
A. Yes, sir.
Q. Okay. And lot 29, is that -- that was the lot involved in which transaction that we've been talking about today?
A. Mr. Burnett.
Q. The hypothecated piece of property that --
A. Yes.
Q. -- Mr. Burnett borrowed half a million dollars off of?
A. Yes, sir.
Q. That's the piece of property that in 2007 appraised at $275,000 I believe it was? Is that right?
A. Yes.
Q. All right. Now let's go on to the previous page, please. And they're talking about a commitment letter. What's a commitment letter -- or an engagement letter, rather?
A. An engagement letter is where the bank authorizes the appraiser to perform an appraisal on the subject property for the bank.
Q. Okay. All right. And toward the bottom of this page we see here Mr. Greenwood's asking him kind of conversationally: "Hope you're doing well and staying busy." Isn't that true?

A. Yes.
Q. Okay. What was his response to that? Why don't you read that e-mail there?
A. "Hey, Buddy. I am staying Buddy, Buddy. And it feels fantastic. Last week I did as many appraisals as I did the entire month of October. November and December were only slightly better so my last quarter was not productive, even considering holiday time, and I always appreciate your business too, Buddy. Thank you. Aaron."
Q. Is it fair to say that you-all were giving Mr. Ollis a lot of business and keeping him business busy?
A. Yes.
Q. Let's go to the very first e-mail. And blow that up, please. Are they here, again, discussing lot 29?
A. Yes, they are.
Q. Okay. And what is Mr. Vinson telling him that the appraisal's for?
A. I am refinancing for me.
Q. Is that what it was for, a refinance? Or at least that was what it was used for?
A. No.
Q. It was hypothecated in another deal; correct?
A. Yes, sir.
Q. Let me show you Government's Exhibit No. 1115.

This is an e-mail that's previously been entered into evidence that is between Mr. Vinson and Mr. Ollis. We move to publish it to the jury.

THE COURT: You may.

BY MR. GAST:

Q. And just the top part, please. If you would, start by reading the e-mail that Mr. Ollis sent to Mr. Vinson on February 19th 2009.

A. "I got 'em, Keith. Recording these deeds showing the sale price of $637,500 with the revenue stamp of $1,275 there. Creates a problem as far as any records are concerned. There has to be a better way to handle that credit discount on the HUD statement. Thank you. Aaron."

Q. Does Mr. Vinson respond to that e-mail?

A. "Good advice."

Q. Are you familiar with how closings work in terms of the revenue stamps and filings of the deeds with the county and everything like that?

A. Vaguely. I mean I understand the process.

Q. Just briefly describe for the members of the jury what this process is.

A. Basically when a loan transaction involving real estate is done, the land development gets a fee for recording the deed of record and they also collect

revenue based on the size of the transaction.
Q. All right. So if -- and that fee or that tax, is that assessed based on the sales price?
A. Yes.
Q. All right. Now in this e-mail Mr. Ollis is telling Mr. Vinson that it's a problem to record revenue tax stamps at $1,275 because that would indicate the sales price was only $637,500. Correct?
A. Yes.
Q. Why is that a problem?
A. Because the sales price was actually $850,000.
Q. Okay. So if another appraiser or someone coming in behind Mr. Ollis to check his work to determine whether or not his appraisals at $850,000 was accurate. If they pulled that deed, what would they see on the tax stamp?
A. $637,500.
Q. And might -- if they found that, might that reveal that the actual sales amount was less than the one that's reflected on the HUD?
A. Yes.
Q. Okay. And I think you were asked a question if banks made money on these loans. Did they make money on these loans?
A. They received a loan origination fee which was

common.
Q. Yeah. A couple -- few thousand dollars?
A. Yeah. Half a point to one point was standard.
Q. Did they get repaid on these loans?
A. Not to my knowledge, sir.
Q. A lot of them took a lot of losses, didn't they?
A. I would say.
Q. Two banks closed --
A. Yes.
Q. -- in large part because of all these loans?
A. Yes, sir.
Q. Was it such a good deal for the banks?
A. No, sir.
Q. You were talking a little bit at one point about lot release fees and why that might have been a problem. Did you know whether or not the money that was -- that did go towards release fees actually got applied toward release fees at NBSC?
A. I have no idea.
Q. Okay. So if we were to tell you that there's been testimony that NBSC only collected a small amount of those lot release fees and actually applied them to paying down the principal of those big loans, would that surprise you?
A. No, sir.

Q. Did you make any effort to hide the terms of these fraudulent loans from Mr. Vinson?

MR. FISCHER: Object to leading.

THE COURT: Overruled.

THE WITNESS: No, sir.

BY MR. GAST:

Q. Did you keep him informed of the progress of these deals?

A. I tried to.

Q. Did you do so -- we've seen your e-mails. Did you also do it by other means than e-mails?

A. Yeah. The occasional conversation. What's the story on this one? Get me an update.

Q. Did you explain to him or did you make any secret of the fact that they were Mr. Cashion, Mr. Chapman and Mr. Gabler?

A. No, sir.

Q. Those names were on the sales contracts; correct?

A. Yes, sir.

Q. Where did the money go for each of these deals? Who got the money?

A. It wasn't me.

Q. So who got the money at these closings?

A. Mr. Cashion and Mr. Vinson.

Q. Well, did Mr. Cashion get money out of the

closings?
A. Some of them.
Q. Did he get it from Mr. Vinson or from the banks?
A. Oh. He got it from Mr. Vinson.
Q. And you talked about how Mr. Cashion, too, wanted to get his money back. How was Mr. Cashion going to get his money back?
A. By keeping the development going.
Q. Right. Who was he relying on to pay him back?
A. Mr. Vinson.
Q. And so who was the beneficiary of these loans?
A. Seven Falls and Mr. Vinson.
Q. Who was applying for the hard money from AML and others?
A. Seven Falls and Mr. Vinson.
Q. Whose name is on the commitment letter from AML?
A. Mr. Vinson and Seven Falls.
Q. Who is the one that needed the bridge funding to keep money going until those funds came through?
A. Mr. Vinson and Seven Falls.
Q. In this case, did those funds come through?
A. No, sir.
Q. Who was the beneficiary on the Burnett loan?
A. Mr. Vinson.
Q. Thank you. Those are all my questions.

THE COURT: Any recross?
MR. FISCHER: Yes, briefly.

**RECROSS EXAMINATION**

BY MR. FISCHER:
Q. You recall the e-mail communication you had with Ms. Cioce at Old Town bank?
A. Yes, I have some.
Q. She wanted to know the, you know, general condition of what was going on at the property. Is that correct?
A. Yes, sir.
Q. And you made reference in your e-mail to a number of specific items, did you not?
A. The construction of the golf course, the roads; I probably mentioned the Arnold Palmer Teaching Academy, and possibly the bridge.
Q. Could we pull up 132, please, sir? And if we could kind of highlight that middle portion. It starts with the golf course. Thank you.
Do you have that in front of you?
A. Yes, I do.
Q. And if I may publish that, Your Honor?
THE COURT: You may.
BY MR. FISCHER:
Q. Okay. That's a kind of the substance of your

answers to Ms. Cioce's questions; is that correct?
A. Yes.
Q. And with regard to the championship 18-hole golf course being under way, with six holes completed, others nearing completion; play should begin in spring of '09. When you wrote that, that was a true statement was it not?
A. To the best of my understanding, yes.
Q. And with regard to the 9-hole teaching course, driving range, short game range and chipping greens being completed June 7th '08. That was a true statement, was it not?
A. That was true.
Q. And actually, they needed to be completed by June 7th 2008 for a particular reason, did they not?
A. Yes, they did.
Q. And what was that reason?
A. That was the grand opening of the Arnold Palmer villas. Mr. Palmer flew in to hit the ceremonial tee shot.
Q. That was a big promotional event, was it not?
A. Yes, sir, it was.
Q. A lot of people came?
A. Yes, sir.
Q. As a promotional event, part of the reason for the

event was to hopefully generate more sales. Is that correct?
A. Yes.
Q. And more sales were in fact generated following that event; correct?
A. I'm sure they were.
Q. Millions of dollars worth, isn't that correct, to your knowledge?
A. Sure.
Q. And when you talk about the Arnold Palmer Teaching Academy, that a permit was pulled, footers are dug and vertical construction should begin on Monday. That was accurate, was it not?
A. Yes.
Q. And as to the clubhouse building pad being ready with construction due to start at any time. That was true, was it not?
A. The building pad was ready, but the construction never came.
Q. Okay. But it could have begun when?
A. Yeah, it could. That's correct.
THE COURT: Don't talk at the same time, gentlemen. One and then the other.
MR. FISCHER: Sorry.
BY MR. FISCHER:

Q. Okay. With regard to the language that says, "Construction can begin at any time." Was that accurate?
A. Yes.
Q. And with regard to the main entrance covered bridge to be completed within 30 to 45 days. Was that accurate as well?
A. To the best of my knowledge, yes.
Q. And Mr. Vinson never asked you to mislead Ms. Cioce or anybody at Old Town about the condition of the development or the financial condition of the development. Isn't that correct?
A. That's correct.
Q. And with regard to the issue of bills being unpaid and checks bouncing. Really, that didn't become a problem until the summer, June or July, August of 2008. Wasn't that your observation?
A. That's approximately correct. Some were in that time frame. Sometime over the summer.
Q. Kind of after you wrote this e-mail?
A. That's correct.
Q. And when the bills and the finances started being a problem, that pretty well coincided with -- about the time the real estate market was going into the tank --
A. Sure.
Q. -- and credit was drying up; correct?

A. Access to credit was drying up, yes.
Q. I don't believe I have any other questions. Thank you, sir.
THE COURT: Anything else, Mr. Gast?
MR. GAST: Yes, Your Honor, briefly.

**FURTHER REDIRECT EXAMINATION**

BY MR. GAST:
Q. On Government's Exhibit No. 132, although technically true at the time, did this tell the whole story to Ms. Cioce?
A. No, sir.
Q. I mean the whole point of -- what was the point of doing all those loans? That's in Government's Exhibit 1132, the lot loans?
A. To raise capital for the development.
Q. And why did you need to raise capital for the development?
A. Because it needed to go -- it needed to be an ongoing concern. The sales were slowing up.
Q. And all the dozers were still moving at this particular time. Were you aware, for example, that checks to staff were bouncing as early as March 2008?
A. I knew that there were issues. I didn't know when that started.
Q. All right. So even if this is technically true,

you can lie by not telling the whole truth can't you?
MR. FISCHER: Object to leading.
THE COURT: Sustained. Keep the leading to a minimum. Et it's going over overboard Mr. Gast.
MR. GAST:
Q. All right. Well in your experience, can you tell a lie even when you're telling the truth?
A. Yes, you can.
MR. FISCHER: Objection.
THE COURT: Overruled. Mr. Gast, keep the leading to a minimum.
BY MR. GAST:
Q. Okay. Did you know that at one of those promotional events that Mr. Fischer was talking about that $500,000 was spent and every one of those checks bounced?
A. I didn't know that they bounced, but I was not surprised with the ice carvings and some of the elaborate detail that was there. That doesn't surprise me.
Q. Did Mr. Vinson tell Ms. Cioce or Mr. Bourque any of those things when they came to visit the property and spoke to him directly about the project?
A. Not to my knowledge.
Q. And what was the purpose of their trip, if you know?

A. To get a sense for what was going on at Seven Falls and get an understanding of the credit that they were going to be getting involved in.
Q. And based on what you told them and what Mr. Vinson told them, do you think -- do you feel like they got an accurate and truthful picture of what was occurring at Seven Falls?
A. No. They did not certainly from me, sir.
Q. Those are all my questions.
THE COURT: Anything else, Mr. Fischer?
MR. FISCHER: Just very briefly, Your Honor.

**FURTHER RECROSS EXAMINATION**

BY MR. FISCHER:
Q. Sir, with regard to that June 7th 2008 promotional event, Arnold Palmer and the academy opening?
A. Yes.
Q. You don't have any specific direct knowledge as to how much was spent on the event itself, the party and promotion, do you?
A. I overheard some comments in the boardroom with Caroline Dixon, but I don't know the total that was spent.
Q. That just wasn't in your job description.
A. No.
Q. That's all. Thank you.

THE COURT: Anything else, Mr. Gast?

MR. GAST: No, sir, Your Honor. Thank you.

THE COURT: May Mr. Hager be released?

MR. GAST: Your Honor, the government's happy for him to remain on standby, but are not prepared to release him from his subpoena at this time.

MR. FISCHER: I think we would concur as well, Your Honor.

THE COURT: Mr. Hager, you may step down from the witness stand. You will remain under subpoena and subject to recall in this trial.

THE WITNESS: Okay.

(Witness excused at 2:53 p.m.)

THE COURT: Call your next witness.

MR. GAST: The government calls Kostas Rantzos to the stand.

THE COURT: Come forward to be sworn.

(Witness duly sworn at 2:53 p.m.)

THE COURT: You may proceed.

MR. GAST: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. GAST:

Q. Good afternoon, sir.

A. Hello, sir.

Q. If you would, please introduce yourself to the

members of the jury by stating your full name and your current occupation if you're employed.
A. My name?
Q. Introduce yourself. Tell them your name, please.
A. Okay. My name Kostas Rantzos.
Q. And Mr. Rantzos, do you use versions of your first name? Do you go by other versions of your name?
A. Kostas or Gus.
Q. Are you currently employed, sir?
A. Excuse me?
Q. Are you currently employed? Do you have a job?
A. No, sir.
Q. Are you retired?
A. I retire.
Q. What type of work did you do before you retired?
A. I used to have clothing store.
Q. What was the name of that clothing store?
A. Kostas Men's Wear.
Q. All right. Was that here right near the courthouse?
A. Yes. Next to Arcade Building.
Q. Okay. And do you have a son named Paul?
A. Yes.
Q. Okay. And what does Paul do for a living?
A. He's finance. Finance.

Q. Finance?
A. Yes.
Q. Okay. Do you know the defendant, Mr. Vinson?
A. Yes, I do.
Q. How do you know him?
A. Used to be my customer, and from the parties from the Seven Falls.
Q. Okay. Tell me about those parties from Seven Falls.
A. They have grand opening over there to see the property and to buy lots.
Q. Do you remember what year that was?
A. 2007 the first one.
Q. And did you end up buying a lot out there?
A. Yes.
Q. In 2007?
A. Yes.
Q. Okay. What lot was that, if you remember?
A. It was the lot 37.
Q. Lot 37? Okay. And did you pay cash for it or did you take a loan? How did you buy it?
A. No. They told me --
MR. FISCHER: Objection.
THE WITNESS: -- they're going to put the money.
THE COURT: Wait, wait, wait.

Basis of your objection?
MR. FISCHER: "They." I don't know who he's talking about.
THE COURT: That's sustained.
BY MR. GAST:
Q. Just did you take a loan from a bank or did you pay cash?
A. Loan from the bank.
Q. Okay. Which bank did you use?
A. We use the NB and C South Carolina bank.
Q. Okay. And do you remember what the terms of that loan were?
A. Yes.
Q. What were the terms?
A. It was for two years they pay the interest. The Seven Falls, you know, they pay the interest for two years, and after that I have to pay to buy the lot.
Q. So two years' interest only. And then after two years --
A. Yeah.
Q. Have you heard the term "balloon mortgage?"
A. Yes.
Q. You pay the principal all at once at the end?
A. Yeah.
Q. Okay. And was there a buy back provision? In

other words, did Mr. Vinson or Seven Falls agree to buy that lot back from you after two years?
A. No, not that lot.
Q. Okay. All right. Was there another lot where you had an agreement like that?
A. Yes. We buy -- year after, maybe six, seven months later, we buy three more lots.
Q. Okay. And who approached you about doing that? Or did you approach them?
A. Oh, no. The people they used to work for Seven Falls, his name Brett? Andrew?
Q. Was it --
A. Hager. Andrew Hager.
Q. Andrew Hager?
A. And Buck Cashion.
Q. And Buck Cashion?
A. Yeah.
Q. Okay. All right. And what was the -- what was the deal for that -- for those three lots? What were the terms?
A. We thought it was, again, they put for two years the interest, and they're going to pay me around $6,500, $6,700 a month. In two years' time, 24 months later, they take it back.
Q. Okay. When you say "take it back," do you mean

buy it back from you?
A. No. I mean they take it or nothing. You know, be his property not my property anymore.
Q. Okay. Were you going to put any money down on those lots?
A. No, nothing.
Q. Okay. Were you going to pay any of the interest payments on those lots?
A. No, because the interest already they put it in.
Q. Okay.
A. I don't got to come up with money.
Q. You said there was an arrangement where they would pay you --
A. Yes.
Q. -- to take the loan?
A. Yes.
Q. Explain that. Why would they pay you to take out a loan?
A. I thought because they -- they're going to use the money. I don't know they use my money or something and they were going to pay me, like, one percent. They pay me back.
Q. Okay. Now you said using your money. Did you put any money into the deal at all?
A. No, I don't.

Q. Okay. Were they using your money or using your credit?
A. Use my credit. My credit.
Q. Okay.
A. Because I don't put no money.
Q. All right. And so this -- you said it was 6,500 to $6,700 or something like that per month?
A. Yes.
Q. All right. That was for all three?
A. For three lots.
Q. Okay. Did they -- when you bought lot 37 in 2007 did they pay you to buy that lot?
A. Yeah. No. No, they no pay. They put the money, the interest, in the bank.
Q. Okay.
A. And the bank, they collect it from there.
Q. Okay. This take back agreement. Was there a take back agreement in 2007 on lot -- on 37?
A. No.
Q. Okay. So that was -- those two are the terms that are different, is that fair?
A. Yes.
Q. Okay. Now was your son Paul going to be involved with you at one point in this?
A. Yes. Supposed to go with me to buy the lots.

Q. And did that work out?
A. No, they don't.
Q. Do you know why that is that he didn't end up buying them with you?
A. Yeah. They talk to him to buy by himself more lots. You're going to make more money. I don't know.
Q. Did your son Paul end up buying some other lots later on?
A. Yes. I don't know how much.
Q. Have you heard of the LLC called Dion?
A. Yes, I do.
Q. Who is that?
A. That is with Nick Dimitris or something. Yes.
Q. And was your son Paul involved in that too?
A. Yeah.
Q. Okay.
A. They do.
Q. Now when it was time to come purchase these lots did you go and -- these three lots in 2008, did you go out to Seven Falls and go pick out your three favorites?
A. No, sir. Never I saw the lots.
Q. Did you haggle with Mr. Vinson or anybody else over the price? You know, try to get a lower price?
A. No.
Q. Okay. Why not?

A. Because I thought more they are, more money I make.
Q. Because you were getting paid a percentage; is that right?
A. Yes. Yes. And I do -- they told me what bank I'm going to take the money and talk, what lawyer I'm going to use.
Q. Okay. Did you have any intention of keeping these lots or maybe building a house on any of them one day or anything like that?
A. No.
Q. Okay. All right. Let me go over one of them. And were the terms of the three of them the same, more or less?
A. Same thing.
Q. Okay. I'll just pick one of them. Let's pick lot 112. Did they all close on the same day?
A. Yes, sir.
Q. Okay. I'm going to show you first Government's Exhibit No. 116-A. This is the HUD-1 for that transaction.
We'd move to publish this previously admitted into evidence to the jury.
THE COURT: You may.
BY MR. GAST:

Q. Okay. All right. And did you sign one of these at the closing?
A. Yeah. I signed a lot of papers.
Q. Okay. Is that your name there in Section D, Mr. Rantzos?
A. Yes.
Q. All right. And the property location is lot 112. Correct?
A. Yes.
Q. And the settlement date there in Section I is May 29th 2008. Is that right?
A. Yes.
Q. Okay. What was the contract sales price for that lot?
A. It's $260,000.
Q. Okay. And if we could scroll down a little more. Now the amount of the actual loan -- and what bank was this?
A. This Pisgah.
Q. Okay. Pisgah Community Bank?
A. Yes, Pisgah Community Bank.
Q. Now was the loan amount $260,000 or something less?
A. It's $195,000.
Q. Okay. And the difference there is that the

purchase credit on 214 -- there on line 214?
A. Mm-hmm. ("Yes.")
Q. If you could answer yes or no.
A. Yes, sir. Yeah. $65,000. Yes.
Q. When you say "Mm-hmm" -- this lady in front of you is writing everything down. If you say "Mm-hmm" it's hard to write that down.
A. Okay.
Q. Thank you.
And that purchase credit, what was that?
A. $65,000 credit.
Q. Okay. And was that the 25 percent that you were supposed to get off the top?
A. A 25 percent discount.
Q. Okay. So how much did you buy this lot for?
A. $195,000.
Q. Okay. Going on to the second page for just a minute. Where did you -- where was this closing? Do you remember?
A. The closing? Yes. It was below the Three Brothers' restaurant. It's some lawyers there.
Q. Is it Jason Peltz?
A. Jason Peltz, yes.
Q. And the second page here shows some of the fees that were paid as part of the transaction. Do you see --

A. Yes.
Q. -- how much Mr. Peltz was paid in attorneys' fees?
A. I don't know. Attorneys fees: $4,600.
Q. Okay. Thank you. All right. Let me go on to the next page then to where the money went. This is now in the first item to commission to Seven Falls Realty. Do you recall dealing with the salesperson on this?
A. No, sir.
Q. Okay. And then there's an appraisal fee paid to Aaron Ollis. Did you ever meet Mr. Ollis?
A. No, sir.
Q. Okay. Then there's some tax stamps and fees for the Register of Deeds. Then there's a line there: "Pisgah Community Bank interest incentive." What is that?
A. What line is that? What line is that?
Q. Can you highlight that for him, Mr. Seres?
A. Oh. Pisgah Community: $25,350.
Q. Okay. Now was that the interest account to pay the interest payments?
A. I don't know.
Q. Okay. Well was it part of the deal that you would -- there would be an interest account that would pay the bills for the two years?

A. That's it.
Q. Okay. Did you have to pay any bills for that first two years?
A. No, I don't.
Q. Okay. And then there's a sports membership fee and club dues. Did you pay those?
A. No, I don't.
Q. Okay. Did you ever use the facility? Did you ever go golfing out there or anything?
A. Once.
Q. Okay. To the practice area?
A. The practice. The practice area, yes.
Q. Was the golf course ever completed?
A. No.
Q. Okay. And then there's $60,000 paid and some change paid to NBSC, and then $60,000 and some change paid to Seven Falls, LLC. Is that right?
A. Yes. But.
Q. Okay.
A. The only thing I know I signed papers. I didn't know anything else.
Q. Did you look over these terribly carefully at closing?
A. No.
Q. Okay. All right. Let me show you Exhibit B.

This is 116-B. And, Your Honor, this has previously been admitted and we'd move to publish this. This is the loan presentation of Pisgah Community Bank.

THE COURT: You may.

BY MR. GAST:

Q. Now Mr. Rantzos, we've heard some testimony about these forms in your absence. This is not typically a form that would be shown to a bank -- to a borrower such as yourself. Did you see this form when you did the closing?

A. I don't remember.

Q. Okay. Now this form shows all three loan requests in one form. Do you see that there under Loan Requests?

A. Where exactly?

Q. (Indicating.)

A. Yeah.

Q. Okay. And is that the amount that you borrowed on all three lots?

A. Yes.

Q. Okay. All right. And under "purpose," do you see that section there what the purpose of the loan was?

A. Mm-hmm. Yes.

Q. And the purpose of each it says was to fund -- to buy each of those properties. Isn't that right?

A. Yes.

Q. Okay. And at the time, was it really your intention to buy the properties and keep them for yourself?
A. No, no. I buy the property only. And I could see the property. I buy it only because they're going to pay me some interest every month, and in two years they got to take it back.
Q. Okay.
A. That exactly -- that's the reason I buy it. I sign papers but what I sign I don't know.
Q. Sure. All right. And under "repayment terms" there a little further down, do you see anything in there about -- and again, I know this wasn't shown to you so I just ask you to read it now. Do you see anything in there about, you know, repayment coming from Mr. Vinson buying it back or taking it back?
A. No.
Q. Okay. And let's see. Under "collateral," do you see that second sentence there that reads, "The loan amounts will not exceed the lesser of 75 percent of the cost of the property or the appraised value based on a new appraisal?"
A. Mm-hmm. Yes.
Q. Okay. Now, did you -- did the loan fund just 75 percent of the purchase price or did it actually fund 100

percent?
A. I think it's 100 percent for me yes.
Q. Did you have to bring -- write a check at closing for 25 percent down?
A. No the Seven Falls was to pay for that.
Q. Okay. Let me show you 116-C. This has been previously entered, Your Honor. This is the appraisal report for one of these lots. We'd ask to publish it to the jury.
THE COURT: You may.
BY MR. GAST:
Q. Mr. Rantzos, this is the appraisal that accompanied the sale of lot 12. Is that right?
A. That's right.
Q. Okay. And did you receive a copy of this appraisal at closing? If you remember.
A. I don't remember.
Q. Okay. Let's first go all the way to the bottom, if you would, Agent Seres. Who did the appraisal?
A. Mr. Ollis.
Q. Okay. Did you meet Mr. Ollis or have anything to do with him?
A. No, sir.
Q. Okay. Now, in addition to your business as a clothier, a clothing store owner, did you also buy and

sell real estate at times in your business career?
A. Yes, I did.
Q. Have you ever seen this section? These appraisals where they use comparables, or comps, to help price a piece of property?
A. Yes, I do.
Q. Are you familiar with that concept and how it works?
A. Yes. Yes.
Q. Okay. We see four columns here. There's the subject property. Is that the piece of property you're buying, lot 112?
A. I buy lot 112.
Q. And then the comparables here are lot 76, lot 69 and lot 65 here --
A. Yes.
Q. -- at Seven Falls. Is that right?
A. Yes.
Q. Okay. Now again, I know that -- did you look at this appraisal very carefully at closing?
A. No.
Q. Okay. Mr. Seres here is going to put a highlight on another row here about sales or financing concessions. Do you see that line there?
A. I saw.

Q. Okay. Now, first, in your column under subject property, was the sales concession you received about 25 percent off the price? Was it listed there under the subject property?
A. No.
Q. Okay. What does it say in that box?
A. On the bottom?
Q. Yes.
A. It says none.
Q. None? No concession?
A. None. No C O N C.
Q. It doesn't record any sales concessions; correct?
A. No.
Q. So nothing in there about your 25 percent off that you got. Correct?
A. No, sir. Correct.
Q. And nothing in there about the seller giving you money to pay towards two years of interest. Correct?
A. Mm-hmm. Yes.
Q. And the boxes under one, two and three, do they also -- are they also blank as to having any -- they either say no concessions or unknown. Correct?
A. No. Yes. No concession.
Q. Okay. Let me show you first -- so these lots are they're used as comparables let's look at one and two,

lots 76 and lot 69. Let me start with lot 76. I want to show you Government's Exhibit 115-A.
Q. We move to publish 115-A that's previously admitted. It's a HUD for George Gabler's purchase of lot 76.
THE COURT: You may.
BY MR. GAST:
Q. Okay. Now, you see here, this is lot 76.
A. Yes.
Q. And that was one of the comparables. What was the settlement date? What date was this sold? Do you see it there on the bottom right corner?
A. May 23, 2008.
Q. And who was the borrower?
A. Mr. George M. Gabler.
Q. Yeah. Do you know who George M. Gabler is?
A. I meet him once.
Q. Okay.
A. But I didn't know him.
Q. Okay. And this was at what bank?
A. What bank?
Q. Yes.
A. What do you mean?
Q. What bank was the bank that loaned Mr. Gabler this money? If you can highlight that for him, Agent

Seres.
A. Old Town Bank.
Q. Okay. And let's scroll down a little bit. And this shows a deposit of $62,500, correct, on line 201?
A. Yes. Yes.
Q. Now we've heard some testimony in your absence that, actually, that was a purchase credit. Did you know anything about this transaction?
A. No idea.
Q. Okay. Let me now show you Government's Exhibit No. 113-A. Is this the -- we move to publish this. It's previously been admitted and published, Your Honor.
THE COURT: You may.
BY MR. GAST:
Q. And this -- what lot transaction was this?
A. Lot 69.
Q. Okay. That's the other comparable on your appraisal?
A. $23,000 -- I mean May 23 they buy it, yes.
Q. Okay. And who's the borrower in this case?
A. Avery Cashion.
Q. Do you also know him as Buck Cashion?
A. Buck, yes.
Q. And Buck Cashion, I believe you said earlier, was one of the people that helped you set up these three

loans for you. Correct?
A. Yes.
Q. All right. So let's go back to 116-C. All right. So if on -- if on those sales on comparable number one and comparable number two they had received 25 percent sellers' credits like you did, and if they had received a two years of interest carry like you did --
A. Yes.
Q. -- do you see anything in that line that would suggest that on this appraisal?
A. No, sir.
Q. Okay. Thank you. Let me show you Government's Exhibit No. 116-F. This has been previously admitted, Your Honor. This is the purchase and sales contract for this transaction. We'd ask to publish it to the jury.
THE COURT: You may.
BY MR. GAST:
Q. Do you recall seeing this document at some point?
A. Not really. No, I don't remember.
Q. You said you just signed this one. Did you look over those documents very carefully?
A. No.
Q. Okay. At the top there is that your name, sir, under the "Kostas Rantzos?"
A. Yes, sir. Kostas Rantzos is my name.

Q. And pull that up a little bit. And do you see what was scribbled out there?
A. Yeah.
Q. Whose name was scribbled out there?
A. My son, Paul Rantzos.
Q. All right. You testified a minute ago that originally he was going to be in this deal and then chose to go another way?
A. Yes.
Q. Is that why that's scribbled off?
A. Yes. Supposed to buy by himself.
Q. Okay. And let me go to -- let's go all the way to page nine first. Is that your signature there at the end?
A. Yes.
Q. Okay. And then there's actually a second page nine. And does someone there sign on behalf of Seven Falls?
A. Yes.
Q. Were you in the same room when they signed at the same time?
A. No, sir.
Q. It looks like they attached two signature pages. So you didn't sign it with whomever was representing Seven Falls?

A. No.
Q. I want to back up, I guess, two pages. Go to section 21 and 22. In 21 tell us what that was for, if you remember.
A. Supposed to pay the bank for two years the interest for 6.5 percent.
Q. Okay. All right. So that's the provision that's supposed to take care of the interest for you?
A. The interest for me.
Q. Okay. And paragraph 22 -- I won't make you read it. The jury's seen a similar one in another case -- what was that paragraph for?
A. You want me to read?
Q. You don't have to read it out loud.
A. Yeah, okay.
Q. Just tell us what that's for.
A. Yeah. I know that this is -- that's what I tell you. In 24 months they pay the interest already, and they're going to pay me that kind of money for $6,500, $6,700 a month for two years and then they got to take it back.
Q. Okay. Let me go on to the next page because it carries over to the next page. All right. And is this the part on the next page where it talks about paying you 12 percent annually, or basically one percent per month?

Is that right?
A. Yes, that's correct.
Q. Okay. And when you testified earlier that you were supposed to receive between six to $7,000 a month?
A. Somewhere, yes.
Q. Is that where that money came from, from this -- from this provision in the contract?
A. Yes.
Q. Okay. Now, the way this is worded, was it your understanding that Mr. Vinson would have an option to buy it back like it was his choice? Or was it your understanding that Mr. Vinson, he would definitely promise to buy it back?
A. Definitely. Got a deed. I don't sign.
Q. All right. I'm going to show you Government's Exhibit 116-G. This is a promissory note for this transaction that's been previously admitted, and we'd move to publish it to the jury.
THE COURT: You may.
BY MR. GAST:
Q. Okay. All right. Is that up on your screen, sir?
A. Yes.
Q. This is the promissory note. Was that for this lot on this -- on May 29th 2008?
A. Yes.

Q. Okay. And this promise to pay, it says that Konstantinos M. Rantzos promises to pay to Pisgah Community Bank or order in lawful money of the United States of America, that the principal amount of $195,000 or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

Now at the time did you sign this? I'm going to go to very bottom. Is this one of those documents they asked you to sign and you signed?

A. Yes, I signed that.

Q. Now at the time that you signed this, did you intend to pay the bank anything?

A. No, because they were going to take it back.

Q. Which direction did you think the money would be coming? Away from you or towards you?

A. The money? What money?

Q. Right. You weren't going to pay any money into the deal; correct?

A. No.

Q. But were you expecting to receive some money?

A. Yeah, the monthly payment.

Q. Okay. And I have the other documents for the other loans, too. But the other loans, were they laid

out similarly to this one?
A. Same thing.
Q. Okay. All right. I'm going to dispense then with showing those all to you unless there's something you want to see for your testimony. Let me know.
Now, did Mr. Vinson actually pay you any money for doing these loans as promised?
A. No, sir. Oh. They pay me for three months and then they stopped.
Q. Okay.
A. They send me four checks. Then the fourth one, they go out and bounce. They don't send no more money.
Q. Let's turn to Exhibit 152. Your Honor, Exhibit 152 is already in evidence. We just ask to publish this portion on page 33.
THE COURT: You may.
BY MR. GAST:
Q. Okay. All right. Can you see that, Mr. Rantzos?
A. Yes.
Q. All right. What is this check?
A. Money-wise? $6,38.25.
Q. All right. And what was this money from Seven Falls -- it's from Seven Falls; correct?
A. From Seven Falls.

Q. All right. And what was this for?
A. The interest they were supposed to pay me monthly.
Q. This was for the taking out these loans we've just been talking about?
A. Yes. Yes.
Q. If you could highlight the memo line for us. What does that say on the memo?
A. First payment? I don't know what the others are.
Q. It says, "First payment per agreement?"
A. Yes, first payment per agreement.
Q. Okay. If we can go to page 47 in that same document. Is this another check from Seven Falls?
A. Yes.
Q. And what's the amount of this check?
A. $6,712.50.
Q. And what does the memo line of this check say?
A. "Interest for lots 122, 116 and 112, something like that.
Q. All right. And are lots 112, 122 and 116 the ones that you bought that we've been talking about that you bought in May of 2008?
A. Yes.
Q. Okay. I'm going to show you another one. Let me pull up Government's Exhibit No. 162. Your Honor, this is an additional exhibit so I'm going to ask him to

identify it.
Mr. Rantzos, do you see that in front of you?
A. Not so clear but I see it.
Q. All right. What is that? We'll blow it up a little bit to see if --
A. Yeah.
Q. What is that that we see? What is it?
A. That's a check.
Q. Okay. And who -- to whom is it addressed?
A. Kostas Rantzos.
Q. Okay. And for how much is this check? It might be easier to read it off to the side there than an the actual check.
A. $6,712.50.
Q. Okay. And what's the memo line there say as to the purpose of this check? It's a little hard to read I know but.
A. I don't know, sir.
Q. Does it say --
A. I saw maybe 122. The lot numbers. I don't see from.
Q. Does it appear to have something to do with the lots that you bought?
A. I don't know.
Q. Does it say interest payments on lot 122, 116 and

112?
A. Yes.
Q. All right.
A. Not too clear but that's what it say.
Q. Is that a fair and accurate copy of a check that you received?
A. I don't know.
Q. Okay. You don't know if that's the check that you received?
A. No, I don't.
Q. Okay. Do you remember receiving a third one? How many checks did you receive in payment of this loan?
A. All together they sent me four checks.
Q. Four checks?
A. Four checks. The third they don't give no money in it. And then they write the fourth one and we cash the fourth one. That means we cash three checks.
Q. All right. Let me show you a fourth one, Government's Exhibit No. 163. Can you see that on your screen?
A. $6,712.50.
Q. And who -- who wrote the check?
A. That's my name. That's Seven Falls.
Q. Okay. And what's the amount of this check?
A. $6,712.50.

Q. Okay. And does the memo line also say interest payments on lots 122, 116 and 112?

A. Yes.

Q. Okay. So does this appear to be the fourth check that you received for the interest payments for these loans you took out?

A. Yeah.

Q. Is it a fair and accurate copy of the check you received?

A. I don't know. My wife take care of books.

Q. I understand.

A. You know, checks and all that.

Q. Your Honor, we'd go ahead and offer 162 and 163 into evidence as business records of the bank.

THE COURT: Any objection?

MR. FISCHER: No, sir.

THE COURT: Let them be admitted.

(Whereupon, the aforementioned exhibit was admitted into evidence without objection.)

BY MR. GAST:

Q. After receiving these payments for these loans, did you -- we'd move to publish 162 and 163, since the jury didn't get to see them.

THE COURT: You may.

BY MR. GAST:

Q. Now you said you received four and then they stopped coming.
A. Yeah.
Q. Do you know why they stopped coming?
A. Maybe they don't got money inside the checkbook.
Q. Okay. When the money stopped coming did you try to figure out why or talk to somebody about it?
A. Yeah.
Q. Who did you talk to?
A. We talk to my son Paul. My wife, she talk to him and send him to see what's happened.
Q. Okay.
A. And after that I didn't know.
Q. All right. Now these lots, did Mr. Vinson end up taking them back from you?
A. No, sir.
Q. Why is that? Did you decide to keep them or did it -- was there some other reason?
A. No. The bank, they go after me and I have to pay the things.
Q. Okay. Was that part of the agreement that you would end up with them?
A. No. The agreement was a hundred percent take it back.
Q. All right.

A. And then the bank, they come and want the money. I tell them I don't got it. We want the money.
Q. Did you end up -- did those loans end up going into default?
A. Yes. But -- yeah.
Q. Thank you, sir. Those are all my questions.
THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. FISCHER:
Q. Sir, when did you first meet Keith Vinson?
A. Maybe five years ago, six, in my store.
Q. So he was a customer of your clothing store, sir?
A. Yes, sir.
Q. And did he continue, after you first met him, to come to your store from time to time to buy clothing?
A. Yes.
Q. Until you bought these three lots, did you have any other business dealings with him?
A. No. With one lot. With the first lot.
Q. The first one?
A. Yeah.
Q. The Founder's Day lot.
A. No, it wasn't the Founder's Day.
Q. When was it?
A. It was the grand opening.

Q. Okay. And that was the one you financed through the National Bank of South Carolina.
A. Yes.
Q. NBSC.
A. NBSC.
Q. Now with regard to these three lots we've been talking about. Who came to you with the idea for you to enter into this deal?
A. I think I told three people they come. Brett -- I don't know his name. He was real estate. Then Andrew Hager and Buck Cashion.
Q. Okay.
A. They talk. Everybody talked to.
Q. And were you at your shop when they came to you? Where did this discussion take place?
A. I think -- no, I don't know. I don't remember where.
Q. Okay.
A. Yeah.
Q. And did you ever talk to Keith Vinson about buying these lots?
A. I don't remember.
Q. So the only names you can remember are Mr. Cashion and Mr. Hager and this other person?
A. Yes.

Q. And the third person was not Keith Vinson, was it?
A. I thought they work for Mr.- -- for the Seven Falls. Everybody works for them, the three people. I thought they come from the Seven Falls.
Q. But whoever you thought they worked for, it wasn't him that you talked to about these three lots. Right?
A. No.
Q. And when you quit getting your checks, did I understand you talked to your son Paul about finding out what was going on?
A. Yes.
Q. You never talked to Keith Vinson about what was going on.
A. My son go talk to him.
Q. But you did not.
A. Personally, no.
Q. Personally, no?
A. I feel embarrassed asking for the money.
Q. Thank you, sir. I have no further questions.
A. You're welcome.
THE COURT: Anything else, Mr. Gast?

**REDIRECT EXAMINATION**

BY MR. GAST:
Q. Was Mr. Vinson at your closing when you did the closing on the loan at Mr. Peltz's office?

A.      He was there.
Q.      Okay.  Was he there when you were signing papers and things like that?
A.      Yes, yes.
Q.      Did you get a chance to talk to him?
A.      Yeah.  We talk to him at the table.
Q.      Okay.  What was the mood like while you were talking?
A.      I don't know.  We're talking not so much for the closing, maybe for something else.  Maybe for golf, maybe for my store or for the clothes he wore -- it was quality -- that kind of things we were talking.
Q.      All right.
A.      But for this we don't.  But they go in and out.  I don't know who it was there.  Who it was him, the lawyer.
Q.      Mr.  Peltz?
A.      Yes and another person.
Q.      Okay.
A.      Who it was, I don't know.
Q.      Okay.
A.      I go there and sign papers.  That's what they told me, to come here and sign papers.  Go to the bank and sign papers.  And I went.
Q.      Okay.  All right.  Thank you, sir.
A.      You're welcome.

THE COURT: Anything else?
MR. FISCHER: No, sir.
THE COURT: May Mr. Rantzos be released?
MR. GAST: Yes, Your Honor.
THE COURT: Any objection?
MR. FISCHER: No, sir.
THE COURT: Thank you, Mr. Rantzos. You may step down. You've been released from your subpoena. You're free to go.
THE WITNESS: Thank you.
(Witness excused at 3:35 p.m.)
THE COURT: Call your next witness.
MR. SAVAGE: Your Honor, the United States would call Mr. Nicholas Dimitris.
THE COURT: Come forward to be sworn.
(Witness duly sworn at 3:36 p.m.)
THE COURT: You may proceed.

**DIRECT EXAMINATION**

BY MR. SAVAGE:
Q. Good afternoon, sir.
A. Good afternoon.
Q. Can I ask you to speak up really loudly so that everyone can hear you? The acoustics are bad. Okay?
A. Good afternoon.
Q. Okay. Thank you. Would you, please, introduce

yourself to the jury by telling them your name and your occupation?
A. My name is Nicholas Dimitris and I'm a minister.
Q. Okay. And where are you a minister?
A. At see C3 Church in Asheville.
Q. Okay. And how long have you been a minister?
A. Well, as an occupation, for many years throughout my life but, specifically, with C3 Church for about four years.
Q. Can I ask, what particular denomination is your church?
A. It's a nondenominational network of churches but contemporary in stock.
Q. Okay. And it's a Christian church?
A. It is a Christian church.
Q. Thank you. Tell us a little bit about your education and training.
A. I received education by an affiliate of Beacon University. It was called Christian Life School of Theology. I went to the satellite campus in Clyde, North Carolina at New Covenant Church.
Q. And how long did you study for the ministry?
A. I studied all the way through to the equivalent of my bachelor's degree. I just haven't submitted to receive my bachelor's degree. I did receive my

associate's.
Q. And do you have any other degrees, other than your associate's degree, and is it in the divinity or theology?
A. Theology. And, no, I do not.
Q. Other than being a minister for how long now? How long have you been a minister?
A. Cumulatively, a paid vocation, since 19, with two different breaks in between.
Q. Okay. And what did you do during those breaks?
A. The first break I served for a period of time on staff at New Covenant Church in Clyde, North Carolina. Then I took a break and I worked as a sales and marketing director at an IT company called e-Worker Technologies here in Asheville. Then I was invited to come on staff at the Rock Church in Candler where I served as an Associate Minister for a season. Then I had resigned from that post and focused in on the real estate business.
Q. Let me draw your attention back to the years of 2007 and 2008. Were you engaged in the ministry at that time?
A. No.
Q. Okay. What was your occupation then?
A. I was a real estate investor/developer.

Q. Okay. And how did you go from the ministry into real estate investing and developing?
A. My intention was to generate additional income or resources for my family. I had seen other people who had been involved in real estate, had lunches with individuals who had been very successful over the years in real estate, and I had also seen things like Carlton Sheets, that type of thing, on TV. So it triggered my interest with a motivation to generate extra income for my family.
Q. Did you have a lot of experience in real estate before you started?
A. No, sir.
Q. Okay. And how did that turn out?
A. How did my real estate experience turn out?
Q. Yes.
A. It has bit me very hard.
Q. Let me ask you, did you plead guilty to an offense involving real estate transactions?
A. Yes, sir.
Q. Let me show you what has been marked as Government's Exhibit No. 1350. Do you recognize that document?
A. Yes, I do.
Q. Okay. And what is it?

A. It is my plea arrangement.
Q. Okay. Well, is that the charge? We'll get to the plea in a minute. Isn't that the charge that you pled guilty to?
A. I'm sorry. It is the Bill of Information.
Q. Okay. And that includes the fact that you were charged by the United States for committing offenses against the government; is that correct?
A. Yes, sir. Thank you for enlarging that image.
Q. Okay. And what is one of the offenses that you pled guilty to?
A. Conspiracy to commit fraud.
Q. Okay. And who did you defraud?
A. The United States.
Q. Okay. And coming down there. Did that involve a bank loan?
A. Did it involve a bank loan?
Q. Yes.
A. Yes, sir.
Q. Okay. What bank loan did it involve?
A. A bank loan with Pisgah Community Bank.
Q. And what is the Pisgah Community Bank?
A. The Pisgah Community Bank was the lending institution that provided the loan on a purchase that I made at Seven Falls.

Q. Okay. And let me go and show you Government's Exhibit No. 1316. And at that time, you pled guilty to a plea agreement with the government didn't you?
A. Yes, sir.
Q. Okay. And in that plea agreement the -- who were you represented by?
A. My attorney was Ronald True.
Q. Okay. And are you still represented by Mr. True?
A. No, sir.
Q. Okay. What happened to Mr. True?
A. Mr. True's deceased.
Q. Okay. At that time, was Mr. True -- did Mr. True, before that time, represent you in other -- in other ways besides simply this plea agreement?
A. Yes. He had also represented me in some real estate transactions.
Q. Okay. Some of the same ones you pled guilty to?
A. Yes.
Q. And as part of that plea agreement did you make an agreement not only to plead guilty but to cooperate with the United States?
A. I did.
Q. Okay. And is part of the cooperation that you testify truthfully?
A. Yes, sir.

Q. Okay. And are you here pursuant to that plea agreement today?
A. Yes, I am.
Q. What are the terms of that cooperation agreement?
A. That I would cooperate with the government and provide truthful testimony and factual information regarding the matter.
Q. Now you're currently represented by another counsel, are you not?
A. Yes.
Q. And when you entered this plea, you entered it -- you took an oath and you enter entered it in federal District Court, didn't you?
A. Yes, sir.
Q. And then after Mr. True was no longer representing you, you had a chance to do it again. You did it twice?
A. Yes. Correct.
Q. And both times you affirmed in Court, under oath, that you were in fact guilty of these offenses, did you not?
A. Yes, I did.
Q. Now with respect to the plea agreement that's here today. Do you expect to receive any kind of benefit from that plea agreement?

A. I hope so.
Q. Okay. And what kind of benefit do you hope to receive?
A. For being cooperative and providing truthful testimony.
Q. Okay. Do you expect to get a lighter sentence for that?
A. I do hope so.
Q. Are you here to tell the truth?
A. Yes, sir.
Q. Well, let's get to it. Let's go to Government's Exhibit No. - -- why don't we go to Government's Exhibit No. 158? What is Government's Exhibit No. 158?
A. This document is the agreement that I had with a private investor, Buck Cashion. I guess his real name is Avery Cashion. This was an agreement that he would guarantee a line of credit on some lots that I had, and he would be an additional guarantor to help me obtain a line of credit for $750,000.
Q. Okay. Let me stop you there.
Your Honor, Government's Exhibit No. 158 has been previously stipulated to. We request permission to publish it.
THE COURT: You may.
BY MR. SAVAGE:

Q. If we can wait a minute until the jury can see the agreement. And I'll ask you, Mr. Dimitris, do you have that in front of you on the screen?
A. Yes, sir.
Q. Thank you. And we'll give the jury just a minute to review the agreement. It's rather short. I think everyone's had a chance to get a glimpse of that. First of all, who is Avery T. Cashion, III?
A. I have known him as "Buck." Buck is a private investor or real estate investor who I learned later on had experience in real estate and development, and he was a friend --
Q. Okay.
A. -- of a partner of mine who I --
Q. Let me stop you here a second. Who is your partner?
A. My partner was Paul Rantzos.
Q. Okay. And tell us, who is Paul Rantzos?
A. Paul Rantzos was -- initially, I had met Paul as my loan officer at Carolina First Bank. He took over a portfolio that included a line, an A and D line, which is an Acquisition and Development line.
Q. Let me stop you there just a minute. What loans -- what were you acquiring and developing when you first met Mr. Rantzos at Carolina First?

A. This was a loan related to a development that I had called Spicewood Hills.
Q. Okay. Let's talk a little bit about Spicewood. What was Spicewood?
A. Spicewood Hills was a small community of about 30 lots. It was a tract of land that we had obtained. We had made into a development.
Q. Okay. And by "development," what kind of development was it? Residential?
A. Homes. A residential development for homes. a community.
Q. And what was your e role with Spicewood? What were you doing at Spicewood?
A. I was the developer at Spicewood.
Q. As the developer, what did you do? Tell us what you did as a developer.
A. Well, as a developer, I was the primary visionary. I was the primary driver. I was the one responsible to carry out the vision that we had put together for that community and to see to it that everything that was necessary to accomplish that would accomplish -- would be accomplished.
Q. So did you acquire land and then divide it up into plots?
A. The property was already subdivided. I had

acquired this land out of a little bit of a hardship, I guess, from the previous developer.
Q. Okay. Had you ever been a real estate developer, a land developer, before this Spicewood thing?
A. Not really. I had -- I had purchased small, like, an acre tract of land and subdivided it a few times, two to three times. Spicewood was my first real venture into a larger community.
Q. Okay. And whenabouts did you get into Spicewood?
A. Whenabouts?
Q. Yeah. When did you buy Spicewood? When were you developing it?
A. Man. I do not recall the exact date. But what I can say is I was heavy in development in 2007.
Q. 2007. And you said you had an Acquisition and Development loan at Carolina First?
A. Correct.
Q. How much was that loan?
A. 650, I believe.
Q. $650,000?
A. I believe.
Q. And how was that loan going to be repaid?
A. There's a release fee that a bank attaches to lots in a development. That release fee can range in percentage. This particular loan I had, I believe, an 80

percent release fee. So if I sold the lots for $100,000, the bank would require $80,000 of that sale to go toward my debt associated with the community.

Q. Okay. Were you having trouble in 2007 and 2008 selling lots at Spicewood?

A. Yes.

Q. Okay. What did -- did that put you behind on your loan?

A. It definitely put me strained and extremely pressured on my loan.

Q. All right. Did there come a time when Mr. Rantzos left Carolina First and started doing business with you?

A. Yes.

Q. First of all, about when was that to the best of your recollection?

A. Right around the period of time we're discussing. 2007.

Q. And how is it that you came to do business with Mr. Paul Rantzos?

A. Well, Paul was short lived at Carolina First. But as I knew him there, and as he helped me with my A and D loan, I felt like he -- he knew what he -- I felt like he knew what he was doing in terms of loans. And so when he left, I was quite disappointed. But, ironically, I met

him at the Charlotte Street Starbucks.
Q. Wait a minute. You had stopped doing business -- he'd left the bank; right?
A. Correct.
Q. And you had a new banker at Carolina First?
A. Yes, sir.
Q. So you went to the Starbucks and Paul Rantzos was there?
A. Yes, sir. He was sitting at the counter.
Q. And what happened?
A. And I went up to him and I asked him, I said, Paul, what are you up to? What happened? He said, I just decided I need to take a break. Right now I'm not doing anything. And I said, would you ever -- would you ever be available for questions, or would you ever be available to take a look at what I'm doing and maybe provide consulting?
Q. Okay. So did you hire Mr. Rantzos as a consultant?
A. I did.
Q. Okay. And what was Mr. Rantzos going to consult about?
A. I had asked him to provide consulting related to my projects and, specifically, even structure as it related to finance, funding, and maybe --

Q. Let me stop you there. Was he going to get you money?
A. Yes.
Q. Was that the main reason you hired him?
A. Yes.
Q. Okay. So how much were you going to pay him to find you money?
A. We agreed on $2,000 a month, initially.
Q. Okay. And did Mr. Rantzos indicate to you that he could find you money for your development?
A. Yes.
Q. Okay. And did he find you money for your development?
A. Yes. In a roundabout way. He provided access to people like a Buck Cashion --
Q. Okay.
A. -- who then guaranteed a loan or a line of credit for me.
Q. Okay. Did you go to a bank first, before you went to Buck Cashion?
A. I did.
Q. Okay. Did Mr. Rantzos introduce you to that bank?
A. Yes.
Q. Okay. Which bank was it?

A. That was BB&T.
Q. Okay. And when you went to BB&T, what did you do?
A. I presented what we had put together for this line of credit, and they denied me.
Q. Okay. Did they indicate there was any way they might approve you?
A. They indicated I would need a stronger guarantor.
Q. Okay. And did you have a stronger guarantor who was willing to sign up for your loan at Spicewood?
A. I did not. Paul Rantzos did, and he introduced me to Buck Cashion.
Q. Okay. And is that the subject of this agreement which is before the jury and dated April 4th 2008?
A. Yes, sir.
Q. Okay. And what does this agreement have to do with your loan at BB&T?
A. This is the agreement for him, Buck Cashion, to become a guarantor on that loan. We went forward and got that line of credit at BB&T.
Q. Okay. So let's kind of review here. So you had a previous loan. And did you still have your loan, your A and D loan, at Carolina First at this time?
A. If I did, it would have been quite greatly diminished. It's possible I did not. It's possible that that loan had been taken care of.

Q. How much was your loan at BB&T?
A. It was a loan for $750,000.
Q. And what was to be the payments on the BB&T loan? How were you supposed to pay that back?
A. Well, on the line of credit, payments are relative to the amount drawn on the line. So as I would draw down on the $750,000, my payment would increase. The maximum amount was in the $3,000 range.
Q. Okay. Per month?
A. Per month.
Q. Okay. And how quickly did you draw on that line of credit?
A. Relatively quickly. Within months.
Q. Okay. Now what was happening out at Spicewood, and whenabouts did you draw the line of credit at BB&T about this line in April 2008?
A. Yes. From there forward I began to draw it down.
Q. By the end of April, how much was left on that loan?
A. By the end of April?
Q. Yeah.
A. Well, I mean, again, this being the initial beginning of our line of credit. From this day forward I significantly drew down on that line. I do not recall how many months it took to max out that line.

Q. Okay. Well what you say was the loan maxed out by, say, June of 2008? The $750,000.
A. Very close, if not.
Q. Okay. So you had $3,000 a month payments on the loan. Right?
A. Yeah.
Q. And then you still had to pay Paul Rantzos how much? $2,000?
A. $2,000.
Q. And then you had to pay Buck Cashion $5,000 a month; right?
A. Correct.
Q. So, at the very least, you had -- let me add that up. So that would have been three, eight -- about $10,000 a month just on these debts. Right?
A. Yes, sir.
Q. Did you have any other money coming in?
A. If I did, it was trickling and minimal. The market was tanking at this point.
Q. Okay. And what was that doing to your sales over at Spicewood?
A. It just shut down.
Q. Okay. To be fair, you did sell some houses over at Spicewood didn't you?
A. Yes, sir.

Q. Well who did you sell them to?
A. Investors.
Q. Okay. When you say "investors," what are you talking about?
A. People who were available to purchase these properties who were not intending to live in them, but they were willing to invest and/or be available as a guarantor.
Q. Are you aware of the phrase "straw borrower?"
A. Yes, sir.
Q. Were they straw borrowers?
A. Yes, sir.
Q. Did.
Q. Did you pay them to take out loans for you?
A. Yes, sir.
Q. Why did you do that?
A. To provide capital.
Q. Did you agree to buy back the properties and pay them a certain fee?
A. Yes, I did.
Q. Did you, in fact, pay them to take out loans?
A. Yes, I did.
Q. How much did you pay your people at Spicewood to take out loans?
A. $5,000 per lot.

Q. Okay. So, you -- with respect to the development, were you able to resell any of those lots that you paid people to take out loans on?
A. No.
Q. Okay. By the way, did you think that was wrong?
A. Yes.
Q. Did you know it was wrong to do that?
A. Yes, sir.
Q. Why did you do it?
A. At the time I thought, "I can fix it. I'll get past this situation if I can just breathe another day."
Q. Okay. But it turned out to be risky business, didn't it?
A. Yes, sir.
Q. Okay. Moving on. How did you solve your problem in, say, June of 2008 with all this money coming out and none coming in?
A. Paul Rantzos. I spoke with my partner at that time, consultant as well, and I said, Paul, I need to generate capital. Do you know of any opportunities, or do you have any ideas? I've got to figure out a way to raise some money.
Q. Okay. And did Mr. Paul Rantzos come up with a way for you to raise some money?
A. He did.

Q. What was that way?
A. He presented the opportunity of Seven Falls.
Q. Okay. Well, how would you make money at Seven Falls? Are you going to work for them?
A. No.
Q. Were you going to build something out there?
A. No.
Q. Okay. Were you going to contract for them?
A. No.
Q. What were you going to do?
A. The same thing as Spicewood.
Q. You were going to be the borrower this time?
A. This time I was the borrower.
Q. So this time you would get paid for taking on a loan?
A. Yes, sir.
Q. How did that come about?
A. Paul had introduced an opportunity to purchase two lots at Seven Falls, no money down, two year interest carry, two year buyback guarantee and a one percent a month investor fee, and we determined to move forward.
Q. Okay. Let me show you what is marked as Government's Exhibit 130. Did Mr. Rantzos tell you which bank you'd be going to to get these loans?
A. Initially, he had indicated National Bank of South

Carolina, NBSC.

Q. Okay. Now I showed you an e-mail up here. This is an e-mail that is not part of you. But if you would read the part -- and even though you haven't seen this e-mail, does this describe what you understood to be the part of the deal that you were involved in initially, at least the proposal? Just read it to yourself and tell us if that -- if that was the -- your understanding of how the deal got started.

A. Yes, it is.

Q. Your Honor, this has been previously stipulated to, and I'd like to introduce it and publish it to the jury as Government's Exhibit 130.

THE COURT: You may.

BY MR. SAVAGE:

Q. I'd ask Agent Seres if he could roll that up to the shot. First, let's show the jury what the whole document looks like. First of all, this is Government's Exhibit No. 130, isn't it, Mr. Dimitris?

A. Yes it is.

Q. Okay. And if you could enlarge just the top so we can see who are the parties on this. Do you see the name "Andrew Hager" there?

A. Yes, sir.

Q. Okay. Who is Andrew Hager?

A. Andrew Hager was -- actually, going back a bit, Andrew Hager was a former loan officer at Carolina First. I had met him back then. He was a personal friend, as well, with Paul Rantzos I'm sure by way of being a loan officer at Carolina First. Paul had mentioned to me, actually, that Andrew was the one who communicated with him this opportunity. So, I knew of Andrew Hager. Paul was the relationship with Andrew Hager.
Q. What did Andrew Hager have to do with all of this?
A. Andrew was the one that presented the opportunity to Paul.
Q. And what was in it for Paul?
A. Paul's consulting fee was $2,000 initially. After a while, he felt like he deserved more than that. And one of the ways to increase that was also to increase money coming into our organization. I did not have it from my other means, so Paul was motivated as much as I.
Q. And just scrolling down a little bit. Do you see the paragraph that -- the headlines regarding the lots at Blue Ridge Savings Bank?
A. I see that.
Q. Okay. And do you see the paragraph that begins, "So we have implemented Plan D?," and as Paul Rantzos and Nick Dimitris are signing contracts on the next -- within the next hour on lots 127 and 138? First of all, is that

you? Are you the "Nick Dimitris" they were referring to in there?
A. I believe that's what they meant.
Q. Okay. And a little later on it has -- it is the exact deal you cut for Gus and Emily. Who are Gus and Emily, if you know?
A. Gus and Emily are Paul's parents.
Q. Mr. and Mrs. Rantzos. Kostas Rantzos and his wife Emily?
A. Yes.
Q. Do you know whether or not they purchased lots?
A. Yes, they did.
Q. Okay. And when you say Paul and Nick, who are Paul and Nick?
A. Paul is my partner, Rantzos, Paul Rantzos, and I'm Nick.
Q. It says here you have over a million dollars in cash, and a hundred thousand dollars in annual income. Was that on your financial sheet?
A. I'm not sure where they're referencing that.
Q. Was that true?
A. No.
Q. Okay.
A. I'm not sure if they're trying to reference my line of credit. I don't know why they put that in there.

Q. Okay. Well, who -- did you give Mr. Paul Rantzos your financials?
A. Yes, I did.
Q. Did Mr. Andrew Hager have your financials?
A. I have no idea.
Q. Okay. If we go to the top. And if we could indicate, who is this Mr.- -- who is Mr. Hager relaying this information to?
A. It appears Keith -- Keith Vinson.
Q. At Seven Falls?
A. At Seven Falls.
Q. Did you know Mr. Vinson at this time?
A. No.
Q. And had you ever spoken to Mr. Vinson about his development at Seven Falls?
A. No.
Q. Who were your dealings with?
A. Paul.
Q. Okay. And did you come to purchase, with Paul, two lots at Seven Falls?
A. We did.
Q. Okay. And did you buy them from -- did you -- where did you get the money from to buy them?
A. Two separate banks, one being Pisgah Community Bank the other being the Bank of Asheville.

Q. Well, if we go back, what happened to NBSC and Blue Ridge Savings?
A. I'm not sure the reference to Blue Ridge Savings. As far as NBSC? I believe that was denied. Paul handled the pursuit of financing. I believe we were denied at that bank.
Q. Okay. Which bank did you go to first afterwards?
A. We went to Pisgah Community Bank.
Q. Now, before you went to Pisgah Community Bank, did anyone explain to you what the terms of this deal would be?
A. Yes.
Q. Okay. And who did the explaining and what did they explain?
A. Paul explained the deal.
Q. Okay. And what was the deal?
A. The deal was 25 percent Developer credit and a two year interest carry reserve held in the bank that made the loan. That was used for payments for the two years. A two year buyback guarantee and a one percent per month investor fee on the purchase price.
Q. Okay. How much money were you going to have to put into this deal?
A. None.
Q. Okay. Well you had been a developer; right?

A. Yes.
Q. You're familiar with the acronym LTV; right?
A. Yes, sir.
Q. What's that stand for?
A. Loan to value.
Q. Okay. What's "loan to value?"
A. Loan to value? If something is valued at $100,000 and the bank is willing to loan $75,000, or 75 percent LTV, then you would get $75,000.
Q. And where does the other $25,000 have to come from?
A. The buyer.
Q. Okay. And what were these going to be? What LTV were these going to be?
A. 75 percent LTV.
Q. Were you going to put $25,000 down?
A. No, sir.
Q. Were these 100 percent LTV?
A. Yes.
Q. Okay.
A. Absolutely.
Q. The bank was going to fund the entire purchase price. True?
A. True.
Q. Let's go to Exhibit --

THE COURT: Mr. Savage, before you do that, is this a logical place for us to take a break?

MR. SAVAGE: Yes, your Honor.

THE COURT: Ladies and gentlemen of the jury, we're going to take the afternoon break at this time. I will have the marshal take you into the jury room for approximately 15 minutes.

Marshal, please, take the jury out.

(Jury excused at 4:04 p.m.)

THE COURT: Anything we need to address while the jury is out?

MR. SAVAGE: No, Your Honor.

MR. FISCHER: No, Your Honor.

THE COURT: Marshal, 15 minutes.

(Off the record at 4:05 p.m.)

(On the record at 4:22 p.m.)

THE COURT: Anything we need to address?

MR. SAVAGE: No, Your Honor.

MR. FISCHER: No, sir.

THE COURT: I will mention, just briefly, that there is a matter in which I may need to have a hearing on a somewhat emergency basis this evening. I'm hoping to get word during this next session. We may need to recess a little bit earlier than ordinary, rather than recessing at 6 o'clock, so that I will be able to move to

that issue. At this moment I do not know whether that will be necessary, but I wanted to give you a heads up so that nobody was completely surprised if I suddenly recess us at, say, 5:45.

Marshal, please, bring us the jury.

(Jury returns at 4:27 p.m.)

THE COURT: Mr. Dimitris, please return to the witness stand. You were previously sworn in this trial. You remain under oath until the trial is over.

(Witness resumes the stand at 4:27 p.m.)

THE COURT: Mr. Savage, you may resume your direct examination.

MR. SAVAGE: Thank you.

**FURTHER DIRECT EXAMINATION**

BY MR. SAVAGE:

Q. Pastor Dimitris, when you left the stand we were talking about -- I think we were about ready to talk about your loan at Pisgah Community Bank. First of all, what did you know about the Pisgah Community Bank in April of 20- -- June of 2008?

A. I did not know about Pisgah Community Bank. Pisgah Community Bank was introduced to me by Paul.

Q. And did you go to the bank to talk about your loan?

A. No, we did not. We met at Charlotte -- Biltmore

Starbucks.
Q. Who did you meet at the Biltmore Starbucks?
A. We met Craig Gourlay and Dave Smith.
Q. Who is Craig Gourlay?
A. Craig Gourlay was one of the bank officers, I believe, the vice president. Dave Smith was also an officer of the bank, but I believe he was a loan officer.
Q. When you went to meet with them, about how long was your meeting with Craig Gourlay and Dave Smith?
A. Maybe 20 minutes.
Q. Okay. And who went with you to the Starbucks to meet Craig and Dave?
A. Paul.
Q. Okay. So, just the four of you?
A. Yes, sir.
Q. Did you discuss in any detail the terms of the loan?
A. No.
Q. Okay. You didn't talk about the hundred percent down or the money back or any of that?
A. No.
Q. Well, what did you talk about?
A. Primarily, Paul, again, had -- I had asked Paul if he could help maybe find some folks that we could interview or question regarding Keith Vinson and, even at

this time, Buck Cashion, because I knew that Buck at that point was invested deep with Seven Falls. So Buck introduced us to -- introduced the meeting. We got to the meeting. And the primary focus of that meeting was just to ask regarding Keith Vinson and Buck Cashion.
Q. And what did you want to know about them?
A. What do they know about these guys.
Q. No. No. What did you want to know about Buck and Mr. Vinson? What did you want to know?
A. We wanted to know what they knew about the development or these guys' experience in development.
Q. Well, were you concerned about the value of the lot? What were you concerned about?
A. I was not concerned about the value of the lot. I really just wanted to know if they had anything negative to report regarding the two guys.
Q. Well, what was your interest in this whole deal?
A. Well my interest was to create a cash flow, a positive cash flow, and I really wanted to make sure that these guys were good to follow through on the deal.
Q. You wanted to know if you borrowed the money, were they going to pay?
A. Yes, sir.
Q. Did you ask that to Paul and David?
A. Yes, sir.

Q. Okay. And what did they say?
A. I'm sorry. Craig and Dave.
Q. Craig and David. Craig Gourlay and David Smith?
A. That's right.
Q. What did they say?
A. At that point, Craig had acknowledged that he had known Buck and his partner, Ray, for quite a while. He had an extensive relationship with them, and he vouched that these guys were good for their word. They follow through. He felt like that this would work. He felt like this would be successful endeavor.
Q. Okay. Let me show you what has been marked as Government's Exhibit 122. I'm going to go to 122-I. Okay? And I'll ask you if you recognize that.
A. I do. That is the Purchase Sale Agreement.
Q. Your Honor, I believe this has been previously stipulated and admitted. We'd like to publish what has been marked as Government's Exhibit 122 I.
A. You.
THE COURT: You may.
BY MR. SAVAGE:
Q. I think the jury has seen a couple of these, so we'll wait until it comes up. Okay. Can you see 122-I on your screen?
A. Yes, I do.

Q. Okay. Well there's a name on there. What's the name on there?
A. Dion Holdings.
Q. Well what is Dion Holdings?
A. Dion Holdings was the entity that my partner, Paul, and I created for the purchase of these two lots.
Q. Okay. Had you done any other business through Dion Holdings?
A. No, sir.
Q. Okay. And so what was -- other than these lots, what was the purpose of Dion Holdings?
A. There was no other intention but to purchase these lots with Dion.
Q. You could have bought them in your individual name. Whose idea was Dion?
A. The two of us. As far as the idea of putting it in an entity? I am not certain. I'm not certain where the initiation of that idea came. As far as having an entity, Dion, the two of us decided to call it Dion because it's short for Dionysus.
Q. Okay. Well, what lot were you going to borrow on in this particular deal?
A. This was for Lot 138.
Q. Okay. And let me go to the third page. There's a lot of terms on this, but we're going to go to the third

page. And I'll ask Agent Seres to enlarge the -- first of all, could you pick up where the initials are? Are those your initials on this document?
A. Yes. Mine are on the left.
Q. Okay. And how much were you going to pay for this lot?
A. $795,000.
Q. Well, I say "pay." How much was the cost of the lot?
A. $795,000.
Q. Out of that, how much were you going to pay?
A. Nothing.
Q. Okay. Well, you're the developer. How much -- did you know it was worth $795,000?
A. I didn't know it was worth $795,000.
Q. Did you go out and look at it?
A. I had driven-- I had driven to the place, the developing area. No, I did not look at that specific lot.
Q. Did you pick out this lot?
A. No, sir.
Q. Who picked out the lot?
A. I don't actually know. It was presented to me through this. This was how I became aware of this lot.
Q. Okay. Well did you care about what lot it was or

how much it was or whether it was worth it?
A. No. I was interested in the deal.
Q. Okay. Well, let's go to Exhibit -- to the page -- to the last page of that exhibit, paragraph 23. First of all, did you read this contract before you signed it?
A. Yeah.
Q. Okay. Is that your signature on the contract?
A. Yes, sir.
Q. It doesn't have any of the dates or anything filled in. Why is that?
A. I don't know.
Q. Okay. So you just signed it?
A. Yes.
Q. Did you sign more than one of these at the same time?
A. Yes.
Q. Okay. What other one did you sign?
A. I believe it was 127, I believe.
Q. Okay.
A. Lot 127.
Q. Well, we're going to jump ahead just a little bit. I'm going to ask you to look at Exhibit No. 123. We'll come back to this deal here. It would be Exhibit No. G, as in George. I'll ask you, is this another deal that you and Mr. Rantzos agreed to do on behalf of Dion?

A. Yes.
Q. And what lot is this?
A. Lot 127.
Q. Now, what was this contract like when you signed it? Was it even filled out?
A. As it appears is what it was like.
Q. Okay. Well, do you remember if there was a lot number in it?
A. Yes, I believe so.
Q. Okay. Do you know which one was which? Which one was going to be -- this was at a different bank, isn't it, this second deal?
A. Yes.
Q. Where did you -- where was this loan shopped?
A. This one was shopped at Bank of Asheville.
Q. Okay. And who chose the banks?
A. Paul.
Q. Okay. So you signed these both at the same time.
When you signed them, did you know which one was going to which bank?
A. No. To the best of my recollection we signed them simultaneously.
Q. Okay. Well, let's go to the second page of this -- the third page of this deal.
Your Honor, I would ask to -- this document has

also been stipulated and admitted. I'd like to publish it, as well, because I've --

THE COURT: You may.

BY MR. SAVAGE:

Q. And if we could go back to the first page so everybody can see. I think the jury's seen a bunch of these, so I won't go through too much detail. That's the second -- this is the document we were just talking about, Exhibit No. 123-G. Right?

A. Yes.

Q. Let's go to the third page of this one. I'll ask you, are your initials on there as well?

A. Yes. On the left.

Q. Okay. And how much were you going to pay for this lot?

A. The purchase price was $850,000.

Q. Well what made the other lot, which was lot number 138, worth $795,000 and this one was worth, like, almost you know, $55,000 more? What was the difference on these? Why was one better than the other, more expensive?

A. I don't honestly know.

Q. Did you care?

A. No.

Q. Okay. And let's go to the last page of this

exhibit. Did you sign this one?
A. Yes.
Q. Okay. And somebody else signed it as well, did they not?
A. My partner, Paul.
Q. Okay. And who signed, if you know, on behalf of the seller, Seven Falls, LLC? Do you recognize that signature?
A. I'm not certain about that.
Q. You had never seen that signature before?
A. No.
Q. Now let's go to the repurchase option and enlarge that. We're talking about -- right now we have two exhibits out here, so we're going to talk about 123-G and then I'll go back and compare it.
What were the important parts of this repurchase option as far as you were concerned?
A. Well the important part is actually the second sentence --
Q. Okay.
A. -- which says. "Seller hereby agrees to repurchase the property no later than the expiration of the two year period."
Q. Now that says "option" on it. What was your understanding as to the discretion that Seven Falls had

with respect to this option? Could they do it or not? What was the promise that was made to you?
A. The promise was that it will be reacquired, that there was a buyback guarantee.
Q. Okay. Would you have done it if it wasn't an option?
A. No.
Q. Okay. And what was the other important part, if there was another important part?
A. It says, "In addition, Seller shall pay to Purchaser monthly payments of an amount equal to 12 percent simple interest per annum on the discounted purchase price amount."
Q. Okay. Thank you very much.
Now let's go back to pick up where we left off with Government's Exhibit No. 122, that Dion deal. And I'd ask Agent Seres to go to Exhibit 122-A. I'll ask if you recognize that document.
A. This is the settlement statement for Dion purchasing Lot 138.
Q. Okay. Did you attend that closing?
A. Yes.
Q. Okay. Who else attended that closing?
A. Paul Rantzos.
Q. Okay. And anyone else that you -- to your memory?

Well, let's see. Who are the other parties? Did anyone attend for Seven Falls?
A. Someone did.
Q. Okay. Were you introduced to anybody on behalf of Seven Falls?
A. I don't believe so.
Q. Okay. What was the settlement date on this?
A. June 16, 2008.
Q. Okay. Let's scroll down. And I'll ask you what the purchase price was on the settlement deal, on the deal. Looking at the purchaser's side, the borrower's side, what was the purchase price?
A. $795,000.
Q. And how much money was the loan going to be?
A. $596,250.00.
Q. Okay. And I'm going to write that number down. So is that how much you were going to borrow?
A. Yes.
Q. And it was $596,250.
Okay. Let's go to Government's Exhibit No. 122-B. Your Honor, this has been stipulated to as a document of the Pisgah Community Bank. We would like to introduce this and publish it, please.
THE COURT: You may.
BY MR. SAVAGE:

Q. Now, Mr. Dimitris, you didn't see this document at the time that you made this loan, did you?
A. No, sir.
Q. Okay. Well let's go through -- you're familiar with the terms of the loan; right?
A. Yes.
Q. Okay. So the borrower was going to be Dion, and we've already established that, but who were the guarantors on this?
A. My partner, Paul Rantzos, and myself.
Q. So what does that mean? What did that mean to you being a guarantor?
A. That we would be financially responsible.
Q. Okay. If Dion didn't pay, you would pay. Correct?
A. Correct.
Q. Well who was supposed to pay? Was Dion supposed to pay anyone? Who was really supposed to pay off this loan?
A. From the document, as guarantors, Paul and I --
Q. Okay.
A. -- had responsibility.
Q. Who asked you to make the loan?
A. Seven Falls.
Q. Okay. And how was the loan -- how were you --

were you going to hold this for two years and build on it?
A. No, sir.
Q. Okay. You were a developer. Were you going to develop it or put a house on it and sale it?
A. No, sir.
Q. Were you going to hold it and then flip it for more money later on?
A. No, sir.
Q. Okay. What was the purpose of this loan?
A. For me it was money.
Q. Okay. And how long was it going to be before they, the Seven Falls, took this loan out of your company's name? What did they tell you? How long were you going to hold this? Two years?
A. Up to two years.
Q. No Longer?
A. No longer.
Q. And who was going to repay it?
A. Seven Falls.
Q. Okay. It says that the purchase of this lot -- if we could highlight the "Purpose," part H, "is to fund the purchase of Lot 138, a one acre residential lot in Seven Falls Golf and Country Development in Henderson County, North Carolina." Do you know how large or small this lot

was? Do you know the size of the lot?
A. Not to my recollection. No.
Q. Okay. Well, was the purchase of the loan to fund 138? What was the purpose of the loan, as far as you were concerned?
A. Again, for me, the purpose of this whole transaction was to create profit or money coming into my company.
Q. Okay. Did Mr. Gourlay know that? Did Mr. Gourlay know that?
A. I assume so.
MR. FISCHER: Objection.
THE COURT: Sustained.
THE WITNESS: I can't be sure.
BY MR. SAVAGE:
Q. Well, did you -- did Mr. Smith know that?
A. The reason I say I assume so is we had given them a copy of the contract, along with our financials. So I guess I would say yes.
Q. Okay. Is that -- is this statement true then? Was it to purchase a lot?
A. No.
Q. Okay. Let's go back to the exhibit. And if we could scroll down. It says here that the repayment source is going to be the sale of the property. Does it

say anything in there about a guaranteed buyback from the seller?
A. No, sir.
Q. Okay. It says here that the lien will be -- that the loan -- if we could go to the "Collateral" part, and if I could ask Agent Seres to highlight the second sentence in the Collateral part. Okay. It says here that the loan will not exceed the lesser of 75 percent of the cost of the property or the appraised value, based on a new appraisal. What does that mean to you?
A. That the loan amount will not go above 75 percent of the cost of the property or the appraised value.
Q. Well, we've already talked about that. Is that true?
A. That's not, in fact, what happened, but it is what this says.
Q. Okay. No. I'm just asking you -- you didn't write this, did you?
A. No, sir.
Q. I'm just asking you was it true? Was that the deal?
A. This is not true.
Q. Okay. Well, was it ever the deal?
A. No.
Q. Okay. You gave a contract to Mr. Smith and

Mr. Gourlay, or somebody did. Right?
A. Correct.
Q. They knew this wasn't the deal either.
A. Yes.
Q. Okay. So it's a hundred percent of the cost?
A. Correct.
Q. Okay. And if we would keep going down to the contract. So there would be an appraisal on this property, as well. I'd ask to go to Government's Exhibit No. 123 -- 122, I'm sorry, D, as in Delaware. You were in the developer business. Did you ever see one of these before?
A. Yes.
Q. Okay. What is it?
A. A land appraisal report.
Q. And what's the purpose of this document as far as the bank is concerned?
A. To provide market value and an appraisal.
Q. In fact, if you look at "Instructions to Appraiser," it says, "Determine market for mortgage loan." Right?
A. Yes, sir, I see that.
Q. What does "market" mean?
A. "Market" is what similar properties would be valued at.

Q. Okay. And what is the sales price listed on this particular appraisal?
A. $795,000.
Q. Okay. And it also says that this development was 25 to 75 percent complete. Had you ever been out there to Seven Falls?
A. I have driven -- I have driven to it. At this point, I can't say that that was true about this lot. Well, in fact, is this referencing the whole neighborhood? It is definitely not true about the neighborhood.
Q. Okay. And this is in -- if we looked at the date, this was, of course, in the mid-2008 going into -- this is June going into -- well, I'm sorry. The date of the sale is listed as April 2008. First of all, did you buy this on April 15th?
A. No, sir.
Q. Okay. And, Your Honor, I would like to publish this exhibit also. I'm forgetting that.
THE COURT: You may.
BY MR. SAVAGE:
Q. And we'll give the jury a second to catch up with what I thought they were seeing. All right. And we talked about the purpose. Again, it says, "Instructions to Appraiser: Determine market for mortgage." Right?

A. Yes.
Q. We talked about the sales price. It looks like this one was going to close in April of 2008. But you didn't actually buy this until June; right?
A. Correct.
Q. Okay. And we talked about it, going down into the next block there, it was 25 or 75 percent done. What was your answer to that?
A. Well, on the left side, it's speaking in reference to the neighborhood.
Q. Right.
A. So in reference to the neighborhood, at this point, I'd be amazed -- I don't even think -- I can't imagine it reached the 25 percent completion at that point.
Q. Was there a single house on any of those lots that you know of in April of 2008?
A. No. No.
Q. Okay. If we could kind of scroll on down. First of all, up on the top there, it says, "Loan charges paid by," and if we could go across and enlarge on the right below the price on the very top block. If we could just do that whole top section. Do you see there it has some things, a loan charge, to be paid by Seller? Do you see what it says there?

A. "None."
Q. Okay. Was that true? Who was --
A. No, that's not true.
Q. Were you going to pay the lawyer? I mean Dion was it going to pay the lawyers?
A. No, sir.
Q. Was it going to pay the real estate taxes?
A. No, sir.
Q. Was it going to pay the sales commissions?
A. No, sir.
Q. Was it going to pay anything?
A. No. The deal was no money.
Q. Okay. And the other thing -- it says, "Other sales condition." What's there?
A. None.
Q. Okay. But whoever did this had the contract. All that would be in there, wouldn't it?
A. Yes.
Q. Okay. If we could go to the big form. Let's go down to the narrative underneath that thing there. It has some comments, and it talks about, "...is a new developing golf course near Etowah. The course is designed by Arnold Palmer." Did you see a golf course out there?
A. I mean, I saw the grading for the golf course.

Q. Okay. "It will be in the future a self-contained community with town village of shops restaurant, bakery, General Store, tennis court, wellness and family activity centers, and several lakes, hiking trails and other amenities." Was there a Panera Bread out there, or a Dunkin Donuts or an anything?

A. No, sir.

Q. Okay. "Homes will range from $800,000 and up, lots $300,000 to over a million." Did you see any homes at all there from $800,000 or more?

A. There was no homes at all.

Q. Okay. And then if we could keep going down. Now, are you familiar with a comparative approach to determining the market value property?

A. I'm familiar in that it's where they list comparable properties to the subject property.

Q. Okay. And in your particular instance -- if we could go down to comparable. An important part of a comparable, if you're looking at sales price, was whether or not there were concessions involved in those prices. Is that right?

A. Yes.

Q. Okay. And if we could go and highlight the "Concessions" block. I'll ask you in this appraisal for the property that Dion was making, in particular your

subject property at lot Rolling Green Drive -- by the way, if you wanted to go out to Seven Falls and find Rolling Green Drive, like, would there be a street sign there? How would you know -- how would you find Rolling Green Drive?
A. I do not know. I don't remember.
Q. Do you even know if there was a street or a road or a trail there?
A. I don't -- I don't know.
Q. Okay.
A. I don't know that there was.
Q. Okay.
A. I don't know, in fact, that there were any street signs at this time.
Q. Okay. Well, I mean, you're spending almost $800,000 here. I mean, wouldn't you want a street with your house?
A. The grading had begun on many roads. I don't remember street signs at all.
Q. Okay. Well what about this sales and financing concessions? It says none. No concessions? Is that true?
A. No, sir.
Q. Okay. And if we can go down to the very last part of this. Who did this appraisal?

A. Aaron Ollis.
Q. And the appraisal is as of June 13th 2008. And the appraisal was, remarkably, $5,000 more than your asking price. Do you have any basis to believe that this is true, that that's a true market value of this property?
A. I don't have any basis to know that.
Q. Okay. Did you care?
A. Again, for me, I don't -- I didn't even receive this.
Q. Okay.
A. So, to me, I was solely focused on the opportunity for cash.
Q. You've been a developer, and you've bought a house before, haven't you?
A. Yes, sir.
Q. Did you care how much it was worth when you bought it?
A. Yes.
Q. Did you look at the appraisal when you bought your house?
A. Yes.
Q. Okay. Did you think you might want to sell it some day and what is this thing worth?
A. Yes.

Q. Okay. None of that here; right?
A. No, sir.
Q. Okay. Let's go back to Exhibit No. 122-A. Did you, in fact, close on this transaction?
A. Yes, sir.
Q. Okay. And if we can go there. The date that you closed was when?
A. June 16, 2008.
Q. And did you -- you didn't bring any money. Do you know where the money went?
A. Not off -- not from my knowledge. But on the HUD, if I can see it enlarged.
Q. Let's go to the second page of the HUD, because what is on the second page of the HUD?
A. Disbursements.
Q. Okay. It's Settlement Charges; right?
A. Settlement Charges. Correct.
Q. And what we saw on the appraisal a minute ago, who was going to pay the settlement charges according to the appraisal? The seller wasn't going to pay them. Who was going to pay them?
A. The buyer.
Q. Did you pay settlement charges?
A. No, I did not.
Q. All right. We'll look at a couple of things.

First of all, there's a 10 percent real estate commission on this. Did you have -- did you talk to a broker?
A. No, I did not.
Q. You paid $49,173.75 for a commission. Did some broker come out and talk to you?
A. No, sir.
Q. Okay. Well, who is Seven Falls Realty, LLC? Do you know who that is?
A. I would suppose --
MR. FISCHER: Objection.
THE COURT: Sustained.
BY MR. SAVAGE:
Q. If you know. Do you know who that is?
A. Keith Vinson.
Q. Okay. All right. Did you care if you were paying a real estate commission on this lot?
A. No, sir.
Q. Did you care how much it was?
A. No, sir.
Q. By the way, in your line of work, you were selling houses. What's the standard -- you've used a Realtor. What's the standard real estate commission even on developed property? What's the going rate about this time frame.
A. Six to seven percent.

Q. Ten percent? Is that high?
A. It's higher than I'm used to.
Q. Okay. Then it goes into a "Loan Origination Fee." Pisgah was going to get a cut of this. Mr. Ollis got some money. You didn't pay any of that; right?
A. No, sir.
Q. Let's scroll on down. How about Mr. Peltz? Did anybody pay him?
A. I don't know.
Q. Okay. And by the way, the tax and recording city/county stamp deeds. You've -- have you filed county deed stamps before? Have you recorded a deed before? Do you know how they figure out that tax? If you know.
A. I'm not certain. I'm sure it has to do with the price that the property sold for.
Q. Okay. Divided by however much the tax is; right?
A. Correct.
Q. Okay. Keep on going down. "Interest Incentive." That $77,000, what's that about? Was that -- what was that for? That went to Pisgah Community Bank.
A. Yes. That's the -- that's the two year deposit. That's what was used to make the payments for the two years.
Q. Okay. And then a working contribution to the Seven Falls Property Owners' Association. Were you part

of the homeowner's association?
A. No, sir, I am not.
Q. Why did you pay them $27,000? I'm sorry. Wrong line. I'm sorry. Right. That was only $150. What is the initial distribution -- initial distribution exhibit? We need to go $27,000, to the next page, and let's see where that $27,000 went. Oh. How about the Seven Falls Amenities, LLC, Sports Membership Fee? Did you see any sports clubs out there?
A. No, sir.
Q. Okay. And then $12,000 for the golf club dues. There was a practice facility out there. Was it open?
A. No, sir.
Q. Okay. Did you ever go out to the practice facility?
A. I drove by it.
Q. After you bought it? Okay. Well, tell us about that. When did you go to the practice facility?
A. I actually went to an Arnold Palmer and Kenny G party celebration that was held near and on the practice facility, where Arnold Palmer hit the ball.
Q. Okay. Well tell us about that event. How many people were there?
A. I would -- over the course of the day? Probably well over 100 people.

Q. Okay. And with respect to that. When the driving range opened in June of 2008 did you ever, like, play golf on it?
A. No, sir.
Q. Okay. Well what did you get for your $12,000?
A. I never received anything for that.
Q. Okay. Let's go up and look at the next transaction. About a month later, did you -- did you wind up borrowing more money on lots over at the Bank of Asheville?
A. Yes, sir.
Q. Okay. And who did you meet when you went over to the Bank of Asheville?
A. Eric Morris.
Q. Okay. And who did you go see at the Bank of Asheville?
A. Eric Morris. He was a relationship of Paul Rantzos. And he was also, I believe, the loan officer, or a loan officer, at that time. He was the one who handled the purchase.
Q. Okay. Now, was the difference in meeting with Eric Morris different than the meeting that you had over at the Starbucks with Craig Gourlay and David Smith?
A. No. It was identical.
Q. Okay. On that particular one, do you know whether

or not they actually got a copy of the sales contract at that time?
A. I cannot be sure.
Q. Okay. Well who would have handed the documents to the bank?
A. Paul Rantzos.
Q. Okay. Did you?
A. No, sir.
Q. Okay. Was there any discussion of the money that you were to receive in that transaction?
A. No, sir.
Q. Was there any discussion of the money you were to bring to the table for that?
A. No, sir.
Q. How long after that -- let me show you what has been marked as Government's Exhibit No. 123. Let me show you Exhibit No. 123-B, as in boy.
And, Your Honor, I'd like to publish this exhibit. It is a record of the Bank of Asheville. It has been previously stipulated and admitted into evidence.
THE COURT: You may.
BY MR. SAVAGE:
Q. Now, to be fair, Pastor, this is not a document that you would have seen, is it?
A. No, sir.

Q. But looking it over, does it discuss the terms of the transaction in which your company and Paul Rantzos' company, Dion Holdings, was involved?
A. Yes, it is in reference to that.
Q. And it has a date on that credit review which -- what is the date on that?
A. July 18, 2008.
Q. Okay. Was this about the time that you would have gone over to the Bank of Asheville?
A. About the time.
Q. Okay. Now, Paul Rantzos was traveling, was he not, around this time frame?
A. Yes, he was. He was away in Greece.
Q. Okay. And how was it that you were going to close on this transaction when Mr. Rantzos was in Greece?
A. He signed a Power of Attorney over to me.
Q. Okay. Now it says here that the purpose of this is to purchase Lot 127 in the Seven Falls subdivision for the purpose of investment. Was that true?
A. The real purpose, again, was for the cash flow to provide to my company.
Q. You were investing in Seven Falls?
A. I did not want to keep those lots.
Q. What does the word "investment" mean to you? Does it mean you put some money in hoping to get a return on

it? Let me ask this. Did you ever have a retirement account? An IRA?
A. Savings.
Q. Savings account? You put money in the bank. You invested it in the bank; right?
A. Yes.
Q. Did you get anything back from it? Did you get a return on your money?
A. Yes.
Q. Did you ever have a savings account where they paid you --
A. No.
Q. -- instead of you putting money in?
A. No.
Q. So an investment is when you put your own money in; right?
A. Yes, sir.
Q. Was this an investment?
A. No, sir.
Q. And the source of repayment. How was it going to be repaid?
A. From the two year interest carry and reserve that would have been placed in the bank that did the financing.
Q. That says "Appraisal Date." What's the LTV ratio

that they're looking for according to this memorandum?
A.     75 percent.
Q.     Okay.  Deposit accounts have been committed by both borrowers prior to closing.  Were you going to deposit money in this bank?
A.     The only deposit would have been proceeds from this closing.
Q.     Okay.  So you weren't going to, like, spend, like, other -- you didn't have, like, a million dollars or a hundred thousand dollars or $10 to put in the bank. Right?
A.     No.  I was not going to put -- yeah.
Q.     All right.  If we can scroll on down.  Now, at the top of this, it says this request was initially approved for Messrs.  Dimitris and Rantzos but was later changed to Dion and to remove Mr.  Rantzos from the loan.  What does that mean?  What's that all about?
       Let's break that down.  Was there initially a request of proof for Nicholas Dimitris and Paul Rantzos, to your knowledge, prior to this date?
A.     I don't actually know.
Q.     Okay.  Did Mr.  Rantzos ask to take his name off the loan?
A.     I did not know that.
Q.     Okay.  If he did, you didn't know it.

A. No, I did not know it.
Q. All right. And then it has a description. It says the purchase price on the lot is 850. The loan amount -- and if we could highlight that part. The loan amount will be 75 percent of the lesser of the purchase price of appraised value. Maybe that's a typo. That should say "or," right? You know it's what 75 percent means, right?
A. Yes, sir.
Q. What does that mean to you?
A. 75 percent of whatever the appraised value is. If it's appraised at $100,000, they will loan $75,000.
Q. Okay. And then it goes on to talk about your financial statement and that you showed excellent liquidity. Was your credit pretty good at this time?
A. Yes, sir.
Q. And it says at the very bottom, "Dion has also agreed to deposit $82,875 at closing with the Bank of Asheville which will cover interest payments for approximately two years." Where was that money going to come from?
A. From the proceeds of this loan.
Q. And then it has those three stars. And that refers up to the top, doesn't it?
A. Yes, sir.

Q. Okay. Well, was all that true? Was that true? I'm asking you, was it true what it says?
A. That Dion agreed to deposit the $82,000? Correct.
Q. Well where was it going to come from?
A. It was coming from the loan. So, in actuality, it was the bank --
Q. So it might be partially true, but it wasn't coming from the loan --
MR. FISCHER: Object to leading, Your Honor.
THE COURT: Sustained.
BY MR. SAVAGE:
Q. I'm sorry. Thank you.
did Dion have $82,000 to deposit?
A. No, sir.
Q. Okay. Was it true that the loan was going to be 75 percent of the lesser of the purchase price or the appraised value?
A. No, sir.
Q. Thank you. Let's go to Government's Exhibit No. 123-C. That would be the appraisal report. Go to the second page or third page. Well, let me go to the second page. Do you know who picked this appraiser, by the way?
A. I do not.
Q. Okay. But this is a different appraiser, isn't it? It's a Mr. Sam Roberts?

A. Yes, sir.
Q. Gary Sam Roberts. So this wasn't the same as the appraiser over at Pisgah, Mr. Ollis?
A. No.
Q. Let's go to the second page of that particular -- we'll enlarge the top part of that and kind of -- since we've got a different appraiser. And, Your Honor, we can publish, please, Government's Exhibit No. 123-C. It's been previously stipulated and admitted as a record of the Bank of Asheville.
THE COURT: You may.
BY MR. SAVAGE:
Q. Okay. And I won't go back over all that. Okay. Pastor, can you see the Land Appraisal Report?
A. Yes, sir.
Q. Okay. Now, with respect to that, it is Lot 127. So we're talking about the same thing; right?
A. Yeah.
Q. The date of the sale in this case was pending; right?
A. Yes.
Q. All right. And do you see the loan charge to pay by seller "NA?" "Other sales concessions: NA."
A. Yes, sir.
Q. In your mind, were they not applicable?

A. No. They're very applicable.
Q. Okay. Well, why were they applicable to you?
A. Because without the concessions and without the seller paying those fees we wouldn't have bought them.
Q. Okay. Well what do you think about this neighborhood? Was the neighborhood more done up to 75 percent and suburban in --
A. No, sir.
Q. -- a month later?
A. No, sir.
Q. I notice it went from "rural" when Mr. Ollis looked at it to "suburban" about a month later. Was that true?
A. No, sir.
Q. Any, like, shopping centers? Anything out there?
A. No.
Q. In fact, the nearest development is, really, the airport, isn't it? Pretty much?
A. I would imagine.
Q. Okay. Well if we can keep scrolling down. Keep coming down. There's not quite the glowing narrative there.
All right. Let's look at this. They're comparing this against which lots? This is a comparison approach?
A. They're comparing against the same development.

Q. Okay. But let's go and see what lots these are. Do you know who the purchaser of Lot 133 was?
A. No, I do not.
Q. Do you know who the purchaser of Lot 134 was?
A. No.
Q. Do you know who the purchaser of Lot 135 was?
A. No, sir.
Q. Well let me show you what has been previously admitted as Government's Exhibit No. 1322. This is a chart that the jury has previously seen. And I'll ask you if you see lots -- those lots, the very same lots, on here, 133, 134 and, I think, 135. Do you see -- who are the purchasers on those lots?
A. Yes, sir.
Q. Who are they?
A. Buck Cashion, Ray Chapman, George Gabler.
Q. Do you know who those people are?
A. Yes, sir.
Q. Do they have anything to do with Seven Falls?
A. Yes, they do.
Q. Okay. Were they, like, just people off the street who would have bought this at arm's length?
A. No. They had -- they were invested, I believe, with the development.
Q. Do you know what kind of deal Mr. Cashion got on

his loans over at Seven Falls?
A. I do not.
Q. Okay. Well let's go back to Government's Exhibit No. 123-C and we'll go back to the section of the page three. So you don't know whether or not there are any concessions in those particular areas. Let me go to the subject property. Was there a significant concession in regards to the subject property, Lot 127?
A. Yes, sir.
Q. By the way, if you went out there and you wanted to drive and take a look around at Seven Falls Golf and Country Club, where would you find this lot?
A. I don't know.
Q. Okay. And I notice that one of these says it's in Arden and one says it's in Hendersonville. I mean, do you know if the development was in Hendersonville or Arden?
A. It was in Hendersonville.
Q. Okay. So you don't know why two of those says Hendersonville and one says Arden?
A. I do not.
Q. So would it be a true comparison to compare your lot, assuming that those other ones didn't have sales concessions with the price you're paying for your lot?
A. No, sir.

Q. Okay. Thank you. Let me go to Government's Exhibit No. 123-A. And I'll ask you if that -- if you recognize that document. And, Your Honor, if I haven't done this already, this is also a record of the Bank of Asheville. It's been previously stipulated, and we request permission to publish it.

THE COURT: You may.

THE WITNESS: This the settlement statement where Dion bought Lot 27 from Seven Falls.

BY MR. SAVAGE:

Q. Okay. What is the settlement date on this one?

A. July 22nd 2008.

Q. And do you remember going to this settlement?

A. Yes.

Q. Okay. And where did it take place?

A. Jason Peltz's office. The Peltz Law Firm.

Q. Do you remember who was there?

A. There were a number of folks there. I remember walking in and Buck and Keith were in the foyer area.

Q. Well let me back up there. You had met Buck Cashion before; right? You were paying him $5,000 a month?

A. Absolutely. Yes.

Q. How did you know it was Keith that he was talking to in the foyer? Had you met him or seen him before?

A. I believe I'd already met him, but I'm just -- I'm not sure where, at this point.
Q. But you recognized him.
A. I knew him. Yes, I did. I knew of him.
Q. Well, do you see the person who you saw in the foyer of the Peltz Law Firm in the courtroom today?
A. Yes, I do.
Q. Did you know that person to be Keith Vinson?
A. Yes, I do.
Q. Can you identify him by a piece of his clothing?
A. He's wearing a brown jacket and white-collared shirt.
Q. Your Honor, the record will reflect identification of the Defendant.
THE COURT: The record will so reflect.
BY MR. SAVAGE:
Q. Thank you. So what were Mr. Vinson and Mr. Cashion doing in the lobby of the Peltz Law Firm when you arrived for this settlement?
A. They were in an extreme intense exchange, I believe, possibly arguing. They were pretty intense. Significant enough that Andrew Hager, who was also there, he came and he just asked me to come into the closing room. And I, at that point, got very uncomfortable and began to question what's going on.

Q. Okay. Well, could you tell what they were arguing about?
A. I did not know what they were arguing about. I asked what they were arguing about, and the conversation was that they were wrestling over disbursement or settlement.
Q. Who was going to get this money?
A. I think that was the argument.
Q. Thank you. Let's scroll down here. So the sales price is $850,000, and the concession -- the principal amount of the loan was $637,000. Then there's the purchase credit. How much, if you go to the bottom line, did you put in?
A. Zero.
Q. Okay. And if we go to the other -- by the way, is this signed?
A. Yes, sir.
Q. Did you see who signed this HUD settlement statement?
A. No, I did not.
Q. Okay. It wasn't signed in your presence?
A. No.
Q. Okay. But is that your signature on behalf of Dion?
A. It is, on the left.

Q. Okay. Thank you.

If we can go to the next page of that settlement statement. We'll go through that and see where the money went. Okay. Another 10 percent sales commission. Did you talk to any Realtors about this?

A. No, sir.

Q. Anybody from the Seven Falls Realty Company, LLC?

A. No, sir.

Q. Anything a Realtor did to earn $52,000?

A. Not to my knowledge.

Q. Okay. The Bank of Asheville got a one percent cut right?

A. Mm-hmm. ("Yes.")

Q. Okay. If we can scroll on down.

Okay. There were some fees paid to the Peltz Law Firm. How much?

A. $115 for a title examination. $2,000 for attorney fees.

Q. Okay. And then there was tax stamps of $1,275.00 paid. Do you know what that amount was paid on?

A. I assume tax stamps.

Q. Okay. What were the tax stamps based on, if you know?

A. I suspect it would be based on the sale price.

Q. Okay. So if the sales price was $850, you ought

to be able to divide that by the tax price and get that tax number; right?

A. Correct.

Q. Interest incentive. The bank [sic] was deposited with the Bank of Asheville $82,875.00. What was that?

A. That was the two year interest carry that would be deposited in the bank providing the loan.

Q. Okay. And then there was a working -- I'm sorry. Then there's an additional -- out of all that, taking out the fee, the $52,000, who got the 173,785.50? I mean, who got the bulk of the money on this?

A. Seven Falls.

Q. Let's go back over the first page. I'm sorry. I think I'm getting myself confused here. All right. Let's see who got the money. First of all, Seven Falls Realty Commission got a check for $52,000. Right?

A. Yes.

Q. All right. And it looks like the National Bank of South Carolina got a release fee. What do you know a "release fee" to be?

A. A release fee, again, is the amount of money that a bank would require to release the property.

Q. Okay. Seven Falls, LLC. How much did they get?

A. $92,743.50.

Q. Okay. And then -- but they're also -- they get

the $52,000, as well, right, their sister company, Seven Falls Realty?
A. Correct.
Q. And then there's another $27,000 that goes to the amenities club and the golf club that we just talked about?
A. Yes.
Q. Okay. So, out of that, and I don't want to add all that up. They got a significant amount of money out of this deal; right?
A. Yes.
Q. Okay. Now let's go to your part of the deal. After you closed on these, did you get paid?
A. Yes.
Q. Okay. And let me show you what's been marked as Government's Exhibit No. 160. It's going to be a little hard to read, and I'd like to ask Agent Seres to make that larger.
Your Honor, this is a record of the -- I believe this is a record of the bank -- Mountain 1st Bank. We request permission -- it's been previously admitted and stipulated. We request permission to publish it.
THE COURT: You may.
BY MR. SAVAGE:
Q. What is that?

A. That is a check from Seven Falls to Dion Holdings for $7,812.50.
Q. Now, in fairness, that's a little hard to read, isn't it?
A. It is.
Q. Okay. But let's see if we can't enlarge it and see what date that check is. And if you look on the side, the bank has kind of put a routing number. It has a post date. What is the post date that the bank typed into their records?
A. "August 6, 2008."
Q. Okay. Well it would be 7th, right?
A. Oh, I'm sorry. The post date on the right. I was looking on the left side of the check. Yes, it is August 7th of 2008.
Q. So it might have been written on August 6th, but it got posted to the bank's records a day later?
A. Yes.
Q. And if we could look at the amount there. It's a little hard to read, isn't it?
A. It is.
Q. Do you remember how much you got paid on that occasion? Let me go to the -- we'll scroll on down here. Underneath the check there are some numbers. See that line of -- see those numbers underneath there?

A. Yes, I do.
Q. There is a routing number, but there's also the amount of the check that's entered by the clerk. Right?
A. On the right side?
Q. On the right side. Can you see that number?
A. Yes, sir.
Q. And just to save us a little time. Is that $7,812.50? Right? Let me see. You would have taken out a loan over at the bank of -- the Pisgah bank in June. So you would have been owed one percent of the amount of that loan, which would have been roughly, what, some $6,000; right?
A. Very close.
Q. But you'd only just taken out the loan over at the Bank of Asheville; right?
A. Right.
Q. So they only owed you a couple of days for that.
A. Correct.
Q. So is this about what they owed you for the first month?
A. Correct.
Q. Okay. And who issues that check?
A. It's from Seven Falls.
Q. Okay. And this looks like the same signature that was on all the other documents that we've seen, isn't it?

A. Yes, sir.
Q. You don't know who signed that though. You don't know whose signature that is?
A. I do not.
Q. Okay. Let's go to Government's Exhibit No. 161. All right. And I'll ask you if you recognize that document. All right?
A. It's a check from Seven Falls to Dion Holdings.
Q. Okay. Your Honor, this is also a record of the Mountain 1st Bank. We request permission to publish it.
THE COURT: You may.
BY MR. SAVAGE:
Q. Okay. And can you see the post date on that one?
A. September 8, 2008.
Q. So this would have been the second month's payment; right?
A. Yes, sir.
Q. And what is the amount of money that you got from Seven Falls for that second month?
A. The $12,337.50.
Q. Okay. Now, if we go back, the first loan to PCB was in the amount of $596,200. That sounds right?
A. Yes, sir.
Q. Then you've got the Bank of Asheville loan, and that's in the amount of $6,500 which, if you add it up

all together, comes to $1,233,700; is that right? If we could add that -- Your Honor, if I could -- does that sound about right?
A. Yes, sir.
Q. Okay. And this check for $12,337.50 is calculated on what?
A. One percent.
Q. Just to finish this up then. You borrowed $1.2 million?
A. Yes, sir.
Q. So you could get paid $12,000 a month?
A. Yes, sir.
Q. Did these payments stop?
A. Yes, sir.
Q. How long did they continue?
A. Well, I believe this was the last one.
Q. Did you make any inquiry about that with anyone?
A. Yes, we did.
Q. Who did you ask?
A. Initially, we asked Buck Cashion to help.
Q. All right. Who went to Buck?
A. I take that back. Initially, Paul Rantzos called Seven Falls and asked for --
MR. FISCHER: Objection, Your Honor, hearsay.
THE COURT: Sustained.

BY MR. SAVAGE:
Q. Okay. Well how do you know Paul Rantzos called Seven Falls?
A. We had a discussion. He was my partner. He has the motivation on the proceeds of this loan.
Q. Well let me ask you a couple more things about Paul Rantzos. Did Paul Rantzos know all the facts that we were just talking about here today?
A. Yes, sir.
Q. Paul Rantzos was, in fact, himself a banker?
A. Yes, sir.
Q. Paul Rantzos received part of this money?
A. Yes, sir.
Q. Paul Rantzos was getting paid to find you money?
A. Yes, sir.
Q. Paul Rantzos knew all the facts that you knew, and he knew banking as well?
A. Yes, sir.
Q. Was Paul Rantzos one of your conspirators?
MR. FISCHER: Objection.
THE COURT: Sustained.
BY MR. SAVAGE:
Q. Did you have an agreement with Paul Rantzos to get money from the bank for which you were not entitled?
A. Yes, sir.

Q. Okay. Your Honor, at this time the Government would request permission to ask its last question on the basis that it is not hearsay.

THE COURT: Any objection?

MR. FISCHER: Not without foundation, Your Honor.

THE COURT: You may proceed.

BY MR. SAVAGE:

Q. What did you talk to Mr. Paul Rantzos about?

A. Regarding this matter?

Q. Yes.

A. At this point, after we weren't receiving the funds, I was not able to continue to pay Paul at the rate of his expectation. He had a motivation at that point, along with I, to reach out to Seven Falls and ask what's happening. Why are the payments not being made?

Q. Okay. Wait a minute. Who did Mr. Rantzos tell you he talked to at Seven Falls?

A. At that point, I am not confident as to who he reached out to initially.

Q. Well what information did he relay to you?

A. At that point, he relayed -- I had told him we'll get it. It'll come. It did not come. We began to get more concerned at that point. And after a phone call did not produce the results, Paul then went to see Keith Vinson directly.

Q. Okay. And how do you know that?
A. Because that's -- we discussed it. He went and then came back. The next day I met him and he was comforted and felt confident that Keith would follow through. They actually enjoyed at his -- he relayed to me at that point that they enjoyed a nice bottle of wine at his home.
Q. He actually talked to Keith Vinson about this?
A. Correct.
Q. Did he say you will get paid?
A. He said -- yeah.
Q. Okay. Did you get paid?
A. No, sir. And when we did not beyond that, at that point, it became a very financially straining issue for me, at which point I then reached out to Buck Cashion and asked him to help us with Keith Vinson.
Q. Well, wait a minute. Let's stop there. Where did you reach out to Buck? Where did you see him? Do you remember?
A. At that time there was a coffee shop in South Asheville, I don't believe it is there now, and it used to be called Green Berries.
Q. Okay.
A. We often would go there to meet them.
Q. You went over to Green Berries. Do you know who

else was present, or do you remember?
A. I believe Ed Worlund was present at that time.
Q. When you say "we," who was "we?" "We" went. Did Mr. Rantzos go with you?
A. Yes, sir.
Q. Okay. Why did you go see Buck Cashion?
A. I went to see Buck Cashion because, again, I knew he was vested in the development, and he was the closest person to Keith Vinson and --
Q. Well? Did you still owe him $5,000 a month?
A. And that was -- that was the third reason why, and the most important reason why. I then asked Buck, Buck, will you help us? If we can get this money, then I can continue to pay you. He had offered to help.
Q. All right.
A. It did not translate to monies anymore from Seven Falls. At that point Buck said, tell you what. Until I can get this fixed, you don't have to pay me.
Q. Well, after that meeting with Buck, did you hear back from him again? After you talked to Mr. Cashion, what did he say he would do when you were at the --
A. He said he would get with Keith Vinson and take care of it.
Q. Okay. Did you hear back from him after that?
A. I did.

Q. And what did Mr. Cashion say to you?
A. Well, it wasn't at his pursuit. It was at my pursuit. I went to Buck and asked, have you taken care of that? When could we expect a check? He said, I'll tell you what. I will get it taken care of. Until it happens, you don't have to pay me my $5,000.
Q. Did that solve your financial problems?
A. It definitely lightened the load on me.
Q. Okay.
A. It did not solve all my problems.
Q. Okay. Were you able to keep up with Spicewood? What happened to Spicewood?
A. Spicewood was spiraling fast -- faster than I could manage.
Q. And what eventually happened?
A. It failed.
Q. Okay. Did you -- who was going to make -- the payments made on these two loans, did they continue?
A. They continued inasmuch as the deposits would allow for them to continue. There was only two years of interest carry to maintain that debt. If the follow through on the buyback guarantee did not happen, then there was no monies to pay it.
Q. Okay. Now, even after this point, did you continue to do the loans and assign loans with straw

loans with Buck Cashion at the Pisgah Community Bank? Even after this point in time did you get involved with more loans with Buck Cashion?
A. I did. Buck was aware of the turmoil that I was in. I had shared with Buck that I really can't afford -- I can't engage in flat land or dead weight. I needed to get -- I needed to get vertical on top of the flat land I already had. By that I mean --
Q. Stop. Stop a second. Let's break this down. What do you mean you needed to get vertical?
A. By that, I mean I needed to get a structure built on my land, my home, because you could always rent out a finished home and provide some cash flow to offset your debt.
Q. Did Mr. Cashion present to you more opportunities to engage in bank fraud?
A. At that time, yes, he did.
Q. And did you take him up on this?
A. Yes, I did.
Q. Okay. Did you get your wife involved in it?
A. Yes, I did.
Q. Okay. Did she know anything about this deal really?
A. No, sir.
Q. Okay. And where do you stand today? Did you wind

up paying these loans that we just talked about?
A. No, sir.
Q. Did you wind up paying the loans you made later on?
A. No, sir.
Q. Okay.
A. Everything went down.
Q. Your Honor, I would pass the witness.
THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. FISCHER:
Q. So you began your professional career as a minister. Is that what I understand, sir?
A. Yes, sir.
Q. And you worked full-time as a minister from when to when, at least initially?
A. Initially, I went on full-time staff at the first church that I was a staff member at in '94.
Q. And how long did you continue your ministry as a full-time occupation?
A. At that first location I was on staff for about eight years. Then I took one year off at New Yorker Technologies. Then I went back to ministry for six years at the Rock. And then I had resigned, at which point I went and focused on real estate.

Q. Okay. And that would have been what year, sir?
A. Around 2007. 2006.
Q. Now, at that point, did you have any experience in dealing with real estate matters at all?
A. I had -- yes, I had some. At that point I hadn't had development experience, but I had -- just before I resigned I had purchased some rental property.
Q. So you've been a landlord?
A. Well, some of my rental properties needed construction work. And then after those rental properties, I started building single family homes.
Q. And your first development, was this Spicewood we've heard about?
A. It was the first of that size. Yes.
Q. And what size was Spicewood, sir?
A. About 30 lots.
Q. And where exactly was that located?
A. Out in Weaverville.
Q. And you had to obtain some initial financing for that; is that correct?
A. Yes, sir.
Q. That was with who?
A. Carolina First.
Q. And that was, what, about 600,000 bucks, did I understand?

A. $650,000, I believe.
Q. And there were release fees of 80 percent built into your agreement with Carolina First?
A. Yes.
Q. So as you sold some of the lots at Spicewood you would pay down your debt; is that correct?
A. Correct.
Q. Okay. How many lots did you eventually sell out of Spicewood?
A. Between 15 and maybe 18.
Q. And did you build on any of them?
A. There were five homes.
Q. So, mostly, you were selling unimproved lots or home plots? Home sites might be a better way of putting it.
A. Yeah. Because we didn't put a lot of -- a lot into improving the lots. The majority were just lots for people to purchase and build on.
Q. And I gather Spicewood became something of a financial burden to you?
A. It did.
Q. And you still own an interest in Spicewood?
A. No, sir.
Q. What happened to it?
A. I lost it all.

Q. And how did you happen to lose it all? Did the bank foreclose?
A. Yes, sir.
Q. That was Carolina First again?
A. At that point -- at that point we had paid off that A and D line. Some of the foreclosures were with, well, BB&T on that $750,000 line of credit which would attach to five lots. They foreclosed. And, I believe, Asheville Savings Bank.
Q. So is it the fact that you first got the $600,000 from Carolina First and that let the project get going? Is that accurate?
A. Again, I believe around $650,000.
Q. Okay. Call it 650 then. But that was not enough to complete the project, was it?
A. No, sir.
Q. And that's why you needed the additional financing that you went to BB&T for?
A. No. Carolina First. Then I went to Carolina First for some additional funding to develop.
Q. Okay. So at what point does BB&T come into the Spicewood development?
A. They come after I had already paid down my Acquisition and Development loan. Then I got a line of credit on five lots that I held and owned free and clear.

Q. And the purpose of that line of credit was what?
A. To continue forward with the development, and to maintain my business.
Q. So the totality of the financing you obtained from Carolina First wasn't enough to finish the whole thing? That's my question.
A. It was close enough that we had our first cover of pavement. But to put our final coat of pavement and some other things, then we would have used some of the $750,000.
Q. And when you went into BB&T the first time, that was at the urging of Mr. Rantzos?
A. Yes, sir.
Q. He made the introduction.
A. He introduced it.
Q. He kind of got you in the door?
A. Correct.
Q. Okay. And they turned you down.
A. Yes, sir.
Q. They said that -- well, if you know, why did they turned you down?
A. I expect that it was they weren't confident enough in my guarantee alone.
Q. And that's when Mr. Rantzos introduced you to Buck Cashion.

A. Correct.
Q. And Buck Cashion met with you, and you entered into this line of credit that he guaranteed for $750,000?
A. Yes, sir.
Q. And that had the payment terms that we've talked about?
A. Yes, sir.
Q. And at that point in time you had nothing to do with Keith Vinson or Seven Falls; it was entirely with Buck Cashion.
A. Yes, sir.
Q. And you were required to pay Buck Cashion $5,000 a month on that line of credit?
A. Yes, sir.
Q. Did you ever get late on a payment with Mr. Cashion?
A. Yes, sir.
Q. And when you got late on a payment to Mr. Cashion, what happened?
A. He asked why I was late.
Q. He was pretty quick about following up on the money that was due him, was he not?
A. Yes, sir.
Q. Okay. Did you ever, with regard to this line of credit, have any dealings with Mr. Worlund?

A. Yes, sir.
Q. And what dealings would those have been, sir?
A. Oftentimes, he would pick up the payment.
Q. What about Mr. Ray Chapman?
A. I mean, my dealings with Ray were occasionally he'd be with Buck and I'd meet the two of them after they went running, or I met them at Green Berries. Ray Chapman was quite a quiet fellow.
Q. So, while he and Mr. Cashion would often be together, Buck would do most of the talking. Is that a fair statement?
A. Yes, sir.
Q. Now, with regard to these two lots that your company, Dion Holdings, purchased. This was brought to you by Mr. Cashion as a business proposal, was it not?
A. No, sir.
Q. Who brought it to you?
A. I'm sorry.
Q. Who brought the idea of you buying these two lots?
A. Paul Rantzos.
Q. Okay. So it's your urging that Mr. Rantzos was approached by Mr. Cashion?
A. No. Paul had mentioned that Andrew Hager had presented him with an opportunity. That's my understanding.

Q. Okay. I'm trying to make sure I've got the sequence of events here.
A. Yes, sir.
Q. So was it your partner, Mr. Rantzos, who came to you with the idea?
A. Mr. Rantzos came to me with the idea.
Q. Now, at this point in time, had Dion Holdings been established?
A. No, sir.
Q. Okay. Did you have a separate company of some sort that was running Spicewood?
A. Yes, I did.
Q. Okay. And how was it determined that you and Mr. Rantzos would form a new company with these two lots?
A. Because Paul was not a partner of any other company of mine. The whole purpose that we created Dion was because he was then going to partner with me on these purchases only.
Q. And with regard to Spicewood. Did I understand that you indicated that you had been involved in some sort of straw borrowing activity for that development?
A. Yes, sir.
Q. And that took place before these two lots were mentioned to you as an investment possibility; is that

correct?
A. Yes, sir. Before and during.
Q. Okay. And how did that work, the straw borrowing, on Spicewood?
A. Individuals would borrow money to buy a lot. I would pay them $5,000 as a fee to do so, and I would make the payments until such time as they sold.
Q. And you had -- these individuals who were shown as buying the lots at Spicewood, did you have sales contracts with them?
A. We did.
Q. Those sales contracts did not include any provision about buybacks, did they?
A. I don't believe -- I don't think -- I don't believe the sales contracts did include that. We did have what was called an "Assumption Agreement."
Q. Okay. And was -- was that Assumption Agreement presented to the bank at issue in that particular scheme?
A. No, sir.
Q. Now, in these two lots that you purchased at Seven Falls, we've been over some of the contractual provisions; right?
A. Correct.
Q. And these contracts specifically had it in there in black and white that Mr. Vinson agreed to purchase --

repurchase the property during this two year period; right?
A. Correct.
Q. Now that was not the case in the straw borrowing scheme you were involved in; is that correct?
A. Correct.
Q. And these contracts also had the money that was going to be paid on a monthly basis to you laid out in black and white.
A. Correct.
Q. And that is different from the contracts that you had your issues with at Spicewood; correct?
A. No. The Assumption Agreement spelled out the agreements.
Q. Did it spell out that there was going to be monthly payments made?
A. No. It spelled out that they would receive the finance -- they would receive their funding right up front.
Q. Okay. It would be accurate to say, would it not, that these two contracts involving the Seven Falls lots were much more transparent in terms of what you were going to receive than the contracts that your straw borrowing was involved in?
A. Yes, in terms of the land sales.

Q. Now who drafted these contracts, if you know, these two for Dion Holdings and Seven Falls?
A. I do not know.
Q. And once Mr. Hager contacted Mr. Rantzos and Mr. Rantzos contacted you to get these two lot sales in progress, you never really talked about it -- talked to Keith Vinson, did you?
A. No, sir.
Q. Other than seeing Keith Vinson at the closing, where you mentioned he and Buck Cashion were having this angry exchange, you really didn't have any dealings with him, did you?
A. No, sir.
Q. Okay. Certainly Mr. Vinson never told you to lie to any bank or any banker about any provision of these two sales, did he?
A. I didn't have any exchange with Keith Vinson.
Q. And once things went sour and you were not getting the monthly payments you were expecting, ultimately you went to Buck Cashion. Correct?
A. Paul.
Q. Okay. But after you went to Paul -- I said ultimately. You eventually talked in person to Buck, didn't you?
A. To Buck, correct.

Q. About, you know, where's my monthly payments? I need the money, basically.
A. Correct.
Q. You never had that conversation with Keith Vinson, did you?
A. I did not. My partner did.
Q. Okay. And the monies you did receive -- how many total payments did you get?
A. I believe.
Q. Mr. Savage showed you several checks.
A. I believe it was two. Maybe three checks, but I believe two -- I think one was a prorated check.
Q. Okay. And these were all checks, as we've seen, drawn on a Seven Falls account; correct?
A. Correct.
Q. And in the little "memo" portion there was a "payment per agreement." Is that correct?
A. I'm sorry.
Q. Was there a listing that this was a payment to you per an agreement?
A. Yes.
Q. It's right there in black and white; correct?
A. It's listed "Interest" on the memo section of the check.
Q. That would be interest consistent with the

agreement you had in your contract with Seven Falls; right?
A. I guess it would be considered the payment that was referenced on the contract.
Q. Now, sir, when you dealt with Bank of Asheville on one of these particular loans, it was Mr. Morris that you primarily worked with. Is that correct?
A. Yes, sir.
Q. Okay. Did you know Mr. Morris before?
A. No, I did not.
Q. How were you introduced to Mr. Morris?
A. By Paul Rantzos.
Q. And he had some prior relationship with him, as best you know?
A. Yes. Best I know, he had referenced having a relationship with him.
Q. And you had to fill out a financial statement as part of the loan application process, didn't you?
A. We actually presented our financial statement. We did not use a financial request or a financial statement they provided to us. We provided our financial statement.
Q. So you already had one put together.
A. Yes, sir.
Q. And Agent Seres, if I could ask you to pull up

123-E, please, sir. I think it's E. E is what I have.
Take a look at that. Is that on your screen, sir?
A. I see it.
Q. It's been previously admitted, Your Honor, and I'd ask to publish.
THE COURT: You may.
BY MR. FISCHER:
Q. If you could scroll down a little bit, particularly to the portion starting with Section -- it looks like Section II right there. That, basically, contains information about what your financial situation was at the time of your application. Is that accurate, sir?
A. No, sir.
Q. I'm sorry?
A. This is not -- this is Paul Rantzos's statement.
Q. That's not your financial statement?
A. Can we scroll up?
Q. Yeah. Let's, please, do that.
A. Yeah. This is Paul Rantzos'.
Q. Did you present a financial statement?
A. I did.
Q. In your past dealings did you have to present -- say, with the Spicewood development, the loans you were paying there, did you have to present a financial

statement?
A. Yes, sir.
Q. Do you know why, in this case, the Bank of Asheville did not require you to present a financial statement, since you and Mr. Rantzos were working together in Dion Holdings to acquire this property?
A. We did provide a financial statement to the Bank of Asheville.
Q. Was that something besides 12- E there?
A. I don't know if it's besides 123-E.
Q. Okay. I just want to make sure. Did you present information to the Bank of Asheville about what your personal financial status --
A. Yes, sir.
Q. And did the Bank of Asheville, to your knowledge, have a copy of the contract that you had signed to purchase the lot at Seven Falls?
A. I can't be sure. I believe. I'm not certain though.
Q. You didn't try to hide any terms of that contract, did you?
A. No, sir.
Q. I believe we've seen some information about the fact there was going to be the interest carry provision in the bank's credit memorandum. Do you recall seeing

that?
A. Mm-hmm. ("Yes.")
Q. If I can have just a moment, Your Honor.
If we can pull up 124-B, and if we can highlight the middle area down there at the bottom. Yes. Okay. I'm sorry. I'm looking at the wrong number, Your Honor. That is absolutely my mistake there. That would be, I'm sorry, 123-B. If we can look at the top first, please. And do you have that in front of you?
A. I do.
Q. And that -- this Dion Holdings, now that I've got the right one. That would be you and Mr. Rantzos; correct?
A. Correct.
Q. With the account officer listed as Eric Morris?
A. Correct.
Q. And if we go down a little bit to that part right there which states "Background History" and gives some information about Dion Holdings. Do you see that?
A. Correct. Yes, I do.
Q. I would ask to publish, please, Your Honor.
THE COURT: You may.
BY MR. FISCHER:
Q. It says, "Nicholas Dimitris is owner in several real estate development and holding companies in Buncombe

County." That's about the middle of that paragraph. Do you see that, sir?
A. I do.
Q. "He has a strong financial statement and shows excellent liquidity with $1,457,000 cash on hand." Do you see that?
A. I do.
Q. Was that a true statement that you had $1,457,000 sitting in a bank account somewhere?
A. First of all, I did not write this.
Q. I understand that. I understand.
A. I don't know off the top of my head what liquidity I did or did not have at the moment it was purchased.
Q. The truth would have been that you didn't have anywhere close to a million and a half dollars.
A. No, sir.
Q. If you had, you wouldn't have needed to come up with another way to generate money.
A. Correct.
Q. And that, really, was your purpose in buying these two lots was to generate some monthly payments to help your cash flow.
A. Correct.
Q. I'm through with that, please.
And did I understand you to say, Mr. Dimitris,

that even after these two loans were closed you continued to be involved in similar financial dealings with Mr. Cashion?
A. I did.
Q. And what were those financial dealings?
A. He had me to get rid of some assets that were dead weight to him. He wanted to open up his borrowing power. He needed it to help out in Seven Falls. I needed cash. He said I could get -- I could -- we could work out an opportunity where you would take some of my assets and, in exchange, I could also provide you cash, which then would allow me -- he was not focused on selling any of his assets. I would then focus on selling off those assets but also have the benefit of having the cash to carry my businesses.
Q. And which assets was he going to give you?
A. Well, there was a list of opportunities. We looked through a bunch of properties. I mean they varied from just lots to the Residences at Biltmore to commercial pieces of land.
Q. And what exactly did Mr. Cashion want you to do?
A. Basically, he wanted to sell off his real estate as much as he could and get his borrowing power opened up so he can help out at Seven Falls.
Q. And Mr. Vinson had absolutely nothing to do with

these subsequent transactions with Mr. Cashion, did he?
A. No, sir.
Q. That was all something that was arranged between you and Buck?
A. That's correct.
Q. And how many of these deals did you and Buck eventually finalize?
A. I can't be certain as to how many. I would speculate and say that there was at least one purchase of a number -- a number of lots, and then at that time another partner of mine purchased some.
Q. Somebody other than Mr. Rantzos?
A. Correct.
Q. And you, in fact, did -- and correct me if I'm wrong -- derive some income from that. You got some money out of it.
A. Correct. That was, again, the deal up front.
Q. And how much did you get?
A. You know, over the whole picture, there was a list of assets we had access to. We selected from those assets to purchase. The goal was to somehow accumulate near half a million dollars in cash over the duration of the purchases.
Q. For you or for Mr. Cashion?
A. For me and my companies.

Q. Okay. And did you achieve that goal?
A. No. We didn't get to the end of that. We couldn't. At that time the market kept crashing, or kept tanking, and banks were not funding. We were not eligible to borrow.
Q. And in conjunction with these deals you had with Buck Cashion, did you, in fact, submit false information to some bank or financial institution?
A. Yes.
Q. And that was at the urging of Buck Cashion, was it not?
A. No, sir.
Q. That was just your idea?
A. Yes, it was.
Q. Did Buck Cashion know about it?
A. Not that I know of.
Q. He just said, here are the deals. Go for it.
A. Yeah.
Q. Words to that effect? Certainly he had nothing to do with any of that whatsoever, did he?
A. No, he did not.
Q. Thank you, sir. No further questions.
THE COURT: Anything else?
MR. SAVAGE: Briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. SAVAGE:
Q. Some of those assets -- one of those assets that you picked -- were there some lots in Queens Gap?
A. Yes, sir.
Q. Do you know who the principal of Queens Gap was in 2009?
A. Keith Vinson.
Q. Oh. So, do you know -- do you have any -- are you privy to the conversations between Buck Cashion and Keith Vinson in 2009?
A. No, I'm not. I just know that suddenly Queens Gap became an opportunity, since Keith was taking it, and Buck could have access to some of those lots to help generate cash.
Q. So when the defense asked you if you and Mr. Vinson had nothing to do with this, that's only as far as you know?
A. Correct.
Q. You don't know what was going on behind Keith Vinson and Buck Cashion with Queens Gap or other developments, do you?
A. I do not. Only that he then took over Queens Gap and it was his development.
Q. Okay. And he began by asking you questions about your straw borrower program. Was it much different than

what you did over here with Seven Falls?
A. Significantly in the price point.
Q. Other than the amount of money involved, because you were paying $5,000 and you were getting $12,000 in Seven Falls, did it work basically the same?
A. Yes, sir.
Q. Is that how you knew you could make money on it?
A. Yeah.
Q. Okay. And Mr. Fischer says that Mr. Vinson didn't know anything about that. I'm not going to show them because it's getting late in the hour. Do you remember those closing statements that we saw?
A. Yes, sir.
Q. Who got the bulk of the money from those closings?
A. Seven Falls.
Q. Okay. And who was Seven Falls?
A. Keith Vinson.
Q. And who was arguing with Buck Cashion about the disposition of the proceeds when you went to close on the Bank of Asheville loans?
A. Keith Vinson.
Q. And who wrote the checks that paid you the kickbacks that you got?
A. Seven Falls.
Q. Okay. And who was Seven Falls?

A. Keith Vinson.
Q. And who did Paul Rantzos go when the kickbacks stop?
A. Keith Vinson.
Q. Who did Buck Cashion say he was going to when the kickbacks stopped?
A. Keith Vinson.
Q. Thank you. No further questions, Your Honor.
THE COURT: Mr. Fischer, anything else?

**RECROSS EXAMINATION**

BY MR. FISCHER:
Q. Mr. Savage asked you if your straw borrowing was significantly different and you said no. Didn't you say a few minutes ago that the contracts you had in your straw borrowing did not include the buyback provision that was specifically stated in your two lot sales at Seven Falls?
A. My contracts were an Assumption Agreement at which my agreement said I had the option to repurchase them for up to two years.
Q. So the contracts were different, weren't they?
A. One was an option. This was a guarantee.
Q. Thank you.
THE COURT: Anything else?
MR. SAVAGE: No, Your Honor.

THE COURT: May Mr. Dimitris be released?

MR. SAVAGE: Your Honor, we would request that the witness be on standby in case he's needed later on. He's free to leave the courthouse.

THE COURT: Okay. Mr. Dimitris, you may step down but you are not released from your subpoena. You are still on standby, subject to being recalled later in this proceeding.

THE WITNESS: Yes, sir.

THE COURT: You my step down from the witnessstand.

(Witness excused at 5:55 p.m.)

THE COURT: Ladies and gentlemen of the jury, we're going to go ahead and recess for the evening at this time. I will remind you, as I have before, to have no discussions with anyone regarding this case. Don't allow anyone to have a discussion with you. I know every day that goes by that gets harder when you go home, but you must abide by that.

Please leave your notes on the table in the jury room. Please also remember there is some media coverage of this case. Do not read anything in the paper. Do not listen to anything on the radio. Do not watch anything on television. Don't look up anything on the Internet regarding this case. Please keep yourself completely

insulated from any other source of information about this case, other than what you hear and see in this courtroom. That is very important.

Please be aware of your surroundings as you depart and aware of your surroundings as you return. Please also remember to wear your juror badge and your cell phone badges prominently so that the security officers will know who to allow in with a cell phone.

With that, we will resume tomorrow morning at nine o'clock. Please be here a couple of minutes before nine o'clock so we can start on time.

Marshal, please take the jury out. Please inform the Court when the jury has cleared the building.

(Jury excused at 5:56 p.m.)

THE COURT: Anything we need to address while the jury is out?

MR. FISCHER: I don't believe so, Your Honor.

MR. SAVAGE: No, Your Honor.

THE COURT: Okay. The only thing I would say is, as the day wore on, particularly the examination of Mr. Dimitris, it certainly seemed be labored to me. And looking at the jurors I think that that's their impression as well. I certainly hope that the pace will pick up tomorrow. Otherwise, you will have a jury that's dead asleep and you might have a presiding judge that's

unhappy. So with that, we will wait for the marshal to let us know that the jury has cleared the building. I hope that you would make some arrangements along those lines.

With that, Mr. Savage, Mr. Gast, what's the program for tomorrow?

MR. GAST: Your Honor, please, we expect to call Mr. Morris and Mr. Hamrick from Bank of Asheville -- not necessarily in this order -- and perhaps Mr. Burnett, perhaps Buck Cashion, and that's likely to take up most of the day. We have -- we'll have a couple of others in case there's more.

THE COURT: What do you roughly anticipate for the length for Mr. Morris?

MR. GAST: About an hour.

THE COURT: What about Mr. Hamrick?

MR. GAST: I would say between one and two hours.

THE COURT: And Mr. Burnett?

MR. GAST: Mr. Burnett, I think, will be relatively short. I think half an hour to an hour.

THE COURT: And Mr. Cashion?

MR. GAST: He could be -- I think Mr. Cashion would take -- he'd be similar to Mr. Hager, I would suspect. I'm told he was five hours total. I'm not sure. I wasn't keeping track because I was doing the

questioning. It would be pretty similar in terms of how comprehensive he can be.

THE COURT: Okay. Mr. Fischer, do you have anything to add with regard to the issue of cross-examinations on any of those individuals that would lengthen those estimates?

MR. FISCHER: Not really, Your Honor. I certainly think Mr. Cashion would be the one that's going to take far and away the longest.

THE COURT: I think we all expect that. Okay. Anything else?

MR. FISCHER: No, sir.

THE COURT: As soon as we hear back from the security officer that the jury has cleared we will recess until nine o'clock tomorrow morning.

Marshal, has the jury cleared the building?

THE BAILIFF: Yes, sir.

THE COURT: Please recess us to nine a.m. tomorrow.

(Off the record at 6:00 p.m.)

**CERTIFICATE**

I, Tracy Rae Dunlap, RMR, CRR, an Official Court Reporter for the United States District Court for the Western District of North Carolina, do hereby certify that I transcribed, by machine shorthand, the proceedings had in the case of UNITED STATES OF AMERICA versus KEITH ARTHUR VINSON, Criminal Action Number 1:12-CR-20 on October 9, 2013.

In witness whereof, I have hereto subscribed my name, this 17th day of August 2015.

__/S/__Tracy Rae Dunlap__
TRACY RAE DUNLAP, RMR, CRR
OFFICIAL COURT REPORTER