THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:18-cv-00179-MR
[CRIMINAL CASE NO. 1:12-cr-00020-MR-5]

KEITH ARTHUR VINSON,          )
                              )
            Petitioner,       )
                              )     MEMORANDUM OF
      vs.                     )     DECISION AND ORDER
                              )
UNITED STATES OF AMERICA,     )
                              )
            Respondent.       )
_____ )

THIS MATTER is before the Court following an evidentiary hearing on

the Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or

Correct Sentence by a Person in Federal Custody [CV Doc. 1].[1]

I.    BACKGROUND

      A.    Petitioner's Fraudulent Scheme

      In August 2006, the Petitioner Keith Arthur Vinson ("Petitioner")

obtained an initial land-acquisition and development loan of approximately

$6 million from the National Bank of South Carolina ("NBSC") and purchased

_____

[1] Citations to the record herein contain the relevant document number referenced
preceded by either the letters "CV," denoting that the document is listed on the docket in
the civil case file number 1:18-00179-MR, or the letters "CR," denoting that the document
is listed on the docket in the criminal case file number 1:12-cr-00020-MR-5.

property in Henderson County, North Carolina, to develop "Seven Falls," a golf course and luxury residential community. [J.A.[2] 109, 221, 966]. Avery "Buck" Cashion, III ("Cashion"), helped the Petitioner obtain financing for Seven Falls, initially by borrowing $2 million from the Bank of Asheville and giving it to the Petitioner to be used as "seed money," or a down payment on a bank loan. [J.A. 966, 973-74]. In return, the Petitioner was to pay Cashion $4 million. [J.A. 966-68].

In January 2007, the Petitioner obtained an increase in the acquisition and development loan to $25 million, secured by the Seven Falls property. [J.A. 214, 222-23, 226, 281, 985]. The Petitioner used $4 million of this money to buy a dairy farm adjoining the tracts he already owned, thereby increasing the size of the Seven Falls development. [J.A. 226]. In early summer 2007, contractors began bulldozing for roads. [J.A. 127].

Notwithstanding this $25 million investment, the Petitioner was unable to complete Phase I of the Seven Falls development, and he was also unable to borrow more money from NBSC. [J.A. 286-87, 991-92]. The Petitioner asked Cashion to purchase the dairy farm property, and on July 2, 2007,

---

[2] For ease of reference in discussing the relevant factual background, the Court will cite to the 15 volumes of the Joint Appendix (J.A.) that was presented to the Fourth Circuit Court of Appeals for its review when adjudicating the Petitioner's direct appeal. The Joint Appendix is filed in Civil Case No. 1:18-cv-00179-MR at Documents 6 through 17.

Zeus Investments ("Zeus"), a company owned and operated by Cashion, Raymond M. Chapman ("Chapman"), and George M. Gabler ("Gabler"), borrowed $4 million from NBSC to purchase that property from the Petitioner. [J.A. 123, 125, 475, 547, 968, 977, 991-92, 994, 996]. The Petitioner agreed to buy the property back from Zeus within 30 days. [J.A. 995].

By early 2008, lot sales in Seven Falls stalled, and the Petitioner did not have the funds necessary to pay subcontractors, make loan payments to NBSC, or continue to build improvements such as roads and bridges. [J.A. 135, 170, 274, 277, 330, 332-34, 336, 484, 541, 1011, 1093, 1095, 2045-52]. The Petitioner, in concert with his co-conspirators, devised and participated in several schemes to secure funding that could be used to pay debts and continue improvements. [J.A. 484, 544, 1007-08, 1012-16, 1020, 1030, 1092, 1186].

### 1. The Lot Loan Scheme

Between April and July 2008, the Petitioner participated in a "lot loan scheme" through which straw borrowers obtained loans for the purchase of undeveloped lots within Seven Falls, the proceeds of which primarily went to Vinson or those to whom he was indebted. [J.A. 361, 401, 486-87, 498, 544, 559-61, 567-69, 571, 592-94, 728, 731, 777-78, 809, 949-50, 1186, 1625, 1630, 1634]. The genesis of the lot-loan scheme was a failed effort to obtain

3

an acquisition and development loan from Pisgah Community Bank ("PCB") in the amount of $2.5 million to benefit Seven Falls. [J.A. 1011-14, 1017, 1032, 1036, 1196]. PCB was a new community bank in which Cashion and his wife had invested nearly $100,000; Cashion and Chapman approached Craig Gourlay ("Gourlay"), the bank's chief credit officer, and Ted Durham ("Durham"), the president of PCB about the loan request. [J.A. 1011-14, 1017, 1032, 1036, 1196, 1599-1600, 1607-09]. Although Gourlay explained to Cashion and Chapman that PCB could not issue an acquisition and development loan on that scale, Gourlay suggested that the parties could achieve the same result through a series of lot loans. [J.A. 1016, 1021, 1027, 1031-32, 1037, 1198-99, 1201, 1613].

The Petitioner, Cashion, Chapman, Gabler, and two others associated with Zeus negotiated the terms of the lot-loan program, finalizing those terms in a memorandum of agreement to which they all agreed. [J.A. 1015-19, 5612-16]. The Petitioner agreed that he would bear the costs of the loans, provide for 24 months' interest, and "continue to sell and market [the] lots as developer inventory." [J.A. 5615]. The Petitioner also agreed that he would repurchase any lots not sold to bona fide purchasers after two years and that he would pay the straw borrowers kickbacks in the amount of 2% of the loan balance each month. [J.A. 5615].

4

The Petitioner entered into sales contracts with the straw borrowers who agreed to use their credit to secure a loan for the purchase of the property; in exchange, the Petitioner agreed to pay the interest related to the loan for a period of two years and kickbacks to the "borrowers" of 1%-2% of the loan balance per month. [J.A. 365-66, 368, 501, 546, 554, 569-70, 592, 596, 610-11, 728-29, 746-48, 752, 778, 782-83, 789, 796, 833, 5471-79, 1047, 1049, 1635, 1691]. The contracts also provided that the Petitioner would have the option to repurchase the lots and that, at all times, the lots would continue to be marketed by Seven Falls as available for purchase. [J.A. 366-67, 386-87, 463, 502, 544, 584-86, 589, 728, 795, 1038, 1630]. Although the contracts indicated that the Petitioner had an "option" to repurchase, the straw borrowers understood that he would, in fact, repurchase the lots no later than two years after the loans closed. [J.A. 491, 503-04, 508, 531, 554, 609-10, 613, 728, 747, 783, 795-96].

Cashion, Chapman, and Gabler served as the straw borrowers on 20 lots in 2008 and "shopped" these loans to various banks without informing the banks that they were obtaining loans elsewhere at approximately the same time. [J.A. 273, 281-82, 305, 357-59, 487, 538, 1017-18, 1173-74]. Cashion, Chapman, and Gabler also failed to inform some of the lenders that they owned a parcel of the Seven Falls property and were, therefore,

"insiders" whose loans should have been aggregated with other Seven Falls-related loans to comply with the loans-to-one-borrower limit imposed by the Federal Deposit Insurance Corporation ("FDIC").  [J.A. 273, 347-50, 1175-76; see also J.A. 899].  Between April 24, 2008, and May 23, 2008, Cashion, Chapman, and Gabler closed on 16 loans for Seven Falls lots and closed loans with Old Town Bank, Community Bank of Rowan, Southern Community Bank and Trust, and Branch Banking and Trust Bank.  [J.A. 8604].

To obtain the maximum loan proceeds, while requiring no money down from the straw borrowers, the Petitioner and his co-conspirators employed appraisers, usually Aaron Ollis, who provided appraisals with artificially inflated land values.  [J.A. 393-94, 497, 564, 603, 709, 806, 1060].  The appraisers also used other lots within the program, which had similarly received artificially inflated appraisal values, as "comparables" to justify these high appraisals.  [J.A. 389, 498, 603-04, 741-44, 821-22, 1060, 1728].

Another feature of the lot-loan scheme was a "seller concession" that amounted to a 25% discount in the sales price and the cost of mortgage-loan interest for two years.  [J.A. 380-82, 490, 502, 554, 595, 734, 783, 1631, 1636].  With these "concessions" in place, the straw borrower could request a loan at 75% of the stated (undiscounted) sales price.  [J.A. 211, 319, 358-

60, 380-82, 411, 443, 462, 490, 492, 495-96, 548, 554, 595-96, 600-01, 748, 783-84, 801-02, 811, 818-19, 894-95, 899-900, 904-05, 947, 1516-17, 1620, 1623, 1625].  The borrower could then bring no money to the closing and still appear to provide 25% of the sales price as a down payment.  [Id.].  With this information, the loan committee of the lending bank would then be led to conclude that the loan-to-value ("LTV") ratio was 25:75, the minimum acceptable ratio without special approval.  As a result, the loan proceeds—rather than the Petitioner's money—would be used to fund the two years of interest payments that the Petitioner agreed to pay in the parties' contract. [Id.]. These concessions were included in the contracts of sale between the Petitioner and the straw borrowers, but they were not noted in the appraisal documents or the HUD-1 settlement statements, the documents signed at closing that reflect what funds are collected from whom and to whom those funds were disbursed.  [J.A. 377, 380-82, 392-93, 459, 461, 499, 555, 605, 741, 807, 820-21, 946, 1727; see also J.A. 1806].

Although the straw borrowers did not intend to hold the properties as an investment or build on the lots and did not consider themselves the owners of those properties—which they still considered owned by the Petitioner—they represented to the banks that they were bona fide investors. [J.A. 367-68, 419, 438, 491, 494, 549, 553, 599, 614, 732, 738, 815, 883-84,

1303-04, 1515-16, 1714]. The Petitioner attended many of the closings related to the lot loan scheme, which raised approximately $10 million. [J.A. 591, 757-58, 824-25, 1022, 1064].

### 2. Plastics Plant Loan Scheme

Among the property that the Petitioner owned in August 2008 and intended to include in the Seven Falls development was the former site of a plastics plant. [J.A. 111, 1112]. The Petitioner, Cashion, Chapman, and Gordon "Buddy" Greenwood ("Greenwood"), president of the Bank of Asheville, colluded to generate more funds for Seven Falls by arranging a straw "sale" of the plastics plant property to Cashion's wife, Joan Cashion, and to Chapman. [J.A. 172-73, 1095-97, 1106, 1123, 1196-97, 1312-13]. Although Greenwood was aware that the Petitioner, Cashion, and Chapman were all invested in Seven Falls, he concealed from the bank's loan committee the relationship between the straw borrowers and the Petitioner to subvert the loans-to-one-borrower limit. [J.A. 1312-13].

### 3. Check Fraud and Check Kiting Scheme

On the same day the plastics plant loan closed, August 18, 2008, the Petitioner wrote a check to Zeus in the amount of $400,000 from an account at the Bank of Asheville. [J.A. 1116-17, 1119-20, 1370, 1401, 1414, 1437, 1571]. At the time the Petitioner wrote the check, he had just over $100,000

in that account. [J.A. 1415]. Instead of dishonoring the check, Greenwood directed a subordinate at the Bank of Asheville to honor the check, thereby granting the Petitioner a de facto loan that violated the Bank of Asheville's lending policies. [J.A. 1416]. Four months later, on the last day of 2008, Greenwood approved a loan of more than $308,000 to the Petitioner to cover the shortfall in his account, notwithstanding the fact that Greenwood did not have the necessary consent or authorization from the bank's board of directors at the time the loan was made. [J.A. 1318-19, 1321, 1370, 1402-03, 1417, 6151, 6154]. Faced with the fact that the end-of-year books would otherwise reflect either a $300,000 loss or a loan made without proper authority, the loan committee of the board of directors approved the loan after the fact in early January 2009. [J.A. 1361, 1421-22, 1507, 1510, 1512, 6155-56; see also J.A. 1419-20].

The Petitioner wrote other checks on accounts with vastly insufficient funds. For example, on December 9, 2009, the Petitioner asked his wife to sign a blank check from her credit union account that had a balance of $151.37. [J.A. 1376, 1379, 1381]. The Petitioner then wrote the check, payable to Seven Falls, for more than $95,000. [J.A. 1377-78, 1381, 1383, 6247]. That same day, the Petitioner deposited the check into a Seven Falls

account, bringing the negative balance in the Seven Falls account up to $1. [J.A. 1383-84, 1386-87].

A few weeks later, on December 30, 2009, the Petitioner wrote a check to himself in the amount of $500,000 from an account at the First Bank of Avon, even though the balance of that account was just over $4,100. [J.A. 1272-73, 1393-98, 1441, 1503, 1571]. The Petitioner deposited that check into an account at the Bank of Asheville he shared with his wife. [J.A. 1274, 1279-81, 1438-39, 1442-43]. He then caused $95,000 of those funds to be deposited into a Seven Falls account, $113,000 to be deposited into an account in Cashion's name, and approximately $206,000 to make payments on loans related to the lot loan program and other Seven Falls-related loans at the Bank of Asheville. [Id.]. When Greenwood received the $500,000 check and was asked by a subordinate whether he was "seriously going to … deposit it and accept it," Greenwood said that he was and then laughed, stating that there "was probably about a 20 percent chance it might be good." [J.A. 1439].

### 4.    The Burnett Loan Scheme

In March 2009, Andrew Hager ("Hager"), an employee hired to promote and obtain funding for Seven Falls, met with Charles Burnett ("Burnett"), a broker who specialized in obtaining funding when banks would no longer

lend to a particular commercial interest. [J.A. 617, 1216]. While Hager and Burnett were meeting, the Petitioner called and asked Burnett if he would serve as a straw borrower on a $500,000 loan from the Bank of Asheville. [J.A. 618-19, 633, 1218-19, 1241, 6294]. The Petitioner was aware that he could no longer borrow funds from the bank because he was at or near his loans-to-one-borrower limit, but he needed more financing for Seven Falls and to make past-due loan payments. [J.A. 618, 626-27, 1218, 1325, 6294; see also J.A. 347-48]. The Petitioner offered a lot in Seven Falls as collateral for the straw loan, and Ollis provided an appraisal for the lot that made it appear that Burnett was borrowing no more than 75% of the value of the collateral, thereby satisfying the 25:75 LTV ratio. [J.A. 624, 627-29, 631-32, 1218, 1225, 1229, 1325].

In exchange for the use of Burnett's credit, the Petitioner paid Burnett a kickback of $40,000. [J.A. 621, 624, 633-34, 1221, 1225, 1233-34, 1339, 6294, 6303]. Burnett and the Petitioner also agreed that if the Petitioner had not repaid the loan taken out by Burnett within 60 days of its issuance, Burnett would be entitled to $10,000 per month for a maximum of four months. [J.A. 1221, 6294]. Both Burnett and the Petitioner signed a contract agreeing to these terms, and while Greenwood may have been aware of these terms, neither the chief credit officer nor the loan committee at Bank

of Asheville was aware of them.  [J.A. 1223, 1228, 1329, 6294].  Although

Greenwood was aware of the relationship between Burnett and Seven Falls,

he failed to disclose these facts to the loan committee.  [J.A. 1220, 1240].

### 5. Additional Straw Loans

In July 2008, Robert Dowling ("Dowling") agreed to permit the

Petitioner and Cashion to use his annuity, valued at over $900,000, as

collateral for a loan from PCB to Edward Worlund ("Worlund"), a friend and

associate of Cashion's, in the amount of $650,000.  [J.A. 636-37, 645, 1066,

1641, 1645].  The purpose of the loan was to provide funding for an escrow

account with AML & Associates, a consulting firm, in an attempt to secure a

private investment of $60 million in Seven Falls.  [J.A. 549-50, 639-42, 647,

1009, 1067-69, 1072, 1190, 1639, 1647].  Although Zeus initially intended to

be the borrower instead of Worlund, PCB could not loan money to Zeus

because its owners, Cashion, Chapman, and Gabler, already had loans with

the bank and adding this loan would exceed the loans-to-one-borrower limit.

[J.A. 643-44, 1073, 1076, 1642].  The parties then arranged for Worlund to

serve as straw borrower for the loan.  [J.A. 644-45, 689, 1066, 1076-77,

1642-43].  For the use of Dowling's annuity, the Petitioner agreed to pay

Dowling $35,000, and Cashion assigned Dowling the right to receive more

than $5,200 per month for ten years.  [J.A. 1074-75, 6615, 6617, 1642, 1646-47].

On February 25, 2009, Cashion's mother, Betty Zeiger ("Zeiger"), served as a straw borrower on a loan of $50,000 from PCB.  [J.A. 1121, 1128, 1132-35, 1139, 1651-55].  Although the stated purpose of the loan was to provide the "borrower" with capital for real-estate investment purposes, the parties intended the funds to be used by the Petitioner to make payroll for Seven Falls, and Zeiger endorsed the $50,000 loan-proceeds check over to the Petitioner.  [J.A. 1134, 1651-55, 1691, 6627].

### 6.    Queens Gap Scheme

In 2009, the Petitioner met Devin McCarthy ("McCarthy"), a real-estate developer who owned an incomplete 3,500-acre residential and golf course development known as Queens Gap.  [J.A. 173, 1137, 1895-96, 1989]. McCarthy decided that he wanted to sell Queens Gap and that he was willing to be paid out of future lot sales, rather than with funds up front, as long as the buyer would commit to finishing the project.  [J.A. 1892-94].

The Petitioner represented to McCarthy that he could help shepherd Queens Gap to completion in exchange for an ownership interest in the project. [J.A. 177, 1898, 1903-04, 1911].  During their extended negotiations, McCarthy insisted that he maintain control over any funds spent on the

project and that the Petitioner agree that the priority was to complete the necessary infrastructure as quickly as possible. McCarthy entered into a contract with the Petitioner, agreeing to sell Queens Gap and to give control over the improvements to the Petitioner in exchange for a percentage of future lot sales. [J.A. 1912, 1914-17, 1933-34, 6350-71].

As part of the agreement, on May 20, 2009, the Petitioner and McCarthy created a joint account at the Bank of Asheville that required both of their signatures in order for funds in the account to be released. [J.A. 183-85, 1461-62, 1467, 1537, 1936-37, 6372-78, 6400, 6415]. McCarthy deposited $4.25 million into the account with the express restriction that those funds be used solely for the completion of the infrastructure at Queens Gap. [J.A. 1463-64, 1537, 1923, 1934-35, 1937, 1939, 1977-78; <u>see also</u> J.A. 2054]. The parties also agreed that all work would be approved by an engineer before any payments to contractors were disbursed. [J.A. 179-80, 1940-41]. The Petitioner signed the parties' agreements and the Bank of Asheville dual signature card. [J.A. 1938, 1941-42, 6371, 6378, 6400].

Notwithstanding the parties' agreement, on July 9, 2009, the Petitioner unilaterally executed a new signature card for the Queens Gap account at the Bank of Asheville and a resolution, approved by Greenwood, that removed McCarthy as an authorized signatory on the account. [J.A. 1472,

1475-76, 1537, 1961, 1979, 2016-17, 2031-32, 6413, 6418, 6424-27].

Between July and November of 2009 and without McCarthy's knowledge or approval, the Petitioner withdrew nearly all of the $4.25 million from the account, resulting in an account balance at the end of January 2010 of $79.09. [J.A. 1469, 1474, 1477, 1479, 1480-87, 1537, 1980-81, 6407-09, 6420-21, 6424-27, 6438-49]. The Petitioner used the funds to meet debt obligations associated with Seven Falls or deposited the funds into accounts related to Seven Falls. [J.A. 2033-34, 2063-64].

### 7. The Petitioner and His Partners Default

Many of the loans the Petitioner and his associates arranged went into default, causing numerous losses for the banks and contractors who had worked on Seven Falls and Queens Gap. [J.A. 1126, 1163, 1237, 2055]. In large part because of these losses, both Bank of Asheville and PCB closed, causing shareholders and investors total losses. [J.A. 714, 755, 839-40, 883, 1254, 1343, 1551-54, 1737, 1853-54].

### B. Pretrial Proceedings

A federal grand jury first indicted the Petitioner, along with Cashion, Cashion's wife, Chapman, and Durham, on April 4, 2012. [CR Doc. 1]. A Superseding Bill of Indictment was issued on December 5, 2012, adding additional counts as well as naming Gabler and Ollis as additional

defendants. [CR Doc. 100]. After the Petitioner's co-defendants all pled guilty to various charges, a Second Superseding Bill of Indictment (hereinafter "the Indictment") was issued on October 1, 2013, naming the Petitioner as the sole remaining defendant. [CR Doc. 269]. This Indictment charged the Petitioner with bank fraud conspiracy, in violation of 18 U.S.C. §§ 1344 and 1349 (Count One); two counts of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Counts Two and Nine); aiding and abetting the misapplication of bank funds, in violation of 18 U.S.C. §§ 656 and 2 (Counts Three through Six and Ten); aiding and abetting wire fraud affecting a financial institution, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Seven and Eight); money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Eleven); and two counts of aiding and abetting money laundering, in violation of 18 U.S.C. §§ 1957 and 2 (Counts Twelve and Thirteen). [Id.].

The Petitioner was initially appointed attorney Randy Seago as counsel. [CR Doc. 18]. In August 2012, however, Seago moved to withdraw due to health reasons. [CR Doc. 78]. The Court allowed Seago to withdraw and appointed attorney J. Clark Fischer ("Fischer") to represent the Petitioner. [CR Doc. 79].

## C.    The Trial

The Petitioner proceeded to trial on October 7, 2013.  During his opening statement to the jury, the Petitioner's counsel asserted that the documents the Government would introduce concerning the banking transactions at issue did not contain any misrepresentations by the Petitioner and that the Petitioner did not act intentionally to break any law.  [J.A. 98-99]. Counsel further asserted that the Petitioner had not known "anything about" legal lending limits and that the Petitioner never asked any banker to break any laws or regulations on his behalf.  [J.A. 99].

The Government presented the testimony of co-conspirators, bank officials, and regulators and introduced hundreds of exhibits during its case-in-chief.  At the close of the Government's case, counsel for the Petitioner made an oral Rule 29 motion for a judgment of acquittal arguing that there was insufficient evidence to support a guilty verdict.  [J.A. 2098-99].  In particular, counsel argued that "while there . . . may have been omissions and problems in the HUDs and information submitted to the banks," there was "no evidence that [the Petitioner] lied or deceived any banker or had any role in the lies or deceptions toward any banker."  [J.A. 2099, 2102, 2106]. After hearing argument from the Government, the Court denied the Petitioner's motion as to all counts.  [J.A. 2126-27].

After consulting with his counsel, the Petitioner elected not to present any evidence, including his own testimony. [J.A. 2127-28, 2130]. The Court conducted a voir dire on the record with the Petitioner about his decision not to testify, and the Petitioner affirmed that he had discussed whether to testify with his attorney and "elect[ed] not to take the witness stand and testify in [his] own behalf." [J.A. 2127-28].

The case then proceeded to the charge conference. At that time, the Petitioner's counsel addressed the Court's proposed willful-blindness instruction, arguing that he "[did not] have hard feelings about [it], but [he was] not sure the willful blindness instruction [was] appropriate" based on the evidence. [J.A. 2144]. The Court found that the evidence supported a willful-blindness inference, and counsel did not offer further argument. [J.A. 2144-45].

The parties presented closing arguments on October 17, 2013, and on that date the jury returned a verdict of guilty as to each count in the Second Superseding Bill of Indictment. [CR Doc. 291]. With respect to the bank-fraud conspiracy charged in Count One, the jury found that the objects of the conspiracy included defrauding a bank, 18 U.S.C. § 1344(1), and obtaining bank funds by false and fraudulent pretenses, 18 U.S.C. § 1344(2). [Id.]. Related to Count Two, the jury found that the objects of the bank-fraud

conspiracy involving Bank of Asheville included the plastics plant loan scheme, the check fraud and unauthorized Bank of Asheville loan scheme, the check kite scheme, the Burnett loan scheme, and the Queens Gap scheme. [Id.]. Related to Count Nine, the jury found that the objects of the bank-fraud conspiracy involving PCB included the Worlund loan scheme and the Zeiger loan scheme. [Id.].

Following the verdict, the Petitioner's counsel renewed his motion for judgment of acquittal. [CR Doc. 295]. In this motion, counsel argued that there was insufficient evidence to support any of the counts of conviction. [Id.]. The Court denied the Petitioner's motion. [CR Doc. 311].

### D. Sentencing

In anticipation of sentencing, the U.S. Probation Office prepared a draft Presentence Report ("PSR"). In this draft PSR, the probation officer calculated a total offense level of 33 and a criminal history score of zero (CHC I), resulting in an advisory Guidelines range of 135 to 168 months' imprisonment. [CR Doc. 344 at 28].

The Petitioner's counsel filed a number of objections to the draft PSR, including objections to a proposed four-level enhancement for conduct affecting the safety or soundness of a financial institution and a proposed twenty-level enhancement for a loss amount between $7 million and $20

million.  [CR Doc. 353].  The Government also filed objections to the draft PSR, arguing *inter alia* that the loss amount should be greater and that the Petitioner should receive an additional enhancement based on his role as a leader and chief beneficiary of the Seven Falls scheme.  [CR Doc. 358].

The case proceeded to a sentencing hearing on June 25, 2015.  After resolving the parties' objections, the Court calculated an advisory Sentencing Guidelines range of between 262 and 327 months based on a total offense level of 39 and a criminal-history category of I.  [CR Doc. 446 at 37].  The Court then asked the parties to state their positions on the appropriate sentence to be imposed.  The Petitioner's counsel argued in favor of a sentence of 36 months in prison.  [Id. at 38-44].  In so doing, counsel asked the Court to consider the sentences received by the Petitioner's co-conspirators and argued that the most important sentencing factor described in 18 U.S.C. § 3553(a) was the need to avoid unwarranted sentencing disparities.  [Id.].  In particular, counsel argued that there was no "significant distinction" between the Petitioner's conduct and that of Chapman and Cashion, both of whom received sentences of 36 months' imprisonment.  [Id. at 42].

The Government argued for a sentence within the advisory Guidelines range.  [CR Doc. 446 at 44-61].  In so arguing, the Government asserted that

the Petitioner stood "in a substantially different posture than [his] co-defendants…." [Id. at 44]. The Government noted that the Petitioner had participated in offense conduct unique to him, including the check kiting and Queens Gap fraud. [Id. at 45-46]. The Government also noted that the Petitioner had not accepted responsibility for his criminal conduct and that many of his co-conspirators not only pleaded guilty, but also cooperated with the Government. [Id. at 48-49]. Finally, the Government noted that, unlike any of his co-conspirators, the Petitioner was a recidivist who had a history of worthless check convictions. [Id. at 54-55]. The Government also emphasized the extent of the losses caused by the offense conduct, including the closure of two banks, and the need to promote respect for the law and provide just punishment for a defendant who had expressed no remorse. [Id. at 56-61].

The Petitioner himself then gave a lengthy allocution to the Court, in which he disputed the Government's evidence and denied any criminal culpability for his conduct. [CR Doc. 446 at 61-107].

The Court sentenced the Petitioner to a term of 216 months' imprisonment for the bank fraud and wire fraud offenses and a concurrent term of 120 months' imprisonment for the money laundering offenses. [Id. at 108]. In explaining the sentence, the Court noted that during his allocution,

the Petitioner had "spoken at length about factors that at bottom [were] an argument that the defendant [had] committed no crime." [Id. at 109]. Addressing the nature and circumstances of the Petitioner's offense, the Court noted that Vinson misrepresented facts in order to risk the money of other people, including the shareholders of the banks. [Id. at 110]. The Court noted that the losses were "huge," including the losses realized by those who did not willingly participate in the offense conduct. [Id.at 111]. The Court explained that its sentence needed to send a "clear message not just to [the Petitioner] but to anyone else" in the development business who might "skirt" regulations. [Id. at 112]. The Court also noted that the Petitioner had "a prior history of dishonesty and theft crimes" and that he was "the one really at the top of [the] organization" who stood to gain the most and "therefore was in a position to prevent the most" harm. [Id. at 113].

Finally, the Court addressed the need to avoid unwarranted sentencing disparities. [Id. at 114]. The Court noted that the Petitioner's argument "fail[ed] to take into account the facts of this case," which made clear that the Petitioner was the "hub of the wheel" who "had a greater connection to more of the . . . criminal activity" than his co-conspirators. [Id.]. The Court concluded that the Petitioner's sentence needed to reflect that his involvement was greater than the others. [Id.]. Additionally, the Court

explained that several of the Petitioner's co-conspirators received lower sentences as a result of their substantial assistance to the Government and that all of the other defendants had accepted responsibility, unlike the Petitioner. [Id. at 115]. The Court explained that it nevertheless decided to impose a downward-variance sentence because the laws that applied to Vinson's offense were "extremely complex" and because the Guidelines range seemed to contemplate conduct that was more overtly fraudulent than the Petitioner's. [Id. at 116-17].

### E. Appeal

The Petitioner appealed. [CR Doc. 418]. On March 24, 2017, the Fourth Circuit Court of Appeals affirmed the Petitioner's conviction and sentence in a published opinion. United States v. Vinson, 852 F.3d 333 (4th Cir. 2017). The Fourth Circuit held that there was ample evidence to support the jury's finding that the Petitioner purposely and knowingly joined a bank fraud conspiracy with the intent to further its unlawful purpose. Id. at 351. The Court upheld the Petitioner's convictions for conspiring to defraud the United States related to his Bank of Asheville and PCB schemes to defraud. Id. at 352-53. The Court also held that the jury heard evidence supporting each of Vinson's five convictions for aiding and abetting the misapplication of bank funds. Id. at 353-55. Related to the Queens Gap scheme to defraud,

the Fourth Circuit held that based on the evidence presented at trial, the jury "could . . . readily find" that the Petitioner committed wire fraud when he made wire transfers of large sums of money in furtherance of that scheme. Id. at 355-56. The Court also found that there was substantial evidence to support the Petitioner's money laundering offenses. Id. at 356–57. Further, the Court held that this Court acted "well within its discretion in charging the jury on willful blindness" and held that the Petitioner's 216-month sentence was substantively reasonable. Id. at 357-58.

## F. Post-Conviction Proceedings

In June 2018, the Petitioner filed a *pro se* motion to vacate his convictions and sentence, presenting claims of ineffective assistance of counsel both with respect to the advice given about the Government's plea offer and with respect to counsel's failure to present any defense on behalf of the Petitioner at trial. [CV Doc. 1]. The Court ordered the Government to respond to the Petitioner's allegations. [CV Doc. 2]. In its Response, the Government argued that this Court should hold an evidentiary hearing regarding the Petitioner's claim of ineffective assistance with respect to the plea offer. Regarding the Petitioner's claim complaining about his representation at trial, the Government requested that this Court summarily deny this claim. [CV Doc. 5]. In support of its Response, the Government

submitted an affidavit from the Petitioner's trial counsel. [CV Doc. 5-1: Fischer Aff.].

The Court scheduled an evidentiary hearing on the Petitioner's Motion to Vacate on the following issues: (1) whether counsel improperly advised the Petitioner about the sentence he could receive if convicted at trial; (2) whether counsel improperly advised the Petitioner about the possibility that he would be convicted at trial; and (3) whether, if advised differently, the Petitioner would have accepted the Government's plea offer. [CV Doc. 18]. On February 25, 2019, the Court appointed attorney Howard W. Anderson, III to represent the Petitioner at the evidentiary hearing.

The Court held the evidentiary hearing on July 8, 2019. The Petitioner presented the testimony of three witnesses at the evidentiary hearing: Richard Fennell, J. Clark Fischer, and the Petitioner.

### 1.    Richard Fennell

Richard Fennell is a lawyer who practices in Charlotte, North Carolina. [CV Doc. 34 at 30]. Fennell had previously represented the Petitioner in some civil matters and one state criminal matter. [Id.]. Fennell testified that he talked with the Petitioner about his pending federal case in the months leading up to the trial. [Id. at 31]. The Petitioner told Fennell that he understood the Government's plea offer to be an active ten-year sentence.

[Id. at 32].  Fennell recalled that the Petitioner was "very confident" [id. at 34], and that his "mind was made up" that he was going to reject the plea offer, because the Petitioner "did not believe that his exposure was much greater than ten years active…."  [Id. at 32, 33].  Fennell also recalled that the Petitioner "felt like he was being treated unfairly, because he did not consider himself to be a ring leader, and that he had—the way the plea had been explained to him he needed to serve more than Mr. Cashion and the others because he was a ring leader."  [Id. at 33].  Fennell spoke to the Petitioner during the trial and found him to "still shockingly upbeat . . . for someone who had been through three or four days of a criminal trial."  [Id. at 34].

Fennell also spoke to the Petitioner after the trial.  Based on that conversation, Fennell did not believe that the Petitioner understood his potential sentencing exposure.  [Id. at 38].  Specifically, Fennell testified that the Petitioner appeared "visibly surprised" when Fennell explained how the Guidelines might apply in his case.[3]  [Id. at 39].  Fennell testified that the Petitioner appeared to believe that he would be sentenced similarly to his co-defendants.  [Id. at 40].

---

[3] At the evidentiary hearing, the Court sustained the Government's objections to this testimony regarding Vinson's apparent lack of understanding of the Sentencing Guidelines but allowed the Petitioner to present this testimony as an offer of proof.  Upon further consideration, the Court will allow the admission of this testimony.

## 2.    J. Clark Fischer

Next, the Petitioner presented the testimony of his trial counsel, J. Clark Fischer.   Fischer is a board-certified attorney in criminal law and appellate practice.   He has practiced law since 1980 and specializes in criminal defense.   [Id. at 90-91].   Fischer recalled having a number of in-person meetings and telephone conversations with the Petitioner after he was appointed.   [Id. at 50].   While Fischer could not specifically recall how many hours he spent meeting with the Petitioner, he remembered that it was a "great deal" of time, comparable to the amount of time he would normally spend on a capital case.   [Id. at 51].   Fischer later estimated that he spent between 16 and 25 hours meeting with the Petitioner before trial.   [Id. at 56].

Fischer recalled going through the first indictment and the subsequent superseding indictments with the Petitioner and "discussing in general what the government was claiming that he had done and why that violated various federal statutes alleged in the indictment."   [Id. at 57].   He specifically recalled giving him an overview of the federal sentencing guidelines and that discussion "probably took place on more than one occasion."   [Id.].   They also discussed the maximum possible punishments for all the charges set forth in the indictment.   [Id. at 96].

Fischer specifically recalled telling the Petitioner that "the biggest concern in his case under the guidelines was going to be the amount of loss" that the Petitioner's offense conduct had caused. [CV Doc. 34 at 87]. Fischer recalled that he advised the Petitioner that, due to the loss amounts involved, he was likely facing over 20 years if he were found guilty on all counts. [Id. at 86, 87, 98-99]. Fischer testified further that he believed that he explained to the Petitioner that "nobody can tell you exactly what your sentence is going to be at the time of conviction or when you go to trial, [because] the judge has to consult the guidelines on an advisory basis." [Id. at 86]. Because of the "many variables," Fischer testified that he would not have been more specific and that he did not think that Vinson "was interested in that level of detail." [Id. at 98-99].

Fischer did not recall telling the Petitioner before trial that he would likely receive a sentence of eleven and a half years. [Id. at 89]. Fischer acknowledged that he might have discussed the possibility of an eleven-and-a-half-year sentence after the draft presentence report was issued, stating that he might have told the Petitioner that they could "try really hard to get that," but that he never predicted a sentence that low or even considered such a possibility until well "after the trial." [Id. at 98]. As Fischer explained, he never would have predicted a sentence of no greater than eleven-and-a-

28

half years because that is "just not how federal sentencing works." [Id. at 100]. Fischer did not do a written guideline work-up for the Petitioner, as he never did that with any of his clients. [Id. at 87].

Fischer testified that hundreds of thousands of documents were produced by the Government in discovery. [Id. at 93]. He recalled that the Petitioner was given the opportunity to review these documents, and that he and the Petitioner also reviewed some of these documents together. [Id.].

Fischer was "quite certain" that he advised the Petitioner that under the theory of conspiracy, the Government's burden of proof "is often a little easier than in some substantive cases and that that was something we had to deal with." [Id. at 59]. He also recalled that he discussed with the Petitioner the different factual assertions that the Government was making with respect to each of the substantive charges. [Id.]. Fischer did not review any jury instructions with the Petitioner, as he stated that he had never done that with any client in 39 years of practicing law. [Id. at 58-59].

Regarding the potential verdict in the case, Fischer stated that he was aware early on that the case was "very high profile" and had generated "much negative publicity" given the economic losses sustained in the community. [Id. at 60]. In light of these "intangibles," Fished advised the Petitioner that "it would be a difficult [case]." [Id.]. Given the number of

defendants charged, Fischer initially decided that the defense strategy should be to "sit at the end and let the government focus on all this bad banking." [Id. at 61]. Fischer felt that this was a particularly viable strategy in light of the fact that the Petitioner "was very adamant . . . from day one that he had no interest whatsoever in entering a plea and that he felt he was being wrongly prosecuted as were his friends Mr. Cashion and Mr. Chapman." [Id.].

On September 18, 2013, just weeks prior to the scheduled trial date, Cashion and Chapman entered guilty pleas. [Id. at 94]. The remaining defendants—Durham, Gabler, and Ollis—pleaded guilty shortly thereafter. [Id.]. Once the Petitioner was left as the sole remaining defendant, Fischer began to feel that their chances of prevailing at trial became much worse. [Id. at 61]. Fischer did not give the Petitioner any odds of an acquittal [Id. ("I would never in a million years have done that.")], nor did he express any opinion as to whether he thought the jury would find him guilty or not guilty. Fischer did, however, discuss with the Petitioner that he felt that the chances of success at trial diminished significantly with the pleas of Cashion and Chapman. [Id. at 100]. Nevertheless, as Fischer explained, the Petitioner was "very strongly of the opinion he did not believe he had done anything

wrong and wished to proceed to trial. I followed that direction from my client." [Id. at 62].

At one point prior to trial, Fischer met with the prosecutors to receive a "reverse proffer" where the prosecutors went over their key points of evidence against the Petitioner. [Id. at 50-51, 62-63]. During this meeting, the prosecutors offered the Petitioner a plea, capped at five years, if the Petitioner would agree to cooperate and provide substantial assistance against the other co-defendants, including Cashion and Chapman. [Id. at 63]. Fischer immediately called the Petitioner and discussed this plea offer. Fischer recalled that the Petitioner "had no interest in going that route." [Id. at 63, 101].

Fischer had a number of discussions with the Petitioner about pleading. Fischer specifically recalled advising the Petitioner that a jury would likely have "a lot of trouble untangling this financial web that was presented by these two bank cases, and that it would take a very intelligent and sophisticated jury . . . to distinguish what is a crime and what is bad business." [Id. at 64]. Fischer recalled, however, that the Petitioner was "generally uninterested in any plea that was . . . offered or anything that the government was likely to accept." [Id.]. For example, the Petitioner indicated at one point that he would consider pleading guilty if he could serve a

maximum of one year.  According to Fischer, however, "there was never a chance that the prosecutors were going to have any interest in that in this case as to him."  [Id.].

Shortly before trial, the Government offered a new plea offer to the Petitioner to plead to one count of money laundering, which would have a ten-year statutory maximum.  [Id. at 65].  Fischer discussed this offer with the Petitioner over the phone.  Fischer recalled that the Petitioner had a "generally negative" response to the offer, but that Fischer told him that "if he chose to go to trial and it didn't work out that every day after ten years was something he was going to very strongly regret for the rest of his life."  [Id. at 66-67, 86].  Fischer urged the Petitioner to "strongly think" about accepting the plea offer.  [Id. at 67].  The Petitioner, however, rejected the proposed deal.  [Id. at 101-02].

Preparing for trial, Fischer still believed that there was a viable chance that the jury would acquit the Petitioner.  [Id. at 68-69].  The testimony elicited by the Government from Mr. Cashion at trial, however, proved to be very damaging.  [Id. at 74].  Fischer also felt that the jury did not "fit certain profiles" that would have been beneficial to the Petitioner.  [Id.].  In fact, shortly after jury selection, the Petitioner indicated to Fischer that he thought that the jury was likely to convict him.  [Id.].

After discussing the matter with the Petitioner, Fischer elected not to present any evidence and instead focused the defense on "the lack of any particularly damning evidence of this conspiracy to defraud" and the presence of reasonable doubt.  [Id. at 75].  Fischer also discussed with the Petitioner whether the Petitioner should testify.  It was Fischer's thought that the Petitioner's testimony would make a negative impression on the jury and would increase the chance of conviction.  [Id.].

Fischer recalled the Petitioner asking him on a number of occasions whether Fischer thought that he (Petitioner) had committed a crime.  Fischer explained to the Petitioner that what he thought was totally irrelevant but that a jury "could very well find that you had done exactly what the government says you did."  [Id. at 76].  While Fischer continued to express his opinion that there appeared to be no direct evidence of the Petitioner's participation in any conspiracy or plan to defraud [Id. at 84; Doc. 31 at 1-2: Pet'r Ex. 1], Fischer "certainly never told [the Petitioner] in any way, shape or form that he could not be convicted in this case."  [Doc. 34 at 85].

### 3.    The Petitioner

Finally, the Petitioner testified on his own behalf at the evidentiary hearing.  The Petitioner stated that Fischer did not show him any of the discovery produced by the Government.  [Id. at 109].  He testified that on at

least ten occasions when Fischer received new discovery, the Petitioner would ask whether Fischer saw anything in the evidence that indicated that the Petitioner had committed a crime. Each time, Fischer would say no. [Id.]. The Petitioner testified that "each time I insisted that he understand that if you find evidence that I committed a crime then we stop what we're doing and move to the best plea deal we can get, because I will not go to trial if I committed a crime." [Id.].

The Petitioner testified that Fischer contacted him about the ten-year plea deal after Cashion and Chapman pled guilty. [Id. at 111]. The Petitioner told Fischer "I thought you told me that I was looking at around eleven and a half [years] if I was found guilty of everything. And he said, yeah, that sounds about right." [Id.]. The Petitioner then testified:

> A.     I asked [Fischer] why I would plead to ten years if I was looking at eleven and half if I went to trial and that he had told me the whole time that I had not committed a crime. His statement was, the worst day of your life is going to be the first day after ten years when you would have gone home and you still have another year and a half to go. At that point I said, am I guilty of a crime in this case or not?
>
> Q.     What did he say?
>
> A.     That's the first time he used a phrase, and the only time he used a phrase, and he said, well, let me put it like this. There's a lot of smoke but there's no smoking gun.

34

[Id. at 111-12].

The Petitioner testified that Fischer declined to give him advice about whether he should accept or reject the plea offer. The Petitioner asked Fischer to go back to the Government and ask for a plea deal that was "something similar to what everyone else [was] doing," but Fischer refused, stating that the Government would not accept such a deal. [Id. at 112]. Because Fischer had told him that he did not see any evidence that the Petitioner had committed a crime, and because the Petitioner did not see a big difference between a sentence of ten years and a sentence of eleven and a half years, the Petitioner opted to go to trial. [Id. at 113, 144].

The Petitioner testified that Fischer "didn't tell [him] anything about the sentencing guidelines." [Id. at 113]. When the Petitioner asked if he was facing around eleven and a half years, Fischer said, "yes, that sounds about right." [Id.]. The Petitioner testified that prior to trial, the Petitioner was not even aware that the sentencing guidelines existed. [Id. at 113-14]. The Petitioner estimated that he and Fischer met for a total of 12 to 16 hours. [Id. at 124]. The Petitioner testified, however, that Fischer never provided him with an understanding of the applicable law. They never discussed what a conspiracy is or the what the term "willful blindness" means. [Id. at 115, 116,

127].  The Petitioner testified that had he understood how the substantive law applied and how the sentencing guidelines worked, he would have taken the ten-year plea deal.  [Id. at 124, 125-26, 144-45].

### 4.    Other Evidence Presented by the Petitioner

In addition to the testimony of live witnesses, the Petitioner also offered the affidavit of his daughter, Kaitlyn Vinson, into evidence.  In her affidavit, Ms. Vinson states that in early October 2013, the Petitioner told her that his lawyer had told him that "he had a good change of being acquitted" and "that the sentence called for under the plea deal was going to be about the same as the sentence that he would get if he went to trial and lost anyway…."  [CV Doc. 29-1: K. Vinson Aff. at ¶ 3].  Based on her conversations with the Petitioner, Ms. Vinson did "not have any reason to believe that [the Petitioner] thought that a sentence of 216 months was a possibility if he went to trial." [Id. at ¶ 4].[4]

Upon conclusion of the hearing, the Court set deadlines for the filing of post-hearing briefs.  The Petitioner filed his supplemental brief on September

---

[4] The Government objected to the admission of this affidavit on the grounds that the Government was not provided sufficient notice of Ms. Vinson's testimony.  The Court reserved ruling on the admissibility of this affidavit pending further review of the record. Upon review, the Court finds that the Government had sufficient notice of Ms. Vinson's possible testimony and will therefore allow the admission of Ms. Vinson's affidavit into evidence.

4, 2019.  [CV Doc. 35].  The Government filed its responsive brief on October

4, 2019.  [CV Doc. 36].

Having been fully briefed and argued, this matter is ripe for disposition.

## II.  DISCUSSION

### A.    Ineffective Assistance of Counsel Standard

The Sixth Amendment to the United States Constitution guarantees

criminal defendants the right to effective assistance of counsel.  <u>See</u> U.S.

CONST. art. VI.  In order to challenge a conviction based on the ineffective

assistance of counsel, a petitioner has the burden of establishing that: (1)

defense  counsel's  performance  was  deficient,  in  that  counsel's

"representation fell below an objective standard of reasonableness" as

measured by "prevailing professional norms," and (2) the petitioner was

prejudiced thereby, meaning "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have

been different."  <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984).

To establish deficient performance by counsel, a petitioner must

overcome the "strong presumption that counsel's conduct [fell] within the

wide range of reasonable professional assistance."  <u>Strickland</u>, 466 U.S. at

689.  As the <u>Strickland</u> Court cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Id. at 689 (citation omitted). In the end, to prevail on a claim of ineffective assistance, a petitioner has the burden of showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 687).

## B. Petitioner's Claim of Ineffective Assistance with Respect to the Plea Offer

In his first claim, the Petitioner contends that Fischer improperly advised him regarding the Government's offer to plead to one count of money laundering in exchange for a ten-year maximum sentence. Specifically, the Petitioner contends that Fischer improperly advised him that he would be acquitted at trial and failed to adequately explain how the Sentencing Guidelines could apply to him. The Petitioner further argues that

had he been properly advised about the sentence that he was facing, and had he been advised that the evidence against him supported a finding of guilt, he would have pled guilty instead of proceeding to trial.

The Supreme Court has long recognized that the right to effective assistance of counsel extends to the plea negotiation process.  See Padilla v. Kentucky, 559 U.S. 356, 373 (2010); McMann v. Richardson, 397 U.S. 759, 771 (1970).  In Lafler v. Cooper, 566 U.S. 156 (2012), the Court applied the well-established Strickland analysis to conclude that the right to effective assistance may be violated when counsel fails to give proper advice regarding the rejection of a plea offer.  Lafler, 566 U.S. at 162.  To prevail on such a claim, a petitioner must demonstrate that

> but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Lafler, 566 U.S. at 164.

### 1. Advice Regarding the Likelihood of Acquittal

The Petitioner has failed to show that Fischer improperly advised him that he was likely to be acquitted at trial. Fischer testified unequivocally that he never advised the Petitioner that he was likely to be acquitted and that he in fact advised the Petitioner to "strongly think" about accepting the Government's plea offer. [CV Doc. 34 at 86].

Fisher's advice to the Petitioner about the strength of the Government's case against him was well within the range of competent representation. Fischer testified during the evidentiary hearing that he shared with the Petitioner the voluminous documentary evidence of the Petitioner's guilt; that he advised the Petitioner of the nature of the charges against him; and that he reviewed with the Petitioner what the Government would have to show to prove him guilty. Specifically, Fischer recalled advising the Petitioner that under the conspiracy theory of criminal liability, it would be easier for the Government to prove him guilty than it would be if he had only been charged with the underlying substantive offenses. Because the case against the Petitioner was high profile and had generated a great deal of negative publicity in the community, Fischer discussed with the Petitioner that "in terms of the intangibles," his case would be "difficult." [CV Doc. 34 at 60].

Despite these discussions, Fischer testified, the Petitioner made clear to Fischer that he was not interested in pleading guilty and that he felt that he and his friends were being wrongly prosecuted and had not done anything wrong.  While Fischer repeatedly told the Petitioner that it was impossible to predict whether a jury would find him guilty or not guilty, he also advised the Petitioner that "[a] jury . . . could very well find that [he] had done exactly what the government [said he had done]."  [CV Doc. 34 at 76].  Further, Fischer testified that he "certainly never told [the Petitioner] in any way, shape or form that he could not be convicted in this case."  [Id. at 85].

Once the Petitioner was left as the sole remaining defendant, Fischer advised the Petitioner that he felt that the chances of a guilty verdict increased significantly, particularly with the pleas of Cashion and Chapman. Nevertheless, as Fischer explained, the Petitioner continued to assert that he had not done anything wrong and wished to proceed to trial.  Although Fischer strongly encouraged the Petitioner to consider accepting the plea offer, the Petitioner was willing to consider only serving one year in prison, an offer which Fischer knew the Government would not extend to the Petitioner.

Fischer's testimony—that he never advised the Petitioner that he had committed no crime and would not be convicted at trial—is credible.  Fischer

described during the evidentiary hearing the theory of defense he believed might have a chance of success and why he believed the Petitioner's chances of success declined dramatically after his co-defendants pleaded guilty. Further, Fischer credibly testified that notwithstanding the Petitioner's insistence that he wanted to go to trial and would not plead guilty unless offered a very low sentence similar to the sentence his co-defendants were likely to receive, Fischer continued to urge the Petitioner to consider accepting the plea offer.

Vinson's testimony—that he told Fischer that if Fischer found evidence that the Petitioner had committed a crime, he should pursue the best possible plea deal—is not credible. Even after his trial, having heard the voluminous evidence of his guilt as well as the Court's instructions to the jury describing exactly what the Government needed to prove with respect to every count, the Petitioner continued to insist that he had committed no crime. Further, the Petitioner's testimony that Fischer stated that there was no "smoking gun" falls far short of being evidence that Fisher told the Petitioner that he believed that the Petitioner was innocent or that he would be acquitted. Likewise, Richard Fennell's testimony that the Petitioner was confident he would win at trial and was "shockingly upbeat" even several days into the trial, [CV Doc. 34 at 34], is consistent with the Petitioner's insistence that he

was innocent and would be acquitted but does not suggest that the Petitioner's belief resulted from Fischer telling him he had committed no crime.

Because the Petitioner has not presented credible evidence that Fischer advised him that he was not guilty of an offense and would not be convicted at trial, he has not shown that Fischer provided deficient representation in this regard. The Petitioner also has not shown that he was prepared to accept the Government's plea offer and would have done so had Fischer stated more plainly the strength of the Government's evidence and the likelihood of the Petitioner being convicted at trial. Having shown neither deficient representation nor prejudice, this claim of ineffective assistance fails.

### 2. Advice Regarding Sentencing Exposure

The Petitioner contends that he did not accept the Government's plea offer because Fischer improperly advised him that if he were convicted at trial, he would receive at most a sentence of eleven-and-a-half years in prison. This assertion, however, is undermined by the evidence presented at the evidentiary hearing. Fischer testified unequivocally that he advised the Petitioner before trial that he could receive a sentence of more than twenty years in prison if convicted at trial. Fischer testified further that he

explained to the Petitioner how federal sentencing works and that he could not predict what his sentence would be due to the advisory nature of the Guidelines. Fischer acknowledged that he might have discussed the possibility of an eleven-and-a-half-year sentence after the draft presentence report was issued, stating that he might have told the Petitioner that he would argue for that sentence, but that he never predicted a sentence that low or even considered such a possibility until well after the trial. As Fischer explained, he never would have predicted a sentence no greater than eleven-and-a-half years because that is "just not how federal sentencing works." [CV Doc. 34 at 100]. The Court finds Fischer's testimony on this point to be credible.[5]

Even if the Petitioner could establish deficient representation in this regard, he has not shown that he would have pleaded guilty had Fischer advised him differently. Fischer credibly testified that the Petitioner always insisted that he wanted to go to trial and that he would consider a guilty plea only to a sentence well below the ten-year-maximum sentence the

---

[5] The Petitioner's assertion that Fischer told him he faced a maximum of only eleven-and-a-half years in prison is further contradicted by the Petitioner's own statements to the Court. At a status-of-counsel hearing held post-trial before Magistrate Judge Howell in February 2014, the Petitioner asserted that Fischer had told him at the time that the plea offer was tendered that he was "looking at twelve and a half to 14 if [he] was guilty of everything." [CR Doc. 490 at 19].

44

Government had offered him.  Fischer's characterization of the Petitioner's position is consistent with the Petitioner's allocution at sentencing, when the Petitioner continued to insist that he was innocent of all of the charges against him and was wrongly convicted.

In sum, the Petitioner has not shown that Fischer improperly advised him about his sentencing exposure if convicted at trial or that he would have accepted the Government's plea offer had he been advised differently. Accordingly, this claim for ineffective assistance also fails.

### C.    Petitioner's Claim of Ineffective Assistance at Trial

The Petitioner argues that Fischer failed to prepare adequately for trial and failed to prepare the Petitioner to testify.  [See CV Doc. 1-1 at 24].  In so arguing, the Petitioner states that he always understood that he would present a defense to the charges, and he "did not know why [his defense] did not include preparing for [his] testimony."  [Id.].  The Petitioner further asserts that he can present evidence that he did not participate in any scheme to defraud or commit any of the charged offenses.  [Id. at 18-19].

In response to this claim, the Government submits the affidavit of the Petitioner's trial counsel.  In this affidavit, Fischer states that he spent months obtaining and reviewing more than 500,000 pages of discovery and had dozens of in-person meetings and "many more" phone conferences with the

Petitioner before the trial "regarding all aspects of his case, including the evidence against him, what the government would have to prove in order to convict, strategic considerations relevant to the case, and the possible punishment if convicted."  [CV Doc. 5-1: Fischer Aff. at 1-2].  Fischer states that he spent time preparing to cross-examine all the Government's witnesses, which included "coordinating voluminous documents with specific witnesses," and that his preparation time in the Petitioner's case "approximated that in capital trials."  [Id. at 4].

With respect to the Petitioner testifying, Fischer explains in his affidavit that he and the Petitioner had "a number of discussions" regarding whether the Petitioner would testify, and that Fisher reviewed with the Petitioner the kind of questions that he would be asked.  [Id.].  Fisher states, however, that he "was quite concerned about the perception the jury would have of Mr. Vinson if the jurors heard from him in person" and that based on Fischer's more than three decades of trying cases, he believed "that Mr. Vinson would likely make a very poor presentation before the jury."  [Id.].  Fisher states that he advised the Petitioner against testifying to avoid exposing himself "to either negative jury perception or cross-examination," but he emphasized to the Petitioner that the decision to testify was entirely his.  [Id.].  Fisher explains that "[a]fter both telephone and in-person discussions," the

46

Petitioner agreed that "he would not testify and [they] would focus on reasonable doubt." [Id.]. Fischer reaffirmed the statements made in his affidavit at the evidentiary hearing. [See CV Doc. 34 at 92].

The Petitioner's claim of ineffective assistance of counsel related to the defense presented by counsel at trial fails as a matter of law. First, the decision not to call any witnesses on the Petitioner's behalf was a matter of sound trial strategy. As Fischer explained at the evidentiary hearing, upon considering the evidence of the other defendants' wrongdoing, and the lack of evidence showing the Petitioner's direct involvement in many of the underlying transactions, Fischer reasonably believed that the most viable trial strategy would be to "sit at the end and let the government focus on all this bad banking…." [CV Doc. 34 at 61]. Fischer felt that this was a particularly viable theory in light of the fact that the Petitioner "was very adamant . . . from day one that he had no interest whatsoever in entering a plea and that he felt he was being wrongly prosecuted as were his friends Mr. Cashion and Mr. Chapman." [Id.]. Fischer also believed that the Petitioner would make a negative impression upon the jury and thus testifying on his own behalf would not be beneficial to his defense.[6] While

_____

[6] While the Petitioner claims in his Motion to Vacate that counsel did not consult with him about presenting a defense and, in particular, about whether he should testify [CV Doc.

Fischer realized that the guilty pleas of the co-defendants shortly before trial made this strategy more difficult, he still believed that emphasizing the Petitioner's lack of direct participation in many of the alleged schemes was a viable defense to the charges presented. Having decided on a reasonable defense strategy, Fischer executed that strategy at trial with a high degree of professional proficiency. He vigorously cross-examined the Government's witnesses and elicited testimony which he could then rely on in arguing that there was reasonable doubt as to the Petitioner's guilt. While that strategy was ultimately unsuccessful, it nevertheless was a sound and reasonable decision that falls within "the wide range of reasonable professional assistance" contemplated by <u>Strickland</u>. For all these reasons, the Court concludes that the Petitioner has failed to demonstrate deficient performance by his trial counsel.

Even if the Petitioner could show any deficient performance by counsel, he has failed to demonstrate any prejudice. To establish prejudice based on a claim of a failure to call witnesses, a petitioner must show that the testimony would have been favorable. <u>Alexander v. McCotter</u>, 775 F.2d

---

1-1 at 24], this claim is directly refuted by the Petitioner's affirmation to the Court at trial that he had, in fact, discussed whether to testify with Fischer and had decided against testifying. [<u>See</u> J.A. 2127-28].

595, 602 (5th Cir. 1985); Howard v. Lassiter, No. 1:12CV453, 2013 WL 5278270, at *3 (M.D.N.C. Sept. 18, 2013) (holding claim of uncalled witnesses failed where petitioner did not specify the identity of the witnesses, the substance of their anticipated testimony, or how this testimony would have produced a different outcome at trial). Here, the Petitioner asserts that he can prove that he did not participate in the bank fraud conspiracy charged in Count One of the Second Superseding Bill of Indictment; that each of the lot loans were proper; and that he always had access to funds, thereby undermining the Government's theory that he created schemes to defraud banks in order to obtain funds. [CV Doc. 1 at 18-19]. The Petitioner further asserts that he can prove that he is not guilty of any of the other charged offenses. [Id. at 19]. The Petitioner, however, has not proffered any evidence, other than his own self-serving, conclusory statements, in support of these allegations. And the Petitioner's post-hoc rationalization of his conduct does little to counter the overwhelming evidence of his guilt that was presented by the Government at trial, including the testimony of numerous co-conspirators and victims and the presentation of thousands of pages of documentary evidence, which implicated him in the various fraudulent schemes. Having failed to identify any evidence that would have demonstrated his innocence, the Petitioner also has not shown that Fischer

failed to uncover any evidence that would have resulted in his acquittal of any of the counts of conviction. Because the Petitioner cannot show a reasonable probability of a different result had the Petitioner testified or had Fischer presented a defense beyond attempting to create reasonable doubt through the cross-examination of government witnesses, the Petitioner's claim for ineffective assistance of counsel at trial fails as a matter of law and is therefore dismissed.

## IV.   CONCLUSION

For all these reasons, the Petitioner's Motion to Vacate is denied and dismissed.

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the Court declines to issue a certificate of appealability as the Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [CV Doc. 1] is **DENIED** and **DISMISSED**.

**IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**    Signed: March 11, 2020

Martin Reidinger
United States District Judge